**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, STATE OF CALIFORNIA, STATE OF COLORADO, STATE OF CONNECTICUT, STATE OF FLORIDA, STATE OF GEORGIA, STATE OF ILLINOIS, STATE OF INDIANA, STATE OF IOWA, STATE OF LOUISIANA, STATE OF MARYLAND, STATE OF MICHIGAN, STATE OF MINNESOTA, STATE OF NEVADA, STATE OF NEW JERSEY, STATE OF NEW MEXICO, STATE OF NEW YORK, STATE OF NORTH CAROLINA, STATE OF OKLAHOMA, STATE OF TENNESSEE, STATE OF TEXAS, COMMONWEALTH OF VIRGINIA, STATE OF WASHINGTON, STATE OF WISCONSIN, AND THE DISTRICT OF COLUMBIA *ex rel*. [FILED UNDER SEAL], <br><br> Plaintiffs-Relators, <br><br> v. <br><br> [FILED UNDER SEAL], <br><br> Defendants. | **FILED UNDER SEAL** <br><br> **DO NOT PLACE ON PACER** <br><br> **CIVIL ACTION NO.:** <br><br> **JURY TRIAL DEMANDED** |

**RELATOR'S COMPLAINT UNDER THE FALSE CLAIMS ACT, STATE ALSE CLAIMS ACTS, CALIFORNIA INSURANCE FRAUD PREVENTION ACT, AND ILLINOIS INSURANCE CLAIMS FRAUD PREVENTION ACT**

1

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, STATE OF CALIFORNIA, STATE OF COLORADO, STATE OF CONNECTICUT, STATE OF FLORIDA, STATE OF GEORGIA, STATE OF ILLINOIS, STATE OF INDIANA, STATE OF IOWA, STATE OF LOUISIANA, STATE OF MARYLAND, STATE OF MICHIGAN, STATE OF MINNESOTA, STATE OF NEVADA, STATE OF NEW JERSEY, STATE OF NEW MEXICO, STATE OF NEW YORK, STATE OF NORTH CAROLINA, STATE OF OKLAHOMA, STATE OF TENNESSEE, STATE OF TEXAS, COMMONWEALTH OF VIRGINIA, STATE OF WASHINGTON, STATE OF WISCONSIN, AND THE DISTRICT OF COLUMBIA *ex rel*. JOHN BAYNE, <br><br> Plaintiff-Relator, <br><br> v. <br><br> DAVITA INC. and DAVITA HEALTHCARE PARTNERS INC., <br><br> Defendants. | **FILED UNDER SEAL** <br><br> **DO NOT PLACE ON PACER** <br><br> **CIVIL ACTION NO.:** <br><br> **JURY TRIAL DEMANDED** |

**RELATOR'S COMPLAINT UNDER THE FALSE CLAIMS ACT, STATE FALSE CLAIMS ACTS, CALIFORNIA INSURANCE FRAUD PREVENTION ACT, AND ILLINOIS INSURANCE CLAIMS FRAUD PREVENTION ACT**

Plaintiff-Relator John Bayne ("Relator"), on behalf of the United States of America, the State of California, the State of Colorado, the State of Connecticut, the State of Florida, the State of Georgia, the State of Illinois, the State of Iowa, the State of Indiana, the State of Louisiana, the State of Maryland, the State of Michigan, the State of Minnesota, the State of Nevada, the State of New Hampshire, the State of New Jersey, the State of New Mexico, the State of New York, the State of North Carolina, the State of Oklahoma, the State of Tennessee, the State of Texas, the Commonwealth of Virginia, the State of Washington, the State of Wisconsin and the District of Columbia (collectively, "Plaintiff States"), brings this action against Defendants DaVita, Inc. and DaVita Healthcare Partners, Inc. (collectively "DaVita") for violations of the False Claims Act ("FCA"), 31 U.S.C. § 3729, et seq., the corresponding state false claims acts of the Plaintiff States,[1] the California Insurance Fraud Prevention Act ("CIFPA"), Cal. Ins. Code § 1871.7 et seq., and the Illinois Insurance Claims Fraud Prevention Act ("IICFPA"), 740 Ill. Comp. Stat. 92/1 et seq.,  to recover all damages, civil penalties, and all other recoveries provided for under these statutes.

---

[1] The corresponding false claims acts of the Plaintiff States are the California False Claims Act, Cal. Gov't Code §§12650 et seq.; Colorado Medicaid False Claims Act, § 25.5-4-304, et seq.; Connecticut False Claims Act, Conn. Gen. Stat. § 17b-301b; District of Columbia False Claims Act, D.C. Code §§2-308.03 et seq.; Florida False Claims Act, Fla. Stat. §§ 68.081 et seq.; Georgia False Medicaid Claims Act, Ga. Code. §§49-4-168 et seq.; Illinois Whistleblower Reward and Protection Act, 740 Ill. Comp. Stat. §§175/1 et seq.; Indiana False Claims and Whistleblower Protection Act, Indiana Code §5-11-5.5; Iowa False Claims Act, §685.1, et seq.; Louisiana Medical Assistance Integrity Law, La. R.S. 46:437.1 et seq.; Maryland False Health Claims Act, § 2-601, et seq.; Michigan Medicaid False Claims Act, MCLS §§400.601 et seq.; Minnesota False Claims Act, Minn. Stat. § 15C.01 et seq.; Nevada False Claims Act, Nev. Rev. Stat. §§ 357.010 et seq.; New Jersey False Claims Act, N.J. Stat. §2A:32C-1 et seq.; New Mexico Medicaid False Claims Act, N.M. Stat. §§ 27-14-1 et seq.; New York False Claims Act, NY CLS St. Fin. §§187 et seq.; North Carolina False Claims Act, 2009-554 N.C. Sess. Laws §§1-605 et seq.; Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63, §§5053 et seq.; Tennessee Medicaid False Claims Act, Tenn. Code §§ 71-5-171 et seq.; Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code §§36.001 et seq.; Virginia Fraud Against Taxpayers Act, Va. Code §§8.01-216.1 et seq.; Washington Medicaid Fraud False Claims Act, RCW 74.09.201 et seq.; and Wisconsin False Claims for Medical Assistance Act, Wis. Stats. §§20.931.

## I.     SUMMARY OF THE CASE

1.      Approximately 650,000-700,000 Americans suffer from kidney failure, which is also known as End Stage Renal Disease.[2]  Dialysis and related services are the most common treatment option for these patients. DaVita is one of the largest providers of dialysis services in the United States.  Medicare generally provides coverage for dialysis services.  See 42 U.S.C. §§ 426-1, 1395rr.

2.      As described herein, DaVita engaged in a nationwide scheme to pay kickbacks to physicians in exchange for referrals of patients, the overwhelming majority of whom are Medicare patients, to DaVita dialysis centers.  Specifically, DaVita induces physicians to buy into newly-established dialysis centers through entities known, in the parlance of DaVita, as "Joint Venture DeNovos" or "JV DeNovos." When calculating the price at which it would sell an ownership interest to physicians, DaVita intentionally did not take into account the projected future income of the yet-to-be-built dialysis centers.  Rather, DaVita valued the entities at only the startup costs associated with opening a new location.  This failure resulted in valuations which were considerably below fair market value.

3.      This scheme was designed to permit DaVita to sell ownership interests in the entities to doctors at artificially low prices, in order to induce those doctors to bring their existing patients to the newly-opened dialysis center. In this way, the lower price resulting from the artificially reduced valuation resulted in a kickback: DaVita agreed to sell an ownership interest in a JV DeNovo at a reduced price to induce doctors to bring their patients to the newly-established dialysis center.  If DaVita had properly taken into account the projected income of the new dialysis

---

[2] NATIONAL KIDNEY FOUNDATION, End Stage Renal Disease in the United States, available at https://www.kidney.org/news/newsroom/factsheets/End-Stage-Renal-Disease-in-the-US; CONGRESSIONAL RESEARCH SERVICE, Medicare Coverage of End-Stage Renal Disease (ERSD) (Aug. 16, 2018), at 1, available at https://fas.org/sgp/crs/misc/R45290.pdf.

center when valuing the entities – *i.e.* if DaVita had valued the income streams of the JV DeNovos – their prices would have been much higher.

4.      DaVita further induced doctors to invest in the entities by using that same projected income to persuade the doctors that they were going to earn a substantial profit from their investment. In this way, DaVita utilized the projected income of the dialysis center to induce doctors to invest, but on the other side of the exercise, DaVita ignored that same income in order to value the center at below market value and thereby make the doctors' initial investment in the center more financially attractive.

5.      Reimbursement claims made to government healthcare programs (such as Medicare and Medicaid) that are tainted by kickbacks are false claims within the meaning of the False Claims Act.  Accordingly, by engaging in the above-described misconduct, DaVita caused the presentation of false claims to government healthcare programs and is thus liable for this conduct under the False Claims Act.

6.      While the above-described conduct is illegal itself, DaVita added another layer onto the scheme by intentionally steering patients from Government-funded healthcare plans (such as Medicare and Medicaid) to private insurance healthcare plans and Medicare Advantage plans where DaVita had negotiated a higher reimbursement rate for dialysis services.  DaVita's incentive to do so was because it is reimbursed at substantially higher amounts by private insurance carriers than Government-funded healthcare plans. DaVita's steering efforts independently violate the California Insurance Fraud Prevention Act and the Illinois Insurance Claims Fraud Prevention Act. In addition, DaVita's steering efforts facilitated its above-described kickback scheme by (1) allowing DaVita to tell the physicians to whom it sold ownership interests in JV DeNovos that they could anticipate increased profits in order to induce the physicians to invest in the JV

DeNovos at the outset and (2) actually generating increased revenues for DaVita itself and the physicians who co-owned the JV DeNovos when DaVita successfully steered patients to private insurance plans.

7.      Finally, separate and apart from its above-described misconduct, DaVita also partnered with the American Kidney Fund ("AKF"), ostensibly a charitable organization, to pay kickbacks to Medicare patients through the provision of financial assistance.   One of the AKF's signature programs is it Health Insurance Premium Program ("HIPP").  Through HIPP, the AKF provides financial assistance to Medicare patients with respect to costs that Medicare patients would otherwise be personally responsible for, such as yearly premiums, yearly deductibles, and co-pays for each service.   For example, the AKF provides so-called "charitable premium assistance" to assist Medicare beneficiaries with respect to obtaining Medigap coverage, sometimes known as supplemental Medicare coverage.  Medicare typically comes with a yearly premium, yearly deductible and, after the deductible is met, a 20% co-pay.  For ESRD patients on dialysis, these out-of-pocket costs can be very high, and Medigap coverage is available to Medicare patients to defray these costs.   DaVita heavily contributes to the AKF and thus is subsidizing the AKF's provision of financial assistance to DaVita's patients' acquisition of Medigap coverage. Because Medigap coverage covers the costs of the deductible and co-pay that a Medicare patient typically must pay, DaVita is effectively paying kickbacks to its patients.  Reimbursement claims tainted by these kickbacks are false claims under the False Claims Act.

## II.   THE PARTIES

### A.   The Government

8.      The United States is a plaintiff to this action on behalf of the Department of Health and Human Services ("HHS"), the Centers for Medicare and Medicaid Services ("CMS"), and federally funded healthcare programs, including Medicare.

**B.      Relator**

9.      Relator is a dual citizen of the United States and the United Kingdom and presently resides in Pennsylvania.

10.      Relator worked for DaVita from approximately May 2012 through August 2018. He was originally stationed in DaVita's office in Calverton, MD (suburban Washington D.C.) for two years before working in Singapore for approximately 11 months.  He then returned to the United States and worked at DaVita's office in Los Angeles from June 2015 to February 2017.  In February 2017, Relator was transferred to Rio de Janeiro, Brazil, where he remained until leaving DaVita in August 2018.

11.      At the time he left DaVita, Relator's tittle was Director of Financial Planning & Analysis.

12.      During his time in Los Angeles from June 2015 to February 2017, Relator worked for a component of DaVita that, in the jargon of DaVita, was known as "Deal Depot."  Deal Depot is how DaVita refers to the group that handles its domestic mergers and acquisitions.  While working for Deal Depot in Los Angeles, Relator was staffed on a deal for DaVita's attempted purchase of a majority stake in Montebello Artificial Kidney Center (MAKC), a dialysis facility in Montebello, CA.  Through this attempted purchase and other information learned during his time working for Deal Depot in Los Angeles, Relator discovered DaVita's misconduct that underlies the claims asserted in this Complaint.  Specifically, upon returning from the Singapore office, Relator became aware the Affordable Care Act exchanges were being discussed internally as an opportunity to improve the economics of dialysis centers.  Specifically, on this deal in Montebello CA the "Medicaid to Exchange opportunity" was mentioned by a Division Vice President (DVP) as a way to increase the valuation of a target dialysis center that DaVita wanted to purchase from a Physician Seller.  The deal had already been priced internally while the DVP

was out of office and upon returning, the DVP did not want to present what he thought was a low price to the Seller because he did not believe the Seller would accept the offer.  Therefore, he said we should include the "Medicaid to Exchange Opportunity" because there are too many Medicaid patients bringing down the valuation.  As the Selling Physician would retain a minority equity stake while selling the majority to DaVita, the Seller would benefit from the increased valuation as well as future profits when their current Medicaid patients would be steered to exchange plans with DaVita's higher negotiated contractual re-imbursement rates.  As was explained to Relator (on emails and calls), the insurance team was tracking and actively converting (later learned with the help of Social Workers and Physicians) Medicaid patients to higher reimbursing private insurance and cobra plans on the exchanges.  This would result in re-imbursement rates of up to twenty times higher than Medicaid.  Relator was told by the insurance team of historical conversion rate success percentages across California to justify him changing the revenue projections in the model.  Relator became suspicious of the legality of this when he received an email from one Director that said "No more emails on this topic please" and also when he was told to submit the revised projections to a different third-party appraisal firm than the firm he had sent the original projections to.  Under the Corporate Integrity Agreement, DaVita needs third-party appraisal and court appointed monitor to confirm transactions are at Fair Market Value (FMV).  It was clear to Relator that DaVita did not want the original third-party appraiser to ask why the revenue was now higher in the new projections.  The deal ended up being priced well over 50% higher for the selling physicians based on the second appraisal as compared to the original pricing.

13.    Relator has standing to bring this action pursuant to 31 U.S.C. §3730(b)(l), Cal. Ins. Code § 1871.7(e)(1), and 740 Ill. Comp. Stat. 92/15(a).

14.     Relator's complaint is not based on public disclosures of the allegations or transactions discussed herein within the meaning of 31 U.S.C. § 3730(e)(4)(A), ), Cal. Ins. Code § 1871.7(h)(2)(A), and 740 Ill. Comp. Stat. Ann. 92/30(b).

15.     Relator is an original source of the information provided herein within the meaning of 31 U.S.C. § 3730(e)(4)(B), ), Cal. Ins. Code § 1871.7(h)(2)(B), and 740 Ill. Comp. Stat. 92/30(b).

16.     Prior to filing this action, Relator voluntarily disclosed to the United States, the State of California, and the State of Illinois the information on which the allegations or transactions discussed herein are based within the meaning of 31 U.S.C. § 3730(e)(4)(B), ), Cal. Ins. Code § 1871.7(h)(2)(B), and 740 Ill. Comp. Stat. 92/30(b).

**C.     Defendants**

17.     Defendant DaVita Inc. is a corporation incorporated in Delaware that maintains its principal place of business in Denver, Colorado.

18.     Defendant DaVita Healthcare Partners, Inc. is a wholly-owned subsidiary of DaVita, Inc.

19.     DaVita Inc. and DaVita Healthcare Partners, Inc. are collectively referred to as "DaVita" unless other specified.

**III.     JURISDICTION AND VENUE**

20.     Jurisdiction is founded under 31 U.S.C. § 3732(a) and (b), 28 U.S.C. §§ 1331, 1345, and 1367(a).

21.     Personal jurisdiction and venue are proper in the Eastern District of Pennsylvania pursuant to 28 U.S.C. §§ 1391(b) and 1395(a) and 31 U.S.C. § 3732(a), because DaVita transacts and has transacted business in the Eastern District of Pennsylvania and because a substantial

portion of the events or omissions given rise to Relator's claims occurred in the District of Eastern District of Pennsylvania.

## IV.    THE LAW

### A.    The False Claims Act

22.    The FCA "was passed in 1863 as a result of investigations of the fraudulent use of government funds during the Civil War." United States v. Neifert-White Co., 390 U.S. 228, 232 (1968).

23.    The FCA "establishes a scheme that permits either the Attorney General or a private party to initiate a civil action alleging fraud on the Government," U.S. ex rel. Eisenstein v. City of New York, New York, 556 U.S. 928, 932 (2009) (citations omitted), and "imposes significant penalties on those who defraud the Government." Universal Health Servs., Inc. v. United States, 136 S. Ct. 1989, 1995 (2016).

24.    The FCA provides, *inter alia,* that any person who (1) "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," or (2) "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," is liable to the United States for a civil monetary penalty plus treble damages. 31 U.S.C. § 3729(a)(1)(A)-(B).

25.    The terms "knowing" and "knowingly" mean "that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A)(i)-(iii).

26.    Proof of specific intent to defraud is not required.  31 U.S.C. § 3729(b)(1)(B).

27.    The term "claim" means "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or

10

property, that (1) is presented to an officer, employee, or agent of the United States; or (2) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Governments behalf or to advance a Government program or interest, and if the United States Government (a) provides or has provided any portion of the money or property requested or demanded; or (b) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded . . . ."  31 U.S.C. § 3729(b)(2)(A)(i)-(ii).

28.     "[T]he term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  31 U.S.C. § 3729(b)(4).

29.     Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 and 64 Fed. Reg. 47099, 47103 (1999), the civil monetary penalties under the FCA are $5,500 to $11,000 for violations occurring on or after September 29, 1999 but before November 2, 2015. See 28 C.F.R. § 85.3.

30.     Pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015 and 83 Fed. Reg. 706 (Jan. 8, 2018), the civil monetary penalties under the FCA were adjusted to $11,181 to $22,363 for violations occurring on or after November 2, 2015 that are assessed after January 29, 2018. See 28 C.F.R. § 85.5.

### B.     State False Claims Acts

31.     Each of the Plaintiff States has individually enacted a False Claims Act. Each of those Acts is modeled after the Federal FCA, and each contains provisions similar to those quoted above.

32.     Relator asserts claims under the State FCAs for the State portion of Medicaid false claims detailed in this Complaint.

### C.     The Anti-Kickback Statute

33.     The federal Anti-Kickback Statute ("AKS") makes it a criminal offense to "knowingly and willfully" offer, pay, solicit, or receive any remuneration to induce, or in return for, referrals of items or services paid for by a Federal health care program. 42 U.S.C. § 1320a-7b. If any purpose of the remuneration is to induce or reward the referral or recommendation of business payable in whole or in part by a federal health care program, the AKS is violated, i.e., a lawful purpose will not legitimize a remuneration that also has an unlawful purpose.

34.     Specifically, the AKS provides:

(1) Whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind--
     (A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
     (B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,
shall be guilty of a felony and upon conviction thereof, shall be fined not more than $100,000 or imprisoned for not more than 10 years, or both.

(2) Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person--
     (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
     (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,
shall be guilty of a felony and upon conviction thereof, shall be fined not more than $100,000 or imprisoned for not more than 10 years, or both.

42 U.S.C. § 1320a-7b(b)(1)-(2).

35.     "Federal health care program" is defined as "(**1**) any plan or program that provides health benefits, whether directly, through insurance, or otherwise, which is funded directly, in whole or in part, by the United States Government (other than the health insurance program under

chapter 89 of Title 5); or **(2)** any State health care program, as defined in section 1320a-7(h) of this title." 42 U.S.C. § 1320a-7b(b)(1).

36.    "Federal health care program" includes both Medicare and Medicaid.

37.    Violation of the AKS can subject the perpetrator to exclusion from participation in federal healthcare programs and civil monetary penalties of $50,000 per violation and three times the amount of remuneration paid. 42 U.S.C. § 1320a-7(b)(7); 42 U.S.C. § 1320a-7a(a)(7).

38.    Reimbursement claims to federal health care program that are tainted by violations of the AKS are false claims within the meaning of the FCA.  42 U.S.C. § 1320a-7b(g) ("In addition to the penalties provided for in this section or section 1320a-7a of this title, a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of subchapter III of chapter 37 of Title 31.").

39.    As relevant to this lawsuit, the Department of Health and Human Services, Office of Inspector General ("HHS-OIG") has long been conceded with what it has previously characterized as "a proliferation of arrangements" within the health industry "between those in a position to refer business, such as physicians, and those providing items or services for which Medicare or Medicaid pays."  See HHS-OIG, Special Fraud Alert: Joint Venture Arrangements (Aug. 1989), available at https://oig.hhs.gov/fraud/docs/alertsandbulletins/121994.html.

40.    Such arrangements are often referred to as joint ventures.

41.    HHS-OIG has stated on more than one occasion that joint ventures may violate the Anti-Kickback Statute if they are designed to induce patient referrals.

42.    For example, in 1989, HHS-OIG explained:

A joint venture may take a variety of forms: it may be a contractual arrangement between two or more parties to cooperate in providing services, or it may involve the creation of a new legal entity by the parties, such as a limited  partnership or closely held corporation, to provide such services. Of course, there may be

legitimate reasons to form a joint venture, such as raising necessary investment capital. However, the Office of Inspector General believes that some of these joint ventures may violate the Medicare and Medicaid anti-kickback statute.

  Under these suspect joint ventures, physicians may become investors in a newly formed joint venture entity. The investors refer their patients to this new entity, and are paid by the entity in the form of ``profit distributions.'' These subject joint ventures may be intended  not so much to raise investment capital legitimately to start a  business, but to lock up a stream of referrals from the physician  investors and to compensate them indirectly for these referrals.  Because physician investors can benefit financially from their referrals, unnecessary procedures and tests may be ordered or performed, resulting in unnecessary program expenditures.
 The questionable features of these suspect joint ventures may be reflected in three areas:
   (1) The manner in which investors are selected and retained;
   (2) The nature of the business structure of the joint venture; and
   (3) The financing and profit distributions.

Id.

43.   In April 2003, HHS-OIG revisited a similar issue and identified several factors that, "taken separately or together," could signal a prohibited contractual arrangement under the Anti-Kickback Statute, including: (1) a captive referral base of existing patients is being serviced by the new business; (2) the party making the referrals is taking little or no business risk, and making little or no financial investment in the new business; (3) the parties to the venture would otherwise be competitors for the captive referrals, each having the independent capability to provide and bill for the same services; ( 4) the party receiving the referrals also provides a range of administrative services to the new business, such as management, billing, personnel-related services and/or health care items and supplies; (5) the overall effect of the arrangement is to permit one party to bill for the business generated by the other party and the profits of the venture are based on the value and volume of the referrals generated; and ( 6) provisions exist restricting the ability of one or both parties to act in competition with the venture's business operations. HHS-OIG, Special Advisory Bulletin:   Contractual   Joint   Ventures   (April   2003),   available   at https://www.oig.hhs.gov/fraud/docs/alertsandbulletins/042303SABJointVentures.pdf.

   **D.    The California Insurance Fraud Prevention Act**

44.     CIFPA, Cal. Ins. Code § 1871.7 et seq., IICFPA, 740 Ill. Comp. Stat. 92/1 et seq., prohibits insurance fraud and is designed "to facilitate the investigation and prosecution of insurance fraud." People ex rel. Allstate Ins. Co. v. Weitzman, 107 Cal. App. 4th 534, 548, 132 Cal. Rptr. 2d 165, 175 (Cal. Ct. App. 2003), as modified on denial of reh'g (Cal. Ct. App. Apr. 24, 2003).

45.     The California Legislature enacted CIFPA to combat abusive practices aimed at defrauding private insurance providers. The legislative findings and declarations associated with Section 1871.7 make clear that the Legislature was specifically concerned with fraud on health insurance providers: "Health insurance fraud is a particular problem for health insurance policyholders. Although there are no precise figures, it is believed that fraudulent activities account for billions of dollars annually in added health care costs nationally. Health care fraud causes losses in premium dollars and increases health care costs unnecessarily." Cal. Ins. Code § 1871(h).

46.     With respect to insurance fraud subject to the CIFPA, "[i]nsurers, not the state government, are the direct victims of the fraud" and "[i]nsureds are the indirect victims who pay higher premiums due to the prevalence of insurance fraud." Weitzman, 107 Cal. App at 452.  As a result, "[t]he general public also benefits from qui tam actions to enforce Insurance Code section 1871.7, because fraudulent insurance claims result in higher premiums." People ex rel. Strathmann v. Acacia Research Corp., 210 Cal. App. 4th 487, 504, 148 Cal. Rptr. 3d 361, 373 (Cal. Ct. App. 2012).

47.     Under CIFPA, "[e]very person who violates any provision of this section or Section 549, 550, or 551 of the Penal Code shall be subject, in addition to any other penalties that may be prescribed by law, to a civil penalty of not less than five thousand dollars ($5,000) nor more than ten thousand dollars ($10,000), plus an assessment of not more than three times the amount of each

claim for compensation." Cal. Ins. Code § 1871.7(b).  The Court may also order equitable and injunctive relief.  Id.

48.     Under CIFPA, "[t]t is unlawful to knowingly employ runners, cappers, steerers, or other persons to procure clients or patients to perform or obtain services or benefits . . . or to procure clients or patients to perform or obtain services or benefits under a contract of insurance or that will be the basis for a claim against an insured individual or his or her insurer." Cal. Ins. Code § 1871.7(a).

49.     In addition, CIFPA incorporates Section 549, 550, or 551 of the California Penal Code and violations of Section 549, 550, or 551 of the California Penal Code are actionable under CIFPA. Cal. Ins. Code § 1871.7(b).

50.     Section 550 of the California Penal Code prohibits, *inter alia*, "[k]nowingly present[ing] or caus[ing] to be presented any false or fraudulent claim for the payment of a loss or injury, including payment of a loss or injury under a contract of insurance" and "[k]nowingly make or cause to be made any false or fraudulent claim for payment of a health care benefit." Cal. Penal Code §§ 550(a)(1), (6).

51.     To establish a violation of Cal. Penal Code § 550, a plaintiff need only prove (1) presentment or causing the presentment of a false claim and (2) the intent to defraud. People ex rel. Gov't Employees Ins. Co. v. Cruz, 244 Cal. App. 4th 1184, 1193–94, 198 Cal. Rptr. 3d 566, 574 (Cal. Ct. App. 2016). Thus, "[i]t is not necessary that anyone actually be defrauded or actually suffer a financial, legal, or property loss as a result of the defendant's acts." *Id*. at 1194 (internal quotation marks omitted).

52.     CIFPA authorizes "any interested person" to bring a claim for a violation of the CIFPA in the name of the state.  Cal. Ins. Code § 1871.7(e)(1).  In this way, CIFPA "enable[s] and

16

encourage[s] the enforcement of regulatory provisions, such as section 1871.7, that would otherwise be beyond the resources of public entities to enforce." State ex rel. Wilson v. Superior Court, 227 Cal. App. 4th 579, 596, 174 Cal. Rptr. 3d 317, 328 (Cal. Ct. App. 2014), as modified on denial of reh'g (July 25, 2014).

E.    **The Illinois Insurance Claims Fraud Prevention Act**

53.    IICFPA, 740 Ill. Comp. Stat. 92/1 et seq., provides that "it is unlawful to knowingly offer or pay any remuneration directly or indirectly, in cash or in kind, to induce any person to procure clients or patients to obtain services or benefits under a contract of insurance." 740 Ill. Comp. Stat. 92/5(a).

54.    IICFPA further provides that "[a] person who violates any provision of this Act, Section 17-8.5 or Section 17-10.5 of the Criminal Code of 1961 or the Criminal Code of 2012, or Article 46 of the Criminal Code of 19611 shall be subject, in addition to any other penalties that may be prescribed by law, to a civil penalty of not less than $5,000 nor more than $10,000, plus an assessment of not more than 3 times the amount of each claim for compensation under a contract of insurance." 740 Ill. Comp. Stat. 92/5(b).

55.    IICFPA authorizes "an interested person" to bring a claim for a violation of IICFPA on behalf of the State of Illinois. 740 Ill. Comp. Stat. 92/15(a).

V.    **BACKGROUND**

A.    **ESRD and Dialysis**

56.    End-Stage Renal Disease ("ESRD") "occurs when chronic kidney disease — the gradual loss of kidney function — reaches an advanced state."[3]

---

[3] MAYO CLINIC, End-stage renal disease (Mar. 8, 2018), available at https://www.mayoclinic.org/diseases-conditions/end-stage-renal-disease/symptoms-causes/syc-20354532.

57.     When a person suffers from ESRD, the person's "kidneys are no longer able to work as they should to meet [his or her] body's needs." Id.

58.     ESRD is the final stage of chronic kidney disease, which "means kidneys are only functioning at 10 to 15 percent of their normal capacity."[4]

59.     The most common treatments for ESRD are a kidney transplant or dialysis.[5]

60.     As the National Kidney Foundation explains: "Dialysis is a treatment that does some of the things done by healthy kidneys. It is needed when your own kidneys can no longer take care of your body's needs."[6]

61.     More specifically: "Dialysis is a procedure that is performed routinely on persons who suffer from acute or chronic renal failure, or who have ESRD. The process involves removing waste substances and fluid from the blood that are normally eliminated by the kidneys."[7]

**B.      Medicare Coverage of Dialysis**

62.     Medicare is a federal government healthcare program that provides healthcare benefits to people who are 65 or older, certain younger people with disabilities, and people with ESRD.[8]

---

[4] DAVITA, What is End Stage Renal Disease, available at https://www.davita.com/education/kidney-disease/stages/what-is-end-stage-renal-disease.

[5] See MedlinePlus, End stage kidney disease, available at https://medlineplus.gov/ency/article/000500.htm (last accessed on Oct. 15, 2018) ("ESRD may need to be treated with dialysis or kidney transplant.").

[6] NATIONAL KIDNEY FOUNDATION, Dialysis, available at https://www.kidney.org/atoz/content/dialysisinfo (last accessed on Oct. 15, 2018).

[7] JOHNS HOPKINS MEDICINE, End Stage Renal Disease (ERSD), available at https://www.hopkinsmedicine.org/healthlibrary/conditions/kidney_and_urinary_system_disorders/end_stage_renal_disease_esrd_85,p01474 (last accessed on Oct. 15, 2018).

[8] See CMS, What's Medicare, available at https://www.medicare.gov/what-medicare-covers/your-medicare-coverage-choices/whats-medicare (last accessed on Oct. 15, 2018).

63.     Thus, while Medicare is typically limited to individuals over 65 or who suffer from certain disabilities, Medicare generally provides coverage for the treatment of ESRD irrespective of age or disability status.

64.     When Congress extended Medicare coverage to ESRD patients in 1972, it "marked the first time that individuals were allowed to enroll in Medicare based on a specific medical condition rather than on age."[9]

65.      Medicare broadly covers treatment service for ESRD. See 42 U.S.C. § 1395rr(a) ("The benefits provided by parts A and B of this subchapter shall include benefits for individuals who have been determined to have end stage renal disease…").

66.     This coverage includes broad coverage of dialysis and related services including dialysis performed in hospitals, at outpatient facilities, and at home:[10]

---

[9] See CONGRESSIONAL RESEARCH SERVICE, Medicare Coverage of End-Stage Renal Disease (ERSD) (Aug. 16, 2018), at 1, available at https://fas.org/sgp/crs/misc/R45290.pdf.
[10] CMS, Medicare Coverage of Kidney Dialysis & Kidney Transplant Services, at 18, available at https://www.medicare.gov/Pubs/pdf/10128-Medicare-Coverage-ESRD.pdf.

## Dialysis services & supplies covered by Medicare

| Service or supply | Covered by Medicare Part A | Covered by Medicare Part B |
|---|---|---|
| **Inpatient dialysis treatments** (if you're admitted to a hospital for special care). | ✔ | |
| **Outpatient dialysis treatments** (if you get treatments in a Medicare-approved dialysis facility). | | ✔ |
| **Outpatient doctors' services.** See page 35. | | ✔ |
| **Home dialysis training** (includes instruction for you and the person helping you with your home dialysis treatments). | | ✔ |
| **Home dialysis equipment and supplies** (like the machine, water treatment system, basic recliner, alcohol, wipes, sterile drapes, rubber gloves, and scissors). See pages 33–34. | | ✔ |
| **Certain home support services** (may include visits by trained hospital or dialysis facility workers to check on your home dialysis, to help in emergencies when needed, and to check your dialysis equipment and water supply). See page 35. | | ✔ |
| **Most drugs for home and in-facility dialysis.** See page 33. | | ✔ |
| **Other services and supplies that are a part of dialysis** (like laboratory tests). | | ✔ |

67.     Medicare spends a tremendous amount of money to reimburse providers for the provision of services to treat ESRD.

68.     In 2015, Medicare spent approximately $34 billion for reimbursement of ESRD treatment services.[11]

---

[11] Supra n. ☐, at 17.

69.     Medicare spends far more **feor** ESRD Medicare beneficiaries than for non-ESRD Medicare beneficiaries.   In one recent year, "Medicare spent $61,996 per ESRD beneficiary, compared to $9,889 per non-ESRD beneficiary."[12]

70.     Indeed, "[b]ecause Medicare beneficiaries with ESRD have higher-than-average health care costs, they account for about 7% of Medicare fee-for-service (FFS) spending, while making up about 1% of program enrollment."[13]

71.     Medicare provides coverage for the overwhelming majority of ESRD patients in the United States, as compared to other potential providers such as commercial health insurance or Medicaid:[14]



72.     Overall, "FFS Medicare covers three-fourths of U.S. annual medical spending to treat ESRD."[15]

---

[12] <u>Id</u>. at 8.
[13] <u>Id</u>. at 1.
[14] <u>Id</u>. at 8.
[15] <u>Id</u>. at 8.

**C.** **DaVita**

73.     DaVita is one of the nation's largest providers of dialysis and related services.

74.     DaVita operates its dialysis business through a division called DaVita Kidney Care.

75.     DaVita claims to serve more than 1.7 million patients in 13 countries and to have more than 70,800 employees.[16]

76.     In California specifically, DaVita has approximately a 42% market share of the dialysis marketplace.

**D.** **DaVita's History of False Claims Act Liability**

77.     DaVita has a substantial history of violations of the FCA and analogous state statutes.

78.      As most directly relevant here, in 2009, a relator filed a *qui tam* lawsuit under the FCA and its state counterparts against DaVita.  See United States et al. ex rel. Barbetta v. DaVita Inc. et al., No. 09 cv 02175 WJM-KMT (D. Colo. 2009).

79.     Summarized briefly, Barbetta concerned DaVita's payment of kickbacks to physicians in exchange for referral to dialysis centers owned (at least in part) by DaVita).  In Barbetta, the primary component of the kickback scheme was DaVita's agreement to enter into a joint venture with a physician either through (1) DaVita's acquisition of an ownership interest in a dialysis center owned by a physician at an inflated price or (2) DaVita's sale of an ownership interest in a new or existing dialysis center owned by DaVita to a physician at a below fair market value price.   In sum, DaVita sold low and bought high.

---

[16] See DAVITA, About, available at https://www.davita.com/about (last accessed on Oct. 15, 2018).

80.     In October 2014, DaVita entered into a settlement agreement under which it agreed to pay $350 million to resolve the lawsuit.[17]  As part of the settlement agreement, DaVita entered into a corporate integrity agreement. Id.

81.     Many of the same DaVita employees who were important actors with respect to the claims in Barbetta remain with the company, including Michael Staffieri (chief operating officer), Misha Palechek (chief development and transformation officer), Chet Mehta (vice president of finance), David Finn (vice president of mergers & acquisitions), Queenie Nguyen (manager), and Chris Pannell (transaction director).

82.     Beyond Barbetta, DaVita has also been the subject of other FCA lawsuits. See e.g. DEP'T OF JUSTICE, DaVita Rx Agrees to Pay $63.7 Million to Resolve False Claims Act Allegations (Dec. 14, 2017), available at https://www.justice.gov/opa/pr/davita-rx-agrees-pay-637-million-resolve-false-claims-act-allegations; DEP'T OF JUSTICE, Medicare Advantage Provider to Pay $270 Million to Settle False Claims Act Liabilities, (Oct. 1, 2018), available at https://www.justice.gov/opa/pr/medicare-advantage-provider-pay-270-million-settle-false-claims-act-liabilities.

## VI.     DAVITA'S FRAUD

### A.     Overview of DaVita's Use of JV DeNovos

83.     DaVita is extremely aggressive with respect to the expansion of its dialysis business.

---

[17] See DEP'T OF JUSTICE, DaVita to Pay $350 Million to Resolve Allegations of Illegal Kickbacks (Oct. 22, 2014), available at https://www.justice.gov/opa/pr/davita-pay-350-million-resolve-allegations-illegal-kickbacks.

84. The primary method that DaVita utilizes to expand its dialysis business is through the establishment of new dialysis centers that are co-owned by DaVita and one or more physicians or physician groups that can refer patients to the newly-established dialysis centers.

85. In the parlance of DaVita, these newly-established dialysis centers are known as "Joint Venture DeNovos" or "JV DeNovos."

86. "Joint Venture" refers to the fact that the newly-established dialysis center will be co-owned by DaVita and one or more physicians or a physician group.

87. "DeNovo" refers to the fact that the newly-established dialysis center is in fact newly-established, *i.e.* to distinguish it from existing dialysis centers.

88. This Complaint collectively refers to the physician groups or physicians to whom DaVita has sold an ownership interest in a JV DeNovo as "JV Partners."

89. JV Partners can be individual physicians or physician groups that have established bases of dialysis patients (usually from their nephrology practices) that they can refer to the dialysis center owned by the JV DeNovo.

90. As described in detail below, DaVita exploits its JV DeNovos as a front for a kickback scheme under which it pays kickbacks to JV Partners in return for the referral of patients to the dialysis center owned by the JV DeNovo.

91. Specifically, DaVita sells an ownership interest in the JV DeNovo to the JV Partner at a price that does not, even remotely, reflect fair market value. Rather, DaVita values the ownership interest based only on the "startup" costs of opening the new dialysis facility. DaVita does not take into consideration the projected revenue that the dialysis facility will generate. Had DaVita done so, the value of the entity (and consequently the price of the ownership interest sold to the JV Partner) would have substantially increased.

92.     The purpose of DaVita's sale of ownership interests to JV Partners at artificially low values is to induce JV Partners to refer their patients to the new dialysis facility owned by the JV DeNovo.  Put differently, DaVita can confidently assure a potential JV Partner of tremendous profits based on the very low acquisition cost of the JV Partner's ownership interest.  And in fact, JV Partners did realize outstanding returns on their investments, *i.e.* the scheme is working exactly as it is intended to work.

93.     As described in detail below, DaVita's sale of ownership interests in JV DeNovos to JV Partners at artificially low values in order to induce referrals constitutes a kickback in violation of the Anti-Kickback Statute and taints the reimbursement claims that DaVita is submitting to Medicare for reimbursements in violation of the False Claims Act.

**B.     DaVita Works with its JV Partners to Steer Patients from Government-Funded Healthcare Plans to Private Pay Plans.**

94.     Before turning to DaVita's perpetration of the overall kickback scheme, Relator first describes DaVita's intentional steering of patients from Government-funded healthcare plans to private pay plans.   This steering was a critical component of the overall kickback scheme. Moreover, this steering independently violates the CIFPA and the IICFPA.

**1.     DaVita's Massive Financial Motivation to Steer Patients to Private Pay Plans**

95.     As described above, the overwhelming majority of ESRD patients receive coverage from Government-funded healthcare plans ("Government Plans") such as Medicare for ESRD treatment services, including dialysis, kidney transplants, and related services.

96.     However, patients who are eligible for Government Plans may choose to obtain coverage from a private insurance/commercial plan.

97.     DaVita furthers the kickback scheme by working closely with JV Partners to induce JV Partners to encourage patients to switch from Government Plans to private-pay plans.  In other

words, DaVita works with its JV Partners to steer patients from Government Plans to private insurance plans.

98.     In 2010, Congress enacted the Patient Protection and Affordable Care Act ("ACA"). See PATIENT PROTECTION AND AFFORDABLE CARE ACT, PL 111-148, 124 Stat 119 (Mar. 23, 2010).

99.     The ACA spurred the creation of exchanges, or marketplaces, through which people could compare and purchase insurance plans from private insurance companies. See King v. Burwell, 135 S. Ct. 2480 (2015) ("[T]he Act requires the creation of an 'Exchange' in each State—basically, a marketplace that allows people to compare and purchase insurance plans."); 42 U.S.C. § 18031(b)(1) et seq. (providing the statutory framework for the exchanged).

100.    Following the creation of the ACA exchanges, DaVita adopted a comprehensive and company-wide approach of attempting to steer patients to private insurance plans, most importantly including patients who are also eligible for Government Plans.

101.    DaVita's incentive to do so is that it receives considerably higher reimbursement rates from private insurance plans for dialysis and related services than it does from Government Plans.

102.    For example, the below chart compares the amount of reimbursement DaVita would receive from Government Plans (Medicare and Medicaid), a private pay Blue Shield plan, and a private pay COBRA plan:

|  | Charge per Treatment | # of Treatments per Year | DaVita Revenue |
|---|---|---|---|
| Medicaid | $ 169 | 144 | $ 24,314 |
| Medicare | $ 279 | 144 | $ 40,215 |
| Blue Shield | $ 800 | 144 | $ 115,200 |
| COBRA Plan | $ 2,700 | 144 | $ 388,800 |

103. As evidence by these figures, DaVita makes drastically more money from a patient who has coverage through a private insurance plan than it does from a patient who has coverage through Government Plans.

104. DaVita trained its staff on the economics of patients on Government Plans compared to patients on private insurance.

105. For example, DaVita included the following slides in a PowerPoint presentation:





106.    These slides were included in a training module only for social workers called "Insurance, Disability and Patient Assistant Plans."   Social workers at DaVita typically have a case load of 120 dialysis patients on average and never deal with financial matters.  They are typically charged with the provision of social and behavioral guidance for patients and their family members to help them get through this difficult period.

107.    DaVita defines the role of social workers as follows: "A renal social worker is a support person for patients both before and after they start dialysis. Social workers are highly educated and trained to help patients and their families by providing support in all areas of their lives including: emotional, financial, career, lifestyle adjustment and more."

108.    Thus, the defined role of social workers has nothing to do with the financial management of the subject clinic, but DaVita nonetheless trains its social workers to steer patients.

109.    Given the drastically higher reimbursements it receives from private insurance plans than from Government Plans, DaVita has a massive financial motivation to have as many of its patients on private insurance plans as possible.

110.    To that end, DaVita carefully kept track of the breakdown of how many patients in a particular facility (that DaVita owned or wanted to purchase) were receiving coverage through Government Plans and how many patients were receiving coverage through private insurance plans.

### 2.    DaVita's Efforts to Steer Patients to Private Pay Plans

111.    DaVita adopted a comprehensive strategy to work with its JV Partners to encourage and induce patients to switch from Medicare to private insurance plans.

112.    For example, **Exhibit 1** is minutes of a meeting in November 2015 between (1) Brian Nordin, a DaVita Regional Operations Director) and (2) Dr. Jack Rubin, the medical director

of a dialysis center in Los Angeles, CA that is owned and controlled by Glassland Dialysis, LLC in which Dr. Rubin has a minority equity stake.

113.   Glassland Dialysis, LLC is a DaVita joint venture

114.   At the meeting, Mr. Nordin and Dr. Rubin discussed the operations and strategic management of the dialysis center.

115.   As relevant here, Mr. Nordin and Dr. Rubin discussed "Strategic Opportunities." Id. at 6.

116.   As shown below, one of the "Strategic Opportunities" that they discussed was "Medicaid PTs to commercial plans" and they discussed how to effectuate this opportunity through various "Action Items:"

**Strategic Opportunities**

Discussion / Decisions:
- IPA relationships
    - LA Care
- Medicaid PTs to commercial plans

Action Items: *(Who, What, When)*
- IC/SW educate Medicaid patients on commercial plan offerings in Nov/Dec.
- MD support patient education efforts.
- IC give MD list of patients who are not interested in this opportunity.

Id. at 6.

117.   "IC" in this graphic stands for insurance counselor, "SW" stands for social worker, and "MD" stands for medical director.

118.   The minutes conclude by noting that "[o]ption for Medicaid patients to choose a commercial plan is a big opportunity for the clinic." Id. at 7.

119.   Steering is a particularly significant concern with Medicaid patients who are often less sophisticated and less educated than other patients and thus tend to be more susceptible to

pressure.  Above can be seen that DaVita furnishes the MD with a list of patients who said they are not interested in exchange plans so that the MD can convince them to switch.

120.   **Exhibit 2** is minutes of a meeting at a later date in August 2016 between Mr. Nordin and Dr. Rubin.

121.   As shown below, Mr. Nordin and Dr. Rubin again discussed the "strategic opportunity" of "Medicaid PTs to commercial plans" and the minutes note that "18 patients chose commercial plans to be effective in Mar."

## Strategic Opportunities

Discussion / Decisions:
- Medicaid PTs to commercial plans
  - o   18 patients chose commercial plans to be effective in Mar.

Action Items:  *(Who, What, When)*
- IC/SW support  Medicaid patients using their new commercial plans.

Id. at 5.

122.   The minutes again conclude by noting that "[o]ption for Medicaid patients to choose a commercial plan is a big opportunity for the clinic." Id. at 6.

123.   A further example of DaVita's efforts to steer patients to private insurance plans is its "Patient Assistance Department" also known as "Mission Possible."

124.   DaVita describes Mission Possible in the following graphic:



**Patient Assistance Department**

Team Mission Possible (The Patient Assistance Department) works as liaisons to obtain insurance premium assistance for DaVita dialysis patients, who are diagnosed with ESRD. Working on behalf of patients, and working with clinical Social Workers and Insurance Counselors, the Mission Possible Team assists in completing HIPP applications, and processing requests, for assistance through the American Kidney Fund (AKF) Health Insurance Premium Program (HIPP).

The American Kidney Fund processes HIPP applications and provides grant payments that are disbursed to the patient's insurance companies based on the insurance billing cycle. AKF grants insure that DaVita patients can retain their medical insurance coverage, and continue receiving dialysis treatments.

125.    As evidenced by this graphic, Mission Possible's role was to "work[] as liaisons to obtain insurance premium assistance for DaVita dialysis patients" through the American Kidney Fund ("AKF").

126.    The AKF is a non-profit corporation that is, in large measure, funded by dialysis providers such as DaVita.

127.    The AKF provides financial assistance to dialysis patients on private insurance plans by assisting with the payment of the premium a patient is required to pay for the private insurance plan.

128.    The very same dialysis providers who primarily fund the AKF, like DaVita, use the AKF's financial assistance program to steer patients from Medicare to private insurance plans.

129.    As described above, DaVita's Mission Possible unit is responsible for facilitating a patient's receipt of financial assistance through the AKF. This financial assistance makes it more economically feasible for a patient to select a private insurance plan rather than Medicare.

130.    At the time Relator worked for DaVita, the company had a large nationwide team dedicated to Mission Possible as shown in the following graphics:

**Team Mission Possible**

| Fax Lines | | Mission Possible | Role | Phone: (888) 654-3639 ext. | Email |
|---|---|---|---|---|---|
| AKF HIPP | (888) 824-6727 | Diane Hendricks | Manager | 144505 | Diane.Hendricks@davita.com |
| Product Repl. | (888) 825-7642 | Daisy Ronchetti | Supervisor | 144440 | Daisy.Ronchetti@davita.com |
| | | Stephanie Althaqeb | Supervisor | 144582 | Stephanie.Althaqeb@davita.com |
| | | Susanne Fermin | Supervisor | 144513 | Susanne.Fermin@davita.com |
| | | Cameron McKim | PA Database Administrator | 144434 | Cameron.McKim@davita.com |
| | | Elizabeth Salcedo | HIPP Liaison Support | 144588 | Elizabeth.SalcedoRodriguez@da |
| | | Mercedes Milan | HIPP Liaison Support | 144426 | |
| | | Janet Garreans | DR Liaison for Venofer | 144518 | Janet.Garreans@davita.com |
| | | Lucy Souvanat | DR Liaison for Epo | 144516 | Lucy.Souvanat@davita.com |
| | | Alex Stone | HIPP Liaison | 144435 | Alejandra.Stone@davita.com |
| | | Alve Evanculla | HIPP Liaison | 144576 | Alve.Evanculla@davita.com |
| | | Christina Prieto | HIPP Liaison | 144415 | Christina.Prieto@davita.com |
| | | Christy Anthony | HIPP Liaison | 144512 | Christy.Anthony@davita.com |
| | | Cynthia Cao | HIPP Liaison | 144473 | Cynthia.Cao@davita.com |
| | | Diane Alsop | HIPP Liaison | 144503 | Diane.Alsop@davita.com |
| | | Dina Deng | HIPP Liaison | 144567 | Dina.Deng@davita.com |
| | | Dominic Nguyen | HIPP Liaison | 144478 | Dominic.Nguyen@davita.com |
| | | Helly Duran | HIPP Liaison | 144571 | Helly.Duran@davita.com |
| | | Jennel Sarian | HIPP Liaison | 146906 | Jennel.Sarian@davita.com |
| | | Jessica Salcedo | HIPP Liaison | 144555 | Jessica.Salcedo@davita.com |
| | | Katherine Marcelino | HIPP Liaison | 144596 | Katherine.Marcelino@davita.com |
| | | Larry Caraig | HIPP Liaison | 144442 | Larry.Caraig@davita.com |
| | | Lilian Gutierrez | HIPP Liaison | 144569 | Lilian.Gutierrez@davita.com |
| | | Lisa Cabias | HIPP Liaison | 144444 | Lisa.Cabias@davita.com |
| | | Lorena Andrade | HIPP Liaison | 144441 | Lorena.Andrade@davita.com |
| | | Maria Lee Li | HIPP Liaison | 144506 | Maria.LeeLi@davita.com |
| | | Mary Cazares | HIPP Liaison | 144452 | Mary.Cazares@davita.com |
| | | Melanie Escobar | HIPP Liaison | 144431 | Melanie.Escobar@davita.com |
| | | Noelle Ticman | HIPP Liaison | 144511 | Noelle.Ticman@davita.com |
| | | TBA | HIPP Liaison | 146721 | |
| | | Sandra Goldstein | HIPP Liaison | 146707 | Sandra.Goldstein@davita.com |
| | | Sandy Lau | HIPP Liaison | 144514 | Sandy.Lau@davita.com |
| | | Shen Arenas | HIPP Liaison | 144568 | Shen.Arenas@davita.com |
| | | Shizuka Ishii | HIPP Liaison | 144443 | Shizuka.Ishii@davita.com |
| | | Suzanne Lee | HIPP Liaison | 144477 | Suzanne.M.Lee@davita.com |
| | | Tammy Zutler | HIPP Liaison | 144585 | Tammy.Zutler@davita.com |
| | | Tiffany Chen | HIPP Liaison | 146832 | Tiffany.Chen1@davita.com |
| | | Veronica Carillo | HIPP Liaison | 144504 | Veronica.Carillo@davita.com |

**DaVita HIPP Liaison State Assignments (9/1/2016)**

| State | Abbr | Liaison | Division | Reg. | State | Abbr | Liaison | Division | Reg. |
|---|---|---|---|---|---|---|---|---|---|
| Alabama | AL | Jessica | | | Missouri | MO | Jessica | | |
| Arizona | AZ | Shen | | | Montana | MT | Jennel | | |
| Arkansas | AR | Christina | | | Nebraska | NE | Christina | | |
| | | Jennel | Gold Coast / Wild West | All | Nevada | NV | Stephanie | | |
| California | CA | Tammy | Surf'N'Sun / Sierra Terrific | All | New Hampshire | NH | Cynthia | | |
| | | Dominic | Pacific Gold/ORCA/Pioneer | All | New Jersey | NJ | Shizuka | | |
| Colorado | CO | Helly | | | New Mexico | NM | Dominic | | |
| Connecticut | CT | Tiffany | | | New York | NY | Maria | | |
| Delaware | DE | Katherine | | | North Carolina | NC | Mary | | |
| | | | | | North Dakota | ND | Sandra | | |
| DC | DC | Veronica | | | Ohio | OH | Sandra | | |
| | | | | | Oklahoma | OK | Diane | | |
| Florida | FL | Melanie | SunRays, | All | Oregon | OR | Helly | | |
| | | | Team Renaissance | 4,7,9 | | | | Lumineer | All |
| Florida | FL | Alve | Team Renaissance | 12 | Pennsylvania | PA | Maria | Woodlands | All |
| | | | Sunsational, Central Oasis, SuperNova | All | | | | | |
| | | | Southern Stars - Pinnacle | 4,6,7,8 | Pennsylvania | PA | Sandy | Catori | All |
| Georgia | GA | Suzanne L | Southland | All | | | | | |
| | | | Team Renaissance | All | Rhode Island | RI | Veronica | | |
| | | | MiraMonte | All | | | | | |
| Georgia | GA | Cynthia | Southern Stars - Pinnacle | 1,2,3,5 | South Carolina | SC | Veronica | | |
| Hawaii | HI | Shen | | | South Dakota | SD | Sandra | | |
| | | Christina | Skyline | All | Tennessee | TN | Lilian | | |
| Illinois | IL | Larry | Discovery / Keystone | All | | | | Star Wranglers | 2,3 |
| | | | | | Texas | TX | Lorena | Team Explorer | All |
| Indiana | IN | Larry | | | | | | | |
| Iowa | IA | Cynthia | | | Texas | TX | Dina | Eagle | All |
| Idaho | ID | Jennel | | | | | | Star Wranglers | 1,4 |
| Kansas | KS | Tiffany | | | Texas | TX | Lisa | Odyssey | All |
| Kentucky | KY | Shen | | | | | | Silver Spurs | All |
| Louisiana | LA | Diane | | | Texas | TX | Sandra | Southern Diamonds | All |
| Maine | ME | Lilian | | | | | | Southern Heat | 3,4 |
| Maryland | MD | Alex | | | Utah | UT | Helly | | |
| Massachusetts | MA | Veronica | | | Virginia | VA | Christy | | |
| Michigan | MI | Katherine | | | Washington | WA | Daisy | | |
| Minnesota | MN | Susanne | | | West Virginia | WV | Christy | | |
| Mississippi | MS | Lilian | | | Wisconsin | WI | Veronica | | |

131.   In sum, Mission Possible was another component of DaVita's overall effort to steer patients who are eligible for Medicare or Medicaid coverage to private insurance plans.

132.     DaVita's relationship with the AKF is even more troubling given the ***timing*** of DaVita's contributions to the AKF.

133.     When DaVita contributes money to the AKF, it gives it on a per center basis.  Thus, when DaVita's establishes or acquires a new center (for example, through a JV DeNovo), DaVita informs the AKF by sending money affiliated with that newly-established or newly-acquired center.

134.     For example, Relator personally worked on DaVita's acquisition of Crown Dialysis Clinic in Texas in or about April 2013.

135.      As reflected in the attached document, at the same time that DaVita paid for Crown Dialysis Clinic, it also made a contribution of approximately $60,000 to the AKF.

136.     Upon information and belief, the simultaneous timing of these transactions is for DaVita to signal to the AKF that it is going to start steering patients at the new center from Government Plans to private insurance plans and thus that the AKF should anticipate applications for financial assistance for these patients.

**C.     How DaVita's Kickback Scheme and Steering Efforts Work in Tandem**

137.     DaVita's scheme typically relies upon the following sequences of events, which involves illegal steering and illegal kickbacks:

- DaVita identifies one or more physicians or physician groups with whom it is potentially interested in establishing a JV DeNovo.

- DaVita provides information to the physician, generally through the provision of a PowerPoint presentation, with respect to cash flow projections of the JV DeNovo.  These cash flow projections serve as the basis for DaVita to project how much the potential JV Partner can expect to earn from the JV DeNovo.

- DaVita values the JV DeNovo by only taking into consideration the very low startup and construction costs, which is drastically less than the value of the JV DeNovo had DaVita accounted for projected cash flow that the newly-established dialysis center would generate. DaVita then uses this as the basis to offer to sell an ownership interest to the physician at a much lower price than fair market value.

- DaVita and the physician reach an agreement, under which the physician purchases a portion of the JV DeNovo at a price that is much lower than fair market value.

- DaVita educates the physician on how to encourage, *i.e.* steer, Medicare patients to plans provided by private insurance carriers. DaVita and the physician both have a financial incentive to engage in this steering, since private insurance carriers reimburse at substantially higher levels than Medicare for dialysis and related services.

- In some instances, after a few years, DaVita will buy out the physician's ownership interest. DaVita's purchase of the ownership interest is based on market rates with a going concern valuation. Given that the physician's investment was based on DaVita's initial valuation (which, as described above, was artificially low) and that DaVita is now paying market rates, the physician makes a substantial and above market return on their investment.

138.   To fully understand DaVita's misconduct, it is necessary to understand why nephrologists (potential JV Partners) would want to start a new dialysis center with DaVita rather than expanding their current practice or opening their own new practice.

139.   In short, by working with DaVita, JV Partners can take advantage of the substantial financial benefits DaVita enjoys given its dominance of the dialysis marketplace.

140.    For example, JV Partners can take advantage of DaVita's better contractual reimbursement rates with private insurers.  Because DaVita controls so much of the dialysis marketplace, it can exercise leverage over private insurers with respect to reimbursement rates.

141.    As an example, in California, DaVita controls 42% of the outpatient dialysis capacity spread out across the state.   Thus, DaVita can exercise substantial leverage over private insurers whose patient populations are similarly spread out across the state. Otherwise DaVita can lock them out of 42% of the market and their dialysis patients will face logistical challenges or will end up in an inpatient hospital setting like the ER where bedside dialysis is extremely expensive.

142.    Likewise, potential JV Partner physicians are eager to enter into these JV DeNovo transactions rather than build their own centers because the construction costs are lower than if they built their own dialysis centers since DaVita can purchase the capital equipment at lower cost with their national contracts.  Once the center is open and operational, the profits will be much larger, since the JV Partner gets to take advantage of DaVita's lower cost supply contracts and higher revenue commercial contracts which leads to higher profit margins.

### D.    Representative Examples of DaVita's False and Fraudulent Conduct Involving JV DeNovs and Steering

143.    Below, Relator provides two examples that illustrate DaVita's misconduct.

144.    These two representative example illustrates DaVita's fraud, which (based on Relator's firsthand knowledge working at DaVita) Relator knows were pervasive throughout DaVita.  Put differently, these two examples are indicative of DaVita's standardized and systemic efforts of committing fraud through its JV DeNovos.

145.    Given the complex array of corporate entities and individuals involved in these representative examples, Relator provides the following summary table:

| # | DaVita Entity | Name of JV DeNovo Entity | Dialysis Center Owned by JV | JV Partner | Entity or Person Controlling JV Partner |
|---|---|---|---|---|---|
| 1 | Total Renal Care, Inc. | Panther Dialysis LLC | Menifee Home At Home | Menifee Home Dialysis LLC | Nephrology Associates Medical Group |
| 2 | Total Renal Care, Inc. | Olive Dialysis LLC | South Gate Dialysis | Lafayette Medical Dialysis LLC. | Dr. Malvin Yan Do |

### 1.    Representative Example 1 – Panther Dialysis LLC

146.    One example of DaVita's fraud involves Panther Dialysis LLC, an entity jointly owned by Total Renal Care, Inc. (a subsidiary of DaVita) and an entity called Menifee Home Dialysis LLC.

147.    Menifee Home Dialysis LLC operates Menifee Home At Home located in Menifee, CA, which provides home therapy services to dialysis patients, specifically PD (Peritoneal Dialysis) and HHD (Home Hemodialysis).  This means that, as compared to ICHD (In-Center Hemodialysis) patients coming to a dialysis facility for each treatment, these home patients only go to the office once a month to pick up supplies and then self-provide the dialysis services at home.

148.    DaVita's misconduct includes both home-based dialysis centers and traditional office-based dialysis centers.

149.    As illustrated in the chart below, DaVita owns 51% of Panther Dialysis and Menifee Home Dialysis owns 49% of Panther Dialysis:



150.    Menifee Home Dialysis, in turn, is controlled by Nephrology Associates Medical Group ("NAMG").

151.    NAMG is a large physician group with its 14 office locations and extensive patient network throughout Southern California.

152.    NAMG, through Menifee Home Dialysis, collectively invested $977,785 in Panther Dialysis in return for its 49% ownership interest.

153.    This $977,785 investment consisted of an initial capital contribution of $353,035 and two subsequent working capital contributions of $245,000 and $379,750.  The working capital contributions were needed because the volume of dialysis treatments and revenues were growing so rapidly that further working capital was needed to support the business.  This is often a positive sign for fast growing ventures because there is a time delay between when revenue is billed and when it is collected.  So more working capital was required to finance the rapid growth.

154.    NAMG, through Menifee Home Dialysis, made the initial contribution of $353,035 in 2014 and subsequently contributed the remaining contributions of $245,000 and $379,750 in 2015 and 2016, respectively.

155.    Put differently, DaVita collectively required NAMG to invest, through Menifee Home Dialysis, $977,785 for a 49% ownership stake in Panther Dialysis – most of which was working capital.

156.    DaVita routinely prepares financial review statements in connection with its JV De Novo relationships.

157.    A financial review statement dated in April 2018 for Panther Dialysis describes the initial and subsequent contributions to Panther Dialysis by NAMG through Menifee Home Dialysis. **Exhibit 3** at 9.

158.    The initial price of $353,035 and subsequent working capital contributions of $245,000 and $379,750 at which NAMG, through Menifee Home Dialysis, was allowed to buy into Panther Dialysis was not based on traditional valuation methodologies in which future projected cashflows or profits are taken into consideration.

159.    Rather, the price that DaVita set for NAMG for its 49% stake was based ***only*** on the need to fund the cost of construction and working capital only.  The construction costs are very low for this home location because it is essentially just a small medical office location with some computers and exam room where the home therapy patients usually come once a month to get additional medical supplies and have a check-up.  It does not have all the dialysis infrastructure (chairs, water system) of a typical dialysis center as the home patients dialyze at their homes for better quality of life.  However, DaVita utilizes the same rationale and allows the JV Partners to buy into the partnership at just construction costs plus working capital

160.    Through April 2018, NAMG has received $3,653,148 in distributions (*i.e.* profit sharing) from DaVita in the following amounts totaling $3,653,148:

| Year | JV Partners | DaVita |
| --- | --- | --- |
| | 49% | 51% |
| 2016 | $728,915 | $758,667 |
| 2017 | $2,368,863 | $2,465,552 |
| 2018 (as of April) | $555,370 | $578,038 |

161.    These distributions are described in the financial review statement dated in April 2018 for Panther Dialysis. **Exhibit 3** at 9.

162.    A total distribution of $3,653,148 reflects a total return of NAMG's total investment ***plus*** an additional 274% return in only a short period of time.  This excludes the undistributed cash on the balance sheet of the JV which equaled $2,467,979 as of April 2018 (NAMG's 49% of which would be $1,209,310).

38

163.    Moreover, the total distribution does not include an exit value today (for future distributions) of their 49% stake should NAMG wish to sell its interest back to DaVita.  If, however, the commonly accepted Gordon Growth Model (that the third-party appraisers use) is applied to determine the Terminal Value based on the most recent quarter's annualized free cash flow (ending June 2018), the JV Partners' stake would be valued at around $15,567,626 once you add the excess cash on the balance sheet yet to be paid out and apply the same discount rate of 12% that DaVita uses in its models.

164.    This is described in the chart below:

| | |
|---|---|
| Free Cash Flow | 2,629,712 |
| Terminal Value | $30,095,591 |
| Excess Cash | $1,675,075 |
| Equity - 100% | $31,770,665 |
| DaVita - 51% | $16,203,039 |
| **JV Partners - 49%** | **$15,567,626** |

165.    Considering this valuation of $15,567,626 and $ 3,653,148 of prior distributions in tandem, this totals $19,220,774 of value, or a total return of 19.66x or 1,966% return on NAMG's actual invested capital of $977,785.

166.    If DaVita valued Panther Dialysis accurately in 2015 using a widely accepted methodology of Net Present Value and discount rate of 12%, NAMG should have contributed

$13,561,528   of   equity   in   2015.      This   is   described   in   the   chart   below

|  | 3/17/2015 | 6/30/2016 | 6/30/2017 | 6/30/2018 |
|---|---|---|---|---|
| Distributions | $0 | $728,915 | $2,368,863 | $555,370 |
| Exit Value Today |  |  |  | $15,567,626 |
| Total Returns | $0 | $728,915 | $2,368,863 | $16,122,996 |
| Equity Value for 49% in 2015 | 13,561,528 |  |  |  |
| Partners Actual Contributions | $977,785 |  |  |  |

167.    If DaVita had appropriately valued Panther Dialysis, NAMG's contribution of $977,785 would have constituted a 3.5% ownership interest, not 49%. Put differently, if DaVita had appropriately valued Panther Dialysis, the JV Partner would have had to contribute $13,561,528 to purchase a 49% ownership interest.

168.    The difference is so great because DaVita brings many things of value to Panther Dialysis which are not reflected in the construction price at which DaVita allowed NAMG to buy in. DaVita has medical supply contracts that allow them to purchase the home supplies for the home patients at much lower cost because they purchase in scale. On the revenue side, DaVita has significantly greater leverage with insurance companies since they control 35% - 40% of the dialysis capacity in states and gets much higher private reimbursement rates than NAMG would receive if it set up its own dialysis center. These cost and revenue synergies are not captured in the price but are captured in the results and distributions NAMG received. DaVita benefited from NAMG sending its Medicare, Medicaid and Commercial patients to this location.

### 2.      Representative Example 2 – Olive LLC

169.    Another example of DaVita's fraud involves Olive Dialysis LLC, an entity jointly owned by Total Renal Care, Inc. (a subsidiary of DaVita) and an entity named Lafayette Medical Dialysis, LLC ("Lafayette").

170.     Lafayette is controlled by a nephrologist named Dr. Malvin Yan Do.

171.     As shown in the below graphic, DaVita owns 80% of Olive Dialysis LLC and Lafayette owns the remaining 20%:



172.     Olive Dialysis LLC opened a dialysis facility named South Gate Dialysis located in South Gate, CA in or around July 2016.

173.     DaVita sold a 20% ownership interest in Olive Dialysis LLC to Lafayette.

174.     In return for the 20% ownership interest in Olive Dialysis LLC, Lafayette contributed a total of $857,200, consisting of $506,747 in capital expenditures, $24,514 as a development fee, and $325,939 in working capital contributions.

175.     Lafayette's total contribution of $857,200 was not based on traditional valuation methodologies in which future projected cashflows or profits are taken into consideration. Rather, the price that DaVita set for Lafayette Medical Dialysis LLC for its 20% stake was based only on the need to fund the cost of construction and working capital only with respect to Olive Dialysis LLC's opening and operation of South Gate Dialysis at the beginning stages.

176.     The standard template model that DaVita utilizes for JV DeNovo transactions includes a JV Partner cash flow tab so that it can be shown to potential JV Partners and is typically included in the PowerPoint presentations for the JV Partner.

177.     As relevant here, the JV Partner cash flow tab provided:

|  | Total | Partner | Partner's % |
|---|---|---|---|
| Capital Expenditures | ($2,533,735) | ($506,747) | 20% |
| Development Fee[a] | ($122,571) | ($24,514) | 20% |
| Working Capital | ($1,629,694) | ($325,939) | 20% |
| **Equity Total** | **($4,286,000)** | **($857,200)** | **20%** |

| JV Summary | Year 0 | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|---|
| **100% JV Pre-Tax Cash Flow** | | | | | | |
| EBITDA | ($365,504) | ($361,619) | $410,951 | $863,350 | $1,227,160 | $1,560,097 |
| Capital Expenditures | (2,533,735) | (50,000) | (51,500) | (53,045) | (54,636) | (56,275) |
| Development Fee | (122,571) | -- | -- | -- | -- | -- |
| Working Capital | (1,264,190) | 411,619 | (359,451) | (255,596) | (296,509) | (292,078) |
| **Total** | **($4,286,000)** | **--** | **--** | **$554,709** | **$876,014** | **$1,211,744** |
| **Partner's Net Cash Flow** | | | | | | |
| Share of Pre-Tax Cash Flow from DeNovo | ($857,200) | -- | -- | $110,942 | $175,203 | $242,349 |
| Interest to DVA | -- | -- | -- | -- | -- | -- |
| **Total** | **($857,200)** | **--** | **--** | **$110,942** | **$175,203** | **$242,349** |

178.   As shown in the graphic above, DaVita informed Lafayette that it could expect to collectively generate profits of $528,493 in Years 3-5 after an initial contribution of $857,200.

179.   While this does not (strictly speaking) equate with a profit within 5 years, it falls to take into account projected future earnings from South Gate Dialysis after Year 5 or the value of the Lafayette's 20% ownership interest.  This is also known as the terminal value. Applying the Gordon Growth Model (a common method for calculating value) and using the projected figures in the graphic above, the projected terminal value of Lafayette's 20% ownership interest is approximately $1,805,000.

180.   Thus, Lafayette would make $528,493 (its profits in years 3-5) with a Terminal Value of $1,805,000 for a total return of approximately $2,047,461 as set forth in the table below:

|  | 6/30/2015 | 6/30/2016 | 6/30/2017 | 6/30/2018 | 6/30/2019 | 6/30/2020 |
|---|---|---|---|---|---|---|
| *JV Partner Cashflows* | | $0 | $0 | $110,942 | $175,203 | $242,349 |
| *Terminal Value* | | | | | | $1,805,112 |
| **Total Returns** | $0 | $0 | $0 | $110,942 | $175,203 | $2,047,461 |
| *Net Present Value (NPV) of Equity* | $1,351,315 | | | | | |
| *Partners Contribution* | $857,200 | | | | | |

181.   Thus, Lafayette's initial investment of $857,200 in Olive Dialysis LLC generated a projected return of $2,047,461.

182.    If DaVita had appropriately valued Olive Dialysis LLC to take this cashflow stream into consideration, Lafayette's contribution of $857,200 would have constituted a 12.7% ownership interest, not 20%.

183.    Put differently, if DaVita had appropriately valued the Olive Dialysis LLC, Lafayette would have had to contribute $1,351,315 to purchase a 20% ownership interest.

184.    Moreover, as is often the case with DaVita's projected revenues, the actual performance of Olive Dialysis LLC significantly exceeded the projected revenues in the revenue forecast.  The projection shown to potential JV Partners is often a conservative baseline from which performance is expected to be exceeded.  In this case, the actual construction cost was slightly under budget at $851,000 but for the recent six-month period, January to June 2018, the forecast model projected $434,011 of earnings while in reality Olive Dialysis LLC generated earnings of $611,197 (over 40% more).

185.    This clinic has the same Regional Operations Director, Brian Nordin that the Glassland steering example had above.  A great deal of the overperformance of the clinic compared to the original model is because Brian was strategizing with his JV Partner physicians across his region of California to steer patients.  This illegal steering was rationale for actually approving several JV Denovos, as it markedly improves the economics JV Partners can expect to receive without raising the price at which DaVita allows them to buy into the partnership.

186.    This example involving Olive Dialysis LLC is even more reprehensible given that it also illustrates a business strategy that DaVita referred to as "cannibalization."

187.    In DaVita's parlance, cannibalization occurs when DaVita already controls a substantial portion of the dialysis marketplace in a geographic area but nonetheless elects to open a new dialysis center, such as through a JV DeNovo.  Under these circumstances, DaVita is able

to forecast how many of the patients at one of its existing dialysis centers (known as the "Parent") will move to the newly-opened dialysis centers.

188.    Put differently, DaVita knows that once a new center opens up, some of its existing patients will go to the new center.  DaVita calls this "cannibalization" because opening the new center will cannibalize the patient volume at the existing center.

189.    The forecasted cannibalization revenue is then included in the projected cashflows at the new center but not considered in any valuation to determine price.   Thus, as above, DaVita uses the forecasted cannibalization revenue when consideration of it suits its purposes but simultaneously ignores it when doing so would not suit its purposes.

190.    For example, with respect to Olive Dialysis LLC, DaVita forecasted how many of its existing patients would move to South Gate Dialysis once it opened and how much those patients constitute in dollar value to be then attributed to Olive Dialysis LLC.  The "Parent" center was DaVita's Premier Dialysis Center (#437) located at 7612 Atlantic Avenue in Cudahy, CA, which is only 1.8 miles down the road from South Gate Dialysis located at 9848 Atlantic Avenue in South Gate, CA.  As shown in the graphic below, DaVita calculated the value of the patients it anticipated would move from the Parent to South Gate Dialysis as generated $1,828,152 in cashflow to South Gate Dialysis and Olive Dialysis LLC, over the course of five years:

| | | | All Parents - Incremental to DVA | | |
| --- | --- | --- | --- | --- | --- |
| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
| **Cannibalized Parent Cash Flow** | | | | | |
| EBITDA | ($263,126) | ($429,247) | ($430,013) | ($433,089) | ($436,729) |
| Accounts Receivable | $94,365 | $85,038 | $3,459 | $3,727 | $2,758 |
| Inventory | $3,656 | $2,579 | $52 | $53 | $54 |
| Accounts Payable | ($14,366) | ($10,198) | ($379) | ($398) | ($410) |
| Payroll Payable | ($3,509) | ($2,087) | ($112) | ($114) | ($116) |
| **Operating Cash Flow Impact** | **($182,980)** | **($353,915)** | **($426,993)** | **($429,820)** | **($434,442)** |
| | | | | | |
| Change in Min Cash Impact | $50,879 | $33,614 | $1,463 | $1,514 | $1,553 |
| CapEx Impact | $0 | $0 | $0 | $0 | $0 |
| **Cash Flow Impact** | **($132,101)** | **($320,301)** | **($425,530)** | **($428,307)** | **($432,889)** |

191. Despite making this calculation, DaVita did not consider the forecasted cannibalization revenue when setting a price for Lafayette's investment in Olive Dialysis LLC.

> **E.  DaVita's False and Fraudulent Conduct Involving the AKF and Its Financial Assistance for Traditional Medicare, Medigap, and Medicare Advantage Coverage.**

192. In addition to the utilization of the AKF with respect to its above-described steering fraud for patients who obtain private insurance coverage, DaVita also exploits the AKF through the AKF's provision of financial assistance for patients who receive coverage from Medicare.

193. As described above, the AKF is a non-profit corporation that is, in large measure, funded by dialysis providers such as DaVita.

194. Specifically, Medicare patients must pay a yearly premium, a yearly deductible, and a co-pay (also known as co-insurance) each time they receive a covered service.

195. At present, the yearly premium for Medicare Part B is a minimum of $134 with higher amounts depending on income level.

196. At present, the yearly deductible for Medicare Part B is $183.

197. At present, the co-pay (or co-insurance) for Medicare Part B services is 20% of the Medicare-approved amount. Put differently, Medicare only covers 80% of the Medicare-approved amount with the patients being responsible for the remainder.

198. Medigap insurance is available to Medicare beneficiaries through various insurers in return for payment of a premium.

199. Medigap insurance typically covers the amount of a Medicare beneficiary's yearly premium, yearly deductible, and per-service co-pay.

200. The AKF operates the Health Insurance Premium Program ("HIPP").

201. HIPP provides financial assistance to ESRD patients with respect to premiums for Medigap coverage.

45

202.    The AKF also provides financial assistance to ESRD patients on Medicare Advantage plans.

203.    Medicare Advantage, formerly known as Medicare+Choice and sometimes known as Part C, is an alternative to traditional Medicare.

204.    Under Medicare Advantage, private entities called Medicare Advantage organizations ("MAO") directly provide coverage to Medicare beneficiaries and in return receive funding from the federal government. See generally 42 U.S.C. § 1395w-21 et seq.; 42 C.F.R. 422.1 et seq.

205.    Like the above-describe costs associated with traditional Medicare, Medicare Advantage plans typically require the beneficiary to pay a yearly premium, a yearly, deductible, and per-service co-pay.

206.    Typically, ESRD patients cannot enroll in a Medicare Advantage plan; however, there are certain exceptions, including when a patient enrolls in a Medicare Advantage plan before starting dialysis and later begins dialysis.

207.    The AKF refers to its financial assistance (including for costs associated with traditional Medicare coverage, Medigap coverage, and Medicare Advantage coverage) as "charitable premium assistance."

208.    Upon information and belief, a substantial number of DaVita's patients receive financial assistance through the AKF, the overwhelming majority of which is for patients receiving coverage through Medicare in the form of assistance with yearly premiums for traditional Medicare and/or Medigap coverage.

209.    Given its sizable contributions to the AKF and the AKF's provision of financial assistance to many of its patients for costs associated with traditional Medicare coverage, Medigap

coverage, and Medicare Advantage coverage, DaVita is, in effect, subsidizing its own patients' costs. Put differently, DaVita is using the AKF as a mechanism to provide kickbacks to its own patients.

210. For example, as described above, Medigap coverage typically covers a Medicare patient's co-pay obligations. Thus, through its funding of the AKF and the AKF's provision of financial assistance to obtain Medigap coverage through HIPP, DaVita is assisting its patients avoid the co-pay they would otherwise be required to pay.

211. DaVita trains its staff, including its social workers, on the availability of financial assistance through HIPP and facilitates its patients' acquisition of financial assistance through HIPP.

212. For example, DaVita included the following slide in a training presentation (attached as **Exhibit 5**) to social workers:

### Health Insurance Premium Program (HIPP)

Provides health insurance grants to qualified ESRD patients on dialysis to pay the following primary and/or secondary premiums:
- Medicare Part B
- "Medigap" or Supplement plans (< $550/month)
- Commercial insurance (EGHP, Individual, Exchanges)
- COBRA premiums

AKF will not assist with:
- Tertiary insurance
- Medicare Part A
- Medicare Part B reimbursement
- Medicare Part D premiums

**HIPP is supported by provider contributions**

Id. at 49.

213. Another slide makes clear that DaVita initiates a patient's application for assistance through HIPP:

## HIPP Centralized Process Overview

- AKF HIPP requests are initiated at facility level by center teammates

- Forms required: AKF HIPP Application, DaVita HIPPA authorization, Premium Request Form and Fax Cover Sheet
    - Print all forms from Reggie Next Generation (RNG) as top portion of Premium Request Form and Fax Cover Sheet will auto populate

- Completed forms must be faxed to Patient Assistance Department ONLY. Do not fax any documents directly to AKF.

- DaVita HIPP liaisons will enter all requests into AKF Grant Management System (GMS).
    - Entry of AKF HIPP Applications are a partnership between the SW and DaVita HIPP Liaison

Id. at 51.

214. In sum, through the AKF, DaVita is paying kickbacks to its Medicare patients through defraying the costs that the patients would otherwise be responsible for.

## VII.    DAVITA'S FALSE CLAIMS LIABILITY

215. 31 U.S.C. § 3729(a)(1)(A) prohibits the presentation and causing the presentation of false claims.

216. 31 U.S.C. § 3729(a)(1)(B) prohibits the creation or causing the creation of false records that are material to false claims.

217. Dialysis providers like DaVita directly submit reimbursement claims to Medicare for services provided to Medicare beneficiaries.

218. Providers submit claims to Medicare for reimbursement for medical services and equipment by using CMS Form 1500 or its electronic equivalent.

219. The provider must sign the form (field number 31) and attest to the certifications found on the reverse side of CMS Form 1500.

220. These certifications include the following relevant statements (with added emphasis):

> In submitting this claim for payment from federal funds, I certify that: 1) the information on this form is true, accurate and complete; 2) I have familiarized myself with all applicable laws regulations, and program instructions, which are available from the Medicare contractor; 3) I have provided or will provide sufficient information required to allow the government to make an informed eligibility and payment decision; 4) *this claim, whether submitted by me or on my behalf by my designated billing company, complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the Federal anti-kickback statute and Physician Self-Referral law (commonly known as Stark law);* 5) the services on this form were medically necessary and personally furnished by me or were furnished incident to my professional service by my employee under my direct supervision, except as otherwise expressly permitted by Medicare or TRICARE; 6) for each service rendered incident to my professional service, the identity (legal name and NPI, license#, or SSN) of the primary individual rendering each service is reported in the designated section.

221. Thus, if a claim does not "compl[y] with . . . the Federal anti-kickback statute," the certification is false.

222. In addition to this false certification and as described above, by operation of law, Medicare reimbursement claims that are tainted by violations of the AKS are false claims within the meaning of the FCA. 42 U.S.C. § 1320a-7b(g) ("In addition to the penalties provided for in this section or section 1320a-7a of this title, a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of subchapter III of chapter 37 of Title 31.").

223. Thus, when DaVita submitted claims to Medicare tainted by the kickbacks it paid to its JV DeNovo Partners and/or its patients, DaVita presented false claims in violation of 31 U.S.C. § 3729(a)(1)(A). Likewise, when DaVita falsely certified compliance with applicable

federal laws, specifically including the AKS, it created false records material to its false claims in violation of in violation of 31 U.S.C. § 3729(a)(1)(B).

## VIII.   VIOLATIONS OF THE CORPORATE INTEGRITY AGREEMENT

224.    The above-described <u>Barbetta</u> lawsuit also resulted in a corporate integrity agreement ("CIA") between DaVita and Department of Health and Human Services' Office of the Inspector General. **Exhibit 5**.

225.    The CIA explains that "[c]ontemporaneously with this CIA, Da Vita is entering into a Settlement Agreement with the United States."

226.    The CIA defines "focus arrangements" as "every Arrangement that is between Da Vita Dialysis and any Health Care Provider and involves, directly or indirectly, the offer, payment, or provision of anything of value."

227.    The CIA defines "Joint Venture De Novo" as "any transaction in which DaVita partners with a Health Care Provider to establish and jointly own one or more new dialysis clinics or programs prior to Medicare certification." <u>Id</u>. at 4.

228.    Section III of the CIA imposes "corporate integrity obligations." <u>Id</u>. at 5.

229.    Section III(D) of the CIA imposes" corporate integrity obligations" with respect to "Compliance with the Anti-Kickback Statute." <u>Id</u>. at 13.

230.    Section III(D)(1)(b) of the CIA provides:

Within 90 days after the Effective Date, Da Vita Dialysis shall develop criteria to guide its selection of Health Care Providers with whom it enters into Focus Arrangements other than Business Courtesies ("Selection Criteria"). Da Vita Dialysis shall develop Selection Criteria for each type of Focus Arrangement that it enters into with Health Care Providers. For joint venture Focus Arrangements, separate Selection Criteria shall be developed for each type of joint venture that Da Vita enters into (*e.g.,* Partial Acquisition, Partial Divestiture, ***Joint Venture De Novo***). The Selection Criteria shall relate to a Health Care Provider's eligibility and ability to perform the functions required in connection with each such type of Focus Arrangement, and shall not include a Health Care Provider's ability to refer patients to DaVita.

Id. at 13 (emphasis added).

231.     Section III(D)(1)(d) of the CIA provides that "Da Vita Dialysis shall maintain and continue to apply its Selection Process and Selection Criteria throughout the CIA Period." Id. at 14.

232.     Section III(D)(2)(a) of the CIA provides:

> Within 90 days after the Effective Date, DaVita Dialysis shall examine the Valuation Methodologies it uses to price each type of Focus Arrangement, except Business Courtesies, and shall revise each such methodology if necessary to comply with the Anti-Kickback Statute and the requirements of this CIA. To the extent no Valuation Methodology exists for a type of Focus Arrangement, except Business Courtesies, that Da Vita Dialysis enters into, Da Vita Dialysis shall develop a Valuation Methodology to use in pricing that type of Focus Arrangement.

233.     Section III(D)(2)(c) of the CIA provides that "[d]uring the CIA Period, Da Vita Dialysis shall consistently apply the approved Valuation Methodologies to value each type of Focus Arrangement."

234.     While the above-described misconduct independently violates the FCA,  DaVita's misconduct also violates the FCA based on its violations of its above-identified obligations under the CIA.

235.     Specifically, upon information and belief, DaVita failed to develop and/or failed to adhere to criteria to guide its selection of providers with whom to enter into JV De Novo relationships as required by Sections III(D)(1)(b) and III(D)(1)(d) of the CIA.

236.      Additionally, upon information and belief, DaVIta failed to appropriately revise and/or failed to appropriate apply valuation methodologies with respect to its JV De Novo relationships described above in violation of Sections III(D)(2)(a) and III(D)(2)(c) of the CIA.

237.     As a result, any reimbursement claims arising from or otherwise tainted by these violations of the CIA are false claims in violation of the FCA and its state analogs.

## IX.    COUNTS

### COUNT I
### Violation of the False Claims Act - 31 U.S.C. §3729(a)(1)(A)

238.    Relator repeats and re-alleges each and every allegation contained in the paragraphs above as though fully set forth herein.

239.    In violation of 31 U.S.C. § 3729(a)(1)(A), DaVita knowingly presented or caused the presentment of false or fraudulent claims for payment or approval to (1) officials of the United States and/or (2) contractors, grantees, or other recipients of money provided by or that would be reimbursed by the United States.

240.    The false statements made by DaVita had a natural tendency to influence or be capable of influencing the payment of the claims, and in fact, did influence the payment of the claims.

241.    DaVita made fraudulent and false statements with actual knowledge of the falsity of its statements, with deliberate ignorance of the falsity of its statements, or with reckless disregard as to the falsity of its statements.

242.    By virtue of the false or fraudulent claims that DaVita presented or caused to be presented, the United States has suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

### COUNT II
### False Claims Act – Violation of 31 U.S.C. §3729(a)(1)(B)

243.    Relator repeats and re-alleges each and every allegation contained in the paragraphs above as though fully set forth herein.

244.    In violation of 31 U.S.C. § 3729(a)(1)(B), DaVita knowingly made, used or caused to be made or used, false records or statements material to false or fraudulent claims to  (1) the

United States or (2) contractors, grantees, or other recipients of money provided by or that would be reimbursed by the United States.

245.    The false records and statements made by DaVita had a natural tendency to influence or be capable of influencing the payment of the claims, and in fact, did influence the payment of the claims.

246.    By virtue of the false records and statements made by DaVita, the United States has suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

## COUNT III
### California False Claims Act – Violation of  Cal Gov't. Code §12651(a)(1)-(2)

247.    Relator repeats and re-alleges each and every allegation contained in the paragraphs above as though fully set forth herein.

248.    This is a claim for treble damages and penalties under the California False Claims Act.

249.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the California State Government for payment or approval.

250.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to get the California State Government to approve and pay such false and fraudulent claims.

251.    The California State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

252.     By reason of the Defendants' acts, the State of California has been damaged, and continues to be damaged, in substantial amount to be determined at trial

253.     Additionally, the California State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## COUNT IV
## Colorado Medicaid False Claims Act – C.R.S. §25.5-4-305(a)-(b)

254.     Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

255.     This is a claim for treble damages and penalties under the Colorado Medicaid False Claims Act.

256.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Colorado State Government for payment or approval.

257.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to get the Colorado State Government to approve and pay such false and fraudulent claims.

258.     The Colorado State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

259.     By reason of the Defendants' acts, the State of Colorado has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

260.     Additionally, the Colorado State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

## COUNT V
### Connecticut False Claims Act – Conn. Gen. Stat. § 4-275(a)(1)-(2)

261.    Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

262.    This is a claim for treble damages and penalties under the Connecticut False Claims Act.

263.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Connecticut State Government for payment or approval.

264.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to get the Connecticut State Government to approve and pay such false and fraudulent claims.

265.    The Connecticut State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

266.    By reason of the Defendants' acts, the State of Connecticut has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

267.    Additionally, the Connecticut State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## COUNT VI
### Florida False Claims Act – Fla. Stat. §68.082(2)(a)-(b)

268.    Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

269.    This is a claim for treble damages and penalties under the Florida False Claims Act.

270.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Florida State Government for payment or approval

271.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to induce the Florida State Government to approve and pay such false and fraudulent claims.

272.     The Florida State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct. By reason of the Defendants' acts, the State of Florida has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

273.     Additionally, the Florida State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

**COUNT VII**
**Georgia False Medicaid Claims Act – Ga. Code. §49-4-168.1(1)-(2)**

274.     Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

275.     This is a claim for treble damages and penalties under the Georgia False Medicaid Claims Act.

276.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Georgia State Government for payment or approval.

277.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to get the Georgia State Government to approve and pay such false and fraudulent claims.

56

278.    The Georgia State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

279.    By reason of the Defendants' acts, the State of Georgia has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

280.    Additionally, the Georgia State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

**COUNT VIII**
**Illinois Whistleblower Reward And Protection Act – 740 Ill. Comp. Stat. §175/3(a)(1)-(2)**

281.    Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

282.    This is a claim for treble damages and penalties under the Illinois Whistleblower Reward And Protection Act.

283.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Illinois State Government for payment or approval.

284.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to induce the Illinois State Government to approve and pay such false and fraudulent claims.

285.    The Illinois State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

286.     By reason of the Defendants' acts, the State of Illinois has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

287.     Additionally, the Illinois State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

## COUNT IX
## Indiana False Claims and Whistleblower Protection Act – IC 5-11-5.5-2(b)(1)-(2)

288.     Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

289.     This is a claim for treble damages and penalties under the Indiana False Claims and Whistleblower Protection Act.

290.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Indiana State Government for payment or approval.

291.     By virtue of the acts described above, Defendants knowingly made or used false records and statements to obtain payment or approval of a false claim from the Indiana State Government.

292.     The Indiana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

293.     By reason of the Defendants' acts, the State of Indiana has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

294.     Additionally, the Indiana State Government is entitled to a penalty of at least $5,000 for each and every violation alleged herein.

## COUNT X
## Iowa False Claims Act – Iowa Code § 685.2(1)(A), (B)

295.    Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

296.    This is a claim for treble damages and penalties under the Iowa False Claims Act.

297.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Iowa State Government for payment or approval.

298.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to induce the Iowa State Government to approve and pay such false and fraudulent claims.

299.    The Iowa State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

300.    By reason of the Defendants' acts, the State of Iowa has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

301.    Additionally, the Iowa State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## COUNT X
## Louisiana Medical Assistance Programs Integrity Law – La. Rev. Stat. § 46:438.3

302.    Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

303.    This is a claim for treble damages and penalties under the Louisiana Medical Assistance Programs Integrity Law.

304.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Louisiana State Government.

305.     By virtue of the acts described above, Defendants knowingly engaged in misrepresentation or made, used, or caused to be made or used false records and statements, to obtain payment for false and fraudulent claims from the Louisiana State Government.

306.     The Louisiana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

307.     By reason of the Defendants' acts, the State of Louisiana has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

308.     Additionally, the Louisiana State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## COUNT XI
## Maryland False Health Claims Act – Md. Code Health-Gen. §§ 2-602(a)(1), (2)

309.     Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

310.     This is a claim for treble damages and penalties under the Maryland False Health Claims Act.

311.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Maryland State Government for payment or approval.

312.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to induce the Maryland State Government to approve and pay such false and fraudulent claims.

313.     The Maryland State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

314.     By reason of the Defendants' acts, the State of Maryland has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

315.     Additionally, the Maryland State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.


**COUNT XII**
**Michigan Medicaid False Claims Act – Mich. Comp. Laws §400.603(1)-(2)**

316.     Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

317.     This is a claim for treble damages and penalties under the Michigan Medicaid False Claims Act.

318.     By virtue of the acts described above, Defendants knowingly made or caused to be made a false statement or false representation of material fact in an application for Medicaid benefits to the Michigan State Government.

319.     By virtue of the acts described above, Defendants knowingly made or caused to be made a false statement or false representation of material fact for use in determining rights to a Medicaid benefit.

320.     The Michigan State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

321.    By reason of the Defendants' acts, the State of Michigan has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

322.    Additionally, the Michigan State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## COUNT XIII
## Minnesota False Claims Act – Minn. Stat. §15c.02 et seq.

323.    Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

324.    This is a claim for treble damages and penalties under the Minnesota False Claims Act.

325.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Minnesota State Government for payment or approval.

326.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to get the Minnesota State Government to approve and pay such false and fraudulent claims.

327.    The Minnesota State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

328.    By reason of the Defendants' acts, the State of Minnesota has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

329.    Additionally, the Minnesota State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

**COUNT XIV**
**Nevada Submission of False Claims to State or Local Government Act –**
**Nev. Rev. Stat. §357.040(1)(a), (b)**

330.     Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

331.     This is a claim for treble damages and penalties under the Nevada Submission of False Claims to State or Local Government Act.

332.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Nevada State Government for payment or approval.

333.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Nevada State Government to approve and pay such false and fraudulent claims.

334.     The Nevada State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

335.     By reason of the Defendants' acts, the State of Nevada has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

336.     Additionally, the Nevada State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

**COUNT XV**
**New Jersey False Claims Act – N.J. Stat. §2A:32C-3(a), (b)**

337.     Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

338.     This is a claim for treble damages and penalties under the New Jersey False Claims Act.

339.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the New Jersey State Government for payment or approval.

340.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to get the New Jersey State Government to approve and pay such false and fraudulent claims.

341.     The New Jersey State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

342.     By reason of the Defendants' acts, the New Jersey has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

343.     Additionally, the New Jersey State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

**COUNT XVI**
**New Mexico Medicaid False Claims Act – N.M. Stat.§ 27-14-3(a)(1)-(2)**

344.     Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

345.     This is a claim for treble damages and penalties under the New Mexico Medicaid False Claims Act.

346.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the New Mexico State Government for payment or approval.

347.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to induce the New Mexico State Government to approve and pay such false and fraudulent claims.

348.     The New Mexico State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

349.     By reason of the Defendants' acts, the State of New Mexico has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

350.     Additionally, the New Mexico State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## COUNT XVII
### New York False Claims Act – NY St. Fin. §189(a)-(b)

351.     Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

352.     This is a claim for treble damages and penalties under the New York False Claims Act.

353.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the New York State Government for payment or approval.

354.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to get the New York State Government to approve and pay such false and fraudulent claims.

355.     The New York State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

356.     By reason of the Defendants' acts, the State of New York has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

357.     Additionally, the New York State Government is entitled to the maximum penalty of $12,000 for each and every violation alleged herein.

## COUNT XVIII
## North Carolina False Claims Act – N.C. Gen. Stat. 1-607(a)(1)-(2)

358.     Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

359.     This is a claim for treble damages and penalties under the North Carolina False Claims Act.

360.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the North Carolina State Government for payment or approval.

361.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to get the North Carolina State Government to approve and pay such false and fraudulent claims.

362.     The North Carolina State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

363.    By reason of the Defendants' acts, the State of North Carolina has been damaged, and continues to be damaged, in substantial amount to be determined at trial. Additionally, the North Carolina State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

## COUNT XIX
## Oklahoma Medicaid False Claims Act – Okla. Stat. tit. 63, §5053.1B (1)-(2)

364.    Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

365.    This is a claim for treble damages and penalties under the Oklahoma Medicaid False Claims Act.

366.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Oklahoma State Government for payment or approval.

367.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to get the Oklahoma State Government to approve and pay such false and fraudulent claims.

368.    The Oklahoma State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

369.    By reason of the Defendants' acts, the State of Oklahoma has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

370.    Additionally, the Oklahoma State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## COUNT XX
### Tennessee False Claims Act and Medicaid False Claims Act –
### Tenn. Code. §§ 4-18-103(a)(1)-(2)  and 71-5-181(a)(1)(A), (B)

371.    Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

372.    This is a claim for treble damages and penalties under the Tennessee False Claims Act and Tennessee Medicaid False Claims Act.

373.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Tennessee State Government for payment or approval.

374.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to induce the Tennessee State Government to approve and pay such false and fraudulent claims.

375.    The Tennessee State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

376.    By reason of the Defendants' acts, the State of Tennessee has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

377.    Additionally, the Tennessee State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein

## COUNT XXI
### Texas Medicaid Fraud Prevention Act – Tex. Hum. Res. Code. §36.002(1)

378.    Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

379.     This is a claim for treble damages and penalties under the Texas Medicaid Fraud Prevention Act.

380.     By virtue of the acts described above, Defendants knowingly made, caused to be made, induced or sought to induce the making of a false statement or misrepresentation of material fact concerning information required to be provided by a federal or state law, rule, regulation or provider agreement pertaining to the Medicaid program.

381.     The Texas State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

382.     By reason of the Defendants' acts, the State of Texas has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

383.     Additionally, the Texas State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

**COUNT XXII**
**<u>Virginia Fraud Against Taxpayers Act – Va. Code §8.01-216.3(a)(1)-(2)</u>**

384.     Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

385.     This is a claim for treble damages and penalties under the Virginia Fraud Against Taxpayers Act.

386.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Virginia State Government for payment or approval.

387.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to induce the Virginia State Government to approve and pay such false and fraudulent claims.

388.     The Virginia State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

389.     By reason of the Defendants' acts, the State of Virginia has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

390.     Additionally, the Virginia State Government is entitled to the maximum penalty $11,000 for each and every violation alleged herein.


## COUNT XXIII
## Washington Health Care False Claim Act – Wash. Rev. Code §§ 48.80.030(1), (2)

391.     Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

392.     This is a claim for treble damages and penalties under the Washington Health Care False Claims Act.

393.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Washington State Government for payment or approval.

394.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to get the Washington State Government to approve and pay such false and fraudulent claims.

395.     The Washington State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

396.     By reason of the Defendants' acts, the State of Washington has been damaged, and continues to be damaged, in substantial amount to be determined at trial. Additionally, the Washington State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

## COUNT XIV
### Wisconsin False Claims For Medical Assistance Act – Wis. Stat. §20.931(2)(a)-(b)

397.     Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

398.     This is a claim for treble damages and penalties under the Wisconsin False Claims for Medical Assistance Act.

399.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Wisconsin State Government for payment or approval.

400.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to get the Wisconsin State Government to approve and pay such false and fraudulent claims.

401.     The Wisconsin State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

402.    By reason of the Defendants' acts, the State of Wisconsin has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

403.    Additionally, the Wisconsin State Government is entitled to the maximum penalt of $10,000 for each and every violation alleged herein.

**COUNT XV**
**District of Columbia False Claims Act – D.C. Code. §2-308.14(a)(1)-(2)**

404.    Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

405.    This is a claim for treble damages and penalties under the District of Columbia False Claims Act.

406.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the District of Columbia Government for payment or approval.

407.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to get the District of Columbia Government to approve and pay such false and fraudulent claims.

408.    The District of Columbia Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

409.    By reason of the Defendants' acts, the District of Columbia has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

410.    Additionally, the District of Columbia Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## COUNT XVI
## Violation of Cal. Ins. Code § 1871.7

411.     Cal. Ins. Code § 1871.7(b) provides that "[e]very person who violates any provision of this section or Section 549, 550, or 551 of the Penal Code shall be subject, in addition to any other penalties that may be prescribed by law, to a civil penalty of not less than five thousand dollars ($5,000) nor more than ten thousand dollars ($10,000), plus an assessment of not more than three times the amount of each claim for compensation."

412.     Cal. Ins. Code § 1871.7(a) provides that "it is unlawful to knowingly employ runners, cappers, steerers, or other persons . . .  to procure clients or patients to perform or obtain services or benefits under a contract of insurance or that will be the basis for a claim against an insured individual or his or her insurer."

413.     In violation of Cal. Ins. Code § 1871.7(a), DaVita knowingly utilized runners, cappers, steerers, or other persons with respect to contracts of insurance.

414.     DaVita violated Cal. Ins. Code § 1871.7(a) with the intent to defraud insurance companies in California.

## COUNT XVII
## Violation of Cal. Ins. Code § 1871.7(b)

415.     740 Ill. Comp. Stat. 92/5(b) provides that "[a]person who violates any provision of this Act, Section 17-8.5 or Section 17-10.5 of the Criminal Code of 1961 or the Criminal Code of 2012, or Article 46 of the Criminal Code of 1961 shall be subject, in addition to any other penalties that may be prescribed by law, to a civil penalty of not less than $5,000 nor more than $10,000, plus an assessment of not more than 3 times the amount of each claim for compensation under a contract of insurance."

416.     740 Ill. Comp. Stat. 92/5(a) provides that "it is unlawful to knowingly offer or pay any remuneration directly or indirectly, in cash or in kind, to induce any person to procure clients

or patients to obtain services or benefits under a contract of insurance or that will be the basis for a claim against an insured person or the person's insurer."

417.    In violation of 740 Ill. Comp. Stat. 92/5(a), DaVita knowingly utilized runners, cappers, steerers, or other persons with respect to contracts of insurance.

418.    DaVita violated 740 Ill. Comp. Stat. 92/5(a) with the intent to defraud insurance companies in Illinois.

## **PRAYER FOR RELIEF**

WHEREFORE, Relator, on behalf of the United States and the Plaintiff States, demands that judgment be entered in their favor and against Defendants for:

(1) Three times the amount of damages to the United States;

(2) Civil penalties of (a) $5,500-$11,000 for each violation of the FCA that occurred after September 29, 1999 but before November 2, 2015 and (b) $11,181-$22,363 for each violation of the FCA that occurred on or after November 2, 2015;

(3) Any other recoveries or relief provided for under the FCA;

(4) Civil penalties as provided under the State FCAs;

(5) Any other recovers or relief provided for under the State FCAs;

(6) Civil penalties of $5,000-$10,000 for each violation of the CIFPA;

(7) Any other recoveries or relief provided for under the CIFPA;

(8) Civil penalties of $5,000-$10,000 for each violation of the IICFPA;

(9) Any other recoveries or relief provided for under the IICFPA;

(10)    Relators' receipt of the maximum amount permitted by law of the proceeds of this action or settlement of this action collected by the United States and the Plaintiff States, plus reasonable expenses necessarily incurred, and reasonable attorneys' fees and costs,

based upon the total value recovered, both tangible and intangible, including any amounts received from individuals or entities not parties to this action; and

(11)     Such other relief as the Court may deem appropriate.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Relators hereby demand a trial by jury.

Dated: December 21, 2018

*Daniel R. Miller*
*/s/*_____

Daniel R. Miller
Shauna B. Itri
Jonathan Z. DeSantis
**BERGER & MONTAGUE P.C.**
1818 Market Street, Ste. 3600
Philadelphia, PA  19103-6305
Telephone: (215) 875-3000
Facsimile: (215) 875-4604