# Exhibit A

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, STATE OF CALIFORNIA, STATE OF COLORADO, STATE OF CONNECTICUT, STATE OF FLORIDA, STATE OF GEORGIA, STATE OF ILLINOIS, STATE OF INDIANA, STATE OF IOWA, STATE OF LOUISIANA, STATE OF MARYLAND, STATE OF MICHIGAN, STATE OF MINNESOTA, STATE OF NEVADA, STATE OF NEW JERSEY, STATE OF NEW MEXICO, STATE OF NEW YORK, STATE OF NORTH CAROLINA, STATE OF OKLAHOMA, STATE OF TENNESSEE, STATE OF TEXAS, COMMONWEALTH OF VIRGINIA, STATE OF WASHINGTON, STATE OF WISCONSIN, AND THE DISTRICT OF COLUMBIA *ex rel*. [FILED UNDER SEAL], <br><br> Plaintiffs-Relator, <br><br> v. <br><br> [FILED UNDER SEAL], <br><br> Defendants. | **FILED UNDER SEAL** <br><br> **DO NOT PLACE ON PACER** <br><br> **CIVIL ACTION NO.:** 18-cv-5528 <br><br> **JURY TRIAL DEMANDED** |

**RELATOR'S FIRST AMENDED COMPLAINT UNDER THE FALSE CLAIMS ACT, STATE FALSE CLAIMS ACTS, CALIFORNIA INSURANCE FRAUD PREVENTION ACT, AND ILLINOIS INSURANCE CLAIMS FRAUD PREVENTION ACT**

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, STATE OF CALIFORNIA, STATE OF COLORADO, STATE OF CONNECTICUT, STATE OF FLORIDA, STATE OF GEORGIA, STATE OF ILLINOIS, STATE OF INDIANA, STATE OF IOWA, STATE OF LOUISIANA, STATE OF MARYLAND, STATE OF MICHIGAN, STATE OF MINNESOTA, STATE OF NEVADA, STATE OF NEW JERSEY, STATE OF NEW MEXICO, STATE OF NEW YORK, STATE OF NORTH CAROLINA, STATE OF OKLAHOMA, STATE OF TENNESSEE, STATE OF TEXAS, COMMONWEALTH OF VIRGINIA, STATE OF WASHINGTON, STATE OF WISCONSIN, AND THE DISTRICT OF COLUMBIA *ex rel.* JOHN BAYNE, <br><br> Plaintiff-Relator, <br><br> v. <br><br> DAVITA INC., DAVITA HEALTHCARE PARTNERS INC., MISHA PALECEK, DAVID FINN, MICHAEL SPIVAK KAPIL VASHISTHA, and CASSIE MCLEAN, <br><br> Defendants. | **FILED UNDER SEAL** <br><br> **DO NOT PLACE ON PACER** <br><br> **CIVIL ACTION NO.:** 18-cv-5528 <br><br> **JURY TRIAL DEMANDED** |

## RELATOR'S FIRST AMENDED COMPLAINT UNDER THE FALSE CLAIMS ACT, STATE FALSE CLAIMS ACTS, CALIFORNIA INSURANCE FRAUD PREVENTION ACT, AND ILLINOIS INSURANCE CLAIMS FRAUD PREVENTION ACT

# Table of Contents

I.   SUMMARY OF THE CASE ............................................................................ 2

II.  THE PARTIES............................................................................................... 6

A.   The Government ..................................................................................... 6

B.   Relator .................................................................................................... 6

C.   Defendants.............................................................................................. 8

III. JURISDICTION AND VENUE ................................................................... 9

IV. THE LAW .................................................................................................... 9

A.   The False Claims Act ............................................................................. 9

B.   State False Claims Acts ........................................................................ 11

C.   The Anti-Kickback Statute ................................................................... 11

D.   The California Insurance Fraud Prevention Act .................................. 14

E.   The Illinois Insurance Claims Fraud Prevention Act .......................... 16

V.   BACKGROUND ........................................................................................ 17

A.   ESRD and Dialysis............................................................................... 17

B.   Medicare Coverage of Dialysis ........................................................... 18

C.   DaVita ................................................................................................... 22

D.   DaVita's History of False Claims Act Liability.................................. 22

VI. DAVITA'S FRAUD ................................................................................... 24

A.   Overview of DaVita's Use of JV DeNovos ........................................ 24

B.   DaVita Works with its JV Partners to Steer Patients from Government-Funded
     Healthcare Plans to Private Pay Plans. ............................................... 26

     1.   DaVita's Financial Motivation to Steer Patients to Private Pay and Medicare Advantage
          Plans............................................................................................. 26

     2.   DaVita's Efforts to Steer Patients to Medicare Advantage and Private Pay Plans........ 30

     3.   DaVita Misleads Patients as to the Purported Benefits of Commercial Plans............... 32

     4.   The Role of the AKF in DaVita's Improper Steering Efforts........................................ 36

     5.   DaVita Intentionally Targeted Disadvantaged Racial Groups for Steering Through
          "Hispanic Outreach"................................................................... 44

C.   DaVita's DeNovo Kickback Scheme and Steering Efforts Work in Tandem .............. 45

D.   Specific Conduct Regarding DaVita's Illegal Kickbacks and Steering........................ 48

     1.   Relator Learns About DaVita's Misconduct................................. 48

     2.   JV DeNovo Examples.................................................................... 52

E.    False and Fraudulent Conduct Involving the AKF and Its Financial Assistance for Traditional Medicare, Medigap, and Medicare Advantage Coverage. .......................... 66

F.    DaVita's Provides Kickbacks in the Form of Free Rights of First Refusal .................. 69

G.    DaVita's Use of SMART Communications to Obfuscate its Fraud ............................. 82

VII. DEFENDANTS' FALSE CLAIMS ACT LIABILITY ........................................................ 84

VIII. VIOLATIONS OF THE CORPORATE INTEGRITY AGREEMENT ............................ 86

IX. COUNTS ................................................................................................................................. 88

PRAYER FOR RELIEF ........................................................................................................ 116

Plaintiff-Relator John Bayne ("Relator"), on behalf of the United States of America, the State of California, the State of Colorado, the State of Connecticut, the State of Florida, the State of Georgia, the State of Illinois, the State of Iowa, the State of Indiana, the State of Louisiana, the State of Maryland, the State of Michigan, the State of Minnesota, the State of Nevada, the State of New Hampshire, the State of New Jersey, the State of New Mexico, the State of New York, the State of North Carolina, the State of Oklahoma, the State of Tennessee, the State of Texas, the Commonwealth of Virginia, the State of Washington, the State of Wisconsin and the District of Columbia (collectively, "Plaintiff States"), brings this action against DaVita, Inc. and DaVita Healthcare Partners, Inc. (collectively "DaVita"), and Misha Palecek, David Finn, Michael Spivak, Kapil Vashistha, and Cassie McLean ("Individual Defendants") ("DaVita" and "Individual Defendants" are collectively referred to herein as "Defendants") for violations of the False Claims Act ("FCA"), 31 U.S.C. § 3729, et seq., the corresponding state false claims acts of the Plaintiff States,[1] the California Insurance Fraud Prevention Act ("CIFPA"), Cal. Ins. Code § 1871.7 et seq.,

---

[1] The corresponding false claims acts of the Plaintiff States are the California False Claims Act, Cal. Gov't Code §§12650 et seq.; Colorado Medicaid False Claims Act, § 25.5-4-304, et seq.; Connecticut False Claims Act, Conn. Gen. Stat. § 17b-301b; District of Columbia False Claims Act, D.C. Code §§2-308.03 et seq.; Florida False Claims Act, Fla. Stat. §§ 68.081 et seq.; Georgia False Medicaid Claims Act, Ga. Code. §§49-4-168 et seq.; Illinois Whistleblower Reward and Protection Act, 740 Ill. Comp. Stat. §§175/1 et seq.; Indiana False Claims and Whistleblower Protection Act, Indiana Code §5-11-5.5; Iowa False Claims Act, §685.1, et seq.; Louisiana Medical Assistance Integrity Law, La. R.S. 46:437.1 et seq.; Maryland False Health Claims Act, § 2-601, et seq.; Michigan Medicaid False Claims Act, MCLS §§400.601 et seq.; Minnesota False Claims Act, Minn. Stat. § 15C.01 et seq.; Nevada False Claims Act, Nev. Rev. Stat. §§ 357.010 et seq.; New Jersey False Claims Act, N.J. Stat. §2A:32C-1 et seq.; New Mexico Medicaid False Claims Act, N.M. Stat. § 27-14-1 et seq.; New York False Claims Act, NY CLS St. Fin. §§187 et seq.; North Carolina False Claims Act, 2009-554 N.C. Sess. Laws § 1-605 et seq.; Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63, §§5053 et seq.; Tennessee Medicaid False Claims Act, Tenn. Code §§ 71-5-171 et seq.; Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code §§36.001 et seq.; Virginia Fraud Against Taxpayers Act, Va. Code § 8.01-216.1 et seq.; Washington Medicaid Fraud False Claims Act, RCW 74.09.201 et seq.; and Wisconsin False Claims for Medical Assistance Act, Wis. Stats. § 20.931.

1

and the Illinois Insurance Claims Fraud Prevention Act ("IICFPA"), 740 Ill. Comp. Stat. 92/1 et seq., to recover all damages, civil penalties, and all other recoveries provided for under these statutes.

## I.    SUMMARY OF THE CASE

1.      Approximately 650,000-700,000 Americans suffer from kidney failure, also known as End Stage Renal Disease ("ESRD").[2] Dialysis and related services are the most common treatment option for these patients. DaVita is one of the largest providers of dialysis services in the United States. Medicare generally provides coverage for dialysis services.

2.      As described herein, DaVita engaged in a nationwide scheme to pay kickbacks to physicians in exchange for referrals of patients, the overwhelming majority of whom are Medicare patients, to DaVita dialysis centers.  Specifically, DaVita induces physicians to buy into newly-established dialysis centers through entities known, in the parlance of DaVita, as "Joint Venture DeNovos" or "JV DeNovos." When calculating the price at which it would sell an ownership interest to physicians, DaVita intentionally did not take into account the projected future income of the new dialysis centers.  Rather, DaVita valued the entities at only the startup costs associated with opening a new location.  This failure resulted in valuations which were considerably below fair market value ("FMV").

3.      Selling ownership interests to doctors at artificially low prices, in order to induce those doctors to bring their existing patients to the newly-opened dialysis center, resulted in a kickback: DaVita agreed to sell an ownership interest in a JV DeNovo at a below-FMV price to induce doctors to bring their patients to the newly-established dialysis center.  If DaVita had

---

[2] NATIONAL KIDNEY FOUNDATION, End Stage Renal Disease in the United States, available at     https://www.kidney.org/news/newsroom/factsheets/End-Stage-Renal-Disease-in-the-US; CONGRESSIONAL RESEARCH SERVICE, Medicare Coverage of End-Stage Renal Disease (ERSD) (Aug. 16, 2018), at 1, available at https://fas.org/sgp/crs/misc/R45290.pdf.

properly taken into account the projected income of the new dialysis center when valuing the entities – *i.e.* if DaVita had valued the income streams of the JV DeNovos – their prices would have been much higher and doctors would be less inclined to enter the ventures.

4.      DaVita further induced doctors to invest in the entities by using that same projected income to persuade the doctors that they were going to earn a substantial profit from their investment. In this way, DaVita utilized the projected income of the dialysis center to induce doctors to invest, but on the other side of the exercise, DaVita ignored that same income in order to value the center at below FMV and thereby make the doctors' investment in the center more financially attractive.  DaVita often also simultaneously showed doctors the historical financial performance of existing 100% wholly owned DaVita centers nearby, including the actual cashflows, to show the doctors how their below FMV investment would soon increase in value.

5.      In valuing the ownership interests of the JV DeNovos, DaVita also ignored the revenue generated through "cannibalized" patients.  In DaVita's jargon, "cannibalization" refers to instances where DaVita operates a dialysis center that is 100%-owned by DaVita (as distinguished from JVs where DaVita only owns a portion of the center) and DaVita enters a JV DeNovo which contemplates opening a second dialysis center in the same geographic area.  In this circumstance, DaVita forecasts how many of the patients at its existing center will move to the new JV DeNovo center.  In fact, DaVita encourages such movement as an additional inducement to the new JV partner, i.e., DaVita sacrifices some of the patients/revenue from its 100% DaVita-owned center in favor of the new JV DeNovo (where DaVita only owns a portion of the center). In doing so, DaVita increases the revenues of the new center by ensuring a minimum baseline of patients, which substantially reduces the risk to investors in the JV DeNovo. Put differently,

through cannibalization, DaVita provides a kickback in the form of "free patients" as another inducement to prospective investors.

6.      Compounding its misconduct, DaVita does not take into account projected cannibalization revenue when valuing the ownership interests of the JV DeNovo.  But meanwhile, in the process of inducing new JV partners, DaVita shows them the projected revenue stream from the cannibalized patients as further evidence that their investment will be profitable.

7.      While the above-described conduct is illegal itself, DaVita added another layer onto the scheme by intentionally steering patients from government-funded healthcare plans (such as traditional Medicare and Medicaid) to private insurance healthcare plans and Medicare Advantage plans.  DaVita's incentive to do so arises from the substantially higher reimbursement amounts it receives from private insurance carriers and Medicare Advantage plans.

8.      DaVita has implemented this "steering" effort nationwide. This includes making false and misleading statements to patients about the purported benefits of switching to private insurance carriers and Medicare Advantage plans (including by dubiously claiming that patients would be more likely to receive a kidney transplant on commercial insurance plans than if they remained on government-funded plans, when in fact the reverse is true).  In doing so, DaVita prioritized its already-massive profit margins over its patients' best interests.  Moreover, DaVita intentionally targeted Hispanics, a historically disadvantaged racial group, for steering to private-pay plans.

9.      DaVita's steering efforts violate the California Insurance Fraud Prevention Act and the Illinois Insurance Claims Fraud Prevention Act.  In addition, DaVita's steering facilitated the above-described kickback scheme by (1) allowing DaVita to tell prospective investors in JV DeNovos that they could anticipate increased profits from successfully-steered patients in order to

induce the physicians to invest in the JV DeNovos and (2) actually generating increased revenues and profits for DaVita itself and the physicians who co-owned the JV DeNovos when DaVita successfully steered patients to private insurance plans and Medicare Advantage plans.

10.     In addition, in many instances, DaVita provided an additional type of kickback to physician-investors in the form of rights of first refusal ("ROFR").  ROFR's are option contracts which allow physician-investors to match investment proposals made to other physicians within a prescribed geographic area, thereby giving the physicians the opportunity to limit competition in that geography.  These option contracts are a particularly important and lucrative benefit in the context of the dialysis market, because dialysis patients are very sick people and thus they typically reside within just a few miles of their dialysis clinic.

11.     Moreover, the fair market value of ROFR's can be readily and accurately determined, because as option contracts, their valuation is subject to recognized economic valuation formulas.  That said, there is little need to conduct a fair market analysis of the ROFR's DaVita used to induce physicians to enter JV DeNovos, because DaVita provided the ROFR's *for free*, thereby establishing an independent basis of AKS and FCA liability (i.e., independent of its JV DeNovo and patient steering schemes).

12.     Finally, separate and apart from its above-described misconduct, DaVita also conspired with the American Kidney Fund ("AKF"), ostensibly a charitable organization, to pay kickbacks to patients through the provision of financial assistance.   One of the AKF's signature programs is it Health Insurance Premium Program ("HIPP").  Through HIPP, the AKF provides financial assistance to Medicare and Medicaid patients (as well as to patients insured by private health plans in California and Illinois) to cover costs that patients would otherwise be personally responsible for (such as yearly premiums, yearly deductibles, and co-pays).

13.     For example, the AKF provides so-called "charitable premium assistance" to assist Medicare beneficiaries with respect to obtaining "Medigap" coverage (sometimes known as "supplemental Medicare coverage"). Medicare typically comes with a yearly premium, yearly deductible and, after the deductible is met, a 20% co-pay.  For patients on dialysis, these out-of-pocket costs can be very high, and Medigap coverage is available to Medicare patients to defray these costs. DaVita heavily contributes to the AKF and, as described more fully below, effectively is paying its patients' deductibles and co-pays, i.e., DaVita is effectively paying kickbacks to its patients to induce them to use DaVita dialysis centers over the dialysis centers operated by DaVita's competitors.

14.     By engaging in these schemes, DaVita caused the presentation of false claims to government healthcare programs and is thus liable for this conduct under the federal and statute False Claims Acts, as well as under the CIFPA and ILCFPA. Further, as described below, the Individual Defendants were intimately involved in DaVita's misconduct and are thus also liable.

## II.     **THE PARTIES**

### A.     **The Government**

15.     The United States is a plaintiff to this action on behalf of the Department of Health and Human Services ("HHS"), the Centers for Medicare and Medicaid Services ("CMS"), and federally funded healthcare programs.

### B.     **Relator**

16.     Relator is a dual citizen of the United States and the United Kingdom and presently resides in Pennsylvania.

17.     Relator worked for DaVita from approximately May 2012 through August 2018. He was originally stationed in DaVita's office in Calverton, MD (suburban Washington D.C.) for two years before working in Singapore for approximately 11 months.  He then returned to the

United States and worked at DaVita's office in Los Angeles from June 2015 to February 2017. In February 2017, Relator was transferred to Rio de Janeiro, Brazil, where he remained until leaving DaVita in August 2018. At the time he left DaVita, Relator's title was Director of Financial Planning & Analysis.

18.     During his time in Los Angeles from June 2015 to February 2017, Relator worked for a component of DaVita known as the "Deal Depot," which is DaVita's jargon for the group that handles its domestic mergers and acquisitions. As discussed herein, Relator's work at Deal Depot gave him insight into the false and fraudulent conduct at issue in this lawsuit.

19.     Relator has standing to bring this action pursuant to 31 U.S.C. §3730(b)(l), Cal. Ins. Code § 1871.7(e)(1), 740 Ill. Comp. Stat. 92/15(a), and the corresponding false claims statutes of the Plaintiff States.

20.     Relator's complaint is not based on public disclosures of the allegations or transactions discussed herein within the meaning of 31 U.S.C. § 3730(e)(4)(A), Cal. Ins. Code § 1871.7(h)(2)(A), 740 Ill. Comp. Stat. Ann. 92/30(b), and the corresponding false claims statutes of the Plaintiff States.

21.     Relator is an original source of the information provided herein within the meaning of 31 U.S.C. § 3730(e)(4)(B), Cal. Ins. Code § 1871.7(h)(2)(B), 740 Ill. Comp. Stat. 92/30(b), and the corresponding false claims statutes of the Plaintiff States.

22.     Prior to filing this action, Relator voluntarily disclosed to the United States and the Plaintiff States the information on which the allegations or transactions discussed herein are based within the meaning of 31 U.S.C. § 3730(e)(4)(B), Cal. Ins. Code § 1871.7(h)(2)(B), 740 Ill. Comp. Stat. 92/30(b), and the corresponding false claims statutes of the Plaintiff States.

**C.      Defendants**

23.     Defendant DaVita Inc. is a corporation incorporated in Delaware that maintains its principal place of business in Denver, Colorado.

24.     Defendant DaVita Healthcare Partners, Inc. is a wholly-owned subsidiary of DaVita, Inc.

25.     DaVita Inc. and DaVita Healthcare Partners, Inc. are collectively referred to as "DaVita" unless other specified.

26.     Defendant Misha Palecek was a Division Vice President at DaVita in October 2014 when DaVita paid $350 million to settle a False Claims Act case captioned <u>United States ex rel. David Barbetta v. DaVita, Inc. et al</u>., No. 09-cv-02175-WJM-KMT (D. Colo.). Despite the fact that Palecek was specifically named in the <u>Barbetta</u> complaint and was alleged to have been centrally involved in the alleged misconduct, at some point after the <u>Barbetta</u> case was settled, Palecek was promoted to Chief Development Officer at DaVita. In this role, during the relevant time period, Mr. Palecek was heavily involved in Mergers & Acquisitions ("M&A") described in this Complaint, and in setting DaVita's reimbursement rates.

27.     Defendant David Finn is the Group Vice President on Mergers & Acquisitions at DaVita and reports to Mr. Palecek. Mr. Finn was a part of DaVita's "Deal Depot."

28.     Defendant Michael Spivak is a Director of Corporate Development at DaVita and reports to Mr. Finn. Mr. Spivak was also a part of DaVita's "Deal Depot" and worked with many of the JV DeNovos in California.

29.     Defendant Kapil Vashistha is a Division Vice President of Operations at DaVita.

30.     Defendant Cassie McLean was a Division Vice President of Operations at DaVita in the California region and has subsequently been promoted to Group Vice President.

31.     Unless otherwise specified, Mr. Palecek, Mr. Finn, Mr. Spivak, Mr. Vashistha, and Ms. McLean are referred to collectively herein as "Individual Defendants."

32.     "DaVita" and the "Individual Defendants" are collectively referred to herein as "Defendants."

III.    **JURISDICTION AND VENUE**

33.     Jurisdiction is founded under 31 U.S.C. § 3732(a) and (b), 28 U.S.C. §§ 1331, 1345, and 1367(a).

34.     Personal jurisdiction and venue are proper in the Eastern District of Pennsylvania pursuant to 28 U.S.C. §§ 1391(b) and 1395(a) and 31 U.S.C. § 3732(a), because Defendants transact and have transacted business in the Eastern District of Pennsylvania and because a substantial portion of the events or omissions given rise to Relator's claims occurred in the Eastern District of Pennsylvania.

IV.     **THE LAW**

        A.      **The False Claims Act**

35.     The FCA "was passed in 1863 as a result of investigations of the fraudulent use of government funds during the Civil War." United States v. Neifert-White Co., 390 U.S. 228, 232 (1968).

36.     The FCA "establishes a scheme that permits either the Attorney General or a private party to initiate a civil action alleging fraud on the Government," U.S. ex rel. Eisenstein v. City of New York, New York, 556 U.S. 928, 932 (2009) (citations omitted), and "imposes significant penalties on those who defraud the Government." Universal Health Servs., Inc. v. United States, 136 S. Ct. 1989, 1995 (2016).

37.     The FCA provides, *inter alia,* that any person who (1) "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," or (2) "knowingly

makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," is liable to the United States for a civil monetary penalty plus treble damages. 31 U.S.C. § 3729(a)(1)(A)-(B).

38.     The terms "knowing" and "knowingly" mean "that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A)(i)-(iii).

39.     Proof of specific intent to defraud is not required. 31 U.S.C. § 3729(b)(1)(B).

40.     The term "claim" means "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (1) is presented to an officer, employee, or agent of the United States; or (2) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Governments behalf or to advance a Government program or interest, and if the United States Government (a) provides or has provided any portion of the money or property requested or demanded; or (b) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded . . . ." 31 U.S.C. § 3729(b)(2)(A)(i)-(ii).

41.      "[T]he term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

42.     Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 and 64 Fed. Reg. 47099, 47103 (1999), the civil monetary penalties under the FCA are $5,500 to $11,000 for violations occurring on or after September 29, 1999 but before November 2, 2015. See 28 C.F.R. § 85.3.

43.     Pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015 and 83 Fed. Reg. 706 (Jan. 8, 2018), the civil monetary penalties under the FCA were adjusted to $11,665 to $22,331 for violations occurring on or after November 2, 2015 that are assessed after June 19, 2020. See 28 C.F.R. § 85.5.

**B.      State False Claims Acts**

44.     Each of the Plaintiff States has individually enacted a False Claims Act. Each of those Acts is modeled after the Federal FCA, and each contains provisions similar to those quoted above.

45.     Relator asserts claims under the State FCAs for the State portion of Medicaid false claims detailed in this Complaint.

**C.      The Anti-Kickback Statute**

46.     The federal Anti-Kickback Statute ("AKS") makes it a criminal offense to "knowingly and willfully" offer, pay, solicit, or receive any remuneration to induce, or in return for, referrals of items or services paid for by a Federal health care program. 42 U.S.C. § 1320a-7b. If any purpose of the remuneration is to induce or reward the referral or recommendation of business payable in whole or in part by a federal health care program, the AKS is violated, i.e., a lawful purpose will not legitimize a remuneration that also has an unlawful purpose.

47.     Specifically, the AKS provides:

(1) Whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind--
        (A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
        (B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $100,000 or imprisoned for not more than 10 years, or both.

(2) Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person--
      (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
      (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,
shall be guilty of a felony and upon conviction thereof, shall be fined not more than $100,000 or imprisoned for not more than 10 years, or both.

42 U.S.C. § 1320a-7b(b)(1)-(2).

48.    "Federal health care program" is defined as "**(1)** any plan or program that provides health benefits, whether directly, through insurance, or otherwise, which is funded directly, in whole or in part, by the United States Government (other than the health insurance program under chapter 89 of Title 5); or **(2)** any State health care program, as defined in section 1320a-7(h) of this title." 42 U.S.C. § 1320a-7b(b)(1).

49.    "Federal health care program" includes both Medicare and Medicaid.

50.    Violation of the AKS can subject the perpetrator to exclusion from participation in federal healthcare programs and civil monetary penalties of $50,000 per violation and three times the amount of remuneration paid. 42 U.S.C. § 1320a-7(b)(7); 42 U.S.C. § 1320a-7a(a)(7).

51.    Reimbursement claims to federal health care program that are tainted by violations of the AKS are false claims within the meaning of the FCA. 42 U.S.C. § 1320a-7b(g) ("In addition to the penalties provided for in this section or section 1320a-7a of this title, a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of subchapter III of chapter 37 of Title 31.").

52.     As relevant to this lawsuit, the Department of Health and Human Services, Office of Inspector General ("HHS-OIG") has long been conceded with what it has previously characterized as "a proliferation of arrangements" within the health industry "between those in a position to refer business, such as physicians, and those providing items or services for which Medicare or Medicaid pays." See HHS-OIG, Special Fraud Alert: Joint Venture Arrangements (Aug. 1989), available at https://oig.hhs.gov/fraud/docs/alertsandbulletins/121994.html.

53.     Such arrangements are often referred to as joint ventures.

54.     HHS-OIG has stated on more than one occasion that joint ventures may violate the Anti-Kickback Statute if they are designed to induce patient referrals.

55.     For example, in 1989, HHS-OIG explained:

A joint venture may take a variety of forms: it may be a contractual arrangement between two or more parties to cooperate in providing services, or it may involve the creation of a new legal entity by the parties, such as a limited partnership or closely held corporation, to provide such services. Of course, there may be legitimate reasons to form a joint venture, such as raising necessary investment capital. However, the Office of Inspector General believes that some of these joint ventures may violate the Medicare and Medicaid anti-kickback statute.

  Under these suspect joint ventures, physicians may become investors in a newly formed joint venture entity. The investors refer their patients to this new entity, and are paid by the entity in the form of ``profit distributions." These subject joint ventures may be intended not so much to raise investment capital legitimately to start a business, but to lock up a stream of referrals from the physician investors and to compensate them indirectly for these referrals.  Because physician investors can benefit financially from their referrals, unnecessary procedures and tests may be ordered or performed, resulting in unnecessary program expenditures.

 The questionable features of these suspect joint ventures may be reflected in three areas:
    (1) The manner in which investors are selected and retained;
    (2) The nature of the business structure of the joint venture; and
    (3) The financing and profit distributions.

Id.

56.     In April 2003, HHS-OIG revisited a similar issue and identified several factors that, "taken separately or together," could signal a prohibited contractual arrangement under the Anti-Kickback Statute, including: (1) a captive referral base of existing patients is being serviced by the

new business; (2) the party making the referrals is taking little or no business risk, and making little or no financial investment in the new business; (3) the parties to the venture would otherwise be competitors for the captive referrals, each having the independent capability to provide and bill for the same services; ( 4) the party receiving the referrals also provides a range of administrative services to the new business, such as management, billing, personnel-related services and/or health care items and supplies; (5) the overall effect of the arrangement is to permit one party to bill for the business generated by the other party and the profits of the venture are based on the value and volume of the referrals generated; and ( 6) provisions exist restricting the ability of one or both parties to act in competition with the venture's business operations. HHS-OIG, Special Advisory Bulletin:   Contractual   Joint   Ventures   (April   2003),   available   at https://www.oig.hhs.gov/fraud/docs/alertsandbulletins/042303SABJointVentures.pdf.

### D.     The California Insurance Fraud Prevention Act

57.     CIFPA, Cal. Ins. Code § 1871.7 et seq., IICFPA, 740 Ill. Comp. Stat. 92/1 et seq., prohibits insurance fraud and is designed "to facilitate the investigation and prosecution of insurance fraud." People ex rel. Allstate Ins. Co. v. Weitzman, 107 Cal. App. 4th 534, 548, 132 Cal. Rptr. 2d 165, 175 (Cal. Ct. App. 2003), as modified on denial of reh'g (Cal. Ct. App. Apr. 24, 2003).

58.     The California Legislature enacted CIFPA to combat abusive practices aimed at defrauding private insurance providers. The legislative findings and declarations associated with Section 1871.7 make clear that the Legislature was specifically concerned with fraud on health insurance providers: "Health insurance fraud is a particular problem for health insurance policyholders. Although there are no precise figures, it is believed that fraudulent activities account for billions of dollars annually in added health care costs nationally. Health care fraud causes losses in premium dollars and increases health care costs unnecessarily." Cal. Ins. Code § 1871(h).

14

59.     With respect to insurance fraud subject to the CIFPA, "[i]nsurers, not the state government, are the direct victims of the fraud" and "[i]nsureds are the indirect victims who pay higher premiums due to the prevalence of insurance fraud." Weitzman, 107 Cal. App at 452.  As a result, "[t]he general public also benefits from qui tam actions to enforce Insurance Code section 1871.7, because fraudulent insurance claims result in higher premiums." People ex rel. Strathmann v. Acacia Research Corp., 210 Cal. App. 4th 487, 504, 148 Cal. Rptr. 3d 361, 373 (Cal. Ct. App. 2012).

60.     Under CIFPA, "[e]very person who violates any provision of this section or Section 549, 550, or 551 of the Penal Code shall be subject, in addition to any other penalties that may be prescribed by law, to a civil penalty of not less than five thousand dollars ($5,000) nor more than ten thousand dollars ($10,000), plus an assessment of not more than three times the amount of each claim for compensation." Cal. Ins. Code § 1871.7(b).  The Court may also order equitable and injunctive relief.  Id.

61.     Under CIFPA, "[t]t is unlawful to knowingly employ runners, cappers, steerers, or other persons to procure clients or patients to perform or obtain services or benefits . . . or to procure clients or patients to perform or obtain services or benefits under a contract of insurance or that will be the basis for a claim against an insured individual or his or her insurer." Cal. Ins. Code § 1871.7(a).

62.     In addition, CIFPA incorporates Section 549, 550, or 551 of the California Penal Code and violations of Section 549, 550, or 551 of the California Penal Code are actionable under CIFPA. Cal. Ins. Code § 1871.7(b).

63.     Section 550 of the California Penal Code prohibits, *inter alia*, "[k]nowingly present[ing] or caus[ing] to be presented any false or fraudulent claim for the payment of a loss or

injury, including payment of a loss or injury under a contract of insurance" and "[k]nowingly make or cause to be made any false or fraudulent claim for payment of a health care benefit." Cal. Penal Code §§ 550(a)(1), (6).

64.     To establish a violation of Cal. Penal Code § 550, a plaintiff need only prove (1) presentment or causing the presentment of a false claim and (2) the intent to defraud. People ex rel. Gov't Employees Ins. Co. v. Cruz, 244 Cal. App. 4th 1184, 1193–94, 198 Cal. Rptr. 3d 566, 574 (Cal. Ct. App. 2016). Thus, "[i]t is not necessary that anyone actually be defrauded or actually suffer a financial, legal, or property loss as a result of the defendant's acts." Id. at 1194 (internal quotation marks omitted).

65.     CIFPA authorizes "any interested person" to bring a claim for a violation of the CIFPA in the name of the state.  Cal. Ins. Code § 1871.7(e)(1).  In this way, CIFPA "enable[s] and encourage[s] the enforcement of regulatory provisions, such as section 1871.7, that would otherwise be beyond the resources of public entities to enforce." State ex rel. Wilson v. Superior Court, 227 Cal. App. 4th 579, 596, 174 Cal. Rptr. 3d 317, 328 (Cal. Ct. App. 2014), as modified on denial of reh'g (July 25, 2014).

**E.     The Illinois Insurance Claims Fraud Prevention Act**

66.     IICFPA, 740 Ill. Comp. Stat. 92/1 et seq., provides that "it is unlawful to knowingly offer or pay any remuneration directly or indirectly, in cash or in kind, to induce any person to procure clients or patients to obtain services or benefits under a contract of insurance." 740 Ill. Comp. Stat. 92/5(a).

67.     IICFPA further provides that "[a] person who violates any provision of this Act, Section 17-8.5 or Section 17-10.5 of the Criminal Code of 1961 or the Criminal Code of 2012, or Article 46 of the Criminal Code of 1961 shall be subject, in addition to any other penalties that may be prescribed by law, to a civil penalty of not less than $5,000 nor more than $10,000, plus

an assessment of not more than 3 times the amount of each claim for compensation under a contract of insurance." 740 Ill. Comp. Stat. 92/5(b).

68.     IICFPA authorizes "an interested person" to bring a claim for a violation of IICFPA on behalf of the State of Illinois. 740 Ill. Comp. Stat. 92/15(a).

## V.     <u>BACKGROUND</u>

### A.     **ESRD and Dialysis**

69.     End-Stage Renal Disease ("ESRD") "occurs when chronic kidney disease — the gradual loss of kidney function — reaches an advanced state."[3]

70.     When a person suffers from ESRD, the person's "kidneys are no longer able to work as they should to meet [his or her] body's needs." <u>Id</u>.

71.     ESRD is the final stage of chronic kidney disease, which "means kidneys are only functioning at 10 to 15 percent of their normal capacity."[4]

72.     The most common treatments for ESRD are a kidney transplant or dialysis.[5]

73.     As the National Kidney Foundation explains: "Dialysis is a treatment that does some of the things done by healthy kidneys. It is needed when your own kidneys can no longer take care of your body's needs."[6]

---

[3]     MAYO CLINIC, <u>End-stage renal disease</u> (Mar. 8, 2018), <u>available at</u> <u>https://www.mayoclinic.org/diseases-conditions/end-stage-renal-disease/symptoms-causes/syc-20354532</u>.

[4]     DAVITA, <u>What is End Stage Renal Disease</u>, <u>available at</u> <u>https://www.davita.com/education/kidney-disease/stages/what-is-end-stage-renal-disease</u>.

[5]     <u>See</u> MedlinePlus, <u>End stage kidney disease</u>, <u>available at</u> <u>https://medlineplus.gov/ency/article/000500.htm</u> ("ESRD may need to be treated with dialysis or kidney transplant.").

[6]     NATIONAL KIDNEY FOUNDATION, <u>Dialysis</u>, <u>available at</u> <u>https://www.kidney.org/atoz/content/dialysisinfo</u>.

74.     More specifically: "Dialysis is a procedure that is performed routinely on persons who suffer from acute or chronic renal failure, or who have ESRD. The process involves removing waste substances and fluid from the blood that are normally eliminated by the kidneys."[7]

**B.     Medicare Coverage of Dialysis**

75.     Medicare is a federal government healthcare program that provides healthcare benefits to people who are 65 or older, certain younger people with disabilities, and people with ESRD.[8]

76.     Thus, while Medicare is typically limited to individuals over 65 or who suffer from certain disabilities, Medicare generally provides coverage for the treatment of ESRD irrespective of age or disability status.

77.     When Congress extended Medicare coverage to ESRD patients in 1972, it "marked the first time that individuals were allowed to enroll in Medicare based on a specific medical condition rather than on age."[9]

78.     ESRD beneficiaries can be covered by traditional Medicare (fee-for-service) under Medicare Parts A, B, and D or Medicare Advantage Program managed care plans under Medicare Part C.

79.     More specifically, traditional Medicare provides ESRD beneficiaries services on a fee-for-service basis. Traditional Medicare beneficiaries must pay a yearly premium, a yearly deductible, and a co-pay (also known as co-insurance) each time they receive a covered service.

---

[7]  JOHNS HOPKINS MEDICINE, End Stage Renal Disease (ERSD), available at https://www.hopkinsmedicine.org/healthlibrary/conditions/kidney_and_urinary_system_disorders/end_stage_renal_disease_esrd_85,p01474.
[8]  See CMS, What's Medicare, available at https://www.medicare.gov/what-medicare-covers/your-medicare-coverage-choices/whats-medicare.
[9]  See CONGRESSIONAL RESEARCH SERVICE, Medicare Coverage of End-Stage Renal Disease (ERSD) (Aug. 16, 2018), at 1, available at https://fas.org/sgp/crs/misc/R45290.pdf.

80.     Medicare Advantage, formerly known as Medicare+Choice and sometimes known as Part C, is an alternative to traditional Medicare.

81.     Under Medicare Advantage, private entities called Medicare Advantage organizations ("MAO") directly provide coverage to Medicare beneficiaries and in return receive funding from the federal government. See generally 42 U.S.C. § 1395w-21 et seq.; 42 C.F.R. 422.1 et seq.

82.     Like the above-described costs associated with traditional Medicare, Medicare Advantage plans typically require the beneficiary to pay a yearly premium, a yearly, deductible, and per-service co-pay.

83.     Currently, only a small subset of ESRD patients are eligible to participate in a Medicare Advantage plan. If a person becomes eligible for Medicare solely due to ESRD, they are generally not permitted to enroll in a Medicare Advantage plan and must use traditional Medicare. Current Medicare beneficiaries who develop ESRD are allowed to remain in their Medicare Advantage plan, but, with few exceptions, cannot switch to a Medicare Advantage plan if they were enrolled in traditional Medicare at the time of ESRD onset.

84.     In 2016, Congress passed the 21st Century Cures Act which, *inter alia*, largely removed the above-described limitations on ERSD patients participating in Medicare Advantage plans beginning in 2021.[10]

_____

[10] CMS, Contract Year 2021 Medicare Advantage and Part D Final Rule (CMS-4190-F1) Fact Sheet (May 22,2020), available at https://www.cms.gov/newsroom/fact-sheets/contract-year-2021-medicare-advantage-and-part-d-final-rule-cms-4190-f1-fact-sheet ("The Cures Act amended the Social Security Act … to allow all Medicare-eligible individuals with ESRD to enroll in MA plans beginning January 1, 2021.").

85.     Medicare broadly covers treatment service for ESRD. See 42 U.S.C. § 1395rr(a) ("The benefits provided by parts A and B of this subchapter shall include benefits for individuals who have been determined to have end stage renal disease…").

86.     This coverage includes broad coverage of dialysis and related services including dialysis performed in hospitals, at outpatient facilities, and at home:[11]

## Dialysis services & supplies covered by Medicare

| Service or supply | Covered by Medicare Part A | Covered by Medicare Part B |
|---|:---:|:---:|
| **Inpatient dialysis treatments** (if you're admitted to a hospital for special care). | ✔ | |
| **Outpatient dialysis treatments** (if you get treatments in a Medicare-approved dialysis facility). | | ✔ |
| **Outpatient doctors' services.** See page 35. | | ✔ |
| **Home dialysis training** (includes instruction for you and the person helping you with your home dialysis treatments). | | ✔ |
| **Home dialysis equipment and supplies** (like the machine, water treatment system, basic recliner, alcohol, wipes, sterile drapes, rubber gloves, and scissors). See pages 33–34. | | ✔ |
| **Certain home support services** (may include visits by trained hospital or dialysis facility workers to check on your home dialysis, to help in emergencies when needed, and to check your dialysis equipment and water supply). See page 35. | | ✔ |
| **Most drugs for home and in-facility dialysis.** See page 33. | | ✔ |
| **Other services and supplies that are a part of dialysis** (like laboratory tests). | | ✔ |

---

[11] CMS, Medicare Coverage of Kidney Dialysis & Kidney Transplant Services, at 18, available at https://www.medicare.gov/Pubs/pdf/10128-Medicare-Coverage-ESRD.pdf.

87.     Medicare spends a tremendous amount of money to reimburse providers for the provision of services to treat ESRD.

88.     In 2015, traditional Medicare spent approximately $34 billion for reimbursement of ESRD treatment services.[12]

89.     Medicare spends far more for ESRD Medicare beneficiaries than for non-ESRD Medicare beneficiaries. In one recent year, "Medicare spent $61,996 per ESRD beneficiary, compared to $9,889 per non-ESRD beneficiary."[13]

90.     Indeed, "[b]ecause Medicare beneficiaries with ESRD have higher-than-average health care costs, they account for about 7% of Medicare fee-for-service (FFS) spending, while making up about 1% of program enrollment."[14]

91.     Medicare provides coverage for the overwhelming majority of ESRD patients in the United States, as compared to other potential providers such as commercial health insurance or Medicaid:[15]



Figure 3. Types of Coverage for Individuals with ESRD in 2015

---

[12] Supra n. 9, at 17.
[13] Id. at 8.
[14] Id. at 1.
[15] Id. at 8.

92.     Overall, "FFS Medicare covers three-fourths of U.S. annual medical spending to treat ESRD."[16]

### C.     DaVita

93.     DaVita is one of the nation's largest providers of dialysis and related services.

94.     DaVita operates its dialysis business through a division called DaVita Kidney Care.

95.     DaVita claims to serve more than 1.7 million patients in 13 countries and to have more than 70,800 employees.[17]

96.     In California specifically, DaVita has approximately a 42% market share of the dialysis marketplace.

### D.     DaVita's History of False Claims Act Liability

97.     DaVita has a substantial history of violations of the FCA and analogous state statutes.

98.      As most directly relevant here, in 2009, a relator filed a *qui tam* lawsuit under the FCA and its state counterparts against DaVita. See United States et al. ex rel. Barbetta v. DaVita Inc. et al., No. 09 cv 02175 WJM-KMT (D. Colo. 2009) ("Barbetta").

99.     Summarized briefly, the Barbetta case concerned DaVita's payment of kickbacks to physicians in exchange for referral to dialysis centers owned (at least in part) by DaVita.  In Barbetta, the primary component of the kickback scheme was DaVita's agreement to enter into a joint venture with a physician either through (1) DaVita's acquisition of an ownership interest in a dialysis center owned by a physician at an inflated price or (2) DaVita's sale of an ownership interest in a new or existing dialysis center owned by DaVita to a physician at a below fair market value price.   In sum, DaVita sold low and bought high.

---

[16] Id. at 8.
[17] See DAVITA, About, available at https://www.davita.com/about (last accessed on Oct. 15, 2018).

100.    In October 2014, DaVita entered into a settlement agreement under which it agreed to pay $350 million to resolve the FCA lawsuit.[18]   As part of the settlement agreement, DaVita entered into a corporate integrity agreement. Id.

101.    Many of the same DaVita employees who were important actors with respect to the claims in Barbetta remained with the company, including Michael Staffieri (chief operating officer), individual defendant Misha Palechek (chief development and transformation officer), Chet Mehta (vice president of finance), individual defendant David Finn (vice president of mergers & acquisitions), Queenie Nguyen (manager), and Chris Pannell (transaction director).

102.    In fact, Mr. Palechek, who was quoted in the Barbetta complaint as instructing the realtor in that case to "artificially inflate[] the operating cost projections for the centers because he wanted to 'crush the projections to keep the valuation low,'" and when the Barbetta relator indicated discomfort with that brazen admission, Mr. Palececk "warned him not to 'give me any of that ethics nonsense,'" was subsequently promoted within the company.

103.    In addition to a financial settlement agreement, DaVita also entered into a corporate integrity agreement ("CIA") with the Department of Health and Human Services' Office of the Inspector General as part of the resolution of the Barbetta lawsuit. **Exhibit 1**.

104.    As described herein, the CIA required DaVita to adopt various compliance processes and procedures, including *inter alia*, the retention of an independent monitor (the "Monitor") to ostensibly review DaVita's transactions.

---

[18] See DEP'T OF JUSTICE, DaVita to Pay $350 Million to Resolve Allegations of Illegal Kickbacks (Oct. 22, 2014), available at https://www.justice.gov/opa/pr/davita-pay-350-million-resolve-allegations-illegal-kickbacks.

105.     As described herein, the Monitor was reliant on DaVita to provide accurate and complete information, which upon information and belief, DaVita failed to do with respect to the conduct at issue in this lawsuit.

106.     Beyond <u>Barbetta</u>, DaVita has also been the subject of other FCA lawsuits which led to substantial recoveries for the government.[19]

## VI.     DAVITA'S FRAUD

### A.     Overview of DaVita's Use of JV DeNovos

107.     DaVita is extremely aggressive with respect to the expansion of its dialysis business.

108.     The primary method that DaVita utilizes to expand its dialysis business is through the establishment of new dialysis centers that will be co-owned by DaVita and one or more physicians or physician groups that can refer patients to these newly-established dialysis centers.

109.     In the parlance of DaVita, these newly-established dialysis centers are known as "Joint Venture DeNovos" or "JV DeNovos."

110.     "Joint Venture" refers to the fact that the newly-established dialysis center will be co-owned by DaVita and one or more physicians or a physician group.

111.     "DeNovo" refers to the fact that the newly-established dialysis center is in fact newly-established, *i.e.* to distinguish it from existing dialysis centers.

112.     DaVita has established JV DeNovos across the country, and Relator estimates that DaVita presently operates approximately 900 dialysis centers that began as DeNovos.

---

[19] <u>See</u> <u>e.g.</u> DEP'T OF JUSTICE, <u>DaVita Rx Agrees to Pay $63.7 Million to Resolve False Claims Act Allegations</u> (Dec. 14, 2017), <u>available at</u> https://www.justice.gov/opa/pr/davita-rx-agrees-pay-637-million-resolve-false-claims-act-allegations; DEP'T OF JUSTICE, <u>Medicare Advantage Provider to Pay $270 Million to Settle False Claims Act Liabilities,</u> (Oct. 1, 2018), <u>available at</u> https://www.justice.gov/opa/pr/medicare-advantage-provider-pay-270-million-settle-false-claims-act-liabilities.

113.    This Amended Complaint collectively refers to the physician groups, physicians or hospitals to whom DaVita has sold an ownership interest in a JV DeNovo as "JV Partners."

114.    JV Partners can be individual physicians, physician groups or hospital systems that have established bases of dialysis patients (usually from their nephrology practices) that they can refer to the dialysis center owned by the JV DeNovo.

115.    As described in detail below, DaVita, through the conduct of the Individual Defendants, exploits its JV DeNovos as a front for a kickback scheme under which it pays kickbacks to JV Partners in return for the referral of patients to the dialysis center owned by the JV DeNovo.

116.    Specifically, DaVita sells an ownership interest in the JV DeNovo to the JV Partner at a price that does not reflect fair market value. Rather, DaVita values the ownership interest based only on the "startup" costs of opening the new dialysis facility.[20]

117.    More specifically, DaVita does not take into consideration the projected revenue and cashflow that the dialysis facility will generate when valuing the JV Novo for purposes of calculating the ownership interest or the JV Partners' purchase price.   Had DaVita done so, the value of the entity (and consequently the price of the ownership interest sold to the JV Partner) would have substantially increased, thereby making the investment less attractive to physician investors.

118.    The purpose of DaVita's sale of ownership interests to JV Partners at artificially low values is to induce JV Partners to refer their patients to the new dialysis facility owned by the Joint Venture.   Put differently, DaVita can confidently assure a potential JV Partner that in

---

[20] At times, at the request of the physician partner, and for no reason other than to induce the JV Partner in question, DaVita waives a portion of the already artificially low "start-up" costs the physician partner is required to pay at the beginning of the deal.

exchange for a below-FMV investment, the JV Partner will receive tremendous profits.  And in fact, JV Partners did realize outstanding returns on their investments, *i.e.* the scheme is working exactly as it is intended to work.

119.    As an added benefit, DaVita also ensures the JV Partners will assume no risk by providing the JV Partner with a way to exit the JV DeNovo.  More specifically, after a specified anniversary of the close of the JV DeNovo (typically at the 5 or 7 year mark) the JV Partner has the option to sell their interests back to DaVita at fair market value. The fair market value is determined by a third-party appraiser.

120.    To Relator's knowledge, *only one* JV Partner (who was planning to retire) has ever exercised this option.

121.    As described in detail below, DaVita's sale of ownership interests in JV DeNovos to JV Partners at artificially low values to induce referrals constitutes a kickback in violation of the Anti-Kickback Statute and taints the reimbursement claims that DaVita is submitting to Medicare for reimbursements in violation of the False Claims Act.

**B.    DaVita Works with its JV Partners to Steer Patients from Government-Funded Healthcare Plans to Private Pay Plans.**

122.    Before turning to DaVita' perpetration of the systematic kickback scheme, Relator first describes DaVita's intentional steering of patients from traditional Medicare and Medicaid to more profitable private pay and Medicare Advantage plans.  This steering was a critical component of the kickback scheme and independently violates the CIFPA and the IICFPA.

**1.    DaVita's Financial Motivation to Steer Patients to Private Pay and Medicare Advantage Plans**

123.    As described above, the overwhelming majority of ESRD patients receive coverage from traditional Medicare for ESRD treatment services, including dialysis, kidney transplants, and related services, while others receive coverage through Medicaid.

124.    Patients who are eligible for traditional Medicare or Medicaid may choose to obtain coverage from a Medicare Advantage plan or a private insurance/commercial plan.

125.    DaVita furthers the kickback scheme by working closely with JV Partners to encourage patients to switch from traditional Medicare or Medicaid to Medicare Advantage or private-pay plans.

126.    In 2010, Congress enacted the Patient Protection and Affordable Care Act ("ACA"). See PATIENT PROTECTION AND AFFORDABLE CARE ACT, PL 111-148, 124 Stat 119 (Mar. 23, 2010).

127.    The ACA spurred the creation of exchanges, or marketplaces, through which people could compare and purchase insurance plans from private insurance companies. See King v. Burwell, 135 S. Ct. 2480 (2015) ("[T]he Act requires the creation of an 'Exchange' in each State— basically, a marketplace that allows people to compare and purchase insurance plans."); 42 U.S.C. § 18031(b)(1) et seq. (providing the statutory framework for the exchanged).

128.    Following the creation of the ACA exchanges, DaVita adopted a comprehensive and company-wide approach of attempting to steer patients to private insurance and Medicare Advantage "exchange" plans.

129.    DaVita's incentive to do so is that it receives considerably higher reimbursement rates from Medicare Advantage and private insurance plans for dialysis and related services than it does from traditional Medicare and Medicaid.

130.    For example, the below chart compares the amount of reimbursement DaVita would receive from traditional Medicare and Medicaid, a private pay Blue Shield plan, and a private pay COBRA plan, and a Managed Care plan:[21]

---

[21] These rates are representative of the Southern California rates in 2016 and are subject to change.

| Plan Type | Payer/Administrator | Charge Per Treatment | # of Treatments per year | Revenue per year |
|---|---|---|---|---|
| Medicaid | MediCal | $169 | 144 | $24,320 |
| Medicare | Medicare | $279 | 144 | $40,215 |
| Medicare Advantage | Allied Pacific IPA | $472 | 144 | $67,919 |
| Managed Medicaid | Molina Healthcare | $515 | 144 | $74,160 |
| PPO | Blue Shield | $800 | 144 | $115,200 |
| Cobra | First Health Network | $2,700 | 144 | $388,800 |

131.    As evidence by these figures, DaVita make drastically more money from a patient who has coverage through a Medicare Advantage or private insurance plan than it does from a patient who has coverage through traditional Medicare or Medicaid.

132.    DaVita trained its staff on the economics of patients on Medicare compared to patients on Medicare Advantage plans or private insurance.

133.    For example, DaVita included the following slides in a PowerPoint presentation:





134.    These slides were included in a training module only for social workers called "Insurance, Disability and Patient Assistant Plans."

135.    DaVita defines the role of social workers as follows: "A renal social worker is a support person for patients both before and after they start dialysis. Social workers are highly educated and trained to help patients and their families by providing support in all areas of their lives including: emotional, financial, career, lifestyle adjustment and more."  In sum, the social worker provides social and behavioral guidance for patients and their family members to help them get through this difficult period.

136.    Thus, the defined role of social workers has nothing to do with the financial management of the subject clinic, but DaVita nonetheless train its social workers to steer patients.

137.    Given the drastically higher reimbursements it receives from private insurance and Medicare Advantage plans than from Medicare, DaVita has a massive financial motivation to have as many of its patients on Medicare Advantage or private insurance plans as possible.

### 2. DaVita's Efforts to Steer Patients to Medicare Advantage and Private Pay Plans

138.     As noted, DaVita adopted a comprehensive strategy to work with its JV Partners to encourage and induce patients to switch from traditional Medicare (and to a less significant extent, from Medicaid) to Medicare Advantage and private insurance plans.

139.     For example, **Exhibit 2** is minutes of a meeting in November 2015 between (1) Brian Nordin, a DaVita Regional Operations Director and (2) Dr. Jack Rubin, the medical director of a dialysis center in Los Angeles, CA that is owned and controlled by Glassland Dialysis, LLC in which Dr. Rubin has a minority equity stake.

140.     Glassland Dialysis, LLC is a DaVita JV DeNovo.

141.     At the meeting, Mr. Nordin and Dr. Rubin discussed the operations and strategic management of the dialysis center.

142.     As relevant here, Mr. Nordin and Dr. Rubin discussed "Strategic Opportunities." Id. at 6.

143.     As shown below, one of the "Strategic Opportunities" that they discussed was "Medicaid PTs to commercial plans" (which refers to Medicare Managed Care plans and private insurance plans) and they discussed how to effectuate this opportunity through various "Action Items:"

---

**Strategic Opportunities**

Discussion / Decisions:
- IPA relationships
    - LA Care
- Medicaid PTs to commercial plans

Action Items:  *(Who, What, When)*
- IC/SW educate Medicaid patients on commercial plan offerings in Nov/Dec.
- MD support patient education efforts.
- IC give MD list of patients who are not interested in this opportunity.

---

Id. at 6.

144.     "IC" in this graphic means for insurance counselor, "SW" means social worker, and "MD" means medical director.

145.     The minutes conclude by noting that "[o]ption for Medicaid patients to choose a commercial plan [including Medicare Managed Care and private insurance plans] is a big opportunity for the clinic." Id. at 7.

146.     Steering is a particularly significant concern with Medicaid patients who are often less sophisticated and less educated than other patients and thus tend to be more susceptible to pressure.

147.     As can be seen above, DaVita furnishes the MD with a list of patients who told DaVita they are not interested in Medicare Advantage or private pay plans so that the MD can "take a second shot" and convince them to switch.

148.     **Exhibit 3** is minutes of a meeting at a later date in August 2016 between Mr. Nordin and Dr. Rubin.

149.     As shown below, Mr. Nordin and Dr. Rubin again discussed the "strategic opportunity" of "Medicaid PTs to commercial plans" (including Medicare Managed Care and private insurance plans) and the minutes note that "18 patients chose commercial plans to be effective in Mar.," meaning that the plan worked: 18 patients were steered to higher-paying commercial insurance companies.

### Strategic Opportunities

Discussion / Decisions:
- Medicaid PTs to commercial plans
    - o   18 patients chose commercial plans to be effective in Mar.
Action Items: *(Who, What, When)*
- IC/SW support  Medicaid patients using their new commercial plans.

Id. at 5.

150.    The minutes again conclude by noting that "[o]ption for Medicaid patients to choose a commercial plan [including Medicare Managed Care and private insurance plans] is a big opportunity for the clinic." Id. at 6.

   3.    **DaVita Misleads Patients as to the Purported Benefits of Commercial Plans**

151.    Compounding the impropriety of DaVita's steering efforts, DaVita intentionally misleads patients into believing that they are more likely to obtain a kidney transplant if they switch to commercial insurance.

152.    For example, a 2014 PowerPoint presentation entitled "Insurance & employment education" contained the following slide:



153.    The "supporting points" for this slide – *i.e.* the talking points to be used with patients – provide: "Studies show that transplant likelihood is 3x greater for patients with Private Insurance (22% vs. 7%) – for African Americans, it's actually 14x higher."

154.    Upon information and belief, the ostensible basis for this claim is a study measuring the percentage of *referred* dialysis patients who received a transplant, rather than the percentage of *all* dialysis patients who receive a transplant.

155.    DaVita is misusing this data in suggesting that it means that patients on commercial insurance are more likely to receive a transplant than patients on government insurance.  The threshold step to the transplant process is a referral from the patient's dialysis provider (in the case of DaVita patients, that provider is DaVita).

156.    In other words, dialysis providers control whether a patient is referred for a transplant in the first place and thus whether a patient even has the possibility of (1) being waitlisted for a transplant or (2) ultimately receiving a transplant.

157.    This is important because studies show that for-profit dialysis providers like DaVita have significantly lower referral rates for transplants. For example, a September 2019 study examining data from 2000-2016 found that "patients receiving dialysis at for-profit facilities vs nonprofit facilities had significantly lower 5-year cumulative incidence rates for placement on the deceased donor kidney transplantation waiting list (−13.2%), receipt of a living donor kidney transplant (−2.3%), and receipt of a deceased donor kidney transplant (−4.3%)" and concluded that "[r]eceiving dialysis at for-profit facilities in the United States was associated with lower kidney transplantation rates."[22]

---

[22] Gander JC, Zhang X, Ross K, et al. <u>Association Between Dialysis Facility Ownership and Access to Kidney Transplantation</u>, JAMA (Sept. 10, 2019), <u>available at</u> <u>https://jamanetwork.com/journals/jama/fullarticle/2749598</u>.

158.     Another study in November 1999 reached the same result in concluding that "in the United States, for-profit ownership of dialysis facilities, as compared with not-for-profit ownership, is associated with increased mortality and decreased rates of placement on the waiting list for a renal transplant."[23]

159.     DaVita's lower rate of referrals is consistent with its financial motivation to keep patients on dialysis, *i.e.* DaVita loses money if a successful transplant means a patient no longer needs dialysis.

160.     Consequently, it is misleading for DaVita to tell patients on Medicare or Medicaid that they are more likely to receive a transplant if they switch to commercial insurance.  The truth is that patients are significantly *less* likely to be referred for a transplant in the first place because DaVita controls the referral process, and DaVita is financially dis-incentivized to refer patients for a transplant.  And if they are never referred for a transplant by DaVita, they have 0% chance of getting on the transplant waitlist or receiving a transplant.  In other words, DaVita disguises the fact that a referral is the gateway to the entire transplant process and that DaVita controls who makes it through that gateway.

161.     In addition, DaVita misrepresented the data because it reflects correlation rather than causation.  As DaVita knows, patients with commercial insurance are more likely to be employed and have a higher level of education that patients on, say, Medicaid.  An employed patient (i.e., a patient with an income) who is also educated (i.e., and therefore likely more capable of navigating the complexities of obtaining a transplant) is more likely obtain a transplant relative to patients with government insurance who are not employed and not educated.  Thus, once

---

[23] Garg, Pushkal et al., Effect of the Ownership of Dialysis Facilities on Patients' Survival and Referral for Transplantation, N. ENGL. J. MED. (Nov. 25, 199) available at https://www.nejm.org/doi/full/10.1056/NEJM199911253412205.

patients on commercial insurance receive a referral for a transplant, it is expected that a higher percentage of them receive a transplant.

162.    The above-described PowerPoint presentation was a national template that was customized when presented in the context of a specific joint venture's steering efforts.

163.    For example, **Exhibit 4** reflects the minutes of a meeting in May 2015 between, *inter alia,* (1) Cassie McLean, a Division Vice President of Operations the California region, and Brian Nordin, a DaVita Regional Operations Director and (2) doctors representing USC – DaVita Dialysis Center, LLC.

164.     USC – DaVita Dialysis Center, LLC is a joint venture affiliated with the University of Southern California that operates a dialysis center in Los Angeles, California.

165.    At the meeting, the parties "[r]eviewed Insurance and Employment educational materials." Id. At 2.

166.    Upon information and belief, **Exhibit 5** contains the "Insurance and Employment educational materials" referenced in the meeting minutes.

167.    The PowerPoint presentation contains similar slides as those described above, which are inaccurate and misleading for the same reasons. Id. at 2-4.

168.    Relator also observed that it was in the financial interests of the nephrologists with whom DaVita entered JV De Novo's to use their role as "gatekeepers" of the waitlist to impede their patients' progress to transplantation.

169.    JV Partner nephrologists in JV meeting minutes often commented on the positive financial impact from DaVita's Kidney Smart (KS) program as having beneficially increased the commercial mix of the center.

170.    Relator never witnessed them commenting on the Kidney Smart program leading to better transplant success rates.

171.    The annual patient turnover rate of a dialysis center is internally referred to as its "churn" rate. The churn rate is made up of three variables:  % Mortality rate + % Transfer rate + % Transplant rate (*e.g.*, 20% Churn = 15% Mortality + 3% Transfer + 2% Transplant).

172.    By keeping its transplant rate below the industry average, DaVita can lower the churn rate of the center.  This is especially important if a patient's nephrologist has gone to the effort of steering the patient to a higher reimbursing plan.  In this way, even when an increase in deceased donor kidneys became available for transplants in the wake of overdose deaths from the opioid crisis, the JV Partner nephrologist and DaVita both benefit financially from the patient not receiving a kidney transplant and remaining on dialysis until they die.

173.    In sum, DaVita is encouraging its patients to switch from government to commercial insurance plans by misrepresenting that they would be more likely to receive a kidney transplant on commercial insurance plans than if they remained on government plans.

### 4.    The Role of the AKF in DaVita's Improper Steering Efforts

174.    A further example of DaVita's efforts to steer patients to Medicare Advantage and private insurance plans is its "Patient Assistance Department" also known as "Mission Possible."

175.    DaVita describes Mission Possible in the following graphic:



**Patient Assistance Department**

MISSION
POSSIBLE

Team Mission Possible (The Patient Assistance Department) works as liaisons to obtain insurance premium assistance for DaVita dialysis patients, who are diagnosed with ESRD. Working on behalf of patients, and working with clinical Social Workers and Insurance Counselors, the Mission Possible Team assists in completing HIPP applications, and processing requests, for assistance through the American Kidney Fund (AKF) Health Insurance Premium Program (HIPP).

The American Kidney Fund processes HIPP applications and provides grant payments that are disbursed to the patient's insurance companies based on the insurance billing cycle. AKF grants insure that DaVita patients can retain their medical insurance coverage, and continue receiving dialysis treatments.

176.    As evidenced by this graphic, Mission Possible's role was to "work[] as liaisons to obtain insurance premium assistance for DaVita dialysis patients" through the American Kidney Fund ("AKF").

177.    The AKF is a non-profit corporation that is, in large measure, funded by dialysis providers such as DaVita.

178.    The AKF provides financial assistance to dialysis patients on Medicare Advantage and private insurance plans by assisting with the payment of the premium a patient is required to pay for the private insurance plan.

179.    The very same dialysis providers who primarily fund the AKF, like DaVita, use the AKF's financial assistance program to steer patients from Medicare to private insurers or Medicare Advantage plans.

180.    As described above, DaVita's Mission Possible unit is responsible for facilitating a patient's receipt of financial assistance through the AKF. This financial assistance makes it more economically feasible for a patient to select a Medicare Advantage or private insurance plan rather than straight Medicare.

181.    At the time Relator worked for DaVita, the company had a large nationwide team dedicated to Mission Possible as shown in the following graphics:

**Team Mission Possible**

| Fax Lines | | Mission Possible | Role | Phone: (888) 654-3639 ext. | Email |
|---|---|---|---|---|---|
| AKF HIPP | (888) 824-6727 | Diane Hendricks | Manager | 144505 | Diane.Hendricks@davita.com |
| Product Repl. | (888) 825-7642 | Daisy Ronchetti | Supervisor | 144440 | Daisy.Ronchetti@davita.com |
| | | Stephanie Althaqeb | Supervisor | 144582 | Stephanie.Althaqeb@davita.com |
| | | Susanne Fermin | Supervisor | 144513 | Susanne.Fermin@davita.com |
| | | Cameron McKim | PA Database Administrator | 144434 | Cameron.McKim@davita.com |
| | | Elizabeth Salcedo | HIPP Liaison Support | 144588 | Elizabeth.SalcedoRodriguez@davita.com |
| | | Mercedes Milan | HIPP Liaison Support | 144426 | |
| | | Janet Garreans | DR Liaison for Venofer | 144510 | Janet.Garreans@davita.com |
| | | Lucy Souvanat | DR Liaison for Epo | 144516 | Lucy.Souvanat@davita.com |
| | | Alex Stone | HIPP Liaison | 144435 | Alejandra.Stone@davita.com |
| | | Alve Evancuta | HIPP Liaison | 144576 | Alve.Evancuta@davita.com |
| | | Christina Prieto | HIPP Liaison | 144415 | Christina.Prieto@davita.com |
| | | Christy Anthony | HIPP Liaison | 144512 | Christy.Anthony@davita.com |
| | | Cynthia Cao | HIPP Liaison | 144473 | Cynthia.Cao@davita.com |
| | | Diane Alsop | HIPP Liaison | 144508 | Diane.Alsop@davita.com |
| | | Dina Deng | HIPP Liaison | 144567 | Dina.Deng@davita.com |
| | | Dominic Nguyen | HIPP Liaison | 144478 | Dominic.Nguyen@davita.com |
| | | Helly Duran | HIPP Liaison | 144571 | Helly.Duran@davita.com |
| | | Jennel Sarian | HIPP Liaison | 146906 | Jennel.Sarian@davita.com |
| | | Jessica Salcedo | HIPP Liaison | 144555 | Jessica.Salcedo@davita.com |
| | | Katherine Marcelino | HIPP Liaison | 144556 | Katherine.Marcelino@davita.com |
| | | Larry Caraig | HIPP Liaison | 144442 | Larry.Caraig@davita.com |
| | | Lilian Gutierrez | HIPP Liaison | 144569 | Lilian.Gutierrez@davita.com |
| | | Lisa Cabias | HIPP Liaison | 144446 | Lisa.Cabias@davita.com |
| | | Lorena Andrade | HIPP Liaison | 144441 | Lorena.Andrade@davita.com |
| | | Maria Lee Li | HIPP Liaison | 144506 | Maria.LeeLi@davita.com |
| | | Mary Cazares | HIPP Liaison | 144452 | Mary.Cazares@davita.com |
| | | Melanie Escobar | HIPP Liaison | 144431 | Melanie.Escobar@davita.com |
| | | Noelle Ticman | HIPP Liaison | 144511 | Noelle.Ticman@davita.com |
| | | TBA | HIPP Liaison | 146721 | |
| | | Sandra Goldstein | HIPP Liaison | 146707 | Sandra.Goldstein@davita.com |
| | | Sandy Lau | HIPP Liaison | 144514 | Sandy.Lau@davita.com |
| | | Shen Arenas | HIPP Liaison | 144368 | Shen.Arenas@davita.com |
| | | Shizuka Ishi | HIPP Liaison | 144443 | Shizuka.Ishi@davita.com |
| | | Suzanne Lee | HIPP Liaison | 144477 | Suzanne.M.Lee@davita.com |
| | | Tammy Zutler | HIPP Liaison | 144585 | Tammy.Zutler@davita.com |
| | | Tiffany Chen | HIPP Liaison | 146832 | Tiffany.Chen1@davita.com |
| | | Veronica Carillo | HIPP Liaison | 144504 | Veronica.Carillo@davita.com |

INSURANCE MANAGEMENT T E A M

MISSION POSSIBLE

**DaVita HIPP Liaison State Assignments (9/1/2016)**

| State | Abbr | Liaison | Division | Reg. |
|---|---|---|---|---|
| Alabama | AL | Jessica | | |
| Arizona | AZ | Shen | | |
| Arkansas | AR | Christina | | |
| California | CA | Jennel | Gold Coast / Wild West | All |
| | | Tammy | Surf'N'Sun / Sierra Terrific | All |
| | | Dominic | Pacific Gold/ORCA/Pioneer | All |
| Colorado | CO | Helly | | |
| Connecticut | CT | Tiffany | | |
| Delaware | DE | Katherine | | |
| DC | DC | Veronica | | |
| Florida | FL | Melanie | SunRays, | All |
| | | | Team Renaissance | 4,7,9 |
| Florida | FL | Alve | Team Renaissance | 12 |
| | | | Sunsational, Central Oasis, SuperNova | All |
| Georgia | GA | Suzanne L | Southern Stars - Pinnacle | 4,6,7,8 |
| | | | Southland | All |
| | | | Team Renaissance | All |
| Georgia | GA | Cynthia | MiraMonte | All |
| | | | Southern Stars - Pinnacle | 1,2,3,5 |
| Hawaii | HI | Shen | | |
| | | Christina | | |
| Illinois | IL | Larry | Skyline | All |
| | | Christina | Discovery / Keystone | All |
| Indiana | IN | Larry | | |
| Iowa | IA | Cynthia | | |
| Idaho | ID | Jennel | | |
| Kansas | KS | Tiffany | | |
| Kentucky | KY | Shen | | |
| Louisiana | LA | Diane | | |
| Maine | ME | Lilian | | |
| Maryland | MD | Alex | | |
| Massachusetts | MA | Veronica | | |
| Michigan | MI | Katherine | | |
| Minnesota | MN | Susanne | | |
| Mississippi | MS | Lilian | | |

| State | Abbr | Liaison | Division | Reg. |
|---|---|---|---|---|
| Missouri | MO | Jessica | | |
| Montana | MT | Jennel | | |
| Nebraska | NE | Tiffany | | |
| Nevada | NV | Stephanie | | |
| New Hampshire | NH | Cynthia | | |
| New Jersey | NJ | Shizuka | | |
| New Mexico | NM | Dominic | | |
| New York | NY | Maria | | |
| North Carolina | NC | Mary | | |
| North Dakota | ND | Sandra | | |
| Ohio | OH | Sandra | | |
| Oklahoma | OK | Diane | | |
| Oregon | OR | Helly | | |
| Pennsylvania | PA | Maria | Lumineer | All |
| | | | Woodlands | All |
| Pennsylvania | PA | Sandy | Catori | All |
| Rhode Island | RI | Veronica | | |
| South Carolina | SC | Veronica | | |
| South Dakota | SD | Sandra | | |
| Tennessee | TN | Lilian | | |
| Texas | TX | Lorena | Star Wranglers | 2,3 |
| | | | Team Explorer | All |
| Texas | TX | Dina | Eagle | All |
| | | | Star Wranglers | 1,4 |
| Texas | TX | Lisa | Odyssey | All |
| | | | Silver Spurs | All |
| Texas | TX | Sandra | Southern Diamonds | All |
| | | | Southern Heat | 3,4 |
| Utah | UT | Helly | | |
| Virginia | VA | Christy | | |
| Washington | WA | Daisy | | |
| West Virginia | WV | Christy | | |
| Wisconsin | WI | Veronica | | |

182.    DaVita tracked the progress of its work with the AKF in several ways, including through "Premium Status Reports" and the "Grant Management System."

38

183.    The Grant Management System, which was updated in real time, provided AKF and DaVita employees instant access regarding the status of their joint efforts to provide money to patients dialyzing at DaVita centers to meet those patients' co-pays, deductibles and other insurance costs.

184.    The Premium Status Reports were distributed weekly and contained all "AKF grants that were issued the previous week."

185.    DaVita's "HIPP Liaison's" were the individuals at DaVita responsible for working closely with AKF employees to ensure the matriculation of premium assistance through this process.

186.    In sum, Mission Possible was another component of DaVita's overall effort to steer patients who are eligible for Medicare or Medicaid coverage to Medicare Advantage or private insurance plans.

187.    DaVita's relationship with the AKF is even more troubling given the *timing* of its contributions to the AKF.

188.    When DaVita contributes money to the AKF, it gives it on a per center basis.  Thus, when DaVita establishes or acquires a new center (for example, through a JV DeNovo), DaVita informs the AKF by sending money affiliated with that newly-established or newly-acquired center. More specifically, when it wires money to the AKF in the reference line it will include the name and reference number of the dialysis center.

189.    For example, Relator personally worked on DaVita's acquisition of Crown Dialysis Clinic in Texas in or about April 2013.

190.    As reflected in the attached document, at the same time that DaVita wired funds to purchase Crown Dialysis Clinic, it also made a contribution of approximately $60,000 to the AKF. **Exhibit 6**.

191.    Upon information and belief, the simultaneous timing of these transactions is for DaVita to signal to the AKF that it is going to start steering patients at the new center from Medicare to private insurance plans and thus that the AKF should anticipate applications for financial assistance for these patients.

192.    DaVita's conspiracy with the AKF went a step further in or about early 2016.  As of that time, certain insurers were becoming increasingly aware that third parties like the AKF were driving high-cost patients onto their patient rolls.  As a result, these insurers began refusing to accept payments from third parties to cover their insured's out of pocket costs.  One method these insurers undertook was to refuse to accept payments from third parties like the AKF, i.e., these insurers began requiring the payments to come directly from their insureds.

193.    This did not stop the AKF and DaVita.  Instead, they pivoted.  In order to avoid these new "direct patient pay" requirements, the AKF began directly sending DaVita's patients checks to cover their co-pays and coinsurance payments.  However, many of DaVita's patients, including Medicaid patients, were poor and either didn't have a bank account, or they disliked incurring check cashing and/or money order fees.

194.    By March 2016, the AKF and DaVita had developed a pilot program to solve for these problems. First, they tracked which insurers who were denying these third-party payments. Second, they shared that information with each other (Relator has tracking documents from both

DaVita and the AKF showing their respective tracking lists).[24]   Third, they identified patients of these insurers who dialyzed at DaVita centers.   Third, they provided DaVita's patients with virtual credit cards ("V-Cards").   A V-Card is literally an image of a credit card that was sent to patients on a pre-printed letter.   An exemplar appears below:

Dear John Doe :

Below is your virtual credit card number. You must use it to pay for your health insurance premium. **You will not receive a physical credit card.**

This virtual credit card has been given to you through a Health Insurance Premium Program (HIPP) grant from the American Kidney Fund. The virtual credit card number can only be used to pay your American Kidney Fund Credit Card health insurance premium in the exact amount noted below. It can only be used one time,  for the exact amount and cannot be used for anything else besides your health insurance premium.

**Use this virtual credit card number to pay for your health insurance premium as soon as possible.Your virtual credit card number will expire 60 days from the date of this letter.You can find the phone number or website of your health insurance company on the back of your health insurance card.**

Instructions on how to use this virtual credit card number are on the included sheet.



Security Code (CVV code): 946
Billing zip code: 20852*

*Make sure to use 20852 as the billing zip code if asked.  Do not use your personal zip code as this will cause the card to be denied.

If you have any questions about using this card, please contact the American Kidney Fund directly at 855.541.0950 or email HIPPVCCPayments@kidneyfund.org.

---

[24] Many of these insurers were in California, including Sierra Health and Life (both private insurance and exchange plans), Health Net (both private insurance and exchange plans) and Blue Shield of California (exchange plans).

196.    These V-Cards were admittedly "a new method of payment for specific patients who have insurance through carriers that allow credit cards as a payment method and who require premium payments to come directly from patients."   **Exhibit 7** at 2. These paper cards were populated with the exact amount of money each patient owed to their respective insurer and were able to be used only once to make that single payment.

197.    Meanwhile, problems with the V-Card solution began to crop up in the Summer of 2016.  Specifically, DaVita and the AKF became aware that in connection with the forthcoming 2016 open enrollment period later in the year, certain insurers participating in the ACA exchanges would be requiring online payments "by CC or debit card only."

198.    In a memo titled "Open Enrollment 2016" DaVita noted that this problem was "Pending [an] AKF Solution."

199.    The "Solution" ended up being as simple as taking the step from paper V-Cards to actual plastic debit cards that could be used for recurring payments.  DaVita and the AKF rolled out the new "solution" together by writing to DaVita's patients.  Although DaVita's letter to its patients claimed that they were receiving the cards "directly from the American Kidney Fund (AKF)" the cards were actually mailed to patients on DaVita Letterhead.  An exemplar appears below:



Dear Patient,

Attached is your AKF debit card to cover your insurance premium for the following months:

Coverage Months: _____

This debit card is provided by the American Kidney Fund for the purpose of assisting you in making your premium payments to your health insurance company.  It is **your** responsibility to make timely payment for the full amount of your premium. It is critical that your payment of your insurance premiums includes the full amount provided on this debit card. Failure to pay the entire amount of your premium on time could result in termination of your insurance coverage.

Please be aware that you are receiving a debit card directly from the American Kidney Fund (AKF) based on an AKF policy, publically disclosed on its website, that it will provide charitable assistance directly to patients in certain situations.  Your insurance company has indicated that it may not accept premium payments directly from a third party like the AKF such that AKF has decided to follow its policy to mail payment directly to HIPP beneficiaries, care of their social worker.  While we believe that in many cases attempts by insurance companies to restrict the use of charitable premium assistance by patients with kidney disease are discriminatory and illegal, it is important that you are aware of the potential risks associated with your decision to continue to pursue charitable premium assistance. Your choice to use charitable premium assistance to pay for your coverage could be considered by your plan as a breach of their insurance policies that could result in rejection of the premium payment and immediate or retroactive termination of coverage in some situations.

If you no longer wish to use charitable premium assistance to pay your insurance premium it is your responsibility to return your payment to AKF.  Please notify your facility Social Worker or Insurance Counselor if this is the case and we can assist with mailing this debit card back to the AKF.

Here are a few other important reminders regarding charitable premium assistance:

- Failure to bring in your premium bills timely could result in a potential loss of insurance coverage or denial of assistance for the specific time period
- Premium assistance from the AKF may be continued as long as:
  - You reside and dialyze in the U.S. or its territories
  - You continue to qualify based on AKF eligibility guidelines
  - You provide all premium notices and requested financial documents timely

Please contact your facility Social Worker or Insurance Counselor at the phone number listed below with any questions.

_____    _____
Patient Name                                              Date

Sincerely,

IC/SW Name _____

IC/SW Contact info _____

200.    Perhaps more importantly, as described above, the money on the debit cards ultimately came from DaVita.  First, DaVita made huge donations to the AKF.  Second, the AKF placed some of that money on debit cards.  Third, DaVita sent the debit cards to beneficiaries.

**5.     DaVita Intentionally Targeted Disadvantaged Racial Groups for Steering Through "Hispanic Outreach"**

201.    DaVita was well aware that the ACA provided a valuable opportunity to drive patients from low-paying Medi-Cal (the California Medicaid Program) to higher paying exchange plans.  For example, the meeting minutes of the Q1 2015 Operating and Strategic Management call with Capital Dialysis Partners recognized that the revenue per treatment from patient with private insurance was much higher and that "the ACA may be providing greater access to MediCal assigned plans."  Put differently, DaVita recognized that MediCal patients were excellent targets to be steered to private insurance and Medicare Advantage plans.

202.    Once DaVita realized it could coerce Medicaid patients into choosing an ACA exchange plan, it began specifically targeting susceptible patient populations, including Hispanics.

203.    A California Health Interview Survey, using 2015 and 2016 data, "found that Latinos have one of the highest rates of enrollment in Medicaid (or Medi-Cal in California) at 44.9%."[25]

204.    A study by the UCLA Center for Health Policy Research also "finds that Latinos are less likely to have health insurance due to lack of coverage through an employer and barriers such as citizenship restrictions on access. This lack of coverage also means that they have less access to health care services, ultimately resulting in poorer health outcomes."[26]

---

[25]    UCLA, California Health Interview Survey, available at https://healthpolicy.ucla.edu/chis/Pages/default.aspx.

[26] UCLA, Still Left Behind: Health Insurance Coverage and Access to Care Among Latinos in California (Aug. 29, 2019), available at https://healthpolicy.ucla.edu/publications/search/pages/detail.aspx?PubID=1836.

205.    In an effort to seize the opportunity to monetize the formerly less profitable Hispanic Medi-Cal patient population., DaVita launched a "Hispanic Outreach" initiative. Hispanics, as a group, were now seen by DaVita leadership as an untapped resource to be "educated" and steered to the exchanges.

206.    Due to having less economic and educational resources as well as a language barrier in many instances, DaVita perceived that Hispanics on Medi-Cal were less likely to question its coercive "education" tactics.

207.    For example, Routt Dialysis is a DaVita joint venture which operates a dialysis facility in Reno, NV that serves patients in both Nevada and California.

208.    The minutes of a June 2016 regular quarterly meeting between DaVita and the Routt Dialysis JV Partners state that the attendees at the meeting "[d]iscussed Hispanic outreach."

209.    Four months later, the minutes for the November 30, 2016 Routt Dialysis meeting confirm that the Hispanic outreach effort was both operational and successful, referencing an "11% increase in hispanic [sic] population educated" and listing "get more information regarding # of Hispanic [sic] patients educated" as an action item.

**C.    DaVita's DeNovo Kickback Scheme and Steering Efforts Work in Tandem**

210.    DaVita's kickback scheme typically relies upon the following sequences of events, which involves illegal steering and illegal kickbacks:

- DaVita's "Business Development" group identifies one or more physicians or physician groups with whom DaVita is potentially interested in establishing a JV DeNovo.

- DaVita provides information to the physicians, generally through the provision of a PowerPoint presentation, with respect to cash flow projections of the potential JV DeNovo.

These cash flow projections show the physicians how much money they can expect to earn from the JV DeNovo.

- The cash flow projections include the expected profits from the physicians' own patients, "free" patients that DaVita will bring to the JV DeNovo through cannibalization, and expected profits from patients steered from low margin government insurance to high margin private insurance and Medicare Advantage plans.

- These projections are based on DaVita's direct access to all of the relevant data points, including how previous, similar JV DeNovo's performed under similar market conditions.

- For purposes of determining the investment cost to the physicians, DaVita ignores these highly probative data points and the projections they generate.  Instead, DaVita values the JV DeNovo by *only* taking into consideration the very low startup and construction costs (collectively "at cost").  This valuation is significantly less than the value would be if DaVita accounted for projected cash flow that DaVita itself expected the newly-established dialysis center to generate.

- DaVita offers the ownership interest to the physicians "at cost."  This price is far below fair market value.  The physicians are induced to enter the "at cost" deal and bring their patients with them because of the projected revenues DaVita has used to induce them.

- Meanwhile, DaVita educates the physicians on how to encourage, *i.e.* steer, Medicare patients to Medicare Advantage and private insurance plans.  DaVita and the physicians both have a financial incentive to engage in this steering, since private insurance carriers and Medicare Advantage plans reimburse at substantially higher levels than Medicare for dialysis and related services.

- The physicians enjoy the financial benefit of the investment, including receipt of quarterly dividends, Medical Director fees and the appreciation of the asset (*i.e.* the ownership interest in the JV DeNovo).

211.   To fully understand DaVita's misconduct, it is necessary to understand why potential JV Partners such as nephrologists and hospitals would want to start a new dialysis center with DaVita rather than expanding their current practice or opening a new dialysis center on their own.

212.   In short, by working with DaVita, JV Partners can take advantage of the substantial financial benefits DaVita enjoys given its dominance of the dialysis marketplace.

213.   For example, JV Partners can take advantage of DaVita's better contractual reimbursement rates with private insurers. Because DaVita controls so much of the dialysis marketplace, it can exercise leverage over private insurers with respect to negotiating reimbursement rates, whereas the physicians have very little bargaining power with insurance companies.

214.   As an example, DaVita controls 42% of the outpatient dialysis capacity (i.e., available dialysis chairs) in California. These dialysis chairs are "spread out" across the state. Similarly, private insurers in California have insureds that are "spread out" across the state.

215.   These insureds have to dialyze somewhere. If an insurance company does not agree to pay what DaVita demands for dialysis treatments, that insurance company's insureds are locked out of 42% of the available dialysis chairs in California. This leads to logistical challenges for the insureds (and displeasure with their insurer) and exposes these very sick people to a greater risk of ending up in the hospital, which would cost the insurer even more money than if their insured dialyzed at DaVita.

216.     Similarly, due to its bargaining power, DaVita can obtain far more favorable pricing for dialysis machines and related products/supplies than a small group of physicians negotiating on their own.

217.     Finally, potential JV Partner physicians are eager to enter into these JV DeNovo transactions rather than build their own centers because: 1) DaVita has extensive experience building dialysis centers, so DaVita can avoid or reduce many of the costs that would be incurred by a group of physicians seeking to build their own center, and 2) DaVita has greater bargaining power in the construction market than a group of physicians or even a hospital would have.

**D.     Specific Conduct Regarding DaVita's Illegal Kickbacks and Steering**

**1.     Relator Learns About DaVita's Misconduct**

218.     As described above, Relator worked for a component of DaVita known as the "Deal Depot" from June 2015 to February 2017.  Deal Depot is the internal name for the group that handles DaVita's domestic mergers and acquisitions.

219.     Relator first became suspicious of DaVita's conduct in late 2016 when he, through his work at Deal Depot, was a member of the mergers and acquisitions ("M&A") team working to acquire a dialysis center known as Montebello Artificial Kidney Center ("MAKC") owned by Dr. Vijay Dhawan and Dr. Kamlesh Dhawan.

220.     DaVita had approached the owners of MAKC in 2013 to purchase the dialysis center.  In 2013, MAKC serviced 79 patients.  Approximately 6% of the patients had private insurance, so MAKC had a relatively low revenue per treatment ("RPT") of $264.  This led DaVita to make an offer of $1.95 million.  The owners of MAKC were not interested in selling at this price.

221.     Three years later, in 2016, DaVita decided to re-approach MAKC to see if the doctors were interested in selling MAKC. Relator was instructed to prepare the valuation model.

222. By 2016, MAKC was servicing 122 patients (an increase from 79), but the percentage of patients using private pay declined to 0.8% (from 6.3%). The RPT for 2016 ($264) was the same as the RPT for 2013. Thus, MAKC did not experience any growth in its profit margins over three years. In fact, due to inflation, its margins appeared to have declined. Thus, there was no good reason as to why the valuation or selling price for MAKC would increase substantially.

223. On May 10, 2016, Relator sent the valuation memorandum he prepared to DaVita's Vice President of M&A, David Finn.

224. On May 11, 2016, Mr. Finn determined that MAKC should be offered between $2-million and $2.5 million for the center and instructed Relator to send the materials to the appraisal firm so they could validate the internal pricing. Relator did as he was told and sent the materials to the third-party appraisal firm to approve the pricing.

225. About an hour after Mr. Finn priced the deal on May 11, 2016, Gary Lemon, the Vice President of Business Development, sent an email to Relator and others, asking "What are the key drivers that have changed since this proposal?"

226. On May 17, 2016, Relator responded to Mr. Lemon's email including the following financial statement comparison which showed that while the treatment numbers increased due to the increase in the number of patients, the percentage of patients utilizing private pay plans decreased, and thus, the RPT stayed the same ($264), and therefore there should be no significant increase in purchase price:

|  | CURRENT | PREVIOUS |
|---|---|---|
|  | Year 1 | Year 1 |
| Treatments |  |  |
| Chronic | 17,685 | 11,717 |
| PD/HHD | - |  |
| Acutes | - |  |
| Total Treatments | 17,685 | 11,717 |
| *Growth Rate* | - |  |
|  |  |  |
| **Net Revenue** | $ 4,668,935 | $ 3,090,003 |
| *Net revenue per tx* | *$264* | *$264* |
|  |  |  |
| Salaries, Wages & Benefits | 1,783,199 | 1,318,100 |
| **per tx** | **100.83** | **112.49** |
| Pharma + Medical Supplies | 990,911 | 649,631 |
| **per tx** | **56.03** | **55.44** |
| Medical Director Fees | 96,000 | 90,000 |
| Rent | 317,280 | 163,200 |
| Other | 691,790 | 437,297 |
| Other Expenses | 1,105,070 | 690,497 |
| **per tx** | **62.49** | **58.93** |
| Management Fee | 455,380 | 309,000 |
| Total Expenses | $ 4,334,560 | $ 2,967,228 |
|  |  |  |
| **EBITDA** | **$ 334,376** | **$ 122,775** |
|  | 7% | 4% |
| **per tx** | **18.91** | **10.48** |

227.     Kapil Vashistha, DaVita's Division Vice President who had responsibility for over fifty (50) dialysis centers in California (and who was the most senior executive on the email chain), responded with the following:

> On May 17, 2016, at 9:56 PM, Kapil Vashistha <Kapil.Vashistha@davita.com> wrote:
>
> Thanks John. A few questions for you:
>
> 1.) RPT Assumptions: I believe David may have raised this already with Michael, but how are you taking into account the Medicaid to Exchange opportunity over the course of the pro-forma? Based on the eligible Medicaid census in the clinic, this could be a significant driver so want to ensure we are accounting for that reality.

228.     Relator did not know how to respond to this email because there was no history of patients at this center choosing or electing for themselves to opt out of Medicare or Medicaid, and the percentage of patients with Medicare Advantage and commercial health plans had actually gone down over the last three years.

229.    Mr. Vashistha replied to the group "Let's have a call for tomorrow to discuss." And then separately Michael Spivak replied to Relator alone:

> **From:** Michael Spivak
> **Sent:** Wednesday, May 18, 2016 1:47 AM
> **To:** John Bayne
> **Subject:** Fwd: Montebello Presentation
>
> No more emails on this topic please.

230.    Michael Spivak separately replied to the group as follows: "Gary: The below analysis should not be shared with the Doctor. I can explain why tomorrow on a live call."

231.    On May 20, 2016, Mr. Spivak sent an email to the third-party valuation group Relator had contacted to review the deal and told them to cancel the valuation that Relator had sent.

232.    Subsequently, Relator, Mr. Spivak, Mr. Vashistha, Mr. Lemon, and two additional operations directors, David Armstrong and Brian Nordin, had a conference call on May 24, 2016. During that call, Mr. Lemon repeatedly stated that he believes the owners of MAKC wanted to be paid at least $3 million for MAKC and asked to get the valuation "bumped up" to that number. Mr. Vashistha talked about his confidence in converting MAKC's Medicare/Medicaid patients to higher paying "exchange plans."

233.    In the days after the call, a series of emails and communications occurred through which Relator became aware that there was a nationwide effort to convert patients from Medicare/Medicaid coverage to coverage from private insurers or Medicare Advantage plans.  As it specifically related to the MAKC deal, Relator was instructed to, and did, change the valuation model to include a prospective increase in conversions of Medicare/Medicaid patients to these higher paying insurance plans.

234.    Relator's revised valuation for MAKC was carefully worded and approved by Mr. Finn, Mr. Vishistha, Mr. Spivak, and Mr. Young.

235.    At the direction of Mr. Spivak, the deal was sent to a different third-party valuation firm for approval.  This is because DaVita did not have a good explanation for why its valuation went up so much.  Moreover, since the second firm had not seen the first valuation, the second firm would be less likely to question the revised valuation.

236.    On November 11, 2016, Mr. Finn priced the deal in the $3.4 to $3.9 million range.

237.    In sum, a low profitability clinic valued at $1.95 million based on actual historical figures was re-valued at $3.4-$3.9 million based on, *inter alia*, projections incorporating unlawful steering.

### 2.    JV DeNovo Examples

238.    Below are three representative examples that illustrate this same set of principles in the context of JV DeNovo transactions.  These examples are typical and are indicative of DaVita's standardized and systemic efforts of committing fraud through its JV DeNovos.

239.    Given the complex array of corporate entities and individuals involved in these representative examples, Relator provides the following summary table:

| # | DaVita Entity | Name of JV DeNovo Entity | Dialysis Center Owned by JV | JV Partner | Entity or Person Controlling JV Partner |
|---|---|---|---|---|---|
| 1 | Total Renal Care, Inc. | Panther Dialysis LLC | Menifee Home At Home | Menifee Home Dialysis LLC | Nephrology Associates Medical Group |
| 2 | Total Renal Care, Inc. | Holten Dialysis LLC | Serrano Dialysis | NAMG Dialysis Ventures XI, LLC | Nephrology Associates Medical Group |
| 3 | Total Renal Care, Inc. | Olive Dialysis LLC | South Gate Dialysis | Lafayette Medical Dialysis LLC. | Dr. Malvin Yan Do |

### a.      JV DeNovo Example 1 – Panther Dialysis LLC

240.    One example of DaVita's JV DeNovo fraud in the context of at-home dialysis involves Panther Dialysis LLC.

241.    Panther Dialysis is jointly owned by Total Renal Care, Inc. (a subsidiary of DaVita) and an entity called Menifee Home Dialysis LLC, which is located in Menifee, CA.[27]

242.    DaVita owns 51% of Panther Dialysis and Menifee Home Dialysis owns 49% of Panther Dialysis.

243.    Menifee Home Dialysis, in turn, is controlled by Nephrology Associates Medical Group ("NAMG").

244.    NAMG is a large physician group with 14 office locations and an extensive patient network throughout Southern California.

245.    NAMG, through Menifee Home Dialysis, collectively invested $977,785 in Panther Dialysis in return for its 49% ownership interest.

246.    This $977,785 investment consisted of an initial capital contribution of $353,035, and subsequent working capital contributions of $245,000 and $379,750.

247.    NAMG, through Menifee Home Dialysis, made the initial contribution of $353,035 in 2014.  Subsequently, NAMG, through Menifee Home Dialysis, made capital contributions of $245,000 and $379,750 in 2015 and 2016, respectively.

248.    The working capital contributions were needed because the volume of dialysis treatments and revenues at Panther Dialysis were growing so rapidly that further working capital

---

[27] Menifee Home Dialysis LLC operates "Menifee Home At Home," which provides home therapy services to dialysis patients, specifically PD (Peritoneal Dialysis) and HHD (Home Hemodialysis). While in-center dialysis typically requires the patient to travel to the dialysis center three times a week, "home patients" typically go to the dialysis center only once a month to pick up supplies. The "home patients" self-provide their own dialysis services at home.

was needed to support the business.  This is often a positive sign for fast growing ventures because there is a time delay between when revenue is billed and when it is collected.  So, more working capital was required to finance the rapid growth.

249.    A financial review statement dated in April 2018 for Panther Dialysis describes the initial and subsequent contributions to Panther Dialysis by NAMG through Menifee Home Dialysis. **Exhibit 8** at 9.

250.    The initial price of $353,035 and subsequent working capital contributions of $245,000 and $379,750 were based on the startup/construction costs and a need for working capital rather than a valuation methodology which projected future cash flows or profit (such as the projection-based valuation methodology DaVita itself used when the company bought into MAKC).

251.    The construction costs for Panther Dialysis were very low because patients did not dialyze there, i.e., Panther Dialysis was a small medical office location with some computers and exam room where the home therapy patients came once a month to get additional medical supplies so they could self-dialyze at home.  It did not have all the dialysis infrastructure (chairs, water systems, etc.) of a typical dialysis center.

252.    Through April 2018, NAMG received $3,653,148 in distributions (*i.e.* profit sharing) from DaVita:

| Year | JV Partners | DaVita |
|------|-------------|--------|
|      | 49%         | 51%    |
| 2016 | $728,915    | $758,667 |
| 2017 | $2,368,863  | $2,465,552 |
| 2018 (as of April) | $555,370 | $578,038 |

253.    These distributions are described in the April 2018 financial review statement dated for Panther Dialysis. **Exhibit 8** at 9.

254.    A total distribution of $3,653,148 amounts to a total return of NAMG's initial investment **plus** an additional 274% in profits over a period of only 2.25 years (January 2016 to April 2018).

255.    In addition, Panther's April 2018 balance sheet reflected undistributed cash of $2,467,979 (NAMG's 49% of which would be $1,209,310).

256.    Finally, the total distribution does not include a terminal value today (for future distributions) of their 49% stake should NAMG wish to sell its interest back to DaVita.  If the widely recognized and accepted Gordon Growth Model[28] is applied to determine the terminal value based on the most recent quarter's annualized free cash flow (ending June 2018), the JV Partners' stake would be valued at $15,567,626 (after adding the excess cash on the balance sheet yet to be paid out and apply the same discount rate of 12% that DaVita uses in its models).

257.    This is described in the chart below:[29]

| | |
|---|---|
| Free Cash Flow | 2,629,712 |
| Terminal Value | $30,095,591 |
| Excess Cash | $1,675,075 |
| Equity - 100% | $31,770,665 |
| DaVita - 51% | $16,203,039 |
| **JV Partners - 49%** | **$15,567,626** |

258.    Considering this valuation of $15,567,626 and $3,653,148 of prior distributions in tandem, this totals $19,220,774 of value, or a total return of 19.66x or 1,966% return on NAMG's initial invested capital of $977,785.

---

[28] The Gordon Growth Model is a standard model used to value an asset based on the present value of future dividends and is commonly used by third-party appraisers.
[29] This chart utilizes a free cash flow of $2,629,712, based on annualizing (*i.e.,* multiplying by 4) the quarterly free cash flow from the June 2018 quarterly financial statement.

259.    If DaVita valued Panther Dialysis accurately in 2015 using a widely accepted methodology of Net Present Value and discount rate of 12%, NAMG should have contributed $13,561,528 of equity in 2015.    This is depicted in the chart below:

| | 3/17/2015 | 6/30/2016 | 6/30/2017 | 6/30/2018 |
|---|---|---|---|---|
| Distributions | $0 | $728,915 | $2,368,863 | $555,370 |
| Exit Value Today | | | | $15,567,626 |
| Total Returns | $0 | $728,915 | $2,368,863 | $16,122,996 |
| Equity Value for 49% in 2015 | 13,561,528 | | | |
| | | | | |
| Partners Actual Contributions | $977,785 | | | |

260.    If DaVita had appropriately valued Panther Dialysis, NAMG's contribution of $977,785 would have constituted a 3.5% ownership interest, not 49%.  Put differently, if DaVita had appropriately valued Panther Dialysis, the JV Partner would have had to contribute $13,561,528 to purchase a 49% ownership interest.

### b.      JV DeNovo Example 2 – Holten LLC

261.    Holten Dialysis LLC is an entity jointly owned by Total Renal Care, Inc. (a subsidiary of DaVita) and NAMG Dialysis Ventures XI, LLC ("NAMG Ventures").

262.    NAMG Ventures is controlled by Nephrology Associates Medical Group ("NAMG"), the same entity described above in Example 1.

263.    DaVita owns 60% of Holten Dialysis LLC and NAMG Ventures owns the remaining 40%:



264.    Holten Dialysis LLC opened a dialysis facility named Serrano Dialysis located in San Bernardina, CA in or around October 2016.

265.    In or about October 2016, DaVita sold a 40% ownership interest in Holten Dialysis LLC to NAMG Ventures.

266.    In return for the 40% ownership interest in Holten Dialysis LLC, NAMG Ventures contributed a total of $1,525,600, consisting of $952,802 in capital expenditures, $30,247 as a development fee, and $542,551 in working capital contributions.

267.    NAMG Ventures' total investment of $1,525,600 was based on the cost of construction and the working capital initially needed to operate Serrano Dialysis, rather than a valuation methodology in which future projected cashflows or profits are taken into consideration.

268.    The standard template model that DaVita utilize for JV DeNovo transactions includes a JV Partner cash flow tab so that it can be shown to potential JV Partners and is typically included in the PowerPoint presentations for the JV Partner.

269.    As relevant here, the JV Partner cash flow tab for Holten Dialysis LLC provided:

| START-UP COSTS: | Cost | Partner % | Initial Investment |
|---|---|---|---|
| Start-up capital expenditures | (2,382,005) | 40.0% | (952,802) |
| Start-up working capital | (1,356,378) | 40.0% | (542,551) |
| Development fee | (75,617) | 40.0% | (30,247) |
| Contribution | (3,814,000) | | (1,525,600) |
| Interest charge | (87,397) | 40.0% | (34,959) |
| **Total** | (3,901,397) | | (1,560,559) |

**PROJECTED CASH FLOW:**

| | Year 0 | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|---|
| Average Census | | 45 | 82 | 114 | 143 | 156 |
| *% Growth* | | | *82%* | *40%* | *26%* | *9%* |
| Treatments | | 6,447 | 11,738 | 16,418 | 20,646 | 22,461 |
| Revenue per Treatment | | $315 | $312 | $311 | $310 | $312 |
| **Operations - Partner's Share:** | | | | | | |
| EBITDA | $ (68,205) | $ 110,996 | $ 252,435 | $ 430,924 | $ 577,693 | $ 645,048 |
| Working Capital | (474,346) | (91,796) | 125,775 | (150,090) | (123,535) | (24,795) |
| Accounts receivable | - | (205,375) | (106,659) | (102,266) | (80,300) | (11,394) |
| Inventory | - | (8,235) | (4,623) | (4,529) | (4,143) | (431) |
| Accounts payable | - | 39,223 | 24,644 | 22,764 | 21,089 | 6,829 |
| Change in Minimum cash | (474,346) | | | | | |
| Cash distribution adjustment | | 82,590 | 212,413 | (66,058) | (60,182) | (19,799) |
| Development Fee | (30,247) | | | | | |
| **Capital & Investment - Partner's Share:** | | | | | | |
| Capital expenditures | (952,802) | (19,200) | (19,776) | (20,369) | (20,980) | (21,610) |
| Terminal value (c) | | | | | | 3,225,240 |
| **Total cash flow** | $ (1,525,600) | $ - | $ 358,434 | $ 260,465 | $ 433,177 | $ 3,823,883 |
| Medical Director Fees (d) | | 88,632 | 88,632 | 88,632 | 88,632 | 472,362 |
| **Total cash flow with MD fees** | $ (1,525,600) | $ 88,632 | $ 447,066 | $ 349,097 | $ 521,809 | $ 4,296,245 |

| Pre-Tax: | | Pre-Tax with MD Fees: | |
|---|---|---|---|
| **Rate of Return** | 29.7% | **Rate of Return** | 35.9% |
| **NPV (e)** | $1,560,617 | **NPV (e)** | $2,129,176 |

Line of redit requirement (1/12 of year 1 expenses):
Required line of credit: $146,136

(a) Assumes 9 months of operating expenses for start-up working capital.
(b) Assumes 5.0% development fee.
(c) Assumes year 5 terminal value of 5.0x EBITDA.
(d) Year 5 includes the present value of the Medical Director Fees in Year 6 to 10, discounted at 5.0% rate.
(e) Assumes 12.0% discount rate.

270.    As shown in the graphic above, DaVita informed NAMG Ventures that it could expect to generate total returns of $5,702,849, inclusive of: (1) a terminal value in year 5 and (2) ten years of medical directorship fees for serving as the medical director at Serrano Dialysis.

271.    The terminal value represents either: (1) an exit value for NAMG Ventures' 40% ownership interest in Year 5 or (2) in the event NAMG Ventures chose not to exit, the present value of all projected future earnings that NAMG Ventures would receive from Serrano Dialysis after Year 5 into perpetuity.

272.     Even though the terminal value is given at Year 5, the medical director fees include fees for a 10-year period. This is because when a JV Partner elects to serves as a medical director, it does so for a 10-year period.

273.     Thus, NAMG Ventures' initial investment of $1,525,600 in Holten Dialysis LLC was projected to generate a total return of $5,702,849, meaning that NAMG Ventures was projected to generate a net return of $4,177,249 after accounting for the initial contribution.[30]

274.     If DaVita had appropriately valued Holten Dialysis LLC to take this projected cashflow into consideration, NAMG Ventures' contribution of $1,525,600, would have constituted either a 16.7% or 19.6% ownership interest, respectively, with or without the medical director fees, rather than the 40% ownership interest that NAMG Ventures actually received.

275.     Put differently, if DaVita had appropriately valued Holten Dialysis LLC, NAMG would have had to contribute more than $3,000,000 to purchase a 40% ownership interest (inclusive or exclusive of the value of medical director fees).

276.     Moreover, as is often the case with revenue and cash flow projections that DaVita shows to potential and existing JV Partners, included in this deal were the expected financial benefits that would accrue to NAMG Ventures from both DaVita's coercive steering program and its "cannibalization" of patients from nearby locations.

277.     As noted, in DaVita's parlance, cannibalization occurs when DaVita already operates one or more non-JV DeNovo dialysis centers (*i.e.* centers that are 100% DaVita owned

---

[30] As described in the graphic, the net present values (NPV) that DaVita calculated for NAMG's 40% ownership interest is the excess NPVs over the cost of the investment.  The NPVs of just the positive cashflows that the dialysis center will generate (without the initial investment) calculate to $3,086,217 and $3,654,776, respectively, without and with the MDA fees.

and operated) in a geographic area but nonetheless elects to open a new dialysis center through a JV DeNovo.

278.    Under these circumstances, DaVita forecasts how many patients at one of its existing dialysis centers (known as the "Parent") will move to the newly-opened dialysis center. Put differently, DaVita knows that once a new center opens, some of its existing patients will go to the new center and highlights this fact to the potential JV DeNovo as a further inducement.

279.    Through cannibalization, DaVita protects the financial viability of a JV DeNovo when it first opens.

280.    This serves as another reason why JV DeNovos are an incredibly low-risk investment for JV Partners. In other words, DaVita induces JV Partners to invest in JV DeNovos by providing the JV DeNovo with "free patients."

281.    Given that these patients are moving from a 100% DaVita-owned center to a JV DeNovo in which DaVita is not the sole owner, DaVita is sacrificing revenue to accomplish this goal. DaVita calculates DaVita's loss that will arise from the forecast cannibalization. For example, if a patient moves from a 100% DaVita-owned center to a 60% DaVita-owned JV DeNovo, DaVita is giving up a substantial amount of revenue to the 40% JV Partner.

282.    In addition, DaVita includes the forecasted cannibalization revenue in the projected cashflows at the new center but does not consider it in any valuation to determine the price the JV Partner pays to obtain ownership.

283.    Thus, as above, DaVita uses the forecasted cannibalization revenue when consideration of it suits its purposes but simultaneously ignores it when doing so would not suit its purposes.

284.   Serrano Dialysis illustrates the significance of both cannibalization and steering in DaVita's overall scheme.

285.   The inclusion of cannibalization and steering economics for Serrano was determined at DaVita's regional level within California.

286.   As seen highlighted below, Serrano Dialysis was part of DaVita's Surf N' Sun Region #2, which at the time was made up of the nineteen dialysis centers, eight of which were 100% wholly-owned by DaVita and the remaining eleven were joint ventures.

287.   The two centers highlighted in red in Surf N' Sun Region 2 were two of the 100% wholly-owned by DaVita centers that were designated to have patients cannibalized and directed to the new Serrano JV DeNovo.

| Ownership | Facility Name (Common) | City | Stat | Start Date | Oracle Legal Entity (LE) |
|---|---|---|---|---|---|
| W/O | MOUNTAIN VISTA DIALYSIS CENTER | SAN BERNARDINO | CA | 1/1/1994 | 100064 Renal Treatment Centers - California, Inc. |
| W/O | CITRUS VALLEY DIALYSIS | SAN BERNARDINO | CA | 1/19/2005 | 100064 Renal Treatment Centers - California, Inc. |
| JV | YUCAIPA DIALYSIS CENTER | YUCAIPA | CA | 12/23/2006 | 200584 Yucaipa Dialysis, LLC |
| W/O | HESPERIA DIALYSIS CENTER | HESPERIA | CA | 3/31/2009 | 100101 Total Renal Care, Inc. |
| JV | HIGHLAND RANCH DIALYSIS | HIGHLAND | CA | 3/22/2010 | 200761 Crystals Dialysis, LLC |
| JV | BERMUDA DUNES DIALYSIS | PALM DESERT | CA | 5/2/2012 | 200615 Channel Dialysis, LLC |
| W/O | HI-DESERT DIALYSIS | YUCCA VALLEY | CA | 10/1/2005 | 100302 DVA Renal Healthcare, Inc. |
| W/O | BANNING DIALYSIS | BANNING | CA | 10/1/2005 | 100302 DVA Renal Healthcare, Inc. |
| W/O | VICTOR VALLEY DIALYSIS | APPLE VALLEY | CA | 10/1/2005 | 100300 DVA Healthcare Renal Care, Inc. |
| W/O | PALM SPRINGS DIALYSIS | PALM SPRINGS | CA | 10/1/2005 | 100302 DVA Renal Healthcare, Inc. |
| JV | CATHEDRAL CITY DIALYSIS | CATHEDRAL CITY | CA | 8/1/2011 | 200610 Dolores Dialysis, LLC |
| JV | MOJAVE SAGE DIALYSIS | VICTORVILLE | CA | 5/2/2012 | 200685 Villanueva Dialysis, LLC |
| JV | COLTON RANCH DIALYSIS | COLTON | CA | 11/5/2014 | 200475 Walton Dialysis, LLC |
| JV | CATHEDRAL CITY AT HOME | CATHEDRAL CITY | CA | 8/1/2011 | 200610 Dolores Dialysis, LLC |
| W/O | CITRUS VALLEY AT HOME | SAN BERNARDINO | CA | 5/1/2007 | 100064 Renal Treatment Centers - California, Inc. |
| JV | SAN BERNARDINO HT AT HOME | SAN BERNARDINO | CA | 7/30/2014 | 200996 Seabay Dialysis, LLC |
| JV | VISTA DEL SOL AT HOME | VICTORVILLE | CA | 9/12/2016 | 201256 Rollins Dialysis, LLC |
| JV | SERRANO DIALYSIS | SAN BERNARDINO | CA | 10/17/2016 | 201193 Holten Dialysis, LLC |
| JV | VISTA DEL SOL DIALYSIS | VICTORVILLE | CA | 3/9/2017 | 201256 Rollins Dialysis, LLC |

288.   As per the below model, the two "Parent" centers to be cannibalized, Mountain Vista and Citrus Valley, would together send 25 patients (23 government-reimbursed patients and 2 non-government (*i.e.* commercial) patients to Serrano Dialysis:

| Parent Facilities after opening of DeNovo | | | | | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|---|---|---|---|
| | | Pts to DeNovo | Pts at Parent | | | | | | |
| ICHD | Government | 23 | 243 | Growth | 11 | 11 | 0 | 0 | 0 |
| | | | | Total | 254 | 265 | 265 | 265 | 265 |
| | Non-Government | 2 | 16 | Growth | 1 | 1 | 0 | 0 | 0 |
| | | | | Total | 17 | 18 | 18 | 18 | 18 |

| The DeNovo | | | | | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|---|---|---|---|
| | | Pts from Parent | New Pts @ Opening | | | | | | |
| ICHD | Government | 23 | 1 | Growth | 32 | 31 | 29 | 27 | 0 |
| | | | | Total | 56 | 87 | 116 | 143 | 143 |
| | Non-Government | 2 | 1 | Growth | 3 | 2 | 2 | 0 | 0 |
| | | | | Total | 6 | 8 | 10 | 10 | 10 |

289.    This cannibalized patient revenue and the resulting financial returns analysis were incorporated into the financial model that was shown to NAMG Ventures in an effort to induce NAMG to enter the deal. However, these revenues and returns were ignored when determining the "buy in" cost to NAMG.   Instead, DaVita allowed NAMG Ventures to invest at cost (*i.e.* at "DeNovo pricing").

290.    Because DaVita's JV DeNovo's are based on kickbacks, after the Barbetta CIA became effective, DaVita executives were concerned that the CIA process (and the resulting oversight by the Monitor) would effectively extinguish the JV DeNovo scheme. In fact, DaVita's Vice President of Mergers & Acquisitions David Finn openly questioned – in Relator's presence – whether the company would even be able to do JV DeNovos given the strictures of the CIA.

291.    Relator later learned that for reasons unknown, after the CIA was implemented, the CIA process did not require appraisers to review the valuations of JV DeNovo's. So the Monitor would not have seen the valuation components of the deals. Further, on information and belief, the Monitor would not receive the full financial assessment that was shown to the JV partners to induce them to enter the deal, including the net present value and rates of return.

292.    For example, the below information illustrates an example of information that was, upon information and belief, not shown to the Monitor in connection with the Serrano Dialysis deal.

293.    By way of illustration, below is the "Non-Govt" (i.e., commercial insurance) reimbursement data from nearby dialysis centers in Surf N' Sun Region 2, which was used to make the "Non-Govt" Reimbursement assumption for Serrano.  As can be seen, DaVita projected $706 per treatment for in-center hemodialysis ("ICHD") at Serrano, and $730 per treatment for peritoneal dialysis ("PD").

| Rates for DeNovo | | | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Annualized Growth |
|---|---|---|---|---|---|---|---|---|
| ICHD | Govt | Revenue / Tx | $ 270 | $ 271 | $ 273 | $ 275 | $ 279 | |
| | | Growth Rate | | 0.5% | 0.5% | 1.0% | 1.5% | |
| | | Frequency of TX | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | |
| | Non-Govt | Revenue / Tx | $ 706 | $ 722 | $ 739 | $ 756 | $ 773 | 2.3% |
| | | Frequency of TX | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | |
| PD | Govt | Revenue / Tx | $ 306 | $ 308 | $ 309 | $ 313 | $ 317 | |
| | | Growth Rate | | 0.5% | 0.5% | 1.0% | 1.5% | |
| | | Reimbursement Freq | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | |
| | Non-Govt | Revenue / Tx | $ 730 | $ 747 | $ 764 | $ 782 | $ 800 | 2.3% |
| | | Reimbursement Freq | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | |

294.    The JV Partners, however, did receive that detail.

295.    Similarly, looking at the below excerpts from the quarterly financial packets of three other JVs in Region 2 (Crystals, Yucaipa and Seabay) in 2016, in all cases the exchange treatments were higher than the overall non-government Revenue Per Treatment (RPT).  These exchange treatments were therefore helping drive the non-government rate higher for all of Region.  On information and belief, the Monitor therefore also received no information on the components that were driving the "Non-Gov't" reimbursement, while at the same time the JV Partners, (in this case NAMG), were being given quarterly updates on the breakdown of the reimbursement drivers.

63



**c.     JV DeNovo Example 3 – Olive LLC**

296.    Olive Dialysis LLC is an entity jointly owned by Total Renal Care, Inc. (a subsidiary of DaVita), and an entity named Lafayette Medical Dialysis, LLC ("Lafayette"). This example further illustrates how the financial benefit of cannibalization was shown to the JV Partner using cash flow analysis, but was not considered when valuing the ownership interest sold to the JV Partner.

297.    Lafayette is controlled by a nephrologist named Dr. Malvin Yan Do.

298.    DaVita owns 80% of Olive Dialysis LLC and Lafayette owns the remaining 20%.

299.    Olive Dialysis LLC opened a dialysis facility named South Gate Dialysis located in South Gate, CA in or around July 2016.

300.    DaVita sold a 20% ownership interest in Olive Dialysis LLC to Lafayette.

301.    DaVita forecasted how many of its existing patients would move to South Gate Dialysis once it opened and how much those patients constituted in dollar value to be then attributed to Olive Dialysis LLC.

302.    The "Parent" center was DaVita's Premier Dialysis Center (#437) located at 7612 Atlantic Avenue in Cudahy, CA, which is only 1.8 miles down the road from South Gate Dialysis located at 9848 Atlantic Avenue in South Gate, CA.

303.    As highlighted in the graphic below, DaVita calculated the value of the patients it anticipated would move from the Parent to South Gate Dialysis as projected to cumulatively generate $1,739,128 in negative "Cash Flow Impact" to the Parent (which in turn would be a positive Cash Flow Impact to South Gate Dialysis and Olive Dialysis LLC), over the course of five years:

| | | | All Parents - Incremental to DVA | | |
|---|---|---|---|---|---|
| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
| **Cannibalized Parent Cash Flow** | | | | | |
| EBITDA | ($263,126) | ($429,247) | ($430,013) | ($433,089) | ($436,729) |
| Accounts Receivable | $94,365 | $85,038 | $3,459 | $3,727 | $2,758 |
| Inventory | $3,656 | $2,579 | $52 | $53 | $54 |
| Accounts Payable | ($14,366) | ($10,198) | ($379) | ($398) | ($410) |
| Payroll Payable | ($3,509) | ($2,087) | ($112) | ($114) | ($116) |
| **Operating Cash Flow Impact** | **($182,980)** | **($353,915)** | **($426,993)** | **($429,820)** | **($434,442)** |
| | | | | | |
| Change in Min Cash Impact | $50,879 | $33,614 | $1,463 | $1,514 | $1,553 |
| CapEx Impact | $0 | $0 | $0 | $0 | $0 |
| **Cash Flow Impact** | **($132,101)** | **($320,301)** | **($425,530)** | **($428,307)** | **($432,889)** |

304.    DaVita then incorporated the negative value of paying this kickback to the JV into its own financial returns (highlighted below).

| DVA Returns Projected Financials | | | | | | |
|---|---|---|---|---|---|---|
| **Summary P&L: Incr. to DVA** | Year 0 | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
| **Returns Summary** | | | | | | |
| Cash Distributions / (Investment) | ($4,285,785) | $0 | $0 | $554,709 | $876,014 | $1,211,744 |
| Less: Partner Share of Distributions / (Investment) | 857,157 | 0 | 0 | (110,942) | (175,203) | (242,349) |
| Less: DVA Share of Cannibalized Cash Flow | 0 | (132,101) | (320,301) | (425,530) | (428,307) | (432,889) |
| Less: Incremental DVA Taxes | 116,961 | 281,125 | 132,732 | (31,977) | (160,228) | (268,009) |
| Plus: Margin on Management Fee Net of Tax | 0 | 17,881 | 67,687 | 96,283 | 121,812 | 144,986 |
| Plus: Terminal Value | 0 | 0 | 0 | 0 | 0 | 5,264,965 |
| **Total Free Cash Flow to DVA** | **($3,311,667)** | **$166,906** | **($119,881)** | **$82,542** | **$234,089** | **$5,678,447** |

305.    In this scenario, DaVita was losing 100% of the $1,739,128 from the Parent, but only getting back 80% of this cash flow ($1,391,302) in the JV, due to DaVita's 80% interest in

the JV.  In turn, the JV partner at 20% ownership, would be the beneficiary of the remaining $347,826 over five years.

306.    Despite making the calculation of this negative cash flow impact for its own financial returns, DaVita did not consider the forecasted positive impact from this cannibalization cash flow when setting a price for Lafayette's investment into Olive Dialysis LLC.  Had DaVita included this cumulative value over five years highlighted below ($347,826) as well as the future value (Terminal Value), Relator calculates below, that the Net Present Value (NPV) of this kickback was approximately $801,000.

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Total Years 1-5 |
|---|---|---|---|---|---|---|
| 20% of Cash Flow Impact | 26,420 | 64,060 | 85,106 | 85,661 | 86,578 | 347,826 |
| Terminal Value @ 3% perpetual growth rate | | | | | 990,836 | 990,836 |
| Total Return | 26,420 | 64,060 | 85,106 | 85,661 | 1,077,413 | 1,338,661 |

| NPV @ 12% Discount Rate | $801,027 |
|---|---|

307.    These 29 cannibalized patients represent only 17% of the 174 total patients projected in the facility by year 5 and alone represent an incremental value of approximately $801,000 for the 20% JV Partner.   However, Lafayette paid only $857,200 for its entire 20% ownership stake in the project, based on construction costs plus and initial working capital.

### E.    False and Fraudulent Conduct Involving the AKF and Its Financial Assistance for Traditional Medicare, Medigap, and Medicare Advantage Coverage.

308.    In addition to conspiring with the AKF regarding the steering fraud described above, DaVita conspired with the AKF to provide financial assistance to Medicare patients.

309.    As described above, the AKF is a non-profit corporation that is, in large measure, funded by dialysis providers such as DaVita.

310.    Specifically, Medicare patients must pay a yearly premium, a yearly deductible, and a co-pay (also known as co-insurance) each time they receive a covered service.

311.    At present, the yearly premium for Medicare Part B is a minimum of $134 with higher amounts depending on income level.

312.    At present, the yearly deductible for Medicare Part B is $183.

313.    At present, the co-pay (or co-insurance) for Medicare Part B services is 20% of the Medicare-approved amount. Put differently, Medicare only covers 80% of the Medicare-approved amount with the patients being responsible for the remainder.

314.    Medigap insurance is available to Medicare beneficiaries through various insurers in return for payment of a premium.

315.    Medigap insurance typically covers the amount of a Medicare beneficiary's yearly premium, yearly deductible, and per-service co-pay.

316.    As noted above, the AKF operates the Health Insurance Premium Program ("HIPP"), which provides financial assistance to ESRD patients with respect to premiums, deductibles and co-payments for traditional Medicare, Medicare Advantage, and Medigap plans.

317.    The AKF refers to the financial assistance it provides through HIPP (including for costs associated with traditional Medicare coverage, Medigap coverage, and Medicare Advantage coverage) as "charitable premium assistance."

318.    A substantial number of DaVita's patients receive financial assistance through the AKF.  Many of those patients are covered by Medicare, and many have Medigap policies.

319.    Given its sizable contributions to the AKF and the AKF's provision of financial assistance to many of its patients for costs associated with traditional Medicare coverage, Medigap coverage, and Medicare Advantage coverage, DaVita is, in effect, providing kickbacks to its patients.

320.   For example, as described above, Medigap coverage typically covers a Medicare patient's co-pay obligations.  Thus, through its funding of the AKF and the AKF's provision of financial assistance to obtain Medigap coverage through HIPP, DaVita is assisting its own patients avoid the co-pay they would otherwise be required to pay for the care DaVita provides.

321.   When DaVita anticipates having an increase in the number of its patients that will be seeking assistance from the AKF (i.e., during enrollment periods), DaVita increases its contributions to the AKF.

322.   For example, when viewing the monthly financial statements for 2013 relating to one of DaVita's JV DeNovos known as "Waseon," DaVita was donating about $2,500 per month to AKF as of January 2013.  In or about December 2013 (the close of the annual Medicare open enrollment period), and in anticipation of an increase in applications, DaVita nearly tripled its donation for Waseon patient to approximately $7,000.

323.   DaVita trains its staff, including its social workers, on the availability of financial assistance through HIPP and facilitates its patients' acquisition of financial assistance through HIPP.

324.   For example, DaVita included the following slide in a training presentation (attached as **Exhibit 9**) to social workers:



**Health Insurance Premium Program (HIPP)**

Provides health insurance grants to qualified ESRD patients on dialysis to pay the following primary and/or secondary premiums:
- Medicare Part B
- "Medigap" or Supplement plans (< $550/month)
- Commercial insurance (EGHP, Individual, Exchanges)
- COBRA premiums

AKF will <u>not</u> assist with:
- Tertiary insurance
- Medicare Part A
- Medicare Part B reimbursement
- Medicare Part D premiums

**HIPP is supported by provider contributions**

Id. at 49.

325.     Another slide makes clear that DaVita initiates a patient's application for assistance through HIPP:

## HIPP Centralized Process Overview

- AKF HIPP requests are initiated at facility level by center teammates
- Forms required:  AKF HIPP Application, DaVita HIPPA authorization, Premium Request Form and Fax Cover Sheet
  - Print all forms from Reggie Next Generation (RNG) as top portion of Premium Request Form and Fax Cover Sheet will auto populate
- Completed forms must be faxed to Patient Assistance Department ONLY. Do not fax any documents directly to AKF.
- DaVita HIPP liaisons will enter all requests into AKF Grant Management System (GMS).
  - Entry of AKF HIPP Applications are a partnership between the SW and DaVita HIPP Liaison

51

Id. at 51.

326.     In sum, through the AKF, DaVita is paying kickbacks to its patients through defraying the costs that the patients would otherwise be responsible for.

**F.     DaVita's Provides Kickbacks in the Form of Free Rights of First Refusal**

327.     In addition to the above-described kickbacks, DaVita provides additional remuneration to select JV Partners in the form of free rights of first refusal ("ROFR").

328.     An ROFR "is an option to enter a transaction on exactly or approximately the same terms that another bidder has proposed – a right to match." **Exhibit 10** at 2.

329.     In other words, an ROFR provides a contractual option to a party to enter into a transaction with the owner before the owner may transact with a third-party.

330.    DaVita utilizes two types of ROFRs with JV Partners. First, DaVita utilizes Development ROFRs, which confer a right to invest at DeNovo pricing in any future DaVita dialysis centers within the agreed-upon geographic area (referred to in DaVita's parlance as the "restricted area").   Second, DaVita utilizes Medical Director Agreement ROFR's ("MDA ROFR"), which confer the right to serve as the Medical Director of any new dialysis centers in a given restricted area, and the promise of compensation for doing so.

331.    DaVita utilizes ROFR's extensively to induce physicians to enter JV DeNovo's. Relator has documents showing hundreds of JV DeNovo transactions involving ROFR's.

332.    The geographic control provided by Development ROFR's is highly valuable to potential JV Partners, as described immediately below.

333.    Ideally, DaVita would like to partner with all referral sources, but if there are competitive dynamics at play among potential JV Partners in a given area, one of these referral sources (e.g., a hospital or a nephrology group) may demand that DaVita only work with them. This referral source is usually a hospital or nephrology group that, through a large captive base of patients, holds substantial leverage in negotiating with DaVita.

334.    A Development ROFR is an option contract in the form of a conditional non-compete agreement.   For example, if a JV DeNovo partner demands and DaVita provides a Development ROFR, DaVita cannot partner with a different nephrology group to open a new dialysis center in that geographical area unless the JV DeNovo partner declines the option to be the investor at the new dialysis center.

335.    ROFRs are extremely valuable to JV Partners in securing their investments. Absent an ROFR, DaVita could potentially open another dialysis facility with a new JV Partner nearby an existing facility, which would risk the existing facility losing patients to the new facility. A

Development ROFR safeguards against this risk, while also providing the existing JV Partner with the opportunity to invest in the new facility and to serve as the medical director at the new facility. This ensures that a competitor will not benefit from the JV opportunity, in addition to generating additional revenue for the JV Partner.

336.    Development ROFRs also ensure that hospitals and nephrology groups will be able to take advantage of DaVita's lower costs and higher rates in the entire market area, while their competitors will not. If, as expected, the JV Partner grows alongside DaVita, it brings comfort to both DaVita and the JV Partner because they are now tied together (not competing) and expect to lock up the patient pipeline in that geographic area for their mutual benefit.

337.    Development ROFRs are particularly valuable in the context of dialysis patients. While some dialysis patients can travel, many are physically unable or unwilling to travel long distances, while others are dependent on public transportation. Given that patients typically receive dialysis three times a week, patients typically want to be within a few miles of their dialysis center. By affording control to an entire geographic region, Development ROFRs provide the JV Partner with valuable opportunities to make additional investments in new dialysis centers.

338.    By way of illustration, assume Hospital A and Hospital B are both operating in the same city of 4 million people, where there are a total of around 1,600 dialysis patients (as of 2016, the US reported a rate of just under 400 dialysis patients per million residents).  Of these 1,600 patients, around 15% (or 240) have private insurance and the remaining 85% (or 1,360) are insured by government health insurance programs including Medicare and Medicaid.  These numbers are typical in many jurisdictions across the country.

339.    Assume further that these two hospitals are located within a couple miles of each other and that DaVita, through its communications with both, has learned that Hospital A's

nephrology program likely has a pipeline of approximately 100 patients at any given time.  Further assume these patients are receiving treatment in the hospital's in-house dialysis unit (which is comparatively expensive to operate) or at local dialysis units outside the hospital. Further assume Hospital A is affiliated with an academic medical center (such as Cornell and/or Johns Hopkins), making it a valuable "Tier 1" potential partner.

340.    Finally, assume DaVita has also been in Joint Venture talks over the last year with Hospital B, which has a pipeline of around 40 patients among the different stages of kidney disease., and which is a local community hospital (making it a less valuable "Tier 2" potential partner).

341.    DaVita considers Hospital A to be the more attractive partner because its academic relationships make it very likely that Hospital A is "in network" with all of the local health insurance plans and therefore will also have a higher mix of wealthier patients with private insurance (which reimburse at ~$1,000 per treatment on average, v. the Medicare average of $260 per treatment).

342.    Although DaVita values its potential relationship with Hospital A above its potential relationship with Hospital B, DaVita is interested in working with both in separate dialysis centers in the future to obtain the highest referral volume possible.  DaVita ascertains that at the current time, the two-mile area around both hospitals will support one 210-patient dialysis center, but within in a year or two, that specific area could support an additional dialysis center (DaVita knows the dialysis market is growing at 4-5% a year, faster than US population growth).

343.    DaVita therefore pitches Hospital A on investing in a new 35-chair outpatient dialysis center (with a maximum capacity of 210 patients being treated via 6 weekly shifts). Hospital A is interested.  Hospital B also reaches out to say that they are interested but would like

to revisit the planning discussions in six months, because they are going through some administrative changes. This timing works well for DaVita as they can focus first on their preferred partner Hospital A and focus on the second dialysis center with Hospital B later.

344. As is typical in a JN DeNovo transaction, DaVita tells Hospital A that they can invest at cost (*i.e.* not based on cashflow projections), will be able to take advantage of DaVita's payor and purchasing leverage as discussed above.

345. DaVita will also show the JV partner a 5-year cashflow projection for the proposed dialysis center, which includes projections relating to steering government reimbursed patients to private insurance plans and/or Medicare Advantage Plans, and which may also include projections of DaVita diverting (a/k/a "cannibalizing") its own patients from a DaVita center nearby.

346. Hospital A, however, does not want to develop a JV DeNovo with DaVita unless it is given a Development ROFR with a 15-mile radius. This is because Hospital A is worried DaVita will do another JV DeNovo nearby with another partner like Hospital B, which may cause some of Hospital A's patients to switch to the center operated by Hospital B (e.g., if Hospital B's location is closer to certain patients' homes). Hospital A also demands that Davita provide an MDA ROFR to secure the additional revenue provided by medical director agreements.

347. Threatened with the possibility of losing the deal with Hospital A to one of its competitors (*e.g.* Fresenius), DaVita agrees to give Hospital A the 15-mile Development ROFR and the MDA ROFR. This guarantees Hospital A the first "bite at the apple" if another JV DeNovo is planned in the future, while simultaneously preventing DaVita from doing a second deal with Hospital B within the restricted area.

348. DaVita provides these ROFR's **for free**, despite knowing that giving Hospital A the Development ROFR might lead Hospital B to do a deal with DaVita's main competitor

Fresenius, because overall, DaVita secured the larger (100 patients) and more profitable (better commercial insured v. government insured mix) referral source, while its competitors are left to potentially partner with Hospital B, with its 40 patients, the great majority of whom have less profitable government insurance.

349.     At the end of the day, Hospital A opens the new JV DeNovo with DaVita and tells its patients that their current nephrologist(s) from the hospital are now the Medical Director(s) at this new DaVita center.  The patients will go where their nephrologist suggests, as long as it is within reasonable commuting distance.  As a further perk, when the nephrologists from Hospital A become the Medical Director(s) of the new center, the doctors are not required to be at the center any given amount of time, and the doctors will not need to come to the dialysis center often (some only "stop by" once a month).

350.     DaVita knows that with the market growing at 4-5% annually, the ROFR is a very valuable option that it is granting to Hospital A – at no cost – in order to establish the referral relationship.  This is why, when DaVita trains employees who negotiate with potential JV DeNovo partners as follows: "**IMPORTANT: We Don't Give ROFRs Easily!**" **Exhibit** 10 at 5 (DaVita October 2016 internal presentation describing ROFRs (emphasis in original)).

351.     Although the above example involves competing hospitals, this same analysis applies to competing groups of nephrologists.

352.     Consistent with the notion that ROFR's have considerable economic value, DaVita executive David Finn, the Vice President of Mergers and Acquisitions, must approve any ROFR's. Id. at 5.  This is the same David Finn who, in the complaint leading to DaVita's $350 million FCA settlement in 2014 in Barbetta, "manipulated the model" to justify paying kickbacks to nephrologists in the form of above FMV prices in joint ventures.

353.    As noted, a Development ROFR is an option contract. The economic value of a Development ROFR can be readily calculated under well-accepted economic modeling used to value option contracts.

354.    The Black-Scholes Model – the most commonly used economic model for pricing pricing options – utilizes the below formula to value options:

In mathematical notation:

$$C = S_t N(d_1) - Ke^{-rt}N(d_2)$$

**where:**

$$d_1 = \frac{ln\frac{S_t}{K} + \left(r + \frac{\sigma_s^2}{2}\right)t}{\sigma_s \sqrt{t}}$$

and

$$d_2 = d_1 - \sigma_s \sqrt{t}$$

**where:**

$C$ = Call option price

$S$ = Current stock (or other underlying) price

$K$ = Strike price

$r$ = Risk-free interest rate

$t$ = Time to maturity

$N$ = A normal distribution

355.    It is important to understand how the variables impact the value of the option:

| Formula Terms | Call Option Price will be higher when: | Call Option Price will be lower when: |
|---|---|---|
| Current Stock Price | Higher (relative to strike price) | Lower (relative to strike price) |
| Strike Price | Lower (relative to stock price) | Higher (relative to stock price) |
| Time to Maturity | Longer | Shorter |
| Risk free rate | Higher | Lower |
| Volatility (N) | Higher | Lower |

356.    As applied in the context of DaVita's Development ROFRs and utilized in the example below:

- The current stock price is the FMV of the DeNovo opportunity ($3,000,000 in the example below);
- The "strike price" is the price that the referral source is allowed to invest in the DeNovo opportunity ($1,500,000 in the example below);

- The "time to maturity "is the length of the ROFR option (10 years in the example below, although DaVita often grants these options in perpetuity);
- The risk-free rate is the rate on the 10-year treasury bond (a normal corporate finance assumption); and
- Volatility is assumed low or flat as a proxy for the stability of the dialysis business.

357.    The Black-Scholes calculator mathematically applies the Black-Scholes formula.[31]

Using the above-identified inputs, Black-Scholes produces the following results:

### Black-Scholes Calculator

To calculate a basic Black-Scholes value for your stock options, fill in the fields below. The data and results will not be saved and do not feed the tools on this website. Remember that the actual monetary value of vested stock options is the difference between the market price and your exercise price.

To learn more about the the Black-Scholes method of valuing employee stock options, see our Valuation & Expensing section.

| | | |
|---|---|---|
| **Black-Scholes Value:** | **0.886** | |
| Stock Price: (in USD) | 3 | (ex. 31.55) |
| Exercise Price: (in USD) | 1.5 | (ex. 22.75) |
| Time to maturity: (in years) | 10 | (ex. 3.5) |
| Annual risk-free interest rate | 2% | (ex. 5%) |
| Annualized volatility | 1% | (ex. 50%) |
| Calculate | | |

| Formula Terms | DaVita | Example |
|---|---|---|
| **Call Option Price** | DaVita grants at $0 | **$886,000** |
| **Current Stock Price** | FMV of opportunity | $3,000,000 |
| **Strike Price** | DeNovo Pricing | $1,500,000 |
| **Time to Maturity** | 10 years | 10 years |
| **Risk free rate** | 2% | 2% |
| **Volatility (N)** | 1% | 1% |
| | | |

---

[31]   See   Black-Scholes   Calculator,   available   at   https://www.mystockoptions.com/black-scholes.cfm?ticker=&s=2.5&x=1.2&t=10&r=3%25&v=1&calculate=Calculate

358.    As illustrated by this example, the Development ROFR is incredibly valuable because the strike price (DeNovo pricing) is always below the stock price (the fair market value of the opportunity).

359.    In the parlance of option contracts, an option is "in the money" when the current value of an asset exceeds the strike price, since in such circumstances, the option holder can purchase the asset for less than its value. In contrast, an option is "out of the money" where the current value of an asset is less than the strike price, such that the option holder would be forced to pay more than an asset's value.[32] Normally when corporations provide stock options for executive compensation, they set the strike price **<u>above</u>** the current value of the stock, such that that executives are incentivized to improve the current value of the stock so that their out-of-the-money options go to in-the-money and then can be sold at a profit. In contrast, as illustrated above, the Development ROFRs given by DaVita are always "in the money" from the outset.

360.    Despite their considerable value, DaVita gives ROFRs to JV Partners ***for free*** when it concludes that doing so is ultimately in DaVita's best financial interests, *i.e.* where the payoff is worth the cost to DaVita.

361.    DaVita has given hundreds of free Development ROFRs and MDA ROFRs to JV Partners.

362.    By way of representative example, on or around February 4, 2003, DaVita gave a Development ROFR to NAMG Dialysis Ventures, LLC, an entity controlled by Nephrology Associates Medical Group (the same entity described in the Serrano Dialysis example above).

---

[32] <u>See generally</u> <u>In the Money and Out of the Money Options and Their Intrinsic Value</u>, <u>available at</u> <u>https://www.thebalance.com/determining-intrinsic-value-1031125</u>.

363.    This ROFR came with an expiration date of February 4, 2028 (i.e., 25 year term) and included the right of first participation (including up to 40% ownership interest) in any new outpatient dialysis facility located in Riverside County, CA.

364.    This ROFR was given to NAMG Ventures to induce NAMG to make an investment of 40% into DaVita Riverside, LLC.

365.    This ROFR was then amended several times. As of 2011, it was made perpetual (as in it would never expire) and included MDA rights, along with an expanded geographic scope to include mutually agreed upon locations in Norco, Hemet, Chino and Banning, CA.

366.    Under the ROFR, if DaVita "decides to construct, develop, or otherwise establish a new outpatient dialysis center within the Restricted Area," then it must "first provide the Members with at least one hundred twenty (120) days prior written notice before commencing construction on the Additional Center" and "[e]ach Member shall have the right to participate in the ownership of such Additional Center on substantially same or similar terms and conditions as set forth in this Agreement."[33]

367.    Over the next 13 years (and likely through today), NAMG Ventures exercised its ROFR rights to open *sixteen* new dialysis centers with DaVita in the ROFR area (Riverside and San Bernadino counties).  All sixteen centers are co-owned by DaVita (60%) and JV Partners NAMG (40%).  A list of those facilities and their respective operating start dates appears below:

---

[33] The Restricted Area is often defined as a milage radius around the dialysis center's location, but can also include entire counties, zip codes or any custom boundaries required.  Based on Relator's experience at DaVita, the ROFR given to NAMG Dialysis Ventures LLC is representative of the ROFRs that DaVita generally gave to JV Partners.

| Facility Name (Common) | City | State | County | Operating Start Date | Legal Entity |
|---|---|---|---|---|---|
| DIAMOND VALLEY DIALYSIS | HEMET | CA | RIVERSIDE | 8/1/2004 | 200125 Davita - Riverside, LLC |
| MURRIETA DIALYSIS | MURRIETA | CA | RIVERSIDE | 8/1/2004 | 200125 Davita - Riverside, LLC |
| MAGNOLIA WEST DIALYSIS | RIVERSIDE | CA | RIVERSIDE | 5/26/2006 | 200275 Davita - Riverside II, LLC |
| NORCO DIALYSIS | NORCO | CA | RIVERSIDE | 12/1/2006 | 200275 Davita - Riverside II, LLC |
| YUCAIPA DIALYSIS CENTER | YUCAIPA | CA | SAN BERNARDINO | 12/23/2006 | 200584 Yucaipa Dialysis, LLC |
| MAGNOLIA WEST AT HOME | RIVERSIDE | CA | RIVERSIDE | 4/1/2007 | 201151 Iroquois Dialysis, LLC |
| CANYON SPRINGS DIALYSIS | MORENO VALLEY | CA | RIVERSIDE | 4/9/2009 | 200583 Canyon Springs Dialysis, LLC |
| HIGHLAND RANCH DIALYSIS | HIGHLAND | CA | SAN BERNARDINO | 3/22/2010 | 200761 Crystals Dialysis, LLC |
| CATHEDRAL CITY DIALYSIS | CATHEDRAL CITY | CA | RIVERSIDE | 8/1/2011 | 200610 Dolores Dialysis, LLC |
| CATHEDRAL CITY AT HOME | CATHEDRAL CITY | CA | RIVERSIDE | 8/1/2011 | 200610 Dolores Dialysis, LLC |
| BERMUDA DUNES DIALYSIS | PALM DESERT | CA | RIVERSIDE | 5/2/2012 | 200615 Channel Dialysis, LLC |
| MOJAVE SAGE DIALYSIS | VICTORVILLE | CA | SAN BERNARDINO | 5/2/2012 | 200685 Villanueva Dialysis, LLC |
| SUN CITY MENIFEE DIALYSIS | PERRIS | CA | RIVERSIDE | 10/2/2012 | 200690 Cinco Rios Dialysis, LLC |
| SAN BERNARDINO HT AT HOME | SAN BERNARDINO | CA | SAN BERNARDINO | 7/30/2014 | 200996 Seabay Dialysis, LLC |
| MENIFEE HOME AT HOME | MENIFEE | CA | RIVERSIDE | 3/17/2015 | 201158 Panther Dialysis, LLC |
| JURUPA VALLEY DIALYSIS | JURUPA VALLEY | CA | RIVERSIDE | 8/15/2016 | 201180 Noster Dialysis, LLC |
| CIRCLE CITY DIALYSIS | CORONA | CA | RIVERSIDE | 12/21/2016 | 201199 Moraine Dialysis, LLC |

368. In effect, NAMG Ventures used the initial Development ROFR Davita gave to NAMG *for free* to establish a dominant position in the dialysis industry over a huge portion of Southern California.

369. MDA ROFR's are also very valuable. As illustrated in the graphic below, the MDA ROFR entitles the holder (here, West Bay Nephrology in San Francisco, CA) to receive all the future medical director income in the restricted area:



370.    As illustrated above, West Bay Nephrology has been granted a Development ROFR for the center black circle with a radius of 8 miles, encompassing the entire downtown San Francisco area, allowing them the right to participate in any JV DeNovos – at cost – that DaVita builds in that area. In addition, just below the black circle, the blue circle grants West Bay Nephrologists the right to act as medical director, for any DaVita centers within radius of 3 miles.

371.    DaVita calculates the value of all ROFRs by assessing population density as a proxy for density of patients with ESRD by area code using its "NonCompeteRadiusTool."

372.    As illustrated in the chart below, the value of the ROFR to the JV Partner is calculated by grading geographies on "tiers" based on population in the area, referred to as the MSA/CBSA (metropolitan statistical area and core-based statistical area, two metrics used by the government to measure population in a given area). DaVita differentiates between in-center hemodialysis and home dialysis, because home patients only come to the dialysis center once a month (instead of 3 times a week), so the logistical hurdle of sick patients traveling is lower, therefore the protective barrier (radius) to retain these patients needs to be greater for home patients.

373.    For Tier 1 areas with high population densities (and therefore more patients), a 15-mile radius normally suffices to fill up a dialysis center with 35 chairs (210 patient capacity). However, in less urban areas, a larger radius is required to find patients to fill the chairs, i.e., in rural areas, the radii can be as wide as 40 miles as depicted in the chart below.

374.    The radii for home dialysis patients starts at 25 miles, since patients treating at home are typically willing to travel further because they only have to make the trip to pick up home dialysis re-supplies once a month (as opposed to the In-Center (IC) patients who have to travel three times a week to the dialysis center).

| MSA/CBSA Population | Tier | ICHD Non-Compete Radius | Home Non-Compete Radius |
|---|---|---|---|
| ≥ 5M | 1 | 15 mi | 25 mi |
| 2M - 5M | 2 | 20 mi | 30 mi |
| 0.5M - 2M | 3 | 25 mi | 35 mi |
| 0.1M - 0.5M | 4 | 30 mi | 40 mi |
| < 0.1M | 5 | 40 mi | 40 mi |

375.    As with the Development ROFR, DaVita provides MDA ROFRs *for free*.

376.    The guarantee of MDA income is a powerful incentive.  This is particularly true with regard to a hospital, because any nephrologists on payroll are being paid a fixed amount.  If one of the hospital's nephrologists is named the medical director at a nearby Davita dialysis center, the hospital receives the MDA income from that center to help defray their costs (~$85k, $35k, and $15k annually in 2015 with hemodialysis, peritoneal dialysis, and home hemodialysis programs, respectively). Medical Directors do not have to provide any patient care and are not required to be present at the dialysis facility while patients are dialyzing.

377.    Moreover, many of the patients are already the Medical Director's own patients from their hospital or nephrology practice so there is little need to familiarize themselves with the patient population. Often the Medical Directors provide an oversight role and from Relator's experience, they often do not show up to the dialysis center even once a week and many times not more than once a month.  It is more of an oversight role for regulatory purposes (like a board seat) and does not detract meaningfully from a nephrologist's "day job."

378.    As with projected profits from cannibalization and steering, when DaVita is negotiating with physicians or a hospital, DaVita shows the potential partner the remuneration the partner will receive on its investment with and without the Medical Director income.  By showing the referral source that the Medical Director income flows 100% down through to the financial returns, DaVita is showing the referral source that there is really no associated cost to them

receiving this MDA income stream.  This is just a "check the box" regulatory position that will not take up much of their physician's time.

379.    As described above, the MDA ROFR is provided as a "sweetener" to induce the referral source to enter the deal, which is: 1) already priced below fair market value, and 2) already includes a free Development ROFR. Additionally, if there are any existing 100% DaVita-owned dialysis centers in the restricted area, the MDA ROFR entitles the new owner of the ROFR to that MDA income as well, *i.e.* DaVita will replace the existing Medical Director(s) with the MDA ROFR holder's nephrologist(s).

380.    Finally, DaVita's use of ROFR's has negative and disruptive effects on patients. Relator's experience is that DaVita will, without considering patients' needs, switch a group of patients' Medical Director to one receiving and MDA ROFR, or shuffle patients through cannibalization from one DaVita center to a new DaVita center that received a Development ROFR.

### G.    DaVita's Use of SMART Communications to Obfuscate its Fraud

381.    While at DaVita, Relator was repeatedly instructed to adhere to the company's SMART Communications protocol.

382.    SMART is an acronym standing for Simple, Meaningful, Actual, Read, Teach and, as described an internal DaVita presentation, is "[d]esigned to identify potentially problematic communications and to address them."

383.    An important component of the SMART Communications protocol was to whitewash problematic language from communications by replacing it with vague and neutral-sounding language.

384.    For example, a DaVita presentation disseminated widely and then posted to the company's intranet site, sited the following examples of problematic emails that accurately

describe DaVita's efforts to promote illegal payments for referrals and suggested replacement language in the red box:

**From:** DVP
**Sent:** Monday, January 25, 2010 9:54 AM
**To:** ROD
**Subject:** Joint Venture

Please develop a contingency plan if we lose the JV deal. We need this doc as a JV partner to **get him to refer** his patients.   If things go south, Dr. J will take all his patients with him across the street.  So either close the deal to **guarantee our referrals** or have another plan.

Divisional Vice President
DaVita Inc.
123.456.8910 (office)
987.654.3210 (cell)

1.  The business purpose of a physician Joint Venture is to have a partner with:
    A.  A commitment to creating an outstanding operation
    B.  The capability to help do so
    C.  A willingness to create awareness of the center
2.  Joint Venture partners are NEVER limited as to where they can refer their patients, including referring patients to a competitor center.

©2008 DaVita Inc. All rights reserved. Proprietary and confidential. For internal use only.     Privileged and Confidential

**From:** ROD
**Sent:** Friday, January 22, 2010 11:24 AM
**To:** FA
**Subject:** Medical Director

We need to explain why we missed our financial targets again this month.  Only thing I **can guess** is that we did not pay our new MD enough to **motivate him to change his referral pattern**.  We need someone to talk with the MD and **whip him into shape**.

Regional Operations Director
DaVita Inc.
123.456.8910 (office)
987.654.3210 (cell)

- DaVita pays fair market value for Medical Director (MD) services.
- Medical Directors can send their patients to any center they choose without consequence to their medical director pay.  Medical Director contracts have fixed terms.
- DaVita pays Medical Directors for comprehensive clinical and regulatory responsibilities they assume in position.

©2008 DaVita Inc. All rights reserved. Proprietary and confidential. For internal use only.     Privileged and Confidential

385.    As illustrated by these emails, DaVita instructed its employees to forego the use of problematic (but accurate) language in communication, and to replace it with intentionally vague language.

386.    As a further example of this policy with respect to DaVita's above-described improper steering of patients, Relator recalls being instructed to stop referencing such steering as "converting" patients, but rather to refer to patients "electing" to switch coverage.  This sanitizing of problematic language was especially emphasized for on any deal review materials or communications going to the CIA Monitor.

387.    During Relator's time at DaVita, he was told by Defendant David Finn to write emails "as if the Justice Department was reading them over our shoulder" and that if something couldn't be expressed in a coded or compliant way, that a call should be scheduled to discuss it verbally.

## VII.    DEFENDANTS' FALSE CLAIMS ACT LIABILITY

388.    31 U.S.C. § 3729(a)(1)(A) prohibits the presentation and causing the presentation of false claims.

389.    31 U.S.C. § 3729(a)(1)(B) prohibits the creation or causing the creation of false records that are material to false claims.

390.    31 U.S.C. § 3729(a)(1)(C) prohibits conspiring to violate the above provisions of the FCA.

391.    Dialysis providers like DaVita directly submit reimbursement claims to Medicare for services provided to Medicare beneficiaries.

392.    Providers submit claims to Medicare for reimbursement for medical services and equipment by using CMS Form 1500 or its electronic equivalent.

393.    The provider must sign the form (field number 31) and attest to the certifications found on the reverse side of CMS Form 1500.

394.    These certifications include the following relevant statements (with added emphasis):

> In submitting this claim for payment from federal funds, I certify that: 1) the information on this form is true, accurate and complete; 2) I have familiarized myself with all applicable laws regulations, and program instructions, which are available from the Medicare contractor; 3) I have provided or will provide sufficient information required to allow the government to make an informed eligibility and payment decision; 4) *this claim, whether submitted by me or on my behalf by my designated billing company, complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the Federal anti-kickback statute and Physician Self-Referral law (commonly known as Stark law);* 5) the services on this form were medically necessary and personally furnished by me or were furnished incident to my professional service by my employee under my direct supervision, except as otherwise expressly permitted by Medicare or TRICARE; 6) for each service rendered incident to my professional service, the identity (legal name and NPI, license#, or SSN) of the primary individual rendering each service is reported in the designated section.

395.    Thus, if a claim does not "compl[y] with . . . the Federal anti-kickback statute," the certification is false.

396.    In addition to this false certification and as described above, by operation of law, Medicare reimbursement claims that are tainted by violations of the AKS are false claims within the meaning of the FCA.  42 U.S.C. § 1320a-7b(g) ("In addition to the penalties provided for in this section or section 1320a-7a of this title, a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of subchapter III of chapter 37 of Title 31.").

397.    Thus, when DaVita submitted claims to Medicare tainted by the kickbacks it paid to its JV DeNovo Partners and/or its patients, DaVita presented false claims in violation of 31

U.S.C. § 3729(a)(1)(A).  Likewise, when DaVita falsely certified compliance with applicable federal laws, specifically including the AKS, it created false records material to its false claims in violation of in violation of 31 U.S.C. § 3729(a)(1)(B).  Finally, when DaVita conspired with its JV DeNovo partners and/or the AKF to violate § 3729(a)(1)(A) or § 3729(a)(1)(B), DaVita violated § 3729(a)(1)(C).

398.    Given their above-described role in DaVita's misconduct, the Individual Defendants caused the presentation of false claims by DaVita and caused the creation and use of false records materials to the false claims presented by DaVita.

## VIII.   VIOLATIONS OF THE CORPORATE INTEGRITY AGREEMENT

399.    As described above, the Barbetta lawsuit resulted in a corporate integrity agreement ("CIA") between DaVita and Department of Health and Human Services' Office of the Inspector General. **Exhibit 1**.

400.    The CIA explains that "[c]ontemporaneously with this CIA, Da Vita is entering into a Settlement Agreement with the United States."

401.    The CIA defines "focus arrangements" as "every Arrangement that is between DaVita Dialysis and any Health Care Provider and involves, directly or indirectly, the offer, payment, or provision of anything of value."

402.    The CIA defines "Joint Venture De Novo" as "any transaction in which DaVita partners with a Health Care Provider to establish and jointly own one or more new dialysis clinics or programs prior to Medicare certification." Id. at 4.

403.    Section III of the CIA imposes "corporate integrity obligations." Id. at 5.

404.    Section III(D) of the CIA imposes" corporate integrity obligations" with respect to "Compliance with the Anti-Kickback Statute." Id. at 13.

405.   Section III(D)(1)(b) of the CIA provides:

Within 90 days after the Effective Date, Da Vita Dialysis shall develop criteria to guide its selection of Health Care Providers with whom it enters into Focus Arrangements other than Business Courtesies ("Selection Criteria"). Da Vita Dialysis shall develop Selection Criteria for each type of Focus Arrangement that it enters into with Health Care Providers. For joint venture Focus Arrangements, separate Selection Criteria shall be developed for each type of joint venture that Da Vita enters into *(e.g.,* Partial Acquisition, Partial Divestiture, ***Joint Venture De Novo***). The Selection Criteria shall relate to a Health Care Provider's eligibility and ability to perform the functions required in connection with each such type of Focus Arrangement, and shall not include a Health Care Provider's ability to refer patients to DaVita.

Id. at 13 (emphasis added).

406.   Section III(D)(1)(d) of the CIA provides that "Da Vita Dialysis shall maintain and continue to apply its Selection Process and Selection Criteria throughout the CIA Period." Id. at 14.

407.   Section III(D)(2)(a) of the CIA provides:

Within 90 days after the Effective Date, DaVita Dialysis shall examine the Valuation Methodologies it uses to price each type of Focus Arrangement, except Business Courtesies, and shall revise each such methodology if necessary to comply with the Anti-Kickback Statute and the requirements of this CIA. To the extent no Valuation Methodology exists for a type of Focus Arrangement, except Business Courtesies, that Da Vita Dialysis enters into, Da Vita Dialysis shall develop a Valuation Methodology to use in pricing that type of Focus Arrangement.

408.   Section III(D)(2)(c) of the CIA provides that "[d]uring the CIA Period, DaVita Dialysis shall consistently apply the approved Valuation Methodologies to value each type of Focus Arrangement."

409.   Upon information and belief, DaVita failed to develop and/or failed to adhere to criteria to guide its selection of providers with whom to enter into JV De Novo relationships as required by Sections III(D)(1)(b) and III(D)(1)(d) of the CIA.

410.    Additionally, upon information and belief, DaVita failed to appropriately revise and/or failed to appropriate apply valuation methodologies with respect to its JV De Novo relationships described above in violation of Sections III(D)(2)(a) and III(D)(2)(c) of the CIA.

411.    For example, Relator and his Deal Depot colleagues were not permitted to present potential JV DeNovo deals directly to the individuals overseeing the CIA, including the Monitor. Instead, JV DeNovo deals were presented to the Monitor through select individuals, including David Finn.

412.    On information and belief, DaVita violated other sections of the CIA through the conduct described herein, including the company's obligations to report violations of the law to the United States (Section III(P) *et seq.*), repay overpayments (Section III(O) *et seq.*), make various certifications of compliance with the law (Section V(D) *et seq.*), and pay mandatory stipulated penalties for certain violations (Section X(A) *et seq.*).

413.    To the extent said violations occurred, these violations of the CIA caused false claims to be submitted in violation of the FCA and its state analogs.

414.    To the extent said violations occurred, and given their above-described role in DaVita's misconduct, the Individual Defendants caused the presentation of false claims by DaVita that were tainted by these violations of the CIA and caused the creation and use of false records materials to these false claims.

## IX.   COUNTS

### COUNT I
### Violation of the False Claims Act - 31 U.S.C. §3729(a)(1)(A)

415.    Relator repeats and re-alleges each and every allegation contained in the paragraphs above as though fully set forth herein.

416.    In violation of 31 U.S.C. § 3729(a)(1)(A), Defendants knowingly presented or caused the presentment of false or fraudulent claims for payment or approval to (1) officials of the United States and/or (2) contractors, grantees, or other recipients of money provided by or that would be reimbursed by the United States.

417.    The false statements made by Defendants had a natural tendency to influence or be capable of influencing the payment of the claims, and in fact, did influence the payment of the claims.

418.    Defendants made fraudulent and false statements with actual knowledge of the falsity of its statements, with deliberate ignorance of the falsity of its statements, or with reckless disregard as to the falsity of its statements.

419.    By virtue of the false or fraudulent claims that Defendants presented or caused to be presented, the United States has suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

**COUNT II**
**False Claims Act – Violation of 31 U.S.C. §3729(a)(1)(B)**

420.    Relator repeats and re-alleges each and every allegation contained in the paragraphs above as though fully set forth herein.

421.    In violation of 31 U.S.C. § 3729(a)(1)(B), Defendants knowingly made, used or caused to be made or used, false records or statements material to false or fraudulent claims to (1) the United States or (2) contractors, grantees, or other recipients of money provided by or that would be reimbursed by the United States.

422.    The false records and statements made by Defendants had a natural tendency to influence or be capable of influencing the payment of the claims, and in fact, did influence the payment of the claims. By virtue of the false records and statements made by Defendants, the

United States has suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

## COUNT III–
### Violation of the False Claims Act - 31 U.S.C. § 3729(a)(1)(C)

423.     Relator repeats and re-alleges each and every allegation contained in the paragraphs above as though fully set forth herein.

424.     In violation of 31 U.S.C. § 3729(a)(1)(C), Defendant DaVita conspired with its JV DeNovo partners and/or the AKF to commit violations of the False Claims Act, including the violations in Count I and Count II described above.

425.     Through the conduct described in this Complaint, DaVita reached agreements with its JV DeNovo partners and/or the AKF to commit violations of the False Claims Act, including the violations in Count I and Count II described above, and committed overt acts toward the commission of such violations.

426.     This conduct had a natural tendency to influence and was capable of influencing the payment of the claims, and in fact, did influence the payment of the claims.

427.     By virtue of this conspiracy, the United States has suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

## COUNT III
### California False Claims Act – Violation of Cal Gov't. Code §12651(a)(1), (2) (3)

428.     Relator repeats and re-alleges each and every allegation contained in the paragraphs above as though fully set forth herein.

429.     This is a claim for treble damages and penalties under the California False Claims Act.

430.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the California State Government for payment or approval.

431.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to get the California State Government to approve and pay such false and fraudulent claims.

432.     By virtue of the acts described above, Defendant DaVita conspired with its JV DeNovo partners and/or the AKF to commit violations of the California False Claims Act, including the violations described in the preceding paragraphs, and committed overt acts toward the commission of such violations.

433.     The California State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

434.     By reason of the Defendants' acts, the State of California has been damaged, and continues to be damaged, in substantial amount to be determined at trial

435.     Additionally, the California State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## COUNT IV
## Colorado Medicaid False Claims Act – C.R.S. §25.5-4-305(a), (b), (c)

436.     Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

437.     This is a claim for treble damages and penalties under the Colorado Medicaid False Claims Act.

438.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Colorado State Government for payment or approval.

439.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to get the Colorado State Government to approve and pay such false and fraudulent claims.

440.    By virtue of the acts described above, Defendant DaVita conspired with its JV DeNovo partners and/or the AKF to commit violations of the Colorado Medicaid Claims Act, including the violations described in the preceding paragraphs, and committed overt acts toward the commission of such violations.

441.    The Colorado State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

442.    By reason of the Defendants' acts, the State of Colorado has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

443.    Additionally, the Colorado State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

## COUNT V
### Connecticut False Claims Act – Conn. Gen. Stat. § 4-275(a)(1), (2), (3)

444.    Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

445.    This is a claim for treble damages and penalties under the Connecticut False Claims Act.

446.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Connecticut State Government for payment or approval.

447.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to get the Connecticut State Government to approve and pay such false and fraudulent claims.

448.     By virtue of the acts described above, Defendant DaVita conspired with its JV DeNovo partners and/or the AKF to commit violations of the Connecticut False Claims Act, including the violations described in the preceding paragraphs, and committed overt acts toward the commission of such violations.

449.     The Connecticut State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

450.     By reason of the Defendants' acts, the State of Connecticut has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

451.     Additionally, the Connecticut State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

**COUNT VI**
**Florida False Claims Act – Fla. Stat. §68.082(2)(a), (b), (c)**

452.     Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

453.     This is a claim for treble damages and penalties under the Florida False Claims Act.

454.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Florida State Government for payment or approval

455.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to induce the Florida State Government to approve and pay such false and fraudulent claims.

456.     By virtue of the acts described above, Defendant DaVita conspired with its JV DeNovo partners and/or the AKF to commit violations of the Florida False Claims Act, including the violations described in the preceding paragraphs, and committed overt acts toward the commission of such violations.

457.     The Florida State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct. By reason of the Defendants' acts, the State of Florida has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

458.     Additionally, the Florida State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

**COUNT VII**
**Georgia False Medicaid Claims Act – Ga. Code. §49-4-168.1(1), (2), (3)**

459.     Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

460.     This is a claim for treble damages and penalties under the Georgia False Medicaid Claims Act.

461.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Georgia State Government for payment or approval.

462.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to get the Georgia State Government to approve and pay such false and fraudulent claims.

463.    By virtue of the acts described above, Defendant DaVita conspired with its JV DeNovo partners and/or the AKF to commit violations of the Georgia False Medicaid Claims Act, including the violations described in the preceding paragraphs, and committed overt acts toward the commission of such violations.

464.    The Georgia State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

465.    By reason of the Defendants' acts, the State of Georgia has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

466.    Additionally, the Georgia State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

**COUNT VIII**
**Illinois Whistleblower Reward and Protection Act–740 Ill. Comp. Stat. §175/3(a)(1), (2), (3)**

467.    Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

468.    This is a claim for treble damages and penalties under the Illinois Whistleblower Reward And Protection Act.

95

469.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Illinois State Government for payment or approval.

470.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to induce the Illinois State Government to approve and pay such false and fraudulent claims.

471.    By virtue of the acts described above, Defendant DaVita conspired with its JV DeNovo partners and/or the AKF to commit violations of the Illinois Whistleblower Reward and Protection Act, including the violations described in the preceding paragraphs, and committed overt acts toward the commission of such violations.

472.    The Illinois State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

473.    By reason of the Defendants' acts, the State of Illinois has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

474.    Additionally, the Illinois State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

**COUNT IX**
**Indiana False Claims and Whistleblower Protection Act – IC 5-11-5.5-2(b)(1), (2), (3)**

475.    Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

476.    This is a claim for treble damages and penalties under the Indiana False Claims and Whistleblower Protection Act.

477.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Indiana State Government for payment or approval.

478.     By virtue of the acts described above, Defendants knowingly made or used false records and statements to obtain payment or approval of a false claim from the Indiana State Government.

479.     By virtue of the acts described above, Defendant DaVita conspired with its JV DeNovo partners and/or the AKF to commit violations of the Indiana False Claims and Whistleblower Protection Act, including the violations described in the preceding paragraphs, and committed overt acts toward the commission of such violations.

480.     The Indiana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

481.     By reason of the Defendants' acts, the State of Indiana has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

482.     Additionally, the Indiana State Government is entitled to a penalty of at least $5,000 for each and every violation alleged herein.

## COUNT X
## Iowa False Claims Act – Iowa Code § 685.2(1)(A), (B), (C)

483.     Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

484.     This is a claim for treble damages and penalties under the Iowa False Claims Act.

485.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Iowa State Government for payment or approval.

486.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to induce the Iowa State Government to approve and pay such false and fraudulent claims.

487.     By virtue of the acts described above, Defendant DaVita conspired with its JV DeNovo partners and/or the AKF to commit violations of the Iowa False Claims Act, including the violations described in the preceding paragraphs, and committed overt acts toward the commission of such violations.

488.     The Iowa State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

489.     By reason of the Defendants' acts, the State of Iowa has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

490.     Additionally, the Iowa State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

**COUNT X**
**Louisiana Medical Assistance Programs Integrity Law – La. Rev. Stat. § 46:438.3**

491.     Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

492.     This is a claim for treble damages and penalties under the Louisiana Medical Assistance Programs Integrity Law.

493.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Louisiana State Government.

494.    By virtue of the acts described above, Defendants knowingly engaged in misrepresentation or made, used, or caused to be made or used false records and statements, to obtain payment for false and fraudulent claims from the Louisiana State Government.

495.    By virtue of the acts described above, Defendant DaVita conspired with its JV DeNovo partners and/or the AKF to commit violations of the Louisiana Medical Assistance Programs Integrity Law, including the violations described in the preceding paragraphs, and committed overt acts toward the commission of such violations.

496.    The Louisiana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

497.    By reason of the Defendants' acts, the State of Louisiana has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

498.    Additionally, the Louisiana State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

**COUNT XI**
**Maryland False Health Claims Act – Md. Code Health-Gen. §§ 2-602(a)(1), (2), (3)**

499.    Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

500.    This is a claim for treble damages and penalties under the Maryland False Health Claims Act.

501.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Maryland State Government for payment or approval.

502.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to induce the Maryland State Government to approve and pay such false and fraudulent claims.

503.    By virtue of the acts described above, Defendant DaVita conspired with its JV DeNovo partners and/or the AKF to commit violations of the Maryland False Claims Act, including the violations described in the preceding paragraphs, and committed overt acts toward the commission of such violations.

504.    The Maryland State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

505.    By reason of the Defendants' acts, the State of Maryland has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

506.    Additionally, the Maryland State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## COUNT XII
### Michigan Medicaid False Claims Act – Mich. Comp. Laws §400.603(1), (2), (3)

507.    Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

508.    This is a claim for treble damages and penalties under the Michigan Medicaid False Claims Act.

509.    By virtue of the acts described above, Defendants knowingly made or caused to be made a false statement or false representation of material fact in an application for Medicaid benefits to the Michigan State Government.

510.     By virtue of the acts described above, Defendants knowingly made or caused to be made a false statement or false representation of material fact for use in determining rights to a Medicaid benefit.

511.     By virtue of the acts described above, Defendant DaVita conspired with its JV DeNovo partners and/or the AKF to commit violations of the Michigan Medicaid False Claims Act, including the violations described in the preceding paragraphs, and committed overt acts toward the commission of such violations.

512.     The Michigan State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

513.     By reason of the Defendants' acts, the State of Michigan has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

514.     Additionally, the Michigan State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## COUNT XIII
### Minnesota False Claims Act – Minn. Stat. §15c.02(1), (2), (3)

515.     Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

516.     This is a claim for treble damages and penalties under the Minnesota False Claims Act.

517.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Minnesota State Government for payment or approval.

518.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to get the Minnesota State Government to approve and pay such false and fraudulent claims.

519.     By virtue of the acts described above, Defendant DaVita conspired with its JV DeNovo partners and/or the AKF to commit violations of the Minnesota False Claims Act, including the violations described in the preceding paragraphs, and committed overt acts toward the commission of such violations.

520.     The Minnesota State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

521.     By reason of the Defendants' acts, the State of Minnesota has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

522.     Additionally, the Minnesota State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

## COUNT XIV
## Nevada False Claims Act – Nev. Rev. Stat. §357.040(1)(a), (b), (c)

523.     Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

524.     This is a claim for treble damages and penalties under the Nevada Submission of False Claims to State or Local Government Act.

525.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Nevada State Government for payment or approval.

526.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Nevada State Government to approve and pay such false and fraudulent claims.

527.    By virtue of the acts described above, Defendant DaVita conspired with its JV DeNovo partners and/or the AKF to commit violations of the Nevada False Claims Act, including the violations described in the preceding paragraphs, and committed overt acts toward the commission of such violations.

528.    The Nevada State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

529.    By reason of the Defendants' acts, the State of Nevada has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

530.    Additionally, the Nevada State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## COUNT XV
### New Jersey False Claims Act – N.J. Stat. §2A:32C-3(a), (b), (c)

531.    Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

532.    This is a claim for treble damages and penalties under the New Jersey False Claims Act.

533.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the New Jersey State Government for payment or approval.

534.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to get the New Jersey State Government to approve and pay such false and fraudulent claims.

535.    By virtue of the acts described above, Defendant DaVita conspired with its JV DeNovo partners and/or the AKF to commit violations of the New Jersey False Claims Act, including the violations described in the preceding paragraphs, and committed overt acts toward the commission of such violations.

536.    The New Jersey State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

537.    By reason of the Defendants' acts, the New Jersey has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

538.    Additionally, the New Jersey State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

**COUNT XVI**
**New Mexico Medicaid False Claims Act – N.M. Stat.§ 27-14-3(a)(1), (2), (3)**

539.    Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

540.    This is a claim for treble damages and penalties under the New Mexico Medicaid False Claims Act.

541.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the New Mexico State Government for payment or approval.

542.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to induce the New Mexico State Government to approve and pay such false and fraudulent claims.

543.     By virtue of the acts described above, Defendant DaVita conspired with its JV DeNovo partners and/or the AKF to commit violations of the New Mexico Medicaid False Claims Act, including the violations described in the preceding paragraphs, and committed overt acts toward the commission of such violations.

544.     The New Mexico State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

545.     By reason of the Defendants' acts, the State of New Mexico has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

546.     Additionally, the New Mexico State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

**COUNT XVII**
**New York False Claims Act – NY St. Fin. §189(a), (b), (c)**

547.     Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

548.     This is a claim for treble damages and penalties under the New York False Claims Act.

549.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the New York State Government for payment or approval.

550.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to get the New York State Government to approve and pay such false and fraudulent claims.

551.    By virtue of the acts described above, Defendant DaVita conspired with its JV DeNovo partners and/or the AKF to commit violations of the New York False Claims Act, including the violations described in the preceding paragraphs, and committed overt acts toward the commission of such violations.

552.    The New York State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

553.    By reason of the Defendants' acts, the State of New York has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

554.    Additionally, the New York State Government is entitled to the maximum penalty of $12,000 for each and every violation alleged herein.

## COUNT XVIII
## North Carolina False Claims Act – N.C. Gen. Stat. 1-607(a)(1), (2), (3)

555.    Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

556.    This is a claim for treble damages and penalties under the North Carolina False Claims Act.

557.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the North Carolina State Government for payment or approval.

558.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to get the North Carolina State Government to approve and pay such false and fraudulent claims.

559.     By virtue of the acts described above, Defendant DaVita conspired with its JV DeNovo partners and/or the AKF to commit violations of the North Carolina False Claims Act, including the violations described in the preceding paragraphs, and committed overt acts toward the commission of such violations.

560.     The North Carolina State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

561.     By reason of the Defendants' acts, the State of North Carolina has been damaged, and continues to be damaged, in substantial amount to be determined at trial. Additionally, the North Carolina State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

**COUNT XIX**
**Oklahoma Medicaid False Claims Act – Okla. Stat. tit. 63, §5053.1B (1), (2), (3)**

562.     Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

563.     This is a claim for treble damages and penalties under the Oklahoma Medicaid False Claims Act.

564.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Oklahoma State Government for payment or approval.

565.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to get the Oklahoma State Government to approve and pay such false and fraudulent claims.

566.    By virtue of the acts described above, Defendant DaVita conspired with its JV DeNovo partners and/or the AKF to commit violations of the Oklahoma Medicaid False Claims Act, including the violations described in the preceding paragraphs, and committed overt acts toward the commission of such violations.

567.    The Oklahoma State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

568.    By reason of the Defendants' acts, the State of Oklahoma has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

569.    Additionally, the Oklahoma State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

**COUNT XX**
**Tennessee False Claims Act and Medicaid False Claims Act –**
**Tenn. Code. §§ 4-18-103(a)(1), (2), (3) and 71-5-181(a)(1)(A), (B) (C)**

570.    Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

571.    This is a claim for treble damages and penalties under the Tennessee False Claims Act and Tennessee Medicaid False Claims Act.

572.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Tennessee State Government for payment or approval.

573.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to induce the Tennessee State Government to approve and pay such false and fraudulent claims.

574.    By virtue of the acts described above, Defendant DaVita conspired with its JV DeNovo partners and/or the AKF to commit violations of the Tennessee False Claims Act and the Tennessee Medicaid False Claims Act, including the violations described in the preceding paragraphs, and committed overt acts toward the commission of such violations.

575.    The Tennessee State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

576.    By reason of the Defendants' acts, the State of Tennessee has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

577.    Additionally, the Tennessee State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein

**COUNT XXI**
**Texas Medicaid Fraud Prevention Act – Tex. Hum. Res. Code. §36.002(1)**

578.    Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

579.    This is a claim for treble damages and penalties under the Texas Medicaid Fraud Prevention Act.

580.    By virtue of the acts described above, Defendants knowingly made, caused to be made, induced or sought to induce the making of a false statement or misrepresentation of material fact concerning information required to be provided by a federal or state law, rule, regulation or provider agreement pertaining to the Medicaid program.

581.     By virtue of the acts described above, Defendant DaVita conspired with its JV DeNovo partners and/or the AKF to commit violations of the Texas Medicaid Fraud Prevention Act, including the violations described in the preceding paragraphs, and committed overt acts toward the commission of such violations.

582.     The Texas State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

583.     By reason of the Defendants' acts, the State of Texas has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

584.     Additionally, the Texas State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

**COUNT XXII**
**Virginia Fraud Against Taxpayers Act – Va. Code §8.01-216.3(a)(1), (2), (3)**

585.     Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

586.     This is a claim for treble damages and penalties under the Virginia Fraud Against Taxpayers Act.

587.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Virginia State Government for payment or approval.

588.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to induce the Virginia State Government to approve and pay such false and fraudulent claims.

589.     By virtue of the acts described above, Defendant DaVita conspired with its JV DeNovo partners and/or the AKF to commit violations of the Virginia Fraud Against Taxpayers Act, including the violations described in the preceding paragraphs, and committed overt acts toward the commission of such violations.

590.     The Virginia State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

591.     By reason of the Defendants' acts, the State of Virginia has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

592.     Additionally, the Virginia State Government is entitled to the maximum penalty $11,000 for each and every violation alleged herein.

## COUNT XXIII
## Washington Health Care False Claim Act – Wash. Rev. Code §§ 48.80.030(1), (2), (3)

593.     Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

594.     This is a claim for treble damages and penalties under the Washington Health Care False Claims Act.

595.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Washington State Government for payment or approval.

596.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to get the Washington State Government to approve and pay such false and fraudulent claims.

597. By virtue of the acts described above, Defendant DaVita conspired with its JV DeNovo partners and/or the AKF to commit violations of the Washington Health Care False Claims Act, including the violations described in the preceding paragraphs, and committed overt acts toward the commission of such violations.

598. The Washington State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

599. By reason of the Defendants' acts, the State of Washington has been damaged, and continues to be damaged, in substantial amount to be determined at trial. Additionally, the Washington State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

## COUNT XXIV
## Wisconsin False Claims for Medical Assistance Act – Wis. Stat. §20.931(2)(a), (b), (c)

600. Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

601. This is a claim for treble damages and penalties under the Wisconsin False Claims for Medical Assistance Act.

602. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Wisconsin State Government for payment or approval.

603. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to get the Wisconsin State Government to approve and pay such false and fraudulent claims.

604. By virtue of the acts described above, Defendant DaVita conspired with its JV DeNovo partners and/or the AKF to commit violations of the Wisconsin False Claims for Medical Assistance Act, including the violations described in the preceding paragraphs, and committed overt acts toward the commission of such violations.

605. The Wisconsin State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

606. By reason of the Defendants' acts, the State of Wisconsin has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

607. Additionally, the Wisconsin State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

**COUNT XXV**
**District of Columbia False Claims Act – D.C. Code. §2-308.14(a)(1), (2), (3)**

608. Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

609. This is a claim for treble damages and penalties under the District of Columbia False Claims Act.

610. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the District of Columbia Government for payment or approval.

611. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to get the District of Columbia Government to approve and pay such false and fraudulent claims.

612.     By virtue of the acts described above, Defendant DaVita conspired with its JV DeNovo partners and/or the AKF to commit violations of the District of Columbia False Claims Act, including the violations described in the preceding paragraphs, and committed overt acts toward the commission of such violations.

613.     The District of Columbia Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

614.     By reason of the Defendants' acts, the District of Columbia has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

615.     Additionally, the District of Columbia Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

**COUNT XXVI**
**Violation of Cal. Ins. Code § 1871.7(a)**

616.     Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

617.     Cal. Ins. Code § 1871.7(a) provides that "it is unlawful to knowingly employ runners, cappers, steerers, or other persons . . .  to procure clients or patients to perform or obtain services or benefits under a contract of insurance or that will be the basis for a claim against an insured individual or his or her insurer."

618.     Through the actions described above, and specifically through the efforts to steer patients from government insurance to private insurance or Medicare Advantage plans, Defendants violated Cal. Ins. Code § 1871.7(a), by knowingly employed runners, cappers, steerers, or other persons to procure clients or patients to perform or obtain services or benefits under a contract of

insurance, or that will be (and were) the basis for a claim against an insured individual or his or her insurer.

## COUNT XXVII
### Violation of Cal. Ins. Code § 1871.7(b) and Cal. Penal Code § 550(a)

619.     Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

620.     Cal. Ins. Code § 1871.7(b) provides that "[e]very person who violates any provision of this section or Section 549, 550, or 551 of the Penal Code shall be subject, in addition to any other penalties that may be prescribed by law, to a civil penalty of not less than five thousand dollars ($5,000) nor more than ten thousand dollars ($10,000), plus an assessment of not more than three times the amount of each claim for compensation."

621.     Cal. Penal Code § 550(a) provides that "[i]t is unlawful to do any of the following, or to aid, abet, solicit, or conspire with any person to do any of the following … (1) Knowingly present or cause to be presented any false or fraudulent claim for the payment of a loss or injury, including payment of a loss or injury under a contract of insurance [and] (5) Knowingly prepare, make, or subscribe any writing, with the intent to present or use it, or to allow it to be presented, in support of any false or fraudulent claim."

622.     Through the actions described above, Defendants violated Cal. Penal Code § 550(a), and in turn, Cal. Ins. Code § 1871.7(b).

## COUNT XXVIII
### Violation of 740 Ill. Comp. Stat. 92/5(b)

623.     Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

624.     740 Ill. Comp. Stat. 92/5(b) provides that "[a] person who violates any provision of this Act, Section 17-8.5 or Section 17-10.5 of the Criminal Code of 1961 or the Criminal Code of

2012, or Article 46 of the Criminal Code of 1961 shall be subject, in addition to any other penalties that may be prescribed by law, to a civil penalty of not less than $5,000 nor more than $10,000, plus an assessment of not more than 3 times the amount of each claim for compensation under a contract of insurance."

625.   740 Ill. Comp. Stat. 92/5(a) provides that "it is unlawful to knowingly offer or pay any remuneration directly or indirectly, in cash or in kind, to induce any person to procure clients or patients to obtain services or benefits under a contract of insurance or that will be the basis for a claim against an insured person or the person's insurer."

626.   In violation of 740 Ill. Comp. Stat. 92/5(a), DaVita knowingly utilized runners, cappers, steerers, or other persons with respect to contracts of insurance.

627.   Defendants violated 740 Ill. Comp. Stat. 92/5(a) with the intent to defraud insurance companies in Illinois.

## PRAYER FOR RELIEF

WHEREFORE, Relator, on behalf of the United States and the Plaintiff States, demands that judgment be entered in their favor and against Defendants for:

(1) Three times the amount of damages to the United States;

(2) Civil penalties of (a) $5,500-$11,000 for each violation of the FCA that occurred after September 29, 1999 but before November 2, 2015 and (b) $11,665-$23,331 for each violation of the FCA that occurred on or after June 19, 2020;

(3) Any other recoveries or relief provided for under the FCA;

(4) Civil penalties as provided under the State FCAs;

(5) Any other recovers or relief provided for under the State FCAs;

(6) Civil penalties of $5,000-$10,000 for each violation of the CIFPA;

(7) Any other recoveries or relief provided for under the CIFPA;

(8) Civil penalties of $5,000-$10,000 for each violation of the IICFPA;

(9) Any other recoveries or relief provided for under the IICFPA;

(10)    Relator's receipt of the maximum amount permitted by law of the proceeds of this

action or settlement of this action collected by the United States, the Plaintiff States,

the California Insurance Commissioner, and the Illinois Insurance Commissioner, plus

reasonable expenses necessarily incurred, and reasonable attorneys' fees and costs,

based upon the total value recovered, both tangible and intangible, including any

amounts received from individuals or entities not parties to this action; and

(11)    Such other relief as the Court may deem appropriate.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Relators hereby demand a trial by jury.

Dated: March 18, 2021

/s/

Daniel R. Miller
Jonathan Z. DeSantis
WALDEN MACHT & HARAN LLP
2001 Market Street Ste. 2500
Philadelphia, PA 19103
dmiller@wmhlaw.com
jdesantis@wmhlaw.com

## <u>CERTIFICATE OF SERVICE</u>

I certify that I caused the foregoing document, and its exhibits, to be filed with Clerk of Court via email through the email address paed_documents@paed.uscourts.gov pursuant to the Eastern District of Pennsylvania's present protocols and procedures for the filing of sealed documents in light of restrictive access to the Courthouse.

Dated: March 18, 2021

/s/ _____

Daniel R. Miller

# **Exhibit 1**

CORPORATE INTEGRITY AGREEMENT
BETWEEN THE
OFFICE OF INSPECTOR GENERAL
OF THE
DEPARTMENT OF HEALTH AND HUMAN SERVICES
AND
DAVITA HEALTHCARE PARTNERS INC.


I.    **PREAMBLE**

DaVita HealthCare Partners Inc. and its U.S. wholly-owned and partially-owned subsidiaries and joint ventures in which DaVita HealthCare Partners Inc. owns an interest that provide dialysis services, whether directly or indirectly owned by DaVita HealthCare Partners Inc., with the exception of the joint ventures listed in Appendix E (collectively "DaVita") hereby enters into this Corporate Integrity Agreement (CIA) with the Office of Inspector General (OIG) of the United States Department of Health and Human Services (HHS) to promote compliance with the statutes, regulations, and written directives of Medicare, Medicaid, and all other Federal health care programs (as defined in 42 U.S.C. § 1320a-7b(f)) (Federal health care program requirements). Contemporaneously with this CIA, DaVita is entering into a Settlement Agreement with the United States.

II.   **TERM AND SCOPE OF THE CIA**

A.    The period of the compliance obligations assumed by DaVita under this CIA shall be five years from the effective date of this CIA ("CIA Period"). The "Effective Date" shall be the date on which the final signatory of this CIA executes this CIA. Each one-year period, beginning with the one-year period following the Effective Date, shall be referred to as a "Reporting Period."

B.    Sections VII, X, and XI shall expire no later than 120 days after OIG's receipt of: (1) DaVita's final Annual Report, or (2) any additional materials submitted by DaVita pursuant to OIG's request, whichever is later.

C.    The scope of this CIA shall be governed by the following definitions:

1.    "Arrangements" shall mean every arrangement or transaction that involves, directly or indirectly, the offer, payment, solicitation, or receipt of anything of value, and is between DaVita Dialysis and any actual or potential source of health care business or referrals to DaVita Dialysis or any actual or potential recipient of health care business or referrals from DaVita Dialysis. The term "source of health care business or referrals" shall mean any individual or entity that refers, recommends, arranges for,

orders, leases, or purchases any good, facility, item, or service for which payment may be made in whole or in part by a Federal health care program, and the term "recipient of health care business or referrals" shall mean any individual or entity: (1) to whom DaVita Dialysis refers an individual for the furnishing or arranging for the furnishing of any item or service; or (2) from whom DaVita Dialysis purchases, leases, or orders or arranges for or recommends the purchasing, leasing, or ordering of any good, facility, item, or service for which payment may be made in whole or in part by a Federal health care program.

2.     "Arrangements Covered Persons" includes each Covered Person who is involved with the development, approval, management, negotiation, execution, implementation, or review of DaVita Dialysis's Arrangements. This definition does not include Facility Administrators whose sole involvement with Arrangements consists of working with Health Care Providers in implementing an Arrangement with DaVita Dialysis.

3.     "Business Courtesies" means meals, gifts, and other gratuities, excluding educational and promotional materials.

4.     "Certifying Executive" means each Covered Person who is an officer, president, general manager, vice president, group senior vice president, division vice president, or other Covered Person whose position is equivalent to or above a division vice president.

5.     "Clinic Covered Persons" means all Covered Persons employed at a DaVita Dialysis clinic except the Facility Administrators.

6.     "Compliance Program Review" means the review performed by the Compliance Advisor in accordance with Appendix A.

7.     "Covered Executive" means each Covered Person who is an officer, president, senior vice president, or other Covered Person whose position is equivalent to or above a senior vice president.

8.     "Covered Persons" includes:

a.     all owners of DaVita who are natural persons (other than shareholders who: (1) have an ownership interest of less than 5% and (2) acquired the ownership interest through public trading or in connection with the operation of employee incentive programs);

b.   all officers, directors, and employees of DaVita who are responsible for or work for DaVita Dialysis;

c.   all contractors, subcontractors, agents, and other persons who provide patient care items or services or who perform billing or coding functions on behalf of DaVita Dialysis, excluding vendors whose sole connection with DaVita is selling or otherwise providing medical supplies or equipment to DaVita and who do not bill the Federal health care programs for such medical supplies or equipment; and

d.   all domestic dialysis clinic Joint Venture Partners and Medical Directors.

Notwithstanding the above, this term does not include part-time or per diem employees, contractors, subcontractors, agents, and other persons (other than Medical Directors) who are not reasonably expected to work more than 160 hours during a Reporting Period, except that any such individuals shall become "Covered Persons" at the point when they work more than 160 hours during a Reporting Period.  This term also does not include contractors, subcontractors, agents, and other persons (other than Medical Directors) who only provide diagnostic services, facility services and supplies, home medical equipment, laboratory services, pharmacy services, and transportation and ambulance services.

9.   "DaVita Dialysis" means DaVita's domestic dialysis business and clinics, and all DaVita functions that provide support to DaVita's domestic dialysis business and clinics, excluding IT personnel other than IT personnel who develop software and systems, employee benefits personnel, and facility services personnel who provide administrative support for DaVita's corporate business offices.

10.   "Executive Financial Recoupment Program" means the financial recoupment program required by Appendix D that puts at risk of forfeiture and recoupment an amount equivalent to up to three years of annual performance pay (*e.g.*, annual bonus, plus long-term incentives) for a Covered Executive who is discovered to have been involved in any significant misconduct.

11.    "Focus Arrangements" means every Arrangement that is between DaVita Dialysis and any Health Care Provider and involves, directly or indirectly, the offer, payment, or provision of anything of value.  Notwithstanding the foregoing, "Focus Arrangements" shall not include:

        a.    single patient agreements, stat lab agreements, or transfer agreements that DaVita Dialysis enters into with a hospital or related corporate entity, or

        b    Business Courtesies extended by DaVita Dialysis, except those Business Courtesies extended by Certifying Employees, DaVita Dialysis business development personnel, and DaVita Dialysis Regional Operations Directors.

12.    "Health Care Provider" means:  (1) any individual nephrologist or physician practice; (2) any hospital or related corporate entity that is or has entered into a Letter of Intent with DaVita Dialysis to become a Joint Venture Partner; or (3) any joint venture in which DaVita owns an interest that provides dialysis services, whether directly or indirectly owned by DaVita.

13    "Joint Venture De Novo" means any transaction in which DaVita partners with a Health Care Provider to establish and jointly own one or more new dialysis clinics or programs prior to Medicare certification.

14.    "Joint Venture Partner" means a Health Care Provider who owns a percentage, directly or indirectly, whether through shares, membership interests, or other ownership means, of a DaVita Dialysis clinic or holding company that owns an interest in a DaVita Dialysis clinic.

15.    "Medical Director" means a nephrologist or nephrology practice that provides the medical director services required by Medicare regulations (*e.g.*, 42 C.F.R. § 494.150) to a DaVita Dialysis clinic.

16.    "Multi-Specialty Practice" means a physician practice group that includes physicians who practice in general medicine/primary care and/or more than one specialty area.  If physicians who specialize in nephrology are included in the Multi-Specialty Practice, they must represent less than 20% of the practice group's physician members.

17.    "Partial Acquisition" means any transaction in which DaVita acquires a direct or indirect interest of less than 100% in one or more dialysis clinics or programs.

DaVita HealthCare Partners Inc.
Corporate Integrity Agreement
Page 4 of 45

18.    "Partial Divestiture" means any transaction in which the ownership interest held directly or indirectly by DaVita in one or more dialysis clinics or programs is reduced, but remains greater than 0%.

19.    "Risk Determination" means:  (a) the Independent Monitor's decision regarding whether the proposed Focus Arrangement presents a low risk or a high risk of violating the laws and regulations governing the Federal health care programs, including the False Claims Act and the Anti-Kickback Statute; or (b) the Independent Monitor's determination that he or she is unable to make such a conclusion.

20.    "Subject Joint Venture Clinics" means the joint venture clinics listed in Appendix B to this CIA.

21.    "Valuation Methodologies" means the collections of processes used to price a Focus Arrangement, including the template financial models used in those processes, standards concerning the methodology for calculating and documenting the inputs to those models when customized to specific transactions, and procedures for evaluating the output from those models.

## III.    CORPORATE INTEGRITY OBLIGATIONS

DaVita shall establish and maintain a Compliance Program that includes the following elements:

### A.    Chief Compliance Officer and Management Compliance Committee

1.    *Chief Compliance Officer.*  DaVita has appointed a Covered Person to serve as its Chief Compliance Officer and shall maintain a Chief Compliance Officer for the CIA Period.  The Chief Compliance Officer shall be responsible for developing and implementing policies, procedures, and practices designed to ensure compliance with the requirements set forth in this CIA and with Federal health care program requirements. The Chief Compliance Officer shall be a member of senior management of DaVita, shall report directly to the Chief Executive Officer of DaVita and the Chairman of the Compliance Committee of the Board of Directors of DaVita (the "Board"), shall make periodic (at least quarterly) reports regarding compliance matters directly to the Compliance Committee of the Board of Directors ("Board Compliance Committee"), and shall be authorized to report on such matters to the Board or the Board Compliance Committee at any time.  Written documentation of the Chief Compliance Officer's reports to the Board Compliance Committee shall be made available to OIG upon request.  The Chief Compliance Officer shall not be or be subordinate to the Chief Legal Officer or Chief Financial Officer or have any responsibilities that involve acting in any capacity as legal counsel or supervising legal counsel functions for DaVita.  The Chief Compliance Officer shall be responsible for monitoring the day-to-day compliance

activities engaged in by DaVita Dialysis as well as for any reporting obligations created under this CIA. Any noncompliance job responsibilities of the Chief Compliance Officer shall be limited and must not interfere with the Chief Compliance Officer's ability to perform the duties outlined in this CIA.

DaVita shall report to OIG, in writing, any changes in the identity or position description of the Chief Compliance Officer, or any actions or changes that would affect the Chief Compliance Officer's ability to perform the duties necessary to meet the obligations in this CIA, within five days after such a change.

2. *Management Compliance Committee.* DaVita has appointed and shall maintain for the CIA Period a Management Compliance Committee. The Management Compliance Committee shall, at a minimum, include the Chief Compliance Officer and other members of DaVita Dialysis's senior management necessary to meet the requirements of this CIA (*e.g.*, senior executives of DaVita Dialysis Corporate Development, billing, clinical, human resources, audit, and operations). The Chief Compliance Officer shall chair the Management Compliance Committee, and the Management Compliance Committee shall support the Chief Compliance Officer in fulfilling his/her responsibilities (*e.g.*, shall assist in the analysis of DaVita Dialysis's risk areas and shall oversee monitoring of internal and external audits and investigations). The Management Compliance Committee shall meet at least quarterly. The minutes of the Management Compliance Committee meetings shall be made available to OIG upon request.

DaVita shall report to OIG, in writing, any changes in the composition of the Management Compliance Committee, or any actions or changes that would affect the Management Compliance Committee's ability to perform the duties necessary to meet the obligations in this CIA, within 15 days after such a change.

3. *Board of Directors Compliance Obligations.* The Board Compliance Committee shall be responsible for the review and oversight of matters related to compliance with Federal health care program requirements and the obligations of this CIA. The Board Compliance Committee is currently comprised solely of independent (*i.e.*, non-executive) members and shall continue to be comprised solely of independent members for the CIA Period. The Board Compliance Committee has now and shall maintain for the CIA Period the ability to retain, at its sole discretion, outside compliance counsel.

The Board Compliance Committee shall, at a minimum, be responsible for the following:

a. The Board Compliance Committee shall meet at least quarterly to review and oversee DaVita Dialysis's

Compliance Program, including, but not limited to, the performance of the Chief Compliance Officer, Management Compliance Committee, and the Compliance Department.

b.  The Board Compliance Committee shall meet at least quarterly in executive session with the Chief Compliance Officer.

c.  The Board Compliance Committee shall, within 90 days of the second anniversary of the Effective Date, retain a person or entity who meets the qualifications set forth in Appendix A as its Compliance Advisor.  Beginning with the third Reporting Period of the CIA, the Compliance Advisor shall review the effectiveness of DaVita Dialysis's Compliance Program and Risk Assessment and Mitigation Process for DaVita Dialysis (Compliance Program Review) and provide the Board with a Compliance Program Review Report for the remaining Reporting Periods of the CIA.  The Board shall consider the Compliance Program Review Report as part of its review and assessment of DaVita Dialysis's Compliance Program.

d.  The Board Compliance Committee shall, for each Reporting Period of the CIA, adopt a resolution, signed by each member of the Board Compliance Committee summarizing its review and oversight of DaVita Dialysis's compliance with Federal health care program requirements and the obligations of this CIA.

At minimum, the resolution shall include the following language:

"The Compliance Committee of the Board of Directors has made a reasonable inquiry into the operations of DaVita Dialysis's Compliance Program including the performance of the Chief Compliance Officer and the Management Compliance Committee.  Based on its inquiry and review, the Board Compliance Committee has concluded that, to the best of its knowledge, DaVita Dialysis has implemented an effective Compliance Program to meet Federal health care program requirements and the obligations of the CIA."

If the Board Compliance Committee is unable to provide such a conclusion in the resolution, the Board Compliance Committee shall include in the resolution a written explanation of the reasons why it is unable to provide the conclusion and the steps it is taking to implement an effective Compliance Program at DaVita Dialysis.

DaVita shall report to OIG, in writing, any changes in the composition or leadership of the Board Compliance Committee, or any actions or changes that would affect the Board Compliance Committee's ability to perform the duties necessary to meet the obligations in this CIA, within 15 days after such a change.

4.    *Management Accountability and Certifications*.  In addition to the responsibilities set forth in this CIA for all Covered Persons, Certifying Executives are specifically expected to monitor and oversee activities within their areas of authority and shall annually certify that the functional area is compliant with applicable Federal health care program requirements and with the obligations of this CIA.  To the extent that a functional area is not covered by the certification of a Certifying Executive, the person in charge of that functional area shall certify.

For each Reporting Period, each Certifying Executive or person in charge of the applicable functional area shall sign a certification that states:

"I have been trained on and understand the compliance requirements and responsibilities as they relate to [functional area], an area under my supervision.  My job responsibilities include ensuring compliance with regard to the [functional area] with all applicable Federal health care program laws and regulations, obligations of the Corporate Integrity Agreement, and applicable DaVita HealthCare Partners policies, and I have taken steps to promote such compliance.  In the event that I have identified potential issues of noncompliance with these requirements, I have referred all such issues consistent with the processes of DaVita HealthCare Partners for reporting potential misconduct for further review and follow-up.  Apart from those referred issues, and any issues of which I have been made aware by DaVita HealthCare Partners' counsel because they have been brought to the attention of OIG, any other relevant government agency or entity, or the CIA Monitor, I am not currently aware of any violations of applicable Federal health care program laws and regulations, obligations of the Corporate Integrity Agreement, or the requirements of the policies of DaVita HealthCare Partners.  I understand that this certification is being provided to and relied upon by the United States."

If any Certifying Executive or person in charge of the applicable functional area is unable to provide such a conclusion in the certification, the Certifying Executive or person in charge of the applicable functional area shall provide a written explanation of the reasons why he or she is unable to provide the certification outlined above and the steps being taken to address the issue(s) identified in the written explanation.

B.    Written Standards

        1.    *Code of Conduct*. Prior to the Effective Date, DaVita developed, implemented, and distributed a written Code of Conduct for DaVita Dialysis to all Covered Persons. During the CIA Period, DaVita Dialysis shall make the performance of job responsibilities in a manner consistent with the Code of Conduct an element in evaluating the performance of all employed Covered Persons and shall implement a policy requiring that all contracted Covered Persons perform job responsibilities in a manner consistent with the Code of Conduct. The Code of Conduct shall, at a minimum, set forth:

        a.    DaVita's commitment to full compliance with all Federal health care program requirements;

        b.    DaVita's requirement that all of its Covered Persons shall be expected to comply with all Federal health care program requirements and with DaVita's own Policies and Procedures;

        c.    the requirement that all of DaVita's Covered Persons shall be expected to report to the Chief Compliance Officer, or other appropriate individual designated by DaVita, suspected violations of any Federal health care program requirements or of DaVita's own Policies and Procedures; and

        d.    the right of all individuals to use the Disclosure Program described in Section III.L, and DaVita's commitment to nonretaliation and to maintain, as appropriate, confidentiality and anonymity with respect to such disclosures.

        Within 90 days after the Effective Date, each Covered Person shall certify, in writing or in electronic form, that he or she has received, read, understood, and shall abide by DaVita Dialysis's Code of Conduct. New Covered Persons shall receive the Code of Conduct in hard copy or electronic form and shall complete the required certification within 30 days after becoming a Covered Person or within 90 days after the Effective Date, whichever is later.

        DaVita shall periodically review the Code of Conduct to determine if revisions are appropriate and shall make any necessary revisions based on such review. The Code of Conduct shall be distributed in hard copy or electronic form at least annually to all Covered Persons.

        2.    *Policies and Procedures*. Within 90 days after the Effective Date, DaVita shall implement written Policies and Procedures regarding the operation of its

compliance program for DaVita Dialysis, including the compliance program requirements outlined in this CIA and compliance with Federal health care program requirements. The Policies and Procedures also shall address:

      a.    42 U.S.C. § 1320a-7b(b) (Anti-Kickback Statute) and the regulations and other guidance documents related to that statute, and business or financial arrangements or contracts that generate unlawful Federal health care program business in violation of the Anti-Kickback Statute; and

      b.    the requirements set forth in Section III.D (Compliance with the Anti-Kickback Statute).

Within 90 days after the Effective Date, the Policies and Procedures shall be made available in hard copy or electronic form to all Covered Persons. Appropriate and knowledgeable staff shall be available to explain the Policies and Procedures.

At least annually (and more frequently, if appropriate), DaVita shall assess and update, as necessary, the Policies and Procedures. Within 30 days after the effective date of any revisions, a description of the revisions shall be communicated to all affected Covered Persons and any revised Policies and Procedures shall be made available to all Covered Persons in hard copy or electronic form.

C.    Training and Education

1.    *General Training*. Within 90 days after the Effective Date, DaVita Dialysis shall provide at least one hour of General Training to each Covered Person, except Clinic Covered Persons. DaVita Dialysis shall provide at least one hour of General Training to Clinic Covered Persons within the first Reporting Period. This training, at a minimum, shall explain DaVita's:

      a.    CIA requirements; and

      b.    Compliance Program, including the Code of Conduct.

New Covered Persons shall receive the General Training described above within 30 days after becoming a Covered Person or within 90 days after the Effective Date, whichever is later. New Clinic Covered Persons shall receive General Training within 60 days after they become new Clinic Covered Persons. After receiving the initial General Training described above, each Covered Person shall receive at least one hour of General Training in each subsequent Reporting Period.

2.    *Arrangements Training*.  Within 90 days after the Effective Date, each Arrangements Covered Person shall receive at least three hours of Arrangements Training, in addition to the General Training required above.  The Arrangements Training shall include a discussion of:

a.    Arrangements that potentially implicate the Anti-Kickback Statute, as well as the regulations and other guidance documents related to that statute;

b.    DaVita Dialysis's policies, procedures, and other requirements relating to Arrangements and Focus Arrangements, including, but not limited to, the Focus Arrangements Tracking System, the internal review and approval process, and the tracking of remuneration to and from sources of health care business or referrals pursuant to Focus Arrangements as required by Section III.D of the CIA;

c.    the personal obligation of each individual involved in the development, approval, management, negotiation, execution, implementation, or review of DaVita Dialysis's Arrangements to know the applicable legal requirements and DaVita Dialysis's policies and procedures;

d.    the legal sanctions under the Anti-Kickback Statute; and

e.    examples of violations of the Anti-Kickback Statute.

New Arrangements Covered Persons shall receive this training within 30 days after the beginning of their employment or becoming Arrangements Covered Persons, or within 90 days after the Effective Date, whichever is later.  New Arrangements Covered Persons shall not develop, approve, manage, negotiate, execute, implement, or review DaVita Dialysis's Arrangements until after they have completed the Arrangements Training.

After receiving the initial Arrangements Training described in this Section, each Arrangements Covered Person shall receive at least two hours of Arrangements Training, in addition to the General Training, in each subsequent Reporting Period.

3.    *Board Member Training*.  Within 90 days after the Effective Date, DaVita shall provide at least two hours of training to each member of the Board of Directors, in addition to the General Training.  This training shall address the responsibilities of board members and corporate governance.

New members of the Board of Directors shall receive the Board Member Training described above within 30 days after becoming a member or within 90 days after the Effective Date, whichever is later.

4.    *Certification*.  Each individual who is required to attend training shall certify, in writing or in electronic form, that he or she has received the required training.  The certification shall specify the type of training received and the date received.  The Chief Compliance Officer (or designee) shall retain the certifications, along with one copy of all course materials.

5.    *Qualifications of Trainer*.  Persons preparing or providing the training shall be knowledgeable about the subject area.  Persons preparing or providing the Arrangements Training shall have expertise in the Anti-Kickback Statute, as well as the regulations, directives, and guidance related to that law.

6.    *Update of Training*.  DaVita shall review the training annually and, where appropriate, update the training to reflect changes in Federal health care program requirements, any pertinent issues discovered during internal audits, the Compliance Program Review, the Monitor's findings and reviews, and any other relevant information.

7.    *Computer-based Training*.  DaVita may provide the training required under this CIA through appropriate computer-based training approaches.  If DaVita chooses to provide computer-based training, it shall make available appropriately qualified and knowledgeable staff or trainers to answer questions or provide additional information to the individuals receiving such training.

8.    *Training of Medical Directors and Joint Venture Partners*.  DaVita Dialysis shall make the General Training described in Section III.C.1 available to all of its Medical Directors and Joint Venture Partners and shall require them to complete it. If, under existing Focus Arrangements, DaVita does not have the authority to require the Medical Directors and Joint Venture Partners to complete the training, it shall use its best efforts to encourage such Medical Directors and Joint Venture Partners to complete the training.  The Chief Compliance Officer shall maintain records of all active Medical Directors and Joint Venture Partners who receive training, including the type of training and the date received.  These records shall be made available to OIG upon request.

D.      Compliance with the Anti-Kickback Statute

DaVita is responsible for ensuring that the following obligations are met:

1.      *Selection Process and Selection Criteria.*

   a.   Within 90 days after the Effective Date, DaVita Dialysis shall
        develop a process for documenting the selection of Health
        Care Providers with whom it enters into Focus Arrangements
        other than Business Courtesies.

        The Selection Process for each type of Focus Arrangement
        shall include:

        i.    a mechanism by which DaVita Dialysis identifies
              Health Care Providers for possible selection;

        ii.   confirmation that each Health Care Provider
              considered meets designated Selection Criteria, as
              defined in Section III.D.1.b, below, specific to the type
              of Focus Arrangement; and

        iii.  DaVita Dialysis's rationale for choosing the Health
              Care Provider ultimately selected for entry into a
              particular Focus Arrangement.

   b.   Within 90 days after the Effective Date, DaVita Dialysis shall
        develop criteria to guide its selection of Health Care
        Providers with whom it enters into Focus Arrangements other
        than Business Courtesies ("Selection Criteria").  DaVita
        Dialysis shall develop Selection Criteria for each type of
        Focus Arrangement that it enters into with Health Care
        Providers.  For joint venture Focus Arrangements, separate
        Selection Criteria shall be developed for each type of joint
        venture that DaVita enters into (*e.g.*, Partial Acquisition,
        Partial Divestiture, Joint Venture De Novo).  The Selection
        Criteria shall relate to a Health Care Provider's eligibility and
        ability to perform the functions required in connection with
        each such type of Focus Arrangement, and shall not include a
        Health Care Provider's ability to refer patients to DaVita.

   c.   The Monitor shall review and approve the Selection Process
        and Selection Criteria.  During the first two Reporting

Periods, the Monitor also shall prospectively review and approve any modifications or changes to the Selection Process or Selection Criteria. The requirements of this subsection shall apply to the third Reporting Period if OIG exercises its discretion to extend the Monitor's authority pursuant to Section I of Appendix C to the CIA.

d.    DaVita Dialysis shall maintain and continue to apply its Selection Process and Selection Criteria throughout the CIA Period.

e.    Section III.D.1 and Section III.D.2 shall not apply to Focus Arrangements in which a Health Care Provider contracts with DaVita Dialysis solely for the provision of management services and has no other Focus Arrangements with DaVita Dialysis.

2.    *Valuation Methodologies.*

a.    Within 90 days after the Effective Date, DaVita Dialysis shall examine the Valuation Methodologies it uses to price each type of Focus Arrangement, except Business Courtesies, and shall revise each such methodology if necessary to comply with the Anti-Kickback Statute and the requirements of this CIA. To the extent no Valuation Methodology exists for a type of Focus Arrangement, except Business Courtesies, that DaVita Dialysis enters into, DaVita Dialysis shall develop a Valuation Methodology to use in pricing that type of Focus Arrangement.

b.    DaVita Dialysis shall obtain the Monitor's approval of each required Valuation Methodology, and any changes to those Valuation Methodologies during the first two Reporting Periods, prior to implementation.

c.    During the CIA Period, DaVita Dialysis shall consistently apply the approved Valuation Methodologies to value each type of Focus Arrangement.

3.    *Focus Arrangements Procedures.* In addition to the Valuation Methodologies, within 90 days after the Effective Date DaVita Dialysis shall examine its procedures and evaluate whether the procedures are reasonably designed to ensure that each existing and new or renewed Focus Arrangement does not violate the Anti-Kickback

Statute and the regulations and guidance related to the Anti-Kickback Statute (Focus Arrangements Procedures), and shall revise those procedures as necessary.  These procedures shall include the following:

a.  creating and maintaining a centralized tracking system for all existing and new or renewed Focus Arrangements (Focus Arrangements Tracking System);

b.  tracking remuneration to and from all parties to Focus Arrangements;

c.  tracking investments made by and estimated rates of return received during the CIA Period by all parties to all Partial Acquisition and Partial Divestiture transactions between DaVita Dialysis and a Health Care Provider (if applicable), except for those transactions that are part of the conduct released by the Settlement Agreement entered into between the United States and DaVita contemporaneously with this CIA;

d.  tracking services and activities to ensure that parties to the Focus Arrangement are performing the services required under the applicable Focus Arrangement(s) (if applicable);

e.  monitoring the use of leased space, medical supplies, medical devices, equipment, or other patient care items to ensure that such use is consistent with the terms of the applicable Focus Arrangement(s) (if applicable);

f.  establishing and implementing a written review and approval process for all Focus Arrangements, except Business Courtesies, the purpose of which is to ensure that all new and existing or renewed Focus Arrangements do not violate the Anti-Kickback Statute, and that includes at least the following:  (i) a legal review of all Focus Arrangements by counsel with expertise in the Anti-Kickback Statute, (ii) a process for specifying the business need or business rationale for all Focus Arrangements, and (iii) a process for determining and documenting the fair market value of the remuneration specified in the Focus Arrangement;

g.  requiring the Chief Compliance Officer to review the Focus Arrangements Tracking System, internal review and approval

process, and other Focus Arrangements Procedures on at least an annual basis and to provide a report on the results of such review to the Board Compliance Committee; and

h.    implementing effective responses when suspected violations of the Anti-Kickback Statute are discovered, including disclosing Reportable Events and quantifying and repaying Overpayments pursuant to Sections III.O and III.P when appropriate.

Notwithstanding the foregoing, DaVita shall have until the end of the first Reporting Period to identify and enter in the Focus Arrangements Tracking System all existing Focus Arrangements except (i) center transaction agreements; (ii) Medical Director agreements, (iii) leases, and (iv) consulting agreements; and to enter all data for items or services provided under the existing Focus Arrangements on or after the Effective Date. DaVita is not required to include in its Focus Arrangements Tracking System historical remuneration or performance data for items or services provided under the existing Focus Arrangements prior to the Effective Date.

4.    *New or Renewed Arrangements Requirements*.  Prior to entering into new Focus Arrangements or renewing (whether by operation of contract or negotiation) existing Focus Arrangements, except Business Courtesies, in addition to complying with the Focus Arrangements Procedures set forth above, DaVita Dialysis shall comply with the following requirements (Focus Arrangements Requirements):

a.    ensure that each Focus Arrangement is set forth in writing and signed by DaVita Dialysis and the other parties to the Focus Arrangement;

b.    include in the written agreement a requirement that each party to a Focus Arrangement who meets the definition of a Covered Person shall complete at least one hour of training regarding the Anti-Kickback Statute and examples of arrangements that potentially implicate the Anti-Kickback Statute.  Additionally, DaVita Dialysis shall provide each party to the Focus Arrangement with a copy of its Code of Conduct and Policies and Procedures related to the Anti-Kickback Statute in hard copy or electronic form;

c.    include in the written agreement a certification by the parties to the Focus Arrangement that the parties shall not violate the Anti-Kickback Statute with respect to the performance of the Arrangement; and

d.   beginning 120 days from the Effective Date, during the first two Reporting Periods and for the first 120 days of the third Reporting Period, obtain from the Monitor a Risk Determination for each Focus Arrangement. During the first two Reporting Periods and for the first 120 days of the third Reporting Period, DaVita Dialysis shall not enter into or renew a Focus Arrangement until it has received a Risk Determination from the Monitor containing a conclusion that the proposed Focus Arrangement presents a low risk or a high risk of violating the laws and regulations governing the Federal health care programs, including the False Claims Act and the Anti-Kickback Statute. The requirements of this subsection shall apply to the remainder of the third Reporting Period if OIG exercises its discretion under Section I of Appendix C to the CIA to extend the Monitor's authority to make Risk Determinations under Section C of Appendix C to the CIA.

5.   *Records Retention and Access.* DaVita Dialysis shall retain and make available to OIG, upon request, the Focus Arrangements Tracking System and all supporting documentation of the Focus Arrangements subject to this Section and, to the extent available, all non-privileged communications related to the Focus Arrangements and the actual performance of the duties under the Focus Arrangements.

E.   Notice to Joint Venture Partners and Medical Directors

1.   Within 90 days after the Effective Date, DaVita shall send, by first class mail with delivery confirmation, a notice approved by the Monitor to each Joint Venture Partner and Medical Director. Each notice should include the following information, to the extent applicable to the particular recipient:

a.   Joint Venture Partners and Medical Directors, and their employees, colleagues, and contractors, are free to refer patients to and treat patients at non-DaVita-owned dialysis clinics;

b.   DaVita will not enforce any patient-related non-disparagement or non-solicitation clauses contained in any of their existing agreements with DaVita; and

c.   in connection with joint venture clinics formed by Partial Divestitures, DaVita will not enforce the investment non-

compete provisions it may have in those joint venture and
Medical Director agreements.

2.    Within 90 days after the anniversary of the Effective Date in each
subsequent Reporting Period, DaVita shall send, by first class mail, postage prepaid with
delivery confirmation, the notice described in Section III.E.1 to each Joint Venture
Partner and Medical Director.  If DaVita changes or revises the wording of the letter,
DaVita shall obtain, in the second Reporting Period, the approval of the Monitor and, in
subsequent Reporting Periods, the approval of the OIG prior to sending the letter.

F.    Unwinding of Subject Joint Venture Clinics

1.    During the first Reporting Period, DaVita shall unwind the Subject
Joint Venture Clinics.  DaVita may unwind the Subject Joint Venture Clinics by:

a.    selling its interest in the Subject Joint Venture Clinic, at a
price within the range of fair market value, to its nephrologist
or nephrology practice partners;

b.    purchasing its nephrologist or nephrology practice partners'
interest in the Subject Joint Venture Clinic, at a price within
the range of fair market value;

c.    selling its interest in a Subject Joint Venture Clinic, at a price
within the range of fair market value, to an independent third
party; or

d.    selling the full interest of the Subject Joint Venture Clinic, at
a price within the range of fair market value, to an
independent third party, which would buy out all Joint
Venture Partners.

2.    DaVita shall obtain the Monitor's approval for each transaction
involved in the unwinding of the Subject Joint Venture Clinics prior to the transaction's
closure and/or execution.

3.    In the event that DaVita is not able to unwind a Subject Joint
Venture Clinic prior to the end of the first Reporting Period, the Monitor may provide a
certification that DaVita has acted in good faith to unwind the Subject Joint Venture
Clinic.  The Monitor shall provide such a certification only if she or he determines that
DaVita has actively pursued in good faith all avenues for unwinding the Subject Joint
Venture Clinic listed in Section III.F.1 above and that DaVita's failure to complete the

unwind is due to circumstances beyond its control.  In making this determination, the Monitor may consider the conduct of the other parties to the Subject Joint Venture Clinic.

4.      During the term of the CIA, DaVita shall not enter into any Partial Divestitures, unless expressly permitted by Section III.F.5, below.

5.      Notwithstanding Section III.F.4 of this CIA, DaVita is expressly permitted to enter into the following:

a.      Joint Venture De Novo arrangements;

b.      Any joint venture formed by selling a direct or indirect interest in a DaVita dialysis clinic to a Multi-Specialty Practice and/or hospital;

c.      Any joint venture formed by selling a direct or indirect interest in a DaVita dialysis clinic to a Multi-Specialty Practice and a nephrologist or nephrology practice;

d.      Any joint venture formed by selling a direct or indirect interest in a DaVita dialysis clinic to a hospital and a nephrologist or nephrology practice;

e.      Any joint venture formed by selling a direct or indirect interest in a DaVita dialysis clinic to a hospital and a Multi-Specialty Practice and a nephrologist or nephrology practice;

f.      Any transaction pursuant to which DaVita is required under the existing agreements related to the joint ventures listed in Appendix F to sell, offer to sell, or otherwise transfer some of its membership interests to another party;

g.      Any transaction in which DaVita is required by court order sought and obtained by any independent third party to sell, offer to sell, or otherwise transfer some of its membership interests to another party; or

h.      Any transaction consistent with CMS rules or regulations regarding ESRD Seamless Care Organizations (ESCOs).

G.    Independent Monitor

1.    *Retention of the Independent Monitor.*  Within 60 days after the Effective Date, DaVita shall retain the Independent Monitor (Monitor) selected by OIG after consultation with DaVita.  The Monitor may retain additional personnel, including, but not limited to, independent consultants, if needed to help meet the Monitor's obligations under this CIA.  DaVita shall provide OIG with a copy of the agreement between DaVita and the Monitor, and any agreements between DaVita or the Monitor and any consultants retained by the Monitor.  OIG shall have 10 business days to review and provide comment on the agreement(s) prior to final execution.

The Monitor may confer and correspond with DaVita or OIG individually or together.  The Monitor and DaVita shall not negotiate or enter into another financial relationship for at least 12 months after the date of OIG's CIA closure letter to DaVita.

2.    *Duties of the Monitor.*  The Monitor shall perform the tasks and reviews and prepare the reports described in Appendix C of the CIA.  The Monitor shall submit all reports simultaneously to OIG and DaVita.  The Monitor shall not share draft reports with DaVita.

3.    *Retention of Records.*  The Monitor shall retain and make available to OIG, upon request, all work papers, supporting documentation, correspondence, and other documents related to the engagement of and work performed by the Monitor.

4.    *Resignation or Removal of the Monitor.*  The Monitor is not an agent of OIG.  However, the Monitor may be removed by OIG at OIG's sole discretion.  If the Monitor resigns or is removed prior to the termination of the CIA, DaVita shall retain, within 60 days after selection by OIG, another Monitor with the same functions and authorities.  If the Monitor resigns or is removed, all deadlines under Sections III.F and V applicable to the Reporting Period during which the resignation or removal occurs will be tolled until 60 days after OIG selects a new Monitor or DaVita retains the new Monitor, whichever is earlier.  No penalties will be applied under Section X for days that are tolled as a result of this Section III.G.4.

5.    *Validation Review.*  In the event OIG has reason to believe that:  (a) the Monitor's work fails to conform to the requirements of this CIA, or (b) the Monitor's findings or review results are inaccurate, OIG may, at its sole discretion, conduct its own review (Validation Review).  DaVita shall pay for the reasonable cost of any such review performed by OIG or any of its designated agents.  Any Validation Review of reports submitted as part of DaVita's final Annual Report shall be initiated no later than one year after DaVita's final submission (as described in Section II) is received by OIG.

Prior to initiating a Validation Review, OIG shall notify DaVita of its intent to do so and provide a written explanation of why OIG believes such a review is necessary. To resolve any concerns raised by OIG, DaVita may request a meeting with OIG to discuss the matter, present any additional information, and/or propose alternatives to the proposed Validation Review. DaVita agrees to provide any additional information as may be requested by OIG under this Section III.G.5 in an expedited manner. OIG will attempt in good faith to resolve any issues with DaVita prior to conducting a Validation Review. However, the final determination as to whether or not to proceed with a Validation Review shall be made at the sole discretion of OIG.

6.   *Responsibilities and Liabilities.*  Nothing in this Section III.G or Appendix C to this CIA affects DaVita's responsibilities or liabilities under any criminal, civil, or administrative laws or regulations applicable to any Federal health care program including, but not limited to, the Anti-Kickback Statute.

H.   Compliance Audits

1.   DaVita Dialysis has established a compliance audit program consisting of four components: annual audits, routine audits, email audits, and metric monitoring. DaVita shall, at a minimum, maintain this compliance audit program for DaVita Dialysis for the CIA Period at the same level of effort as allocated to the compliance audit program in calendar year 2013.

2.   DaVita shall ensure that OIG receives a list of annual, routine, and email audits completed or scheduled to be completed by DaVita Dialysis during each Reporting Period no later than 30 days prior to the end of the Reporting Period.

3.   The compliance audit program shall not be performed under attorney-client privilege.

I.   Risk Assessment and Mitigation Process

Within 90 days after the Effective Date, DaVita shall develop a standardized, centralized process to allow DaVita Dialysis's in-house or outside legal counsel, compliance, and leaders of the relevant functions to: (1) identify and assess the risks associated with DaVita Dialysis's compliance with Federal health care program requirements, the False Claims Act, and the Anti-Kickback Statute; and (2) determine what steps, if any, DaVita Dialysis should take to mitigate the identified risks. DaVita shall maintain the Risk Assessment and Mitigation Process for the duration of the CIA.

J.   Compensation

1.   *Executive Financial Recoupment Program.*  DaVita shall establish
no later than December 31, 2014, and shall maintain throughout the CIA Period, a
financial recoupment program that puts at risk of forfeiture and recoupment an amount
equivalent to up to three years of annual performance pay (*e.g.,* annual bonus, incentives)
for a Covered Executive who is discovered to have been involved in any significant
misconduct (Executive Financial Recoupment Program).  This financial recoupment
program shall apply both to Covered Executives who are current DaVita employees and
to Covered Executives who are former DaVita employees at the time of a Recoupment
Determination.  The specific terms and conditions of the Executive Financial
Recoupment Program are set forth in Appendix D to this CIA.  DaVita shall maintain an
Executive Financial Recoupment Program consistent with the terms of Appendix D for at
least the duration of the CIA, absent agreement otherwise by OIG.

2.   *Compliance Input on Executive Compensation.*  The Chief
Compliance Officer shall provide information to the Board Compensation Committee
that evaluates each Covered Executive's performance, including, but not limited to, the
Covered Executive's commitment to compliance, as demonstrated by modeling
compliant behavior, leading in a compliant manner, identifying risks and issues, resolving
risks and issues in a compliant manner, working with the Compliance Department to
address issues, and other compliance-related factors as appropriate.  The Board
Compensation Committee shall document its decision regarding the consideration given
to the information for each Covered Executive in determining annual compensation (*e.g.,*
salary, bonuses) and the rationale for its decision.  DaVita shall provide copies of the
Board Compensation Committee's documentation of its decision and rationale to OIG
upon request.

K.   Cooperation

Upon reasonable notice, DaVita shall cooperate with all OIG investigations and
understands that full cooperation includes:  (1) prompt and truthful disclosures to OIG of
all matters relating to any Federal or state health care law investigation, prosecution, or
other enforcement action relating to the Covered Conduct in the Settlement Agreement
entered into between the United States and DaVita contemporaneously with this CIA,
including other matters involving possible violations of Federal or state health care law
by individuals or entities in the dialysis industry and the medical practice of nephrology;
and (2) truthful testimony in any administrative hearing and/or court proceeding.  DaVita,
upon reasonable notice, will make reasonable efforts to facilitate access to, and encourage
the cooperation of, its current and former directors, officers, and employees for
interviews and testimony, and will furnish to OIG, upon reasonable request, all
documents and records in its possession, custody, or control relating to the Covered

Conduct. Section III.K shall not require and shall not be construed as a waiver of any applicable attorney-client or work product privileges.

L.    Disclosure Program

DaVita has established and shall continue to maintain a Disclosure Program that includes a mechanism (*e.g.*, a toll-free compliance telephone line) to enable individuals to disclose, to the Chief Compliance Officer or some other person who is not in the disclosing individual's chain of command, any identified issues or questions associated with DaVita Dialysis's policies, conduct, practices, or procedures with respect to a Federal health care program believed by the individual to be a potential violation of criminal, civil, or administrative law. DaVita shall continue to appropriately publicize the existence of the disclosure mechanism (*e.g.*, via periodic e-mails to employees or by posting the information in prominent common areas).

The Disclosure Program shall continue to emphasize a nonretribution, nonretaliation policy, and shall continue to include a reporting mechanism for anonymous communications for which appropriate confidentiality shall be maintained. Upon receipt of a disclosure, the Chief Compliance Officer (or designee) shall continue to gather all relevant information from the disclosing individual. The Chief Compliance Officer (or designee) shall continue to make a preliminary, good faith inquiry into the allegations set forth in every disclosure to ensure that he or she has obtained all of the information necessary to determine whether a further review should be conducted. For any disclosure that is sufficiently specific so that it reasonably: (1) permits a determination of the appropriateness of the alleged improper practice, and (2) provides an opportunity for taking corrective action, DaVita shall continue to conduct an internal review of the allegations set forth in the disclosure and ensure that proper follow-up is conducted.

The Chief Compliance Officer (or designee) shall maintain a disclosure log for DaVita Dialysis, which shall include a record and summary of each disclosure received (whether anonymous or not), the status of the respective internal reviews, and any corrective action taken in response to the internal reviews.

M.    Ineligible Persons

1.    *Definitions.* For purposes of this CIA:

a.    an "Ineligible Person" shall include an individual or entity who:

i.    is currently excluded, debarred, suspended, or otherwise ineligible to participate in the Federal health

<blockquote>
care programs or in Federal procurement or nonprocurement programs; or

ii.    has been convicted of a criminal offense that falls within the scope of 42 U.S.C. § 1320a-7(a), but has not yet been excluded, debarred, suspended, or otherwise declared ineligible.
</blockquote>

b.    "Exclusion Lists" include:

    i.    the HHS/OIG List of Excluded Individuals/Entities (LEIE) (available through the Internet at http://www.oig.hhs.gov); and

    ii.    the General Services Administration's System for Award Management (SAM) (available through the Internet at http://www.sam.gov).

    2.    *Screening Requirements.* DaVita shall continue to ensure that all prospective and current Covered Persons are not Ineligible Persons, by continuing or implementing the following screening requirements.

    a.    DaVita shall screen all prospective Covered Persons against the Exclusion Lists prior to engaging their services and, as part of the hiring or contracting process, shall require such Covered Persons to disclose whether they are Ineligible Persons.

    b.    DaVita shall screen all Covered Persons against the Exclusion Lists within 90 days after the Effective Date and thereafter shall screen against the LEIE on a monthly basis and screen against SAM on an annual basis.

    c.    DaVita shall implement a policy requiring all Covered Persons to disclose immediately any debarment, exclusion, suspension, or other event that makes that person an Ineligible Person.

Nothing in Section III.M affects DaVita's responsibility to refrain from (and liability for) billing Federal health care programs for items or services furnished, ordered, or prescribed by an excluded person. DaVita understands that items or services furnished, ordered, or prescribed by excluded persons are not payable by Federal health care programs and that DaVita may be liable for overpayments and/or criminal, civil, and

administrative sanctions for employing or contracting with an excluded person regardless of whether DaVita meets the requirements of Section III.M.

        3.    *Removal Requirement.* If DaVita has actual notice that a Covered Person has become an Ineligible Person, DaVita shall remove such Covered Person from responsibility for, or involvement with, DaVita's business operations related to the Federal health care programs and shall remove such Covered Person from any position for which the Covered Person's compensation or the items or services furnished, ordered, or prescribed by the Covered Person are paid in whole or in part, directly or indirectly, by Federal health care programs or otherwise with Federal funds at least until such time as the Covered Person is reinstated into participation in the Federal health care programs.

        4.    *Pending Charges and Proposed Exclusions.* If DaVita has actual notice that a Covered Person is charged with a criminal offense that falls within the scope of 42 U.S.C. §§ 1320a-7(a), 1320a-7(b)(1)–(3), or is proposed for exclusion during the Covered Person's employment or contract term, DaVita shall take all appropriate actions to ensure that the responsibilities of that Covered Person have not and shall not adversely affect the quality of care rendered to any beneficiary, patient, or resident, or any claims submitted to any Federal health care program.

      N.    Notification of Government Investigation or Legal Proceedings

Within 30 days after discovery, DaVita shall notify OIG, in writing, of any ongoing investigation or legal proceeding known to DaVita conducted or brought by a governmental entity or its agents in the United States involving an allegation that DaVita has committed a crime or has engaged in fraudulent activities. This notification shall include a description of the allegation, the identity of the investigating or prosecuting agency, and the status of such investigation or legal proceeding. DaVita shall also provide written notice to OIG within 30 days after the resolution of the matter, and shall provide OIG with a description of the findings and/or results of the investigation or proceedings, if any.

      O.    Repayment of Overpayments

        1.    *Definition of Overpayments.* For purposes of this CIA, an "Overpayment" shall mean the amount of money DaVita Dialysis has received in excess of the amount due and payable under any Federal health care program requirements.

        2.    *Repayment of Overpayments.*

           a.    If, at any time, DaVita Dialysis identifies any Overpayment, DaVita Dialysis shall repay the Overpayment to the appropriate payor (*e.g.*, Medicare contractor) within 60 days

after identification of the Overpayment and take remedial steps within 90 days after identification (or such additional time as may be agreed to by the payor) to correct the problem, including preventing the underlying problem and the Overpayment from recurring.  If the Overpayment is not yet quantified, within 30 days after identification, DaVita Dialysis shall notify the payor of its efforts to quantify the Overpayment amount along with a schedule of when such work is expected to be completed.  Notification and repayment to the payor shall be done in accordance with the payor's policies.

b.      Notwithstanding the above, notification and repayment of any Overpayment amount that routinely is reconciled or adjusted pursuant to policies and procedures established by the payor should be handled in accordance with such policies and procedures.

P.      Reportable Events

1.      *Definition of Reportable Event.*  For purposes of this CIA, a "Reportable Event" means anything that involves:

a.      a substantial Overpayment to DaVita Dialysis;

b.      a matter involving DaVita Dialysis that a reasonable person would consider a probable violation of criminal, civil, or administrative laws applicable to any Federal health care program for which penalties or exclusion may be authorized;

c.      DaVita Dialysis's employment of or contracting with a Covered Person who is an Ineligible Person as defined by Section III.M.1.a; or

d.      the filing of a bankruptcy petition by DaVita.

A Reportable Event may be the result of an isolated event or a series of occurrences.

2.      *Reporting of Reportable Events.*  If DaVita determines (after a reasonable opportunity to conduct an appropriate review or investigation of the allegations) through any means that there is a Reportable Event, DaVita shall notify OIG, in writing, within 30 days after making the determination that the Reportable Event exists.

DaVita Dialysis shall not be required to report as a Reportable Event a matter that is the subject of an ongoing investigation or legal proceeding by a government entity or agent previously disclosed under Section III.N, above.

      3.    *Reportable Events under Section III.P.1.a.*  For Reportable Events under Section III.P.1.a, DaVita's report to OIG shall be made within 30 days of the identification of the Overpayment and shall include:

      a.    a description of the steps taken by DaVita Dialysis to identify and quantify the Overpayment;

      b.    a complete description of the Reportable Event, including the relevant facts, persons involved, and legal and Federal health care program authorities implicated;

      c.    a description of DaVita Dialysis's actions taken to correct the Reportable Event; and

      d.    any further steps DaVita Dialysis plans to take to address the Reportable Event and prevent it from recurring.

Within 60 days of identification of the Overpayment, DaVita shall provide OIG with a copy of the notification and repayment (if quantified) to the payor required by Section III.O.2.

      4.    *Reportable Events under Section III.P.1.b and c.*  For Reportable Events under Section III.P.1.b and III.P.1.c, DaVita's report to OIG shall include:

      a.    a complete description of the Reportable Event, including the relevant facts, persons involved, and legal and Federal health care program authorities implicated;

      b.    a description of DaVita Dialysis's actions taken to correct the Reportable Event;

      c.    any further steps DaVita Dialysis plans to take to address the Reportable Event and prevent it from recurring; and

      d.    if the Reportable Event has resulted in an Overpayment, a description of the steps taken by DaVita Dialysis to identify and quantify the Overpayment.

     5.    *Reportable Events under Section III.P.1.d.* For Reportable Events under Section III.P.1.d, DaVita's report to OIG shall include documentation of the bankruptcy filing and a description of any Federal health care program authorities implicated.

## IV.   SUCCESSOR LIABILITY; CHANGES TO BUSINESS UNITS OR LOCATIONS

### A.   Sale of Business, Business Unit, or Location

In the event that, after the Effective Date, DaVita proposes to sell any or all of its DaVita Dialysis business, business units, or locations (whether through a sale of assets, sale of stock, or other type of transaction) that are subject to this CIA, DaVita shall notify OIG of the proposed sale at least 30 days prior to the sale of the DaVita Dialysis business, business unit, or location. This notification shall include a description of the DaVita Dialysis business, business unit, or location to be sold, a brief description of the terms of the sale, and the name and contact information of the prospective purchaser. This CIA shall be binding on the purchaser of the DaVita Dialysis business, business unit, or location, unless otherwise determined and agreed to in writing by OIG.

### B.   Change or Closure of Business, Business Unit, or Location

In the event that, after the Effective Date, DaVita changes locations or closes a DaVita Dialysis business, business unit, or location related to the furnishing of items or services that may be reimbursed by Federal health care programs, DaVita shall notify OIG of this fact as soon as possible, but no later than within 30 days after the date of change or closure of the DaVita Dialysis business, business unit, or location.

### C.   Purchase or Establishment of New Business, Business Unit, or Location

In the event that, after the Effective Date, DaVita purchases or establishes a new DaVita Dialysis business, business unit, or location related to the furnishing of items or services that may be reimbursed by Federal health care programs, DaVita shall notify OIG at least 30 days prior to such purchase or the operation of the new DaVita Dialysis business, business unit, or location. This notification shall include the address of the new DaVita Dialysis business, business unit, or location; phone number; fax number; the location's Medicare and state Medicaid program provider number and/or supplier number(s); and the name and address of each Medicare and state Medicaid program contractor to which DaVita Dialysis currently submits claims. Each new DaVita Dialysis business, business unit, or location and all Covered Persons at each new DaVita Dialysis business, business unit, or location shall be subject to the applicable requirements of this CIA, unless otherwise agreed to in writing by OIG.

V.    **IMPLEMENTATION, QUARTERLY RESPONSE, AND ANNUAL REPORTS**

    A.    Implementation Report

        Within 120 days after the Effective Date, DaVita shall submit a written report to OIG summarizing the status of its implementation of the requirements of this CIA (Implementation Report). The Implementation Report shall, at a minimum, include:

        1.    the name, address, phone number, and position description of the Chief Compliance Officer required by Section III.A.1, and a summary of other noncompliance job responsibilities the Chief Compliance Officer may have;

        2.    the names and positions of the members of the Management Compliance Committee required by Section III.A.2;

        3.    the names of the Board members who are responsible for satisfying the Board of Directors compliance obligations described in Section III.A.3;

        4.    a copy of DaVita Dialysis's Code of Conduct required by Section III.B.1;

        5.    the number of individuals required to complete the Code of Conduct certification required by Section III.B.1, the percentage of individuals who have completed such certification, and an explanation of any exceptions (the documentation supporting this information shall be made available to OIG upon request);

        6.    copies of all Policies and Procedures required by Section III.B.2;

        7.    the following information regarding each type of training required by Section III.C:

            a.    a description of such training, including a summary of the topics covered, the length of sessions, and a schedule of training sessions;

            b.    the number of individuals required to be trained, percentage of individuals actually trained, and an explanation of any exceptions.

A copy of all training materials and the documentation supporting this information shall be made available to OIG upon request.

8.    a description of: (a) the Selection Process and Selection Criteria required by Section III.D.1; (b) the Valuation Methodologies required by Section III.D.2; (c) the Focus Arrangements Tracking System required by Section III.D.3.a; (d) the internal review and approval process required by Section III.D.3.f; and (e) the tracking and monitoring procedures and other Focus Arrangements Procedures required by Section III.D.3;

9.    a copy of the Notices required by Section III.E and a list of the Joint Venture Partners and Medical Directors to whom each Notice was sent;

10.    a copy of the engagement letter with the Monitor that DaVita is required to retain by Section III.G;

11.    a description of the Disclosure Program required by Section III.L;

12.    a description of the process by which DaVita fulfills the requirements of Section III.M regarding Ineligible Persons;

13.    a list of all of DaVita Dialysis's offices and joint venture dialysis clinics (including locations and mailing addresses); the corresponding name under which each joint venture dialysis clinic is doing business; the corresponding phone numbers and fax numbers; each joint venture clinic's Medicare and state Medicaid program provider number(s) and/or supplier number(s); and the name and address of each Medicare and state Medicaid program contractor to which DaVita Dialysis currently submits claims;

14.    a description of DaVita's corporate structure, including identification of any parent and sister companies, subsidiaries, and their respective lines of business;

15.    a description of DaVita's Executive Financial Recoupment Program implemented pursuant to Section III.J.1; and

16.    the certifications required by Section V.D.

B.    Quarterly Response Reports

Within 30 days after receipt of the Monitor's Quarterly Reports, DaVita shall submit its Quarterly Response Report to OIG and the Monitor containing:

1.    its response to the Monitor's findings and recommendations;

2.    its corrective action plans; and

3.      the certifications required by Section V.D.

C.      Annual Reports

DaVita shall submit to OIG annually a report with respect to the status of, and findings regarding, DaVita Dialysis's compliance activities for each of the five Reporting Periods (Annual Report).  Each Annual Report shall include, at a minimum:

1.      any change in the identity, position description, or other noncompliance job responsibilities of the Chief Compliance Officer; any change in the membership of the Management Compliance Committee described in Section III.A; and any change in the leadership or composition of the Board Compliance Committee;

2.      the dates of each report made by the Chief Compliance Officer to the Board (written documentation of such reports shall be made available upon request);

3.      the Board resolution required by Section III.A.3;

4.      a summary of any changes or amendments to DaVita Dialysis's Code of Conduct required by Section III.B.1 and the reason for such changes, along with a copy of the revised Code of Conduct;

5.      the number of individuals required to complete the Code of Conduct certification required by Section III.B.1, the percentage of individuals who have completed such certification, and an explanation of any exceptions (the documentation supporting this information shall be made available to OIG upon request);

6.      copies of the Policies and Procedures required by Section III.B.2, and a summary of the reasons for any significant changes or amendments.  DaVita shall provide a "redlined" copy of any revised Policy or Procedure at OIG's request;

7.      the following information regarding each type of training required by Section III.C:

a.      a copy of all training materials, the length of the training sessions, and a schedule of training sessions; and

b.      the number of individuals required to complete the initial and annual training, the percentage of individuals who actually completed the initial and annual training, and an explanation of any exceptions.

The documentation to support this information shall be made available to OIG upon request.

8.   a description of:  (a) any changes to the Focus Arrangements Tracking System required by Section III.D.3.a; (b) any changes to the internal review and approval process required by Section III.D.3.f; and (c) any changes to the tracking and monitoring procedures and other Focus Arrangements Procedures required by Section III.D.3;

9.   a copy of documents related to the Selection Process and Selection Criteria required by Section III.D.1 and, in each of the third through fifth Reporting Periods, an explanation of any modifications or changes to, or deviations from, the Selection Process or Selection Criteria made during the applicable Reporting Period;

10.   DaVita Dialysis's response to the reports prepared pursuant to Section H of Appendix C to the CIA, along with corrective action plan(s) related to any issues raised by the reports;

11.   a summary of Reportable Events (as defined in Section III.P) identified during the Reporting Period and the status of any corrective action relating to all such Reportable Events;

12.   a report of the aggregate Overpayments that DaVita Dialysis has returned to the Federal health care programs.  Overpayment amounts shall be broken down into the following categories:  inpatient Medicare, outpatient Medicare, Medicaid (report each applicable state separately, if applicable), and other Federal health care programs.  Overpayment amounts that are routinely reconciled or adjusted pursuant to policies and procedures established by the payor do not need to be included in this aggregate Overpayment report;

13.   a summary of the disclosures in the disclosure log required by Section III.L that:  (a) relate to Federal health care programs, or (b) involve allegations of conduct that may involve illegal remunerations in violation of the Anti-Kickback Statute (the complete disclosure log shall be made available to OIG upon request);

14.   any changes to the process by which DaVita fulfills the requirements of Section III.M regarding Ineligible Persons;

15.   a summary describing any ongoing investigation or legal proceeding required to have been reported pursuant to Section III.N.  The summary shall include a description of the allegation, the identity of the investigating or prosecuting agency, and the status of such investigation or legal proceeding;

16.     a description of all changes to the most recently provided list of DaVita Dialysis's locations (including addresses) as required by Section V.A.13; the corresponding name under which each location is doing business; the corresponding phone numbers and fax numbers; each location's Medicare and state Medicaid program provider number(s) and/or supplier number(s); and the name and address of each Medicare and state Medicaid program contractor to which DaVita currently submits claims;

17.     a description of any changes to DaVita's Executive Financial Recoupment Program;

18.     a copy of the annual report to the Board concerning DaVita's Executive Financial Recoupment Program, as required by Appendix D; and

19.     the certifications required by Section V.D.

The third and subsequent Annual Reports shall also include:

20.     the Compliance Program Review Report; and

21.     a summary and description of any and all current and prior engagements and agreements between DaVita and the Compliance Advisor, if different from what was submitted under Section A of Appendix A to the CIA.

The first Annual Report shall be received by OIG no later than 90 days after the end of the first Reporting Period.  Subsequent Annual Reports shall be received by OIG no later than the anniversary date of the due date of the first Annual Report.

D.     Certifications

1.     *Certifying Executives*.  In each Annual Report, DaVita shall include the certifications of Certifying Executives as required by Section III.A.4.

2.     *Compliance Officer and Chief Executive Officers*.  The Implementation Report and each Quarterly Response and Annual Report shall include certifications by the Chief Compliance Officer, Chief Executive Officer of DaVita Dialysis, and Chief Executive Officer of DaVita that:

a.     to the best of his or her knowledge, except as otherwise described in the report, DaVita is in compliance with all of the requirements of this CIA;

b. to the best of his or her knowledge, DaVita has implemented procedures reasonably designed to ensure that all Focus Arrangements do not violate the Anti-Kickback Statute, including the Focus Arrangements Procedures required in Section III.D of the CIA;

c. to the best of his or her knowledge, DaVita has fulfilled the requirements for new and renewed Focus Arrangements under Section III.D.4 of the CIA; and

d. he or she has reviewed the report and has made reasonable inquiry regarding its content and believes that the information in the report is accurate and truthful.

3. *Chief Financial Officer.*  The first Annual Report shall include a certification by the Chief Financial Officer that, to the best of his or her knowledge, DaVita has complied with its obligations under the Settlement Agreement:  (a) not to resubmit to any Federal health care program payors any previously denied claims related to the Covered Conduct addressed in the Settlement Agreement, and not to appeal any such denials of claims; (b) not to charge to or otherwise seek payment from federal or state payors for unallowable costs (as defined in the Settlement Agreement); and (c) to identify and adjust any past charges or claims for unallowable costs.

E. Designation of Information

DaVita shall clearly identify any portions of its submissions that it believes are trade secrets, or information that is commercial or financial and privileged or confidential, and therefore potentially exempt from disclosure under the Freedom of Information Act (FOIA), 5 U.S.C. § 552.  DaVita shall refrain from identifying any information as exempt from disclosure if that information does not meet the criteria for exemption from disclosure under FOIA.

## VI.   NOTIFICATIONS AND SUBMISSION OF REPORTS

Unless otherwise stated in writing after the Effective Date, all notifications and reports required under this CIA shall be submitted to the following entities:

OIG:        Administrative and Civil Remedies Branch
            Office of Counsel to the Inspector General
            Office of Inspector General
            U.S. Department of Health and Human Services
            Cohen Building, Room 5527
            330 Independence Avenue, SW
            Washington, DC 20201
            Telephone: 202.619.2078
            Facsimile: 202.205.0604

DaVita:     Jeanine Jiganti
            Chief Compliance Officer
            DaVita HealthCare Partners Inc.
            2000 16th Street
            Denver, CO 80202
            Telephone: 303.876.7401
            Facsimile: 877.873.8029

Unless otherwise specified, all notifications and reports required by this CIA may be made by certified mail, overnight mail, hand delivery, or other means, provided that there is proof that such notification was received. For purposes of this requirement, internal facsimile confirmation sheets do not constitute proof of receipt. Upon request by OIG, DaVita may be required to provide OIG with an electronic copy of each notification or report required by this CIA in searchable portable document format (pdf), in addition to a paper copy.

## VII.   OIG INSPECTION, AUDIT, AND REVIEW RIGHTS

In addition to any other rights OIG may have by statute, regulation, or contract, OIG or its duly authorized representative(s) may examine and/or request copies of DaVita's books, records, and other documents and supporting materials and/or conduct on-site reviews of DaVita's headquarters and any of DaVita Dialysis's locations for the purpose of verifying and evaluating: (a) DaVita's compliance with the terms of this CIA; and (b) DaVita Dialysis's compliance with the requirements of the Federal health care programs. The documentation described above shall be made available by DaVita to OIG or its duly authorized representative(s) at all reasonable times for inspection, audit, and/or reproduction. Furthermore, for purposes of this provision, OIG or its duly authorized representative(s) may interview any of DaVita's Covered Persons who

consent to be interviewed at the individual's place of business during normal business hours or at such other place and time as may be mutually agreed upon between the individual and OIG. DaVita shall assist OIG or its duly authorized representative(s) in contacting and arranging interviews with such individuals upon OIG's request. DaVita's Covered Persons may elect to be interviewed with or without a representative of DaVita present.

## VIII.  DOCUMENT AND RECORD RETENTION

DaVita shall maintain for inspection all documents and records relating to DaVita Dialysis's reimbursement from the Federal health care programs and to DaVita's compliance with this CIA for six years (or longer if otherwise required by law) from the Effective Date.

## IX.   DISCLOSURES

Consistent with HHS's FOIA procedures, set forth in 45 C.F.R. Part 5, OIG shall make a reasonable effort to notify DaVita prior to any release by OIG of information submitted by DaVita pursuant to its obligations under this CIA and identified upon submission by DaVita as trade secrets, or information that is commercial or financial and privileged or confidential, under the FOIA rules. With respect to such releases, DaVita shall have the rights set forth at 45 C.F.R. § 5.65(d).

## X.    BREACH AND DEFAULT PROVISIONS

DaVita is expected to fully and timely comply with all of its CIA obligations.

A.    Stipulated Penalties for Failure to Comply with Certain Obligations

As a contractual remedy, DaVita and OIG hereby agree that failure to comply with certain obligations as set forth in this CIA may lead to the imposition of the following monetary penalties (hereinafter referred to as "Stipulated Penalties") in accordance with the following provisions.

1.    A Stipulated Penalty of $2,500 (which shall begin to accrue on the day after the date the obligation became due) for each day DaVita fails to establish and implement any of the following obligations as described in Sections III and IV:

a.    a Chief Compliance Officer;

b.    a Management Compliance Committee;

c.    the Board of Directors compliance obligations;

d.     a written Code of Conduct;

e.     written Policies and Procedures;

f.     the training of Covered Persons, Arrangements Covered Persons, and Board Members;

g.     the Selection Process and Selection Criteria, Valuation Methodologies, Focus Arrangements Procedures, and/or Focus Arrangements Requirements described in Section III.D;

h.     the Notice to Joint Venture Partners and Medical Directors;

i.     the unwinding of the Subject Joint Venture Clinics, except to the extent covered by a Monitor's certification as described in Section III.F.3;

j.     the Executive Financial Recoupment Program;

k.     the Compliance Input on Executive Compensation;

l.     a Disclosure Program;

m.     Ineligible Persons screening and removal requirements;

n.     notification of government investigations or legal proceedings in the United States;

o.     repayment by DaVita Dialysis of Overpayments;

p.     reporting of Reportable Events; and

q.     disclosure of changes to business units or locations.

2.     A Stipulated Penalty of $2,500 (which shall begin to accrue on the day after the date the obligation became due) for each day DaVita fails to engage and use a Compliance Advisor, as required in Section III.A.3 and Appendix A.

3.     A Stipulated Penalty of $2,500 (which shall begin to accrue on the day after the date the obligation became due) for each day DaVita fails to engage and use an Independent Monitor, as required in Section III.G and Appendix C.

4.     A Stipulated Penalty of $2,500 (which shall begin to accrue on the day after the date the obligation became due) for each day DaVita fails to submit the Implementation Report or any Quarterly Response Reports or Annual Reports to OIG in accordance with the requirements of Section V by the deadlines for submission.

5.     A Stipulated Penalty of $2,500 (which shall begin to accrue on the day after the date the obligation became due) for each day DaVita fails to submit a Compliance Program Review Report in accordance with the requirements of Section III.A.3 and Appendix A.

6..     A Stipulated Penalty of $2,500 (which shall begin to accrue on the day after the date the obligation became due) for each day the Independent Monitor fails to submit a Quarterly or Annual Report in accordance with the requirements of Section III.G and Appendix C.

7.     A Stipulated Penalty of $1,500 for each day DaVita fails to grant access as required in Section VII. (This Stipulated Penalty shall begin to accrue on the date DaVita fails to grant access.)

8.     A Stipulated Penalty of $50,000 for each false certification submitted by or on behalf of DaVita as part of its Implementation Report, Quarterly Response Report, Annual Report, additional documentation to a report (as requested by the OIG), or otherwise required by this CIA.

9.     A Stipulated Penalty of $1,000 for each day DaVita fails to comply fully and adequately with any obligation of this CIA. OIG shall provide notice to DaVita stating the specific grounds for its determination that DaVita has failed to comply fully and adequately with the CIA obligation(s) at issue and steps DaVita shall take to comply with the CIA. (This Stipulated Penalty shall begin to accrue 10 days after DaVita receives this notice from OIG of the failure to comply.) A Stipulated Penalty as described in this Subsection shall not be demanded for any violation for which OIG has sought a Stipulated Penalty under Subsections 1–8 of this Section.

B.     Timely Written Requests for Extensions

DaVita may, in advance of the due date, submit a timely written request for an extension of time to perform any act or file any notification or report required by this CIA. Notwithstanding any other provision in this Section, if OIG grants the timely written request with respect to an act, notification, or report, Stipulated Penalties for failure to perform the act or file the notification or report shall not begin to accrue until one day after DaVita fails to meet the revised deadline set by OIG. Notwithstanding any other provision in this Section, if OIG denies such a timely written request, Stipulated

Penalties for failure to perform the act or file the notification or report shall not begin to accrue until three days after DaVita receives OIG's written denial of such request or the original due date, whichever is later.  A "timely written request" is defined as a request in writing received by OIG at least five days prior to the date by which any act is due to be performed or any notification or report is due to be filed.

      C.     <u>Payment of Stipulated Penalties</u>

           1.     *Demand Letter*.  Upon a finding that DaVita has failed to comply with any of the obligations described in Section X.A and after determining that Stipulated Penalties are appropriate, OIG shall notify DaVita of:  (a) DaVita's failure to comply; and (b) OIG's exercise of its contractual right to demand payment of the Stipulated Penalties.  (This notification shall be referred to as the "Demand Letter.")

           2.     *Response to Demand Letter*.  Within 10 days after the receipt of the Demand Letter, DaVita shall either:  (a) cure the breach to OIG's satisfaction and pay the applicable Stipulated Penalties; or (b) request a hearing before an HHS administrative law judge (ALJ) to dispute OIG's determination of noncompliance, pursuant to the agreed upon provisions set forth below in Section X.E.  In the event DaVita elects to request an ALJ hearing, the Stipulated Penalties shall continue to accrue until DaVita cures, to OIG's satisfaction, the alleged breach in dispute.  Failure to respond to the Demand Letter in one of these two manners within the allowed time period shall be considered a material breach of this CIA and shall be grounds for exclusion under Section X.D.

           3.     *Form of Payment*.  Payment of the Stipulated Penalties shall be made by electronic funds transfer to an account specified by OIG in the Demand Letter.

           4.     *Independence from Material Breach Determination*.  Except as set forth in Section X.D.1.c, these provisions for payment of Stipulated Penalties shall not affect or otherwise set a standard for OIG's decision that DaVita has materially breached this CIA, which decision shall be made at OIG's discretion and shall be governed by the provisions in Section X.D, below.

      D.     <u>Exclusion for Material Breach of this CIA</u>

           1.     *Definition of Material Breach*.  A material breach of this CIA means:

                  a.     a failure by DaVita to report a Reportable Event, take corrective action, and make the appropriate refunds, as required in Section III.P;

b.    repeated or flagrant violations of the obligations under this CIA, including, but not limited to, the obligations addressed in Section X.A;

c.    a failure to respond to a Demand Letter concerning the payment of Stipulated Penalties in accordance with Section X.C;

d.    a failure to engage and use a Compliance Advisor in accordance with Section III.A.3 and Appendix A; or

e.    a failure to engage and use an Independent Monitor in accordance with Section III.G and Appendix C.

2.    *Notice of Material Breach and Intent to Exclude*.  The parties agree that a material breach of this CIA by DaVita constitutes an independent basis for DaVita's exclusion from participation in the Federal health care programs.  Upon a determination by OIG that DaVita has materially breached this CIA and that exclusion is the appropriate remedy, OIG shall notify DaVita of: (a) DaVita's material breach, and (b) OIG's intent to exercise its contractual right to impose exclusion.  (This notification shall be referred to as the "Notice of Material Breach and Intent to Exclude.")

3.    *Opportunity to Cure*.  DaVita shall have 30 days from the date of receipt of the Notice of Material Breach and Intent to Exclude to demonstrate to OIG's satisfaction that:

a.    DaVita is in compliance with the obligations of the CIA cited by OIG as being the basis for the material breach;

b.    the alleged material breach has been cured; or

c.    the alleged material breach cannot be cured within the 30-day period, but that: (i) DaVita has begun to take action to cure the material breach, (ii) DaVita is pursuing such action with due diligence, and (iii) DaVita has provided to OIG a reasonable timetable for curing the material breach.

4.    *Exclusion Letter*.  If, at the conclusion of the 30-day period, DaVita fails to satisfy the requirements of Section X.D.3, OIG may exclude DaVita from participation in the Federal health care programs.  OIG shall notify DaVita in writing of its determination to exclude DaVita.  (This letter shall be referred to as the "Exclusion Letter.")  Subject to the Dispute Resolution provisions in Section X.E, below, the exclusion shall go into effect 30 days after the date of DaVita's receipt of the Exclusion

Letter.  The exclusion shall have national effect.  Reinstatement to program participation is not automatic.  After the end of the period of exclusion, DaVita may apply for reinstatement by submitting a written request for reinstatement in accordance with the provisions at 42 C.F.R. §§ 1001.3001–.3004.

E.   Dispute Resolution

1.   *Review Rights*.  Upon OIG's delivery to DaVita of its Demand Letter or of its Exclusion Letter, and as an agreed-upon contractual remedy for the resolution of disputes arising under this CIA, DaVita shall be afforded certain review rights comparable to the ones that are provided in 42 U.S.C. § 1320a-7(f) and 42 C.F.R. Part 1005 as if they applied to the Stipulated Penalties or exclusion sought pursuant to this CIA.  Specifically, OIG's determination to demand payment of Stipulated Penalties or to seek exclusion shall be subject to review by an HHS ALJ and, in the event of an appeal, the HHS Departmental Appeals Board (DAB), in a manner consistent with the provisions in 42 C.F.R. § 1005.2–1005.21.  Notwithstanding the language in 42 C.F.R. § 1005.2(c), the request for a hearing involving Stipulated Penalties shall be made within 10 days after receipt of the Demand Letter and the request for a hearing involving exclusion shall be made within 25 days after receipt of the Exclusion Letter.

2.   *Stipulated Penalties Review*.  Notwithstanding any provision of Title 42 of the United States Code or Title 42 of the Code of Federal Regulations, the only issues in a proceeding for Stipulated Penalties under this CIA shall be:  (a) whether DaVita was in full and timely compliance with the obligations of this CIA for which OIG demands payment; and (b) the period of noncompliance.  DaVita shall have the burden of proving its full and timely compliance and the steps taken to cure the noncompliance, if any.  OIG shall not have the right to appeal to the DAB an adverse ALJ decision related to Stipulated Penalties.  If the ALJ agrees with OIG with regard to a finding of a breach of this CIA and orders DaVita to pay Stipulated Penalties, such Stipulated Penalties shall become due and payable 20 days after the ALJ issues such a decision unless DaVita requests review of the ALJ decision by the DAB.  If the ALJ decision is properly appealed to the DAB and the DAB upholds the determination of OIG, the Stipulated Penalties shall become due and payable 20 days after the DAB issues its decision.

3.   *Exclusion Review*.  Notwithstanding any provision of Title 42 of the United States Code or Title 42 of the Code of Federal Regulations, the only issues in a proceeding for exclusion based on a material breach of this CIA shall be:

a.   whether DaVita was in material breach of this CIA;

b.   whether such breach was continuing on the date of the Exclusion Letter; and

     c.     whether the alleged material breach could not have been cured within the 30-day period, but that:  (i) DaVita had begun to take action to cure the material breach within that period; (ii) DaVita has pursued and is pursuing such action with due diligence; and (iii) DaVita provided to OIG within that period a reasonable timetable for curing the material breach and DaVita has followed the timetable.

For purposes of the exclusion herein, exclusion shall take effect only after an ALJ decision favorable to OIG, or, if the ALJ rules for DaVita, only after a DAB decision in favor of OIG.  DaVita's election of its contractual right to appeal to the DAB shall not abrogate OIG's authority to exclude DaVita upon the issuance of an ALJ's decision in favor of OIG.  If the ALJ sustains the determination of OIG and determines that exclusion is authorized, such exclusion shall take effect 20 days after the ALJ issues such a decision, notwithstanding that DaVita may request review of the ALJ decision by the DAB.  If the DAB finds in favor of OIG after an ALJ decision adverse to OIG, the exclusion shall take effect 20 days after the DAB decision.  DaVita shall waive its right to any notice of such an exclusion if a decision upholding the exclusion is rendered by the ALJ or DAB.  If the DAB finds in favor of DaVita, DaVita shall be reinstated effective on the date of the original exclusion.

     4.     *Finality of Decision*.  The review by an ALJ or DAB provided for above shall not be considered to be an appeal right arising under any statutes or regulations.  Consequently, the parties to this CIA agree that the DAB's decision (or the ALJ's decision if not appealed) shall be considered final for all purposes under this CIA.

## XI.   EFFECTIVE AND BINDING AGREEMENT

DaVita and OIG agree as follows:

     A.     This CIA shall become final and binding on the date the final signature is obtained on the CIA.

     B.     This CIA constitutes the complete agreement between the parties and may not be amended except by written consent of the parties to this CIA.

     C.     OIG may agree to a suspension of DaVita's obligations under this CIA based on a certification by DaVita that it is no longer providing health care items or services that will be billed to any Federal health care program and that it does not have any ownership or control interest, as defined in 42 U.S.C. § 1320a-3, in any entity that bills any Federal health care program.  If DaVita is relieved of its CIA obligations, DaVita will be required to notify OIG in writing at least 30 days in advance if DaVita plans to resume providing health care items or services that are billed to any Federal

health care program or to obtain an ownership or control interest in any entity that bills any Federal health care program.  At such time, OIG shall evaluate whether the CIA will be reactivated or modified.

   D.  The undersigned DaVita signatories represent and warrant that they are authorized to execute this CIA.  The undersigned OIG signatories represent that they are signing this CIA in their official capacities and that they are authorized to execute this CIA.

   E.  This CIA may be executed in counterparts, each of which constitutes an original and all of which constitute one and the same CIA.  Facsimiles of signatures shall constitute acceptable, binding signatures for purposes of this CIA.

## ON BEHALF OF DAVITA

/Jeanine Jiganti/                          10-21-14
_____          _____
JEANINE JIGANTI                           DATE
Chief Compliance Officer
DaVita HealthCare Partners Inc.


/Kim Rivera/                               10-21-14
_____          _____
KIM RIVERA                                 DATE
Chief Legal Officer
DaVita HealthCare Partners Inc.


/Paul E. Kalb/                             10/22/14
_____          _____
PAUL E. KALB, M.D.                         DATE
Partner, Sidley Austin LLP


/Jaime L.M. Jones/                         10/22/14
_____          _____
JAIME L.M. JONES                           DATE
Partner, Sidley Austin LLP

**ON BEHALF OF THE OFFICE OF INSPECTOR GENERAL
OF THE DEPARTMENT OF HEALTH AND HUMAN SERVICES**


/Robert K. DeConti/                                     10/22/14

ROBERT K. DECONTI                                       DATE
Assistant Inspector General for Legal Affairs
Office of Inspector General
U.S. Department of Health and Human Services


/Laura E. Ellis/                                        10/22/14

LAURA E. ELLIS                                          DATE
Senior Counsel


/Kaitlyn L. Dunn/                                       10/22/14

KAITLYN L. DUNN                                         DATE
Associate Counsel

## APPENDIX A

## COMPLIANCE ADVISOR

This Appendix contains the requirements relating to the Compliance Advisor required by Section III.A.3 of the CIA.

    A.    <u>Compliance Advisor Engagement</u>

        1.    The Board Compliance Committee shall engage an independent individual or entity (Compliance Advisor) that possesses the qualifications set forth in Section B, below, to perform the Compliance Program Review. The Compliance Advisor shall conduct the review in a professionally independent and objective fashion, as set forth in Section D. Within 15 days after engaging the Compliance Advisor, the Board Compliance Committee shall provide OIG with: (a) the identity, address, and phone number of the Compliance Advisor; (b) a copy of the engagement letter; (c) information to demonstrate that the Compliance Advisor has the qualifications outlined in Section B, below; (d) a summary and description of any and all current and prior engagements and agreements between DaVita and the Compliance Advisor; and (e) a certification from the Compliance Advisor that it meets the independence requirements of Section D, below. Within 30 days after OIG receives this information or any additional information submitted by the Board Compliance Committee in response to a request by OIG, whichever is later, OIG will notify the Board Compliance Committee if the Compliance Advisor is unacceptable. Absent notification from OIG that the Compliance Advisor is unacceptable, the Board Compliance Committee may continue to engage the Compliance Advisor.

        2.    If the Board Compliance Committee engages a new Compliance Advisor during the term of the CIA, that Compliance Advisor shall also meet the requirements of this Appendix. If a new Compliance Advisor is engaged, the Board Compliance Committee shall submit the information identified in Section A.1, above, within 15 days of engagement of the Compliance Advisor. Within 30 days after OIG receives this information or any additional information submitted by the Board Compliance Committee at the request of OIG, whichever is later, OIG will notify the Board Compliance Committee if the Compliance Advisor is unacceptable. Absent notification from OIG that the Compliance Advisor is unacceptable, the Board Compliance Committee may continue to engage the Compliance Advisor.

B.   Compliance Advisor Qualifications

The Compliance Advisor shall:

1.   have expertise in health care compliance and in the general requirements applicable to dialysis providers of the Federal health care program(s) from which DaVita Dialysis seeks reimbursement; and

2.   have sufficient staff with the expertise described in Section B.1 and sufficient resources to conduct the Compliance Program Review on a timely basis.

C.   Compliance Advisor Responsibilities

The Compliance Advisor shall:

1.   create a work plan for each Reporting Period's Compliance Program Review and submit the work plan to OIG for comment before beginning the Compliance Program Review;

2.   perform the annual Compliance Program Review;

3.   respond to all OIG inquiries in a prompt, objective, and factual manner;

4.   retain and make available to OIG, upon request, all work papers, supporting documentation, correspondence, and other documents related to the engagement of and work performed by the Compliance Advisor; and

5.   prepare timely, clear, and well-written reports.

D.   Compliance Advisor Independence and Objectivity

To ensure that the Compliance Program Reviews are conducted in a professionally independent and objective fashion, the Compliance Advisor shall not have a relationship to DaVita, or to its officers, directors, employees, or agents, that would cause a reasonable person to question the Compliance Advisor's impartiality.

E.   Compliance Advisor Removal/Termination

1.   *The Board Compliance Committee and Compliance Advisor.* If the Board Compliance Committee terminates the Compliance Advisor or if the Compliance Advisor withdraws from the engagement during the term of the CIA, the Compliance

Advisor must submit a notice explaining its reasons for termination or the reason for withdrawal to OIG no later than 30 days after termination or withdrawal. The Board Compliance Committee must engage a new Compliance Advisor in accordance with Section A of this Appendix within 60 days of termination or withdrawal of the Compliance Advisor.

        2.    *OIG Removal of the Compliance Advisor.* In the event OIG has reason to believe the Compliance Advisor does not possess the qualifications described in Section B, is not independent and objective as set forth in Section D, or has failed to carry out its responsibilities in performing the Compliance Program Review as set forth in Section C, OIG may, at its sole discretion, require the Board Compliance Committee to engage a new Compliance Advisor in accordance with Section A of this Appendix. The Board Compliance Committee must engage a new Compliance Advisor within 60 days of termination of the Compliance Advisor.

Prior to requiring the Board Compliance Committee to engage a new Compliance Advisor, OIG shall notify the Board Compliance Committee of its intent to do so and provide a written explanation of why OIG believes such a step is necessary. To resolve any concerns raised by OIG, the Board Compliance Committee may present additional information regarding the Compliance Advisor's qualifications, independence, or performance of its responsibilities. OIG will attempt in good faith to resolve any differences regarding the Compliance Advisor with the Board Compliance Committee prior to requiring the Board Compliance Committee to terminate the Compliance Advisor. However, the final determination as to whether or not to require the Board Compliance Committee to engage a new Compliance Advisor shall be made at the sole discretion of OIG.

**APPENDIX B**

**SUBJECT JOINT VENTURE CLINICS**

1. Llano Dialysis, LLC ("East Bay"), a joint venture consisting of five dialysis clinics:

   - Oakland Peritoneal Dialysis Center and Oakland Peritoneal At Home, Oakland, CA
     National Provider Identifier – 1568699882
     Medicaid Provider Number – 1568699882

   - Vallejo Dialysis, Vallejo, CA
     National Provider Identifier – 1265669444
     Medicaid Provider Number – 1265669444

   - San Pablo Dialysis, San Pablo, CA
     National Provider Identifier – 1790912970
     Medicaid Provider Number – 1790912970

   - El Cerrito Dialysis, El Cerrito, CA
     National Provider Identifier – 1063649242
     Medicaid Provider Number – 1063649242

2. University Dialysis Center, LLC, a joint venture consisting of one dialysis clinic:

   - University Dialysis Center, Sacramento, CA
     National Provider Identifier – 1154415982
     Medicaid Provider Number – CDC52549G

3. Shadow Dialysis, LLC, a joint venture consisting of one dialysis clinic:

   - Antelope Dialysis Center, Citrus Heights, CA
     National Provider Identifier – 1780836684
     Medicaid Provider Number – 1780836684

4. Doves Dialysis, LLC, a joint venture consisting of one dialysis clinic:

   - Carmel Mountain Dialysis, San Diego, CA
     National Provider Identifier – 1669788980
     Medicaid Provider Number – 1669788980

5. Animas Dialysis, LLC, a joint venture consisting of two dialysis clinics:

- Doctors Dialysis of East Los Angeles, Los Angeles, CA
  National Provider Identifier – 1083853667
  Medicaid Provider Number – 1083853667

- Doctors Dialysis Center of Montebello, Montebello, CA
  National Provider Identifier – 1568601789
  Medicaid Provider Number – 1568601789

6. Mountain West Dialysis Services, LLC, a joint venture consisting of seven dialysis clinics:

- Lakewood Crossing Dialysis, Lakewood, CO
  National Provider Identifier – 1437310109
  Medicaid Provider Number - 56325398

- Longmont Dialysis Center, Longmont, CO
  National Provider Identifier – 1336301860
  Medicaid Provider Number – 11485884

- Lakewood Dialysis Center and Lakewood at Home, Lakewood, CO
  National Provider Identifier – 1063673739
  Medicaid Provider Number – 20733283

- Thornton Dialysis Center, Thornton, CO
  National Provider Identifier – 1154582831
  Medicaid Provider Number – 12089273

- Boulder Dialysis Center, Boulder, CO
  National Provider Identifier – 1154582823
  Medicaid Provider Number – 86187589

- Arvada Dialysis Center, Arvada, CO
  National Provider Identifier – 1609037373
  Medicaid Provider Number – 45706794

- Mile High Home Dialysis PD, Lakewood, CO
  National Provider Identifier – 1508026436
  Medicaid Provider Number – 36032395

7. South Central Florida Dialysis Partners, LLC ("IMS/St. Cloud"), a joint venture consisting of four dialysis clinics:

- Celebration Dialysis, Celebration, FL
  National Provider Identifier – 1043287550
  Medicaid Provider Number – 000044200

- Hunters Creek Dialysis and Hunters Creek at Home, Orlando, FL
  National Provider Identifier – 1801864459
  Medicaid Provider Number – 000092700

- Kissimmee Dialysis, Kissimmee, FL
  National Provider Identifier – 1609843010
  Medicaid Provider Number – 000039800

- St. Cloud Dialysis, St. Cloud, FL
  National Provider Identifier – 1245410091
  Medicaid Provider Number – 892801100

8. Bright Dialysis, LLC, a joint venture consisting of one dialysis clinic:

- Bright Dialysis, Fort Pierce, FL
  National Provider Identifier – 1316179062
  Medicaid Provider Number – 001826000

9. Central Kentucky Dialysis Centers, LLC, a joint venture consisting of one dialysis clinic:

- Woodland Dialysis Center, Elizabethtown, KY
  National Provider Identifier – 1861452302
  Medicaid Provider Number – 7100011990

10. Columbus-RNA-DaVita, LLC, a joint venture consisting of three dialysis clinics:

- Columbus Dialysis, Columbus, OH
  National Provider Identifier – 1073787248
  Medicaid Provider Number – 2908241

- Columbus East Dialysis, Columbus, OH
  National Provider Identifier – 1952575128
  Medicaid Provider Number – 2911497

DaVita HealthCare Partners Inc.
Corporate Integrity Agreement – Appendix B
Page 3 of 4

- Columbus Downtown Dialysis, Columbus, OH
  National Provider Identifier – 1528232790
  Medicaid Provider Number – 2955477

11. Wauseon Dialysis, LLC, a joint venture consisting of one dialysis clinic:

- Wauseon Dialysis Center, Wauseon, OH
  National Provider Identifier – 1306010228
  Medicaid Provider Number – 2911522

## APPENDIX C

## RESPONSIBILITIES OF THE INDEPENDENT MONITOR

A.     Review of Selection Process and Selection Criteria, Valuation Methodologies, and Notice

1.     *Selection Process and Selection Criteria Review*.  During the first two Reporting Periods, the Monitor shall review and approve the Selection Process and Selection Criteria required by Section III.D.1 of the CIA, and any subsequent modifications or changes to the Selection Process and Selection Criteria.

2.     *Valuation Methodologies Review*.  During the first two Reporting Periods, the Monitor shall review and approve each Valuation Methodology required by Section III.D.2 of the CIA, and any subsequent modifications or changes to those Valuation Methodologies.  In conducting this review, the Monitor shall ensure that the Valuation Methodologies:

   a.     provide for application of the same methodologies for calculating and documenting inputs when valuing each type of Focus Arrangement; and

   b.     conform to standards commonly used and accepted by accountants and valuation experts.

3.     *Notice to Joint Venture Partners and Medical Directors Review*. The Monitor shall review and approve each type of Notice required by Section III.E of the CIA.

   a.     The Monitor shall ensure that each type of Notice clearly and adequately informs all Joint Venture Partners and Medical Directors that:

      i.     Joint Venture Partners, Medical Directors, and their employees, colleagues, and contractors are free to refer patients to and treat patients at non-DaVita-owned dialysis clinics;

      ii.     DaVita will not enforce any patient-related non-disparagement or non-solicitation clauses contained in any of their existing agreements with DaVita; and

           iii.     in connection with joint venture clinics formed by Partial Divestitures, DaVita will not enforce the investment non-compete provisions it may have in the applicable joint venture agreements and Medical Director agreements.

    b.     The Monitor shall review and approve any changes or revisions DaVita makes to the wording of the Notice in the second Reporting Period before DaVita sends the Notice to its Joint Venture Partners and Medical Directors.

**B.**     <u>Oversight of Unwinding of Subject Joint Venture Clinics</u>

The Monitor shall oversee DaVita's unwinding of the Subject Joint Venture Clinics as required by Section III.F of the CIA.

    1.     The Monitor shall review and approve each transaction required to unwind the Subject Joint Venture Clinic to ensure that it conforms to the requirements set forth in Section III.F of the CIA.

    2.     The Monitor shall review and approve prior to execution any "seller's non-competes" with the Joint Venture Partners who were party to a Subject Joint Venture Clinic to ensure that such clauses or agreements:

        a.     do not contain patient-related non-disparagement or non-solicitation language; and

        b.     do not restrict the nephrologist or nephrology practice's ability to refer patients to or treat patients at a non-DaVita-owned dialysis clinic.

C.    Oversight of DaVita Dialysis Focus Arrangements

The Monitor:

1.    Beginning 120 days from the Effective Date, during the first two Reporting Periods and for the first 120 days of the third Reporting Period, shall prospectively evaluate all Focus Arrangements, except Business Courtesies, that DaVita Dialysis proposes to enter into with Health Care Providers.

    a.    The Monitor shall determine whether DaVita Dialysis properly applied the appropriate Valuation Methodology, as required by Section III.D.2 of the CIA.

    b.    The Monitor shall determine whether the Health Care Provider was selected consistent with DaVita Dialysis's Selection Process and Selection Criteria, as applicable and required by Section III.D.1 of the CIA.

    c.    The Monitor shall inform DaVita Dialysis and OIG of:  (1) the Risk Determination, and (2) the Monitor's basis for the Risk Determination.

2.    For the first two Reporting Periods, shall review and evaluate:

    a.    DaVita's corporate managerial and governance structure overseeing and executing DaVita Dialysis's selection, negotiation, and implementation of Focus Arrangements with, and compensation of, Health Care Providers;

    b.    the Focus Arrangement Procedures required by Section III.D.3;

    c.    DaVita Dialysis's compliance with the Focus Arrangement Requirements set forth in Section III.D.4; and

    d.    DaVita's compliance program in relation to DaVita Dialysis's selection, negotiation, and implementation of Focus Arrangements with, and compensation of, Health Care Providers, including, but not limited to, training and education, policies and procedures, risk assessment, and auditing.

3.      For the first two Reporting Periods, may retrospectively review, in his or her discretion, any payments made under a new or renewed Focus Arrangement to determine whether the payments comply with the laws governing the Federal health care programs, including the False Claims Act and the Anti-Kickback Statute.

4.      For the first two Reporting Periods, may retrospectively review, in his or her discretion, any payments made under a Focus Arrangement existing on or before the Effective Date if the Monitor receives, identifies, or discovers information that suggests the payments do not comply with the laws governing the Federal health care programs, including the False Claims Act and the Anti-Kickback Statute, except for conduct released by the Settlement Agreement entered into between the United States and DaVita contemporaneously with this CIA.  In the event of a disagreement between the Monitor and DaVita as to whether the Monitor has a basis to review under this Section C.4, the OIG shall, in its sole discretion, determine whether a basis to review exists.

D.      Arrangements Review

1.      For the third, fourth, and fifth Reporting Periods, the Monitor shall conduct the Arrangements Review.  The Arrangements Review shall consist of two components:  a systems review and a transactions review.  The Monitor shall perform all components of each Arrangements Review.  If there are no material changes to DaVita Dialysis's systems, processes, policies, and procedures relating to Arrangements after the end of the second Reporting Period, the Arrangements Systems Review shall be performed for the fourth Reporting Period.  If DaVita Dialysis materially changes the Arrangements systems, processes, policies, and procedures during the third or fifth Reporting Periods, the Monitor shall perform an Arrangements Systems Review of the material changes for the Reporting Period in which such changes were made in addition to conducting the systems review for the fourth Reporting Period.  The Arrangements Transactions Review shall be performed annually for the third, fourth, and fifth Reporting Periods.

2.      *Arrangements Systems Review*.  The Arrangements Systems Review shall be a review of DaVita Dialysis's systems, processes, policies, and procedures relating to the initiation, review, approval, and tracking of Arrangements.  Specifically, the Monitor shall review the following:

a.      DaVita Dialysis's systems, policies, processes, and procedures with respect to creating and maintaining a centralized tracking system for all existing and new and renewed Focus Arrangements (Focus Arrangements Tracking System), including a detailed description of the information captured in the Focus Arrangements Tracking System;

b.     DaVita Dialysis's systems, policies, processes, and procedures for tracking remuneration to and from all parties to Focus Arrangements;

c.     DaVita Dialysis's systems, policies, processes, and procedures for tracking services and activities to ensure that parties to the Focus Arrangement are performing the services required under the applicable Focus Arrangement(s) (if applicable);

d.     DaVita Dialysis's systems, policies, processes, and procedures for monitoring the use of leased space, medical supplies, medical devices, equipment, or other patient care items to ensure that such use is consistent with the terms of the applicable Focus Arrangement(s) (if applicable);

e.     DaVita Dialysis's systems, policies, processes, and procedures for initiating Focus Arrangements, including those policies that:  (1) govern the Selection Process and Selection Criteria and the calculation and application of Valuation Methodologies, (2) identify the individuals with authority to initiate a Focus Arrangement, and (3) specify the business need or business rationale required to initiate a Focus Arrangement;

f.     DaVita Dialysis's systems, policies, processes, and procedures for the internal review and approval of all Focus Arrangements, including those policies that identify the individuals required to approve each type or category of Focus Arrangement entered into by DaVita Dialysis, the internal controls designed to ensure that all required approvals are obtained, and the processes for ensuring that all Focus Arrangements are subject to a legal review by counsel with expertise in the Anti-Kickback Statute;

g.     the Chief Compliance Officer's annual review of and reporting to the Board Compliance Committee on the Focus Arrangements Tracking System; DaVita Dialysis's internal review and approval process; and other Focus Arrangements systems, policies, processes, and procedures;

h.     DaVita Dialysis's systems, policies, processes, and procedures for implementing effective responses when

suspected violations of the Anti-Kickback Statute are discovered, including disclosing Reportable Events and quantifying and repaying Overpayments when appropriate; and

i.     DaVita Dialysis's systems, policies, processes, and procedures for ensuring that all new and renewed Focus Arrangements comply with the Focus Arrangements Requirements set forth in Section III.D.4 of the CIA.

3.     *Arrangements Transactions Review*.  The Arrangements Transactions Review shall consist of a review by the Monitor of 100 randomly selected Focus Arrangements that were entered into or renewed by DaVita Dialysis during the Reporting Period.  The Monitor shall assess whether DaVita Dialysis has complied with Section III.D of the CIA with respect to the selected Focus Arrangements.

The Monitor's assessment with respect to each Focus Arrangement that is subject to review shall include:

a.     verifying that the Health Care Provider(s) involved in the Focus Arrangement was selected consistent with DaVita Dialysis's Selection Process and Selection Criteria (if applicable);

b.     verifying that the Focus Arrangement is maintained in DaVita Dialysis's centralized tracking system in a manner that permits the Monitor to identify the parties to the Focus Arrangement and the relevant terms of the Focus Arrangement (*i.e.*, the items/services/equipment/space to be provided, the amount of compensation, the effective date, the expiration date, etc.);

c.     verifying that the remuneration related to the Focus Arrangement was determined using the appropriate Valuation Methodology;

d.     verifying that the Focus Arrangement was subject to the internal review and approval process (including both a legal and business review) and obtained the necessary approvals, and that such review and approval is appropriately documented;

e.      verifying that the remuneration related to the Focus Arrangement is properly tracked;

f.      verifying that the services and activities are properly tracked and reviewed by DaVita Dialysis, and that the parties to the Focus Arrangement are performing the services required under the applicable Focus Arrangement (if applicable);

g.      verifying that the use of leased space, medical supplies, medical devices, equipment, and other patient care items is properly monitored by DaVita Dialysis, and that such use is consistent with the terms of the applicable Focus Arrangement (if applicable); and

h.      verifying that the Focus Arrangement satisfies the Focus Arrangements Requirements of Section III.D.4 of the CIA.

E.      <u>Compliance Audit Review</u>

The Monitor shall conduct an annual review of annual, routine, and email compliance audits conducted of DaVita Dialysis.

1.      OIG shall select three annual audits and one routine audit of DaVita Dialysis for the Monitor's review.

2.      The Monitor shall select a statistically valid random sample of three email audits from the universe comprised of all email audits completed during the Reporting Period.

3.      For each of the audits selected, the Monitor shall:

a.      review the protocol and methodology of the audit to assess whether it was designed in a manner that sufficiently and effectively audits the issue;

b.      review the work papers, including all records and references relied upon by DaVita Dialysis, to assess whether DaVita Dialysis relied on the relevant laws, regulations, and program guidance, and whether the work papers, records, and references reviewed support the findings reached by DaVita Dialysis; and

     c.     to the extent the Monitor finds that DaVita Dialysis's findings are unsupported or incorrect, provide the Monitor's findings and the Monitor's support for those findings.

F.     <u>Independent Investigations</u>

During the first two Reporting Periods, the Monitor may, in his or her discretion, conduct an independent investigation of any complaint, concern, or report that the Monitor receives from any source concerning a probable violation of criminal, civil, or administrative laws applicable to any Federal health care program for which penalties or exclusion may be authorized, where:

1.     such conduct is alleged to be by any member of the Board of Directors, officer, or Certifying Executive of DaVita;

2.     such conduct allegedly has been approved or sanctioned by the DaVita Dialysis Compliance or Legal personnel;

3.     the Monitor has concerns about the integrity or adequacy of DaVita's investigation; or

4.     the Monitor otherwise believes, and OIG agrees, that DaVita Dialysis cannot effectively investigate the complaint, concern, or report,

except for conduct released by the Settlement Agreement entered into between the United States and DaVita contemporaneously with this CIA.  The Monitor shall report its findings from any independent investigation conducted pursuant to this Section F to both DaVita and OIG.  The Monitor shall complete any independent investigation begun but not completed during the first two Reporting Periods.

G.     <u>Quarterly Reports</u>

1.     The Quarterly Reports shall include, but shall not be limited to:

     a.     the Monitor's findings and recommendations to DaVita based on the work performed by the Monitor under Sections A, B, C, E, and F, above;

     b.     a list of the Subject Joint Venture Clinics unwound each quarter, a description of the terms of each transaction, and the Monitor's rationale for approving the transactions required to accomplish the unwinding;

     c.     a list of the Focus Arrangements reviewed each quarter, the Risk Determination for each of the listed Focus Arrangement, and the basis for each Risk Determination;

     d.     a list of the Focus Arrangements that DaVita Dialysis entered into each quarter, the Risk Determination for each of the listed Focus Arrangements, and the basis for each Risk Determination; and

     e.     the Monitor's evaluation of corrective actions taken by DaVita Dialysis based on the Monitor's findings and recommendations.

2.     The Monitor shall submit via overnight delivery Quarterly Reports covering the first two Reporting Periods and the first 120 days of the third Reporting Period, with the first Quarterly Report due 30 days after the first quarter of the first Reporting Period. The last Quarterly Report shall be due 30 days after the first quarter of the third Reporting Period.

3.     The Monitor may provide written recommendations to DaVita in between the Quarterly Reports, provided that the recommendations are simultaneously sent to OIG and included in the subsequent Quarterly Report. DaVita shall include its response and corrective action plans in its corresponding Quarterly Response Report.

4.     With each Quarterly Report, the Monitor shall include a certification, signed by the Monitor, stating that the individuals who assisted in fulfilling the oversight obligations required by Sections A, B, C, E, and F, above, possessed the professional competence necessary to perform the work.

H.     <u>Annual Reports</u>

The Monitor shall submit via overnight delivery each Annual Report no later than 80 days after the end of the Reporting Period for which the review was performed. With each individual review report, the Monitor shall include a certification, signed by the Monitor, stating that the individuals who worked on the review possessed the professional competence necessary to perform the work.

1.     *Compliance Audit Review Report*. The Compliance Audit Review Report shall contain:

     a.     For each audit reviewed:

      i.      a description of the audit's objective, protocol, methodology, and results;

      ii.     the Monitor's assessment of DaVita Dialysis's performance of the audit, including the identification of any issues or deficiencies with the protocol and/or methodology, and any unsupported or incorrect findings; and

      iii.    to the extent DaVita Dialysis's findings are unsupported or incorrect, the Monitor's findings and the Monitor's justification for those findings.

b.      The Monitor's observations and recommendations concerning:

      i.      the strengths and weaknesses of DaVita Dialysis's performance of the audits;

      ii.     any improvements to DaVita Dialysis's compliance audit program to address specific problems or weaknesses identified through the Compliance Audit Review; and

      iii.    other improvements that could strengthen DaVita Dialysis's compliance audit program.

2.    *Arrangements Systems Review Report*.  The Monitor shall prepare a report based upon each Arrangements Systems Review performed.  The Arrangements Systems Review Report shall include the following information:

a.      a description of the documentation (including policies) reviewed and personnel interviewed;

b.      a detailed description of DaVita Dialysis's systems, policies, processes, and procedures relating to the items identified in Section D.2.a–i above;

c.      findings and supporting rationale regarding weaknesses in DaVita Dialysis's systems, policies, processes, and procedures relating to Arrangements described in Section D.2.a–i above; and

      d.      recommendations to improve DaVita Dialysis's systems, policies, processes, or procedures relating to Arrangements described in Section D.2.a–i above.

      3.     *Arrangements Transactions Review Report*.  The Monitor shall prepare a report based on each Arrangements Transactions Review performed.  The Arrangements Transactions Review Report shall include the following information:

      a.     *Review Methodology*

      i.     <u>Review Protocol</u>.  A detailed narrative description of the procedures performed and a description of the sampling unit and universe utilized in performing the procedures for the sample reviewed.

      ii.     <u>Sources of Data</u>.  A full description of the documentation and other information, if applicable, relied upon by the Monitor in performing the Arrangements Transactions Review.

      iii.     <u>Supplemental Materials</u>.  The Monitor shall request all documentation and materials required for its review of the Focus Arrangements selected as part of the Arrangements Transactions Review, and DaVita Dialysis shall furnish such documentation and materials to the Monitor prior to the Monitor initiating its review of the Focus Arrangements.  If the Monitor accepts any supplemental documentation or materials from DaVita Dialysis after the Monitor has completed its initial review of the Focus Arrangements (Supplemental Materials), the Monitor shall identify in the Arrangements Transactions Review Report the Supplemental Materials, the date the Supplemental Materials were accepted, and the relative weight the Monitor gave to the Supplemental Materials in its review.  In addition, the Monitor shall include a narrative in the Arrangements Transactions Review Report describing the process by which the Supplemental Materials were accepted and the Monitor's reasons for accepting the Supplemental Materials.

2.      *Review Findings*.  The Arrangements Transactions Review Report shall include the Monitor's findings with respect to each of the items set forth in Section D.3.a–h, above.  In addition, the Monitor shall identify in the Arrangements Transactions Review Report any Focus Arrangement(s) reviewed that a reasonable person would consider a probable violation of the Anti-Kickback Statute, along with the Monitor's basis for reaching that conclusion.  The Arrangements Transactions Review Report also shall include observations, findings, and recommendations on possible improvements to DaVita Dialysis's systems, policies, processes, and procedures in place to ensure that all Focus Arrangements comply with the Focus Arrangements Procedures and Focus Arrangements Requirements.

I.      <u>Extension of Certain Independent Monitor Responsibilities</u>

OIG may, in its sole discretion, determine that the Monitor should continue to perform his or her responsibilities under Sections A, B, C, F, and G of this Appendix for the full third Reporting Period.  If the OIG exercises this discretion, the requirements of Section D of this Appendix shall be tolled for the third Reporting Period.

## APPENDIX D

## EXECUTIVE FINANCIAL RECOUPMENT PROGRAM

DaVita shall establish and maintain throughout the term of the CIA a financial recoupment program that puts at risk of forfeiture and recoupment an amount equivalent to up to three years of annual performance pay (e.g., annual bonus, plus long-term incentives) for a Covered Executive who is discovered to have been involved in any significant misconduct (Executive Financial Recoupment Program). This financial recoupment program shall apply to Covered Executives who are either current DaVita employees or who are former DaVita employees at the time of a Recoupment Determination.

A.    Existing Commitments. Pursuant to DaVita's existing Board-approved clawback policy (the "Clawback Policy"), if the Board of Directors of DaVita (the "Board") determines that any fraud or intentional misconduct by an executive officer or director was a significant contributing factor to the Company having to restate all or a portion of its consolidated financial statements, the Board may (i) require reimbursement of any bonus or incentive compensation paid to such executive or director, (ii) cause the cancellation of restricted stock unit awards and outstanding stock appreciation rights or stock options granted to such executive officer or director, and (iii) seek reimbursement of any gains realized that are attributable to such awards. These actions may be taken if (a) the amount of incentive compensation was calculated based on the achievement of certain financial results that were subsequently reduced due to a financial statement restatement, (b) the executive officer or director engaged in any fraud or intentional misconduct that was a significant contributing factor to the need for the restatement and (c) the amount of the bonus or incentive compensation that would have been awarded to the officer had the financial results been properly reported would have been lower than the amount actually awarded. Under the Clawback Policy, the Company may not seek to recover bonuses or incentive or equity-based compensation paid or which vests more than three years prior to the date the applicable financial statement restatement is disclosed. In addition, pursuant to the terms of certain awards made under the DaVita HealthCare Partners Inc. 2011 Incentive Award Plan (the "LTI Plan"), an award shall terminate, and the Company may seek repayment of gains realized by a recipient of such an award, if the recipient of the award (w) breaches certain restrictive covenants contained in the award, (x) is convicted of a felony, (y) is adjudicated by a court of competent jurisdiction to have committed an act of fraud or dishonesty resulting or intending to result directly or indirectly in personal enrichment at the expense of DaVita, or (z) is excluded from participating in any Federal health care program (the "Award Provisions" and, together with the Clawback Policy, the "Existing Commitments").

If DaVita discovers any employee misconduct that would implicate the forfeitures described in this paragraph, it will evaluate the situation and make a determination about

whether any forfeiture, and the terms of such forfeiture, will be implemented. DaVita reserves the right to amend the Existing Commitments in order to implement any changes required by rules that may be adopted by the Securities and Exchange Commission and the New York Stock Exchange pursuant to the Dodd-Frank Act relating to clawback policies.

B.     New Commitments.  In addition to the compensation forfeiture provisions of the Existing Commitments already in place with respect to annual bonuses and other forms of incentive compensation, no later than December 31, 2014, DaVita shall modify and supplement the provisions of its annual bonus plan and any plans and programs that provide for the award of long-term incentives (i.e., awards that have vesting dates later than the one year anniversary of the grant date), whether based on or settled in cash or equity, and whether under the LTI Plan or any other plan or program (collectively, the "LTI Program") and any employment agreements, as appropriate, by imposing the following eligibility and repayment conditions on future bonuses and LTI Program awards, as well as establishing the mandatory tolling remedy and additional remedies described below (collectively, "New Commitments") to all Covered Executives.  The New Commitments shall apply prospectively to Covered Executives beginning with the 2015 bonus plan year and LTI Program awards (bonuses earned in 2015 and paid out in 2016 and LTI awards granted in 2015).

1.     *Covered Executive Bonus Eligibility and Repayment Conditions.* DaVita shall implement an eligibility and repayment condition on annual bonuses designed to survive both the payment of the bonus and the separation of a Covered Executive's employment.  This will allow DaVita, as a consequence of a Triggering Event as defined below in Section C, to pursue repayment from the Covered Executive of all or any portion of the bonus monies paid to the Covered Executive.  To the extent permitted by controlling law, these bonus eligibility and repayment conditions will survive the payment of the Covered Executive's bonus and the separation of the Covered Executive's employment for a period of three years from the payment of the bonus for the plan year.

Consistent with a Recoupment Determination, as defined below in Section D, DaVita shall endeavor to collect repayment of any bonus from the Covered Executive through reasonable and appropriate means according to the terms of its bonus plan (or employment agreement, as the case may be) and to the extent permitted by controlling law of the relevant jurisdiction.  If necessary to collect the repayment, DaVita shall file suit against the Covered Executive unless good cause exists not to do so.  For purposes of the Executive Financial Recoupment Program, "good cause" shall include, but not be limited to, a financial inability on the part of the Covered Executive to repay any recoupment amount or DaVita's inability to bring such a suit under the controlling law of the relevant jurisdiction.

2.    *LTI Program Awards.* DaVita shall implement, in all long-term incentive awards that vest in three or more years, a right to clawback any unvested equity or target cash value if a Triggering Event occurred within three years after the issuance of the award. In the event the long-term incentive award vesting is less than three years, DaVita shall implement a right to seek recoupment or forfeiture, as the situation requires, of the portion of the award that has vested and/or been paid or otherwise monetized by the Covered Executive within three years from the grant date. This right is designed to survive the issuance of the awards in the event the award vests in less than three years and to survive the separation of a Covered Executive's employment. This will allow DaVita, as a consequence of a Triggering Event as defined below in Section C, to compel disgorgement by the Covered Executive of all or any portion of the award granted to the Covered Executive, including all unvested awards and payments made to, or value realized by, the Covered Executive. This will also provide that, as a consequence of a Triggering Event, DaVita may pursue repayment by a Covered Executive who is a former employee of all or any portion of the last three years' worth of share option and restricted share grants that became vested and were paid during the Covered Executive's last years of employment and following termination of employment.

To the extent permitted by controlling law, these eligibility and repayment conditions shall survive vesting and payment for a period of three years from the Covered Executive's employment termination date. Consistent with a Recoupment Determination, DaVita shall endeavor to collect repayment of these LTI Program awards from the Covered Executive through reasonable and appropriate means and to the extent permitted by controlling law of the applicable jurisdiction. If necessary to collect the repayment, DaVita shall file suit against the Covered Executive unless good cause exists not to do so.

3.    *Tolling Remedy.* To the extent permitting by controlling law, for the three years during which the bonus eligibility and repayment conditions exist, if DaVita reasonably anticipates that a Triggering Event has occurred pursuant to Section C of this Appendix, and DaVita has recoupment rights remaining under Sections B.1 and B.2 of this Appendix, DaVita shall have the right to notify the Covered Executive that those rights shall be tolled and thereby extended for an additional three years or until the Recoupment Committee determines that a Triggering Event has not occurred, whichever is earlier, to the extent permitted by applicable controlling law.

4.    *Additional Remedies.* If, after expiration of the time period specified in Sections B.1 and B.2, above, the Recoupment Committee determines that a Triggering Event occurred, DaVita shall make a determination as to whether to pursue available remedies (e.g., filing suit against the Covered Executive) existing under statute or common law to the extent available.

C.    Triggering Events

      1.    DaVita shall revise, as necessary, its bonus plan and LTI Program requirements (and employment agreements, if applicable) to provide that a Covered Executive will be ineligible for an annual bonus or LTI Program award upon discovery of significant misconduct, which shall include violations of a significant DaVita policy, applicable regulations, or law.

      2.    *Definition of Triggering Event.*  The eligibility and repayment conditions described above shall be triggered upon a Recoupment Determination that finds:

      a.    significant misconduct (e.g., violation of a significant DaVita policy, or applicable regulations or law) by the Covered Executive that, if discovered prior to payment, would have made the Covered Executive ineligible for an annual bonus or LTI Program award in that program year or subsequent program years; or

      b.    significant misconduct by subordinate employees in the business unit over which the Covered Executive had responsibility that does not constitute an isolated occurrence and which the Covered Executive knew or should have known was occurring that, if discovered prior to payment, would have made the Covered Executive and/or employees in question ineligible for an annual bonus or LTI Program award in that program year or subsequent program years.

D.    Administration of Recoupment Program.  DaVita shall engage in a standardized, formal process to determine, in its sole discretion, whether a Triggering Event has occurred and, if so, the extent of bonus monies, LTI Program awards, and deferred compensation that are subject to repayment or forfeiture by the Covered Executive, and the most appropriate method for securing recoupment of relevant monies previously paid to or value realized by a Covered Executive.  The findings and conclusions resulting from this process shall be referred to as the "Recoupment Determination."

      1.    *Initiation.*  DaVita shall initiate the Recoupment Determination process upon:  (1) discovery of potential significant misconduct that may rise to the level of a Triggering Event, or (2) written notification by a United States federal government agency to the Chief Compliance Officer of DaVita of a situation that may rise to the level of a Triggering Event and gives rise (or may give rise) to liability relating to Federal health care programs.  This written notification shall either identify the Covered

Executive(s) potentially at issue or provide information (e.g., a description of the alleged misconduct and the applicable time period) to allow DaVita to identify the Covered Executive and alleged misconduct.

2.   *Recoupment Committee.*  The Recoupment Determination shall be made by a committee of senior executives headed by the Chief Compliance Officer (Recoupment Committee).  In the event a Recoupment Determination must be made with respect to a member of the Recoupment Committee, it shall be made by the Board Compliance Committee.

3.   *Timeline for Recoupment Determination Process.*  DaVita shall initiate the Recoupment Determination process within 30 days after discovery by DaVita or notification, pursuant to Section D.1 of this Appendix, of a potential Triggering Event. Absent extraordinary reasons, DaVita shall reach a Recoupment Determination within 90 days after initiation of the determination process.

In connection with making its Recoupment Determination, the Recoupment Committee or appropriate Delegate (as defined below), pursuant to implementing policies and procedures, shall:

a.   undertake an appropriate and substantive review or investigation of the facts and circumstances associated with the Triggering Event or any written notifications about potential Triggering Events received pursuant to Section D.1, above;

b.   make written findings regarding the facts and circumstances associated with the Triggering Event and any written notifications about potential Triggering Events received pursuant to Section D.1, above; and

c.   set forth in writing its determinations (and the rationale for such determinations) about:

i.   whether a Triggering Event occurred;

ii.  the extent of bonus monies, LTI Program award payments made or value realized, or deferred compensation that will be subject to forfeiture and/or repayment by the Covered Executive;

iii    the means that will be followed to implement the forfeiture and/or secure the recoupment of performance pay from the Covered Executive; and

iv    the timetables under which DaVita will implement the forfeiture and/or attempt to recoup the performance pay.

For purposes of this section, a "Delegate" shall refer to the DaVita personnel to whom the Recoupment Committee has delegated one or more of its required tasks in furtherance of the Executive Financial Recoupment Program.

E.    Reporting.  The Recoupment Committee shall provide annual reports to the Board (or an appropriate committee thereof) about:  (1) the number and circumstances of any Triggering Events that occurred during the preceding year and any written notifications about potential Triggering Events received pursuant to Section D.1, above; (2) a description of any Recoupment Determinations made during the preceding year (including any decision to require or not require forfeiture/recoupment from any Covered Executives, the amount and type of any forfeiture/recoupment, the means for collecting any recoupment, and the rationale for such decisions); and (3) a description of the status of any forfeitures and/or recoupments required under prior Recoupment Determinations that were not fully completed in prior years.

The Recoupment Committee shall also provide annual reports to the OIG about: (1) the number and circumstances of any Triggering Events that occurred during the preceding year and any written notifications about potential Triggering Events received pursuant to Section D.1, above; (2) a summary description of any Recoupment Determinations made during the preceding year (including any decision to require or not require forfeiture/recoupment from any Covered Executives, the amount and type of any forfeiture/recoupment, the method for collecting any recoupment, and the rationale for such decisions); and (3) a description of the status of any forfeitures and/or recoupments required under prior Recoupment Determinations that were not fully completed in prior years.

DaVita shall maintain all of the forfeiture and recoupment commitments set forth in Sections A–E above for at least the CIA Period.

**APPENDIX E**

**EXCLUDED JOINT VENTURES**

A.   Conditions

In exchange for OIG's agreement that the joint ventures listed below ("Excluded Joint Ventures") will be excluded as parties to the CIA, DaVita agrees to the following:

1.   During the CIA Period, each of the dialysis clinics that is owned and operated by the Excluded Joint Ventures will be managed pursuant to a Management Services Agreement with DaVita Dialysis, and all individuals and entities who provide items or services to the Excluded Joint Ventures will be considered Covered Persons to the same extent that individuals and entities who provide items or services to joint ventures that are parties to the CIA qualify as Covered Persons.

2.   DaVita shall fulfill the obligations of Section III.P of the CIA (Reportable Events) for any Reportable Event that occurs at a dialysis clinic owned by an Excluded Joint Venture.

3.   DaVita shall notify OIG of any sale of its interest in an Excluded Joint Venture or closure of any dialysis clinic that is owned and operated by the Excluded Joint Venture to the same extent as it is required to notify OIG of changes to DaVita Dialysis business units or locations under Section IV of the CIA.

4.   OIG shall be able to exercise its rights under Section VII of the CIA to inspect DaVita's books, records, and other documents and supporting materials related to and/or conduct on-site reviews at the dialysis clinics owned and operated by the Excluded Joint Ventures for the purpose of determining DaVita's compliance with the CIA and DaVita Dialysis's compliance with the requirements of the Federal health care programs.

5.   Section X of the CIA shall apply to DaVita for any violations of the CIA by DaVita or DaVita Dialysis that involve or occur at an Excluded Joint Venture.

B.   List of Excluded Joint Ventures

1.   Bluegrass Dialysis, LLC

2.   DVA Healthcare Southwest Ohio, LLC

3.   DVA/Washington University Healthcare of Greater St. Louis, LLC

4.   Fields Dialysis, LLC

5.   Greater Los Angeles Dialysis Center, LLC

6.   ISD Lees Summit LLC, f/k/a DSI Lees Summit LLC

7.   ISD Plainfield, LLC, f/k/a DSI Plainfield, LLC

8.   Ohio River Dialysis, LLC

9.   Physicians Dialysis of Houston, LLP

10.  Pittsburgh Dialysis Partners, LLC

11.  River Valley Dialysis, LLC

12.  Southcrest Dialysis, LLC

13.  UT Southwestern DVA Healthcare, LLP

**APPENDIX F**

**JOINT VENTURES EXCEPTED FROM
THE PARTIAL DIVESTITURE BAN**

1.  Basin Dialysis, LLC

2.  Bluegrass Dialysis, LLC

3.  Borrego Dialysis, LLC

4.  Carroll County Dialysis Facility Limited Partnership

5.  Cimarron Dialysis, LLC

6.  DVA Healthcare – Southwestern Ohio, LLC

7.  DVA Healthcare of New London, LLC

8.  DVA Healthcare of Norwich, LLC

9.  DVA Healthcare of Tuscaloosa, LLC (f/k/a REN Centers of Tuscaloosa, LLC)

10. Fields Dialysis, LLC

11. Green Desert Dialysis, LLC

12. Grosse Pointe Dialysis LLC & Medical Director Agreement for the Grosse
    Pointe Dialysis Center

13. Joshua Dialysis, LLC

14. Lockhart Dialysis, LLC

15. Longworth Dialysis, LLC

16. Mountain West Dialysis Services LLC

17. Ohio River Dialysis, LLC

18. River Valley Dialysis, LLC (f/k/a Greater Ohio River Dialysis, LLC)

19.  Roose Dialysis, LLC

20.  Routt Dialysis, LLC

21.  Star Dialysis, LLC

22.  Total Renal Care of North Carolina, LLC

23.  TRC-Four Corners Dialysis Clinics, LLC

24.  Tustin Dialysis Center, LLC

25.  UT Southwestern DVA Healthcare, LLP

26.  Valley Springs Dialysis, LLC

# Exhibit 2



**Tool #1: Attendee List**
**Joint Venture Partnership**
**Operating & Strategic Management**

## Record of Attendees:  By signing in, you certify that you have attended the meeting and will review meeting minutes that will be prepared for this meeting and provide comments as appropriate

<u>Glassland Dialysis, LLC-LE 200951</u>
*(Joint Venture Number/Name)*

<u>Brian Nordin, ROD</u>
*(Submitted by)*

| | (Print Name) | (Title) | (Email) | (Signature) |
|---|---|---|---|---|
| 1. | Brian Nordin | ROD | | |
| 2. | Jack Luba | Men Dir | | |
| 3. | | | | |
| 4. | | | | |
| 5. | | | | |
| 6. | | | | |
| 7. | | | | |
| 8. | | | | |
| 9. | | | | |
| 10. | | | | |
| 11. | | | | |

<u>November 9, 2015</u>
*[Meeting Date]*

Property of DaVita Healthcare Partners, Inc
Revision Date: May 2013



**Meeting Minutes**
**Joint Venture Partnership**
**Operating & Strategic Management**

| | |
|---|---|
| **\*JV Legal Entity Names:** | Glassland Dialysis LLC |
| **\*JV Legal Entity Numbers:** | 200951 |
| **\*Participants:** | Dr. Jack Rubin, Brian Nordin |
| **\*Meeting Date:** | 11/9/2015 |
| **\*Period Discussed:** | Jul - Sep |
| **Operational Quarter:** | Quarter 3 |

## \*Review & Approval of Minutes from Last Meeting

Approved by:
- Brian Nordin

Second by:
- Dr. Jack Rubin

Action Items:  *(Who, What, When)*
- FA distribute Fluidwise and CVC literature to patients.
- FA/CSS train designated clinic RN in anemia management to support Central Anemia Manager.

## \*Operations

Discussion / Decisions:
A.  Clinical Review *(Outcomes, Monthly Draws, Actuals vs. Goals)*
- DQI

| Modality | Jul | Aug | Sep |
|---|---|---|---|
| Hemo | 50.0 | 60.0 | 41.0 |
| PD | 56.5 | 51.8 | 3.6 |

- Hemo DQI – Adequacy 95%,  Med Review 92.1%,  BCR 88.9%
- PD DQI – Lab draw issues.  Outside labs not entered into SNAPPY.
- Focus on adequacy and flu vaccine for PD.

- CVC

| LADC | Jul | Aug | Sep |
|---|---|---|---|
| CVC % | 15.9% | 13.5% | 15.7% |

- Fluid Management

| LADC | Jul | Aug | Sep |
|---|---|---|---|
| IDWG | 43.9% | 35.8% | 35.7% |

\* Required Section
\*\* Natural Owner's ownership % of Member entity
\*\*\* Member is entity in Partnership with DaVita (e.g. LLC)

Property of DaVita HealthCare Partners Inc.
Origination Date: October 2008
Revision Date: May 2013, March 2015, June 2015, October 2015

B. Staffing *(Resource Needs, Interviewing/Selection, Teammate Development Plans)*
   - CC and AA opening
   - New RN, Christine Zamora, potential future CC
   - Actively looking for CC in the meantime
   - Michelle Lee on board as full time PD RN
C. Patient Financials *(Census, No Secondaries, Commercial Patient List)*
   - HD Census – 151
   - PD Census – 10
D. Financial Review *(Balance sheet, Capital accounts, Income statement, Cash flow, Payor mix, Fixed assets)*
   - Financials attached
   - Q3 EBITDA - $221,435
   - Q3 Distribution - $2,746
   - Cash reserve now meets requirements of operating agreement.
E. Patient Satisfaction
   -
F. Other Issues *(State surveys, Snappy audits, training, governing body issues, etc.)*
   - CAT audit September

Action Items:  *(Who, What, When)*
- FA continue to recruit and interview potential CC candidates.
- CC from Wilshire continue to support LADC.
- FA and CSS deep dive adequacy and ensure clinic adequacy manager has right level of support.

**\* Required Section**
**\*\* Natural Owner's ownership % of Member entity**
**\*\*\* Member is entity in Partnership with DaVita (e.g. LLC)**
Property of DaVita HealthCare Partners Inc.                    Proprietary and Confidential
Origination Date: October 2008                                              Copyrighted ©
Revision Date: May 2013, March 2015, June 2015, October 2015                    Page **2** of **6**

## *Historical Ownership Changes

Please review the Joint Venture natural owners list loaded with Joint Venture financial packets on Starpoint and make note of any historic Joint Venture ownership changes below:

*Are there historical changes to the Joint Venture natural owners list on Starpoint?
Yes: ☐ No: ☒

If you selected yes, please provide the following information for each Joint Venture ownership change:

| Natural Owner Name | ***Member Name | Event | Effective Date | **Ownership % |
|---|---|---|---|---|
| | | Choose an item. | Click here to enter a date. | |
| | | Choose an item. | Click here to enter a date. | |
| | | Choose an item. | Click here to enter a date. | |
| | | Choose an item. | Click here to enter a date. | |
| | | Choose an item. | Click here to enter a date. | |
| | | Choose an item. | Click here to enter a date. | |
| | | Choose an item. | Click here to enter a date. | |
| | | Choose an item. | Click here to enter a date. | |
| | | Choose an item. | Click here to enter a date. | |
| | | Choose an item. | Click here to enter a date. | |

| Comments |
|---|
| |

* Required Section
** Natural Owner's ownership % of Member entity
*** Member is entity in Partnership with DaVita (e.g. LLC)

Property of DaVita HealthCare Partners Inc.
Origination Date: October 2008
Revision Date: May 2013, March 2015, June 2015, October 2015

Proprietary and Confidential
Copyrighted ©
Page 3 of 6

## *Contemplated Ownership Changes

Please review the Joint Venture natural owners list loaded with Joint Venture financial packets on Starpoint and make note of any contemplated Joint Venture ownership changes below:

---

*Are there contemplated changes to the Joint Venture natural owners list, likely to take effect in the upcoming quarter?
Yes: ☐ No: ☒

If you selected yes, please provide the following information for each Joint Venture ownership change:

| Natural Owner Name | ***Member Name | Event | Estimated Date | **Ownership % |
|---|---|---|---|---|
| | | Choose an item. | Click here to enter a date. | |
| | | Choose an item. | Click here to enter a date. | |
| | | Choose an item. | Click here to enter a date. | |
| | | Choose an item. | Click here to enter a date. | |
| | | Choose an item. | Click here to enter a date. | |
| | | Choose an item. | Click here to enter a date. | |
| | | Choose an item. | Click here to enter a date. | |
| | | Choose an item. | Click here to enter a date. | |
| | | Choose an item. | Click here to enter a date. | |
| | | Choose an item. | Click here to enter a date. | |

| Comments |
|---|
| |

**\* Required Section**
**\*\* Natural Owner's ownership % of Member entity**
**\*\*\* Member is entity in Partnership with DaVita (e.g. LLC)**

**DeNovos, Modalities, Expansions, Relocations**

<u>Discussion / Decisions:</u>
- N/A

<u>Action Items:</u> *(Who, What, When)*
- N/A

## Marketing / Outreach

<u>Discussion / Decisions:</u>
- <u>Kaiser Outreach</u>

<u>Action Items:</u> *(Who, What, When)*
- ROD look into opportunities to build relationship with Caremore and highlight clinic unique vascular management capabilities.
- FA follow up on Kaiser outreach meeting held in August.

## Goal Setting

<u>Discussion / Decisions:</u>
- N/A

<u>Action Items:</u> *(Who, What, When)*
- N/A

## Strategic Opportunities

<u>Discussion / Decisions:</u>
- IPA relationships
  - LA Care
- Medicaid PTs to commercial plans

<u>Action Items:</u> *(Who, What, When)*
- IC/SW educate Medicaid patients on commercial plan offerings in Nov/Dec.
- MD support patient education efforts.
- IC give MD list of patients who are not interested in this opportunity.

**\* Required Section**
**\*\* Natural Owner's ownership % of Member entity**
**\*\*\* Member is entity in Partnership with DaVita (e.g. LLC)**
Property of DaVita HealthCare Partners Inc.
Origination Date: October 2008
Revision Date: May 2013, March 2015, June 2015, October 2015

Proprietary and Confidential
Copyrighted ©

**\*Summary / Recap**

Summary:

- Clinic has stabilized under leadership of new FA.  Staffing is sufficient to continue growth efforts.  DQI measures need some improvement, and are trending in the right direction.  Option for Medicaid patients to choose a commercial plan is a big opportunity for the clinic.

| The next meeting has been tentatively set for: | 2/17/2016 |
| --- | --- |

**\*Regional Operations Director Attestation**

I attest that at least one representative from each ownership group attended the quarterly Joint Venture Meeting and have participated in the discussion related to the operations of the Joint Venture Facilities. If one representative from each ownership group did not attend, I have provided documentation as to why this did not happen. In addition, I have reviewed the Joint Venture partner list to ensure it accurately reflects the current JV members. For instances where the partnership list differed, I updated the historic ownership changes to reflect the changes in JV membership.

Brian Nordin
ROD Name (Printed)

ROD Signature

**\* Required Section**
**\*\* Natural Owner's ownership % of Member entity**
**\*\*\* Member is entity in Partnership with DaVita (e.g. LLC)**
Property of DaVita HealthCare Partners Inc.
Origination Date: October 2008
Revision Date: May 2013, March 2015, June 2015, October 2015

Proprietary and Confidential
Copyrighted ©
Page **6** of **6**

# **Exhibit 3**



**Meeting Minutes**
**Joint Venture Partnership**
**Operating & Strategic Management**

| | |
|---|---|
| *JV Legal Entity Names: | Glassland Dialysis LLC |
| *JV Legal Entity Numbers: | 200951 |
| *Participants: | Dr. Jack Rubin, Brian Nordin |
| *Meeting Date: | 8/18/2016 |
| *Period Discussed: | Apr - Jun |
| Operational Quarter: | Quarter 2 |

## *Review & Approval of Minutes from Last Meeting

Approved by:
- Brian Nordin

Second by:
- Dr. Jack Rubin

Action Items: *(Who, What, When)*
- FA continue focus on CVC and IDWG improvement.
- FA walk through BCR details with MD.
- FA provide current mortality data to MD.
- CC from LA Downtown to support LADC.

## *Operations

Discussion / Decisions:
A. Clinical Review *(Outcomes, Monthly Draws, Actuals vs. Goals)*
- DQI

| Modality | Apr | May | Jun | Jul |
|---|---|---|---|---|
| Hemo | 53 | 62 | 52 | 69 |
| PD | 91 | 68 | 57 | 32 |

- CVC

| LADC | Apr | May | Jun | Jul |
|---|---|---|---|---|
| CVC % | 18% | 23% | 22% | 19% |

- Fluid Management

| LADC | Apr | May | Jun | Jul |
|---|---|---|---|---|
| IDWG | 34% | 35% | 34% | 28% |

* Required Section
** Natural Owner's ownership % of Member entity
*** Member is entity in Partnership with DaVita (e.g. LLC)
Property of DaVita HealthCare Partners Inc.
Origination Date: October 2008
Revision Date: May 2013, March 2015, June 2015, October 2015

Proprietary and Confidential
Copyrighted ©

- ICHD outcomes nice improvement in July
- PD DQI down due to peritonitis episode in July
-

B. Staffing *(Resource Needs, Interviewing/Selection, Teammate Development Plans)*
  - PD RN started in March – Cross training for ICHD
  - Anticipate opening 4th shift TTS by end of year.

C. Patient Financials *(Census, No Secondaries, Commercial Patient List)*
  - HD Census – 168
  - PD Census – 9

D. Financial Review *(Balance sheet, Capital accounts, Income statement, Cash flow, Payor mix, Fixed assets)*
  - Financials attached
  - Q2 EBITDA - $302,808
  - RPT – $309.70/Tx, up from $272.50/Tx in Q2 of 2015.

E. Patient Satisfaction
  -

F. Other Issues *(State surveys, Snappy audits, training, governing body issues, etc.)*

<u>Action Items:</u> *(Who, What, When)*
- FA continue monthly check ins with Kaiser.

**\* Required Section**
**\*\* Natural Owner's ownership % of Member entity**
**\*\*\* Member is entity in Partnership with DaVita (e.g. LLC)**
Property of DaVita HealthCare Partners Inc.
Origination Date: October 2008
Revision Date: May 2013, March 2015, June 2015, October 2015

Proprietary and Confidential
Copyrighted ©
Page 2 of 6

## *Historical Ownership Changes

Please review the Joint Venture natural owners list loaded with Joint Venture financial packets on Starpoint and make note of any historic Joint Venture ownership changes below:

*Are there historical changes to the Joint Venture natural owners list on Starpoint?
Yes: ☐ No: ☒

If you selected yes, please provide the following information for each Joint Venture ownership change:

| Natural Owner Name | ***Member Name | Event | Effective Date | **Ownership % |
|---|---|---|---|---|
| | | Choose an item. | Click here to enter a date. | |
| | | Choose an item. | Click here to enter a date. | |
| | | Choose an item. | Click here to enter a date. | |
| | | Choose an item. | Click here to enter a date. | |
| | | Choose an item. | Click here to enter a date. | |
| | | Choose an item. | Click here to enter a date. | |
| | | Choose an item. | Click here to enter a date. | |
| | | Choose an item. | Click here to enter a date. | |
| | | Choose an item. | Click here to enter a date. | |
| | | Choose an item. | Click here to enter a date. | |

| Comments | |
|---|---|
| | |

* Required Section
** Natural Owner's ownership % of Member entity
*** Member is entity in Partnership with DaVita (e.g. LLC)
Property of DaVita HealthCare Partners Inc.
Origination Date: October 2008
Revision Date: May 2013, March 2015, June 2015, October 2015

Proprietary and Confidential
Copyrighted ©

**\*Contemplated Ownership Changes**

Please review the Joint Venture natural owners list loaded with Joint Venture financial packets on Starpoint and make note of any contemplated Joint Venture ownership changes below:

\*Are there contemplated changes to the Joint Venture natural owners list, likely to take effect in the upcoming quarter?
Yes: ☐ No: ☒

If you selected yes, please provide the following information for each Joint Venture ownership change:

| Natural Owner Name | \*\*\*Member Name | Event | Estimated Date | \*\*Ownership % |
|---|---|---|---|---|
| | | Choose an item. | Click here to enter a date. | |
| | | Choose an item. | Click here to enter a date. | |
| | | Choose an item. | Click here to enter a date. | |
| | | Choose an item. | Click here to enter a date. | |
| | | Choose an item. | Click here to enter a date. | |
| | | Choose an item. | Click here to enter a date. | |
| | | Choose an item. | Click here to enter a date. | |
| | | Choose an item. | Click here to enter a date. | |
| | | Choose an item. | Click here to enter a date. | |
| | | Choose an item. | Click here to enter a date. | |

| Comments |
|---|
| |

\* Required Section
\*\* Natural Owner's ownership % of Member entity
\*\*\* Member is entity in Partnership with DaVita (e.g. LLC)
Property of DaVita HealthCare Partners Inc.
Origination Date: October 2008
Revision Date: May 2013, March 2015, June 2015, October 2015

Proprietary and Confidential
Copyrighted ©
Page 4 of 6

## DeNovos, Modalities, Expansions, Relocations

<u>Discussion / Decisions:</u>
- N/A

<u>Action Items:</u> *(Who, What, When)*
- N/A

## Marketing / Outreach

<u>Discussion / Decisions:</u>
- <u>Kaiser Outreach</u>

<u>Action Items:</u> *(Who, What, When)*
- FA continue monthly Kaiser outreach.

## Goal Setting

<u>Discussion / Decisions:</u>
- N/A

<u>Action Items:</u> *(Who, What, When)*
- N/A

## Strategic Opportunities

<u>Discussion / Decisions:</u>
- Medicaid PTs to commercial plans
  - 18 patients chose commercial plans to be effective in Mar.

<u>Action Items:</u> *(Who, What, When)*
- IC/SW support  Medicaid patients using their new commercial plans.

**\* Required Section**
**\*\* Natural Owner's ownership % of Member entity**
**\*\*\* Member is entity in Partnership with DaVita (e.g. LLC)**
Property of DaVita HealthCare Partners Inc.
Origination Date: October 2008
Revision Date: May 2013, March 2015, June 2015, October 2015

### *Summary / Recap

Summary:
- Clinic has stabilized under leadership of new FA.  Staffing is sufficient to continue growth efforts. DQI measures need some improvement, and are trending in the right direction.  Option for Medicaid patients to choose a commercial plan is a big opportunity for the clinic.

| The next meeting has been tentatively set for: | 11/16/2016 |
|---|---|

### *Regional Operations Director Attestation

I attest that at least one representative from each ownership group attended the quarterly Joint Venture Meeting and have participated in the discussion related to the operations of the Joint Venture Facilities. If one representative from each ownership group did not attend, I have provided documentation as to why this did not happen. In addition, I have reviewed the Joint Venture partner list to ensure it accurately reflects the current JV members. For instances where the partnership list differed, I updated the historic ownership changes to reflect the changes in JV membership.

Brian Nordin
ROD Name (Printed)                                ROD Signature

* Required Section
** Natural Owner's ownership % of Member entity
*** Member is entity in Partnership with DaVita (e.g. LLC)
Property of DaVita HealthCare Partners Inc.
Origination Date: October 2008
Revision Date: May 2013, March 2015, June 2015, October 2015

Proprietary and Confidential
Copyrighted ©
Page 6 of 6



**Tool #1: Attendee List**
**Joint Venture Partnership**
**Operating & Strategic Management**

## Record of Attendees:   By signing in, you certify that you have attended the meeting and will review meeting minutes that will be prepared for this meeting and provide comments as appropriate

Glassland Dialysis, LLC-LE 200951              Brian Nordin, ROD
*(Joint Venture Number/Name)*                    *(Submitted by)*

| | *(Print Name)* | *(Title)* | *(Email)* | *(Signature)* |
|---|---|---|---|---|
| 1. | Jack Muhl... | m | exanded@gmtel... | |
| 2. | Brian Nordin | ROD | | |
| 3. | | | | |
| 4. | | | | |
| 5. | | | | |
| 6. | | | | |
| 7. | | | | |
| 8. | | | | |
| 9. | | | | |
| 10. | | | | |
| 11. | | | | |

August 18, 2016
*[Meeting Date]*

Property of DaVita Healthcare Partners, Inc
Revision Date: May 2013

# Exhibit 4



**Tool #2: Meeting Minutes**
**Joint Venture Partnership**
**Operating & Strategic Management**

| | |
|---|---|
| **Joint Venture Name:** | USC – DaVita Dialysis Center, LLC |
| **Joint Venture #'s:** | #690 |
| **Facilities (Names & #'s):** | TRC-USC Dialysis |
| | |
| **Participants:** | Brian Nordin, Bayan Moshiri, Cassie McLean, Mike Rice, Dr Goldstein, Dr. Ghaffari |
| **Meeting Date:** | May 6, 2015 |
| **Period Discussed:** | Q1 2015 |

## I.    Review & Approval of Minutes from Last Meeting

## II.    Operations

A. Clinical Review
   1. DQI

| Month | Hemo | PD |
|---|---|---|
| Jan | 78.75 | 87.23 |
| Feb | 80.53 | 89.13 |
| Mar | 80.43 | 85.44 |

   2. Catheter Rates

| Month | CVC Rate |
|---|---|
| Jan | 16% |
| Feb | 15% |
| Mar | 15% |

      i.    Dr. Ghaffari gathering data on fistula placement times at Harbor UCLA to compare with timeline at LAC-USC, in order to develop more efficient process for fistula placements in the hospital.

   3. CMS 5-Star rating (Local Area)
      i.    USC received 5-Star rating.
      ii.    Create appropriate marketing materials for distribution to physicians and patients.

| Star Rating | 5 Star | 4 Star | 3 Star | 2 Star | 1 Star |
|---|---|---|---|---|---|
| # Clinics | 2 | 3 | 6 | 0 | 0 |

B. Staffing

C. Patient Financials
   1. Census review and HD growth plan.
   2. Consider offering nocturnal dialysis if future need develops.

D. Financial Review
   1. Financials attached

       i.     Strong quarter with EBITDA of $506,515.
      ii.    Chronic RPT - $260/Tx vs $240/Tx in 2014.
     iii.    PD RPT - $280/Tx vs $255/Tx in 2014.
     iv.   $51,365 added to operating expense reserve this quarter.  This is a one time transaction to meet the requirement of holding 2 weeks operating expense in cash reserve.

E.  Patient Satisfaction

F.  Other Issues

   1.  PD
       i.     Need to identify appropriate geography.
      ii.    Whittier/ Downtown/ East LA/ San Gabriel Valley.
     iii.    USC would consider investing in clinic and having community physician serve as Medical Director.

   2.  Kidney Smart / CKD Education
       i.     First KS class with Keck Hospital scheduled on May 11th.

   3.  Private Pay
       i.     Reviewed JV package prepared by PP ROPs team.
      ii.    Reviewed Insurance and Employment educational materials.

III.      **DeNovos, Modalities, Expansions, Relocations**

IV.      **Summary / Recap**

**Regional Operations Director Attestation**

I attest that at least one representative from each ownership group attended the quarterly Joint Venture Meeting and have participated in the discussion related to the operations of the Joint Venture Facilities.  If one representative from each ownership group did not attend, I have provided documentation as to why this did not happen.

_Brian Nordin_

ROD Name (Printed)                          ROD Signature

# Exhibit 5

DRAFT

Privileged and Confidential



# Insurance & employment education

*Why it's important for patients, our business, and the public healthcare system*

*Confidential – Not For Distribution*





# Summary

- **Premise:** education can help more patients stay fully insured and employed, which in turn often leads to better outcomes*

- **What's at stake?**

| **1** For patients | **2** For our business | **3** For the public healthcare system |
|---|---|---|
| **Quality of life:**<br><br>• Better coverage<br>• Better clinical outcomes<br>• Less financial stress | **Healthy facility economics** | CMS design for ESRD patients with commercial insurance to benefit from 30-33 months of coverage** |

- **Goal:  increase the # of CKD patients who receive education** *(including through free and publicly available programs like Kidney Smart)*

* While numerous studies (several referenced in these materials) demonstrate better outcomes for commercially insured & employed patients, it is not necessarily universally the case that commercially insured / employed patients will have better outcomes than Medicare patients.
** Medicare spending on ESRD amounted to $28.6 billion in 2012, representing ~$55k per patient (savings when patients have alternative commercial insurance)

©2014 DaVita HealthCare Partners Inc. All rights reserved. Proprietary and confidential. For internal use only.



# For patients: better coverage

## Commercial insurance often associated with

| Better access to care | More comprehensive benefits | Lower total cost |
|---|---|---|
| • More choice [1] | • Family coverage | • Equal or lower annual out-of-pocket expense |
| • Shorter wait times | • Rx & dental benefits | |
| • Transplant feasibility increased 3x [2] | • Access to nurse case managers | |

**Patients need education on how important insurance can be**

Note: Footnotes in Appendix. Individual pt. experience may vary based on benefits available
©2014 DaVita HealthCare Partners Inc. All rights reserved. Proprietary and confidential. For internal use only.



# For patients: differential clinical outcomes

**The majority of commercially insured patients work, and working patients are often healthier…**



| Depression | Hospital visits | Mortality | Health and vitality |
|:---:|:---:|:---:|:---:|
| 21% (3) | 8% (4) | 6% (4) | (5) |

**Healthier patients are less costly to treat for the system**

Note: Sources in Appendix
©2014 DaVita HealthCare Partners Inc. All rights reserved. Proprietary and confidential. For internal use only.

4



# For patients: less financial stress

## Staying employed is typically the best financial option

**Social Security Disability covers only 30-40% of current wages** [6]



*Example*

| Working |
|---|
| • 44 years old |
| • $50,000 annual income |

| Social Security Disability |
|---|
| $18,000 annual benefit |

**Patients need encouragement to stay active and employed**

Footnotes in Appendix
©2014 DaVita HealthCare Partners Inc. All rights reserved. Proprietary and confidential. For internal use only.

 # For business: healthy facility economics

**Private Pay accounts for
all industry profitability**

**A few patients can
make a big difference**

An average clinic has **70 patients…**



7 PP — 63 Government

…and gets **25 new patients** per year



5 Private Pay — 20 Government

**Each** Private Pay
patient impacts EBIT
by **$35-100K per year**

(Chart, left side) % axis 0–100

Patients: Gov't (large), Private Pay (small, ~10%)

EBIT: Private Pay (large), Gov't (small, below 0)

Patients        EBIT

©2014 DaVita HealthCare Partners Inc. All rights reserved. Proprietary and confidential. For internal use only.



# For business: a tale of two practices

| Context | • Two practices with 1 clinic each: one actively engaged, one less so |
| --- | --- |
| | • Same potential: Similar demographics, specialist & hospital relationships, etc… |

## Practice A

- Rounds in the afternoon – 5 pts start at 4:30pm, 3 of them Private Pay
- Promotes alternate modalities
- Staff engaged in patient work and insurance decisions

**70 patients**

| 9 PP | 61 Government |
| --- | --- |

## Practice B

- Mature clinic – at capacity on 6 shifts…
- …but no working shift – 'we'll get these patients anyway'
- No Home / PD option
- Insurance conversations only in clinic, after dialysis start

**70 patients**

| 6 PP | 64 Government |
| --- | --- |

**Clinic profitable**



**Capital call needed**

©2014 DaVita HealthCare Partners Inc. All rights reserved. Proprietary and confidential. For internal use only.

# USC at a glance



| | Q1'12 | Q2'12 | Q3'12 | Q4'12 | Q1'13 | Q2'13 | Q3'13 | Q4'13 | Q1'14 | Q2'14 | Q3'14 | Q4'14 | Q1'15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Census | 309 | 310 | 317 | 319 | 322 | 324 | 327 | 334 | 332 | 325 | 333 | 338 | 335 |
| PP Census | 6 | 6 | 5 | 4 | 2 | 3 | 5 | 5 | 5 | 9 | 10 | 12 | 13 |
| Tx Mix | 2.1% | 2.1% | 1.7% | 1.2% | 0.7% | 1.0% | 1.5% | 1.3% | 1.6% | 2.4% | 3.1% | 3.3% | 4.4% |
| Total PP Admits | 0 | 0 | 0 | 0 | 0 | 1 | 2 | 2 | 0 | 6 | 1 | 2 | 2 |
| Total Quarterly Losses | | | 1 | 3 | 0 | 0 | 1 | 2 | 1 | 1 | 0 | 1 | 0 |
| Average PP RPT | $877 | $830 | $926 | $1,083 | $1,468 | $1,149 | $732 | $508 | $379 | $498 | $561 | $780 | $719 |
| Average Total RPT | $265 | $259 | $245 | $238 | $240 | $237 | $238 | $233 | $231 | $238 | $254 | $260 | $267 |

©2014 DaVita HealthCare Partners Inc. All rights reserved. Proprietary and confidential. For internal use only.

 # For the public healthcare system

## Medicare dialysis patients cost CMS $26B per year, and growing



Spend on dialysis pts ($B/yr)

| 2006 | 2007 | 2008 | 2009 | 2010 | 2011 |
|------|------|------|------|------|------|
| 19   | 20   | 22   | 23   | 25   | 26   |

## Each patient keeping commercial insurance saves CMS $72-88K/yr*



Cost per patient per year ($K)

| Peritoneal Dialysis | Hemodialysis |
|---------------------|--------------|
| 72                  | 88           |

* Total cost to CMS (e.g., dialysis, hospitalizations, office visits) of Medicare and Medicare Advantage primary dialysis patients only (i.e., does not include payments by Medicare as secondary payor)    Source: USRDS Atlas of ESRD, 2013 (data through 2011)
©2014 DaVita HealthCare Partners Inc. All rights reserved. Proprietary and confidential. For internal use only.



# Challenges facing patients

## 2/3 of working patients quit [7]

Pts in study

600 — 100%
400 — *2/3 drop in employment*
200 — 33%
0 —

Employed <u>prior to</u> dialysis     Employed <u>after</u> starting dialysis

## Societal forces / pressure

*"You can't work on dialysis. Quit your job, get SSD, and enroll in Medicare"*

*"ESRD patients just get Medicare"*

*"Get Medicare as soon as you are eligible"*

©2014 DaVita HealthCare Partners Inc. All rights reserved. Proprietary and confidential. For internal use only.

10



# Patients need support

**Insurance and employment education is critically important across all stages - from early stage CKD through ESRD**

| CKD | New to ESRD | On Dialysis |
|-----|-------------|-------------|

| | | |
|-----|-------------|-------------|
| **Insurance & Employment Ed.** (e.g. Kidney Smart and practice-based) | **Patient onboarding** (incl. clinical, financial, insurance, employment counseling) | **Ongoing insurance Counseling** |
| **Practice support of working patients** | **Alternate modalities** | |
| **Clinical Education** (e.g. practice-based and Kidney Smart) | **Flexible shifts** | |

©2014 DaVita HealthCare Partners Inc. All rights reserved. Proprietary and confidential. For internal use only.

# How your practice can help

- Talk to your patients about working

- Get your staff involved
  - Balanced, no-pressure education
  - Share success stories of patients working on dialysis
  - Medicare and SSD is not always the best option

- Recommend working and insurance education
  - Practice-based and/or Kidney Smart
  - Public resources

©2014 DaVita HealthCare Partners Inc. All rights reserved. Proprietary and confidential. For internal use only.

 # In summary – the power of education

**Education helps patients make more informed decisions**



which can
lead to

**Patients stay working and / or commercially insured**



which can
lead to

1)   better **quality of life** for the patient

2)   better **clinical outcomes** for the patient

3)   better **financial outcomes** for the facility

©2014 DaVita HealthCare Partners Inc. All rights reserved. Proprietary and confidential. For internal use only.



# Appendix

©2014 DaVita HealthCare Partners Inc. All rights reserved. Proprietary and confidential. For internal use only.



# DaVita's Education Commandments

- **Kidney Smart is a no-cost educational program provided to the community; it is not designed to drive growth to DVA because all attendees have a choice in provider should they need dialysis**

- **The purpose of these programs is to empower all patients to make more informed choices around diet, modality, insurance/employment, and kidney disease – no matter where a patient may eventually start dialysis and regardless of their provider, payor, or employment status**

- **As a result of the education and clinical impact, dialysis providers like DVA may see increased home and commercial mix**

- **DVA does not compensate potential referral sources, including physicians or hospitals, for recommending patients to these educational programs**

- **DVA does not provide patient education to physician or hospital patients for purposes of gaining their patient referrals**

©2014 DaVita HealthCare Partners Inc. All rights reserved. Proprietary and confidential. For internal use only.

# Kidney Smart program overview

*Kidney Smart is a no-cost educational program provided to the entire community, regardless of affiliation to physicians/providers or a patient's employment/insurance status*

- **22,000 CKD patients educated** in 2014 (plus family members & caregivers)
- **Results that benefit patients as well as the broader health care system:**

| Clinical * | Insurance & working |
|---|---|
| • 4x more likely to start with a home modality | • ~15% commit to better insurance and / or staying employed |
| • 2x more likely to start with ideal access in place | • 2/3 follow through |
| • 2x more likely to start in clinic vs. In the hospital | • 2.5x more likely to stay employed |
|  | • 50% quality of life impact |

\* Data represents early stage results of Kidney Smart class attendee data, comparing the clinical metrics at Day 1 for KS-educated CKD patients that started dialysis with DVA versus the general population of new DVA dialysis starts. (n=5,200)

©2014 DaVita HealthCare Partners Inc. All rights reserved. Proprietary and confidential. For internal use only.

 # Publicly available patient resources



## What you need to know about insurance options and living an active life.

A Patient Advocate can help you through the decision-making process you'll experience as you prepare to start dialysis. Together, you'll explore how insurance applies to dialysis and the benefits of maintaining an active lifestyle—including ways to make working on dialysis work for you.

### A PATIENT ADVOCATE CAN PROVIDE EDUCATION ON:

- The importance of staying active and staying employed
- Out of pocket max, co-pay, deductible and premium assistance information
- Open enrollment, COBRA and critical illness benefits
- Dialysis benefit exclusions/limitations

- Medicare Advantage, Part D and Secondary Payor (MSP) coverage
- Social Security and short term disability
- Your rights regarding the Family and Medical Leave Act (FMLA) and the Americans with Disabilities Act (ADA)

**Get in touch with a Patient Advocate today to learn more. Call 1-855-328-4827.**

© 2013 DaVita HealthCare Partners Inc.
All rights reserved. 04637-00-MKTG

Kidney **Smart**



## Resources for Working Patients
Kidney Disease Education & Support

Kidney **Smart**



## Getting Back to Work
Tools to Help You Return to the Workforce While Managing Kidney Disease

Kidney **Smart**



## Staying Employed, Staying Healthy

Explore the benefits of staying on the job.

Kidney **Smart**

©2014 DaVita HealthCare Partners Inc. All rights reserved. Proprietary and confidential. For internal use only.

17



# Home modalities

## Quality of life impact of Home modalities

**Fewer Hospitalizations**

PD ↓ 13%

HHD ↓ 19%

**Reduced Mortality**

PD↓ 44%

**Improved Patient Experience**

Satisfaction with DaVita overall:
9.36 / 10

2010 USRDS data & 2014 DCR study

©2014 DaVita HealthCare Partners Inc. All rights reserved. Proprietary and confidential. For internal use only.

18

# Footnotes & sources

1. Kasper JD, Giovannini TA, Hoffman C. Gaining and losing health insurance: strengthening the evidence for effects on access to care and health outcomes. Med Care Res Rev. 57(3):298-318, 2000.

2. Sandhu GS, Khattak M, Pavlakis M, Woodward R, Hanto DW, Wasilewski MA, Dimitri N, Goldfarb-Rumyantzev A. Recipient's unemployment restricts access to renal transplantation. Clinical Transplantation: Clin Transplant 2013 DOI: 10.1111/ctr.12177

3. Kutner, Nancy G., Rebecca Zhang, Yijian Huang, and Kirsten L. Johansen. Depressed Mood, Usual Activity Level, and Continued Employment after Starting Dialysis. Clin J Am Soc. Nephrol. 2010 Nov;5(11):2040-5

4. Ea WhaKang, MD, PhD, from the Ilsan Hospital in Gyeonggi-do, Korea and Mark Unruh, MD, from the University of Pittsburgh Medical Center. Dialysis Patients' Mental Health Linked To Heart Health And Longevity. Clinical Journal of the American Society Nephrology (CJASN) April 2012.

5. Blake C, Codd MB, Cassidy A, O'Meara YM, School of Physiotherapy, Mater Misericordiae Hospital, University College Dublin, Ireland. Physical function, employment and quality of life in end-stage renal disease. J Nephrol; 13(2):142-9, 2000

6. SSA quick calculator http://www.ssa.gov/cgi-bin/benefit6.cgi; http://www.ssa.gov/pubs/10024.html

7. Nancy Kutner, Tess Bowles, Rebecca Zhang, Yijian Huang, and Stephen Pastan. Dialysis Facility Characteristics and Variation in Employment Rates: A National Study, 2008. Clin J Am Soc. Nephrol. 2008 Jan;3(1):111-6

©2014 DaVita HealthCare Partners Inc. All rights reserved. Proprietary and confidential. For internal use only.

# Exhibit 6



## ACQUISITION ANNOUNCEMENT

Please contact Theresa K. Benson at (610) 722-6138 with questions regarding the information on this form.

| Date: | **Tuesday, April 02, 2013** |
|---|---|
| From: | **Deal Depot** |
| Deal: | **Crown Houston** |

| | |
|---|---|
| *D.B.A. Name of Center* | **Woodforest Dialysis** |
| *Facility Number* | **04254** |
| *Address* | **12626 Woodforest Blvd**<br>**Suite C**<br>**Houston, TX 77015-3425** |
| *Phone #* | **(713) 455-3370** |
| *Fax #* | **(713) 455-3387** |
| *Operating Days* | **Monday thru Saturday** |
| *Operating Hours* | **MWF 5:00am to 8:00pm      TTS 5:00am to 12:00pm** |
| *Hemodialysis Stations* | **15** |
| *PD Program* | **No** |
| *Acute Program* | **No** |
| *Home Hemo Program* | **No** |
| *Central Billing Office* | **Tacoma** |
| *Facility Administrator* | **TBD** |
| *Regional Operations Director* | **Narendra Singh** |
| *Divisional Vice President* | **Chakilla Robinson** |
| *Medical Director's Name* | **Dr. Mary Washington** |
| *Medical Director's NPI#* | **1811992894** |
| *Medical Director's UPIN#* | **F02402** |
| | |
| *Type* | **Asset** |
| *Date Funded* | **Monday, April 01, 2013** |
| *Legal & Accounting Effective Date* | **Monday, April 01, 2013** |
| *Medicare Effective Date* | **Monday, April 01, 2013** |
| *DaVita Acquiring Entity* | **Renal Treatment Centers - Southeast, LP** |
| *DaVita Acquiring Entity Tax ID#* | **23-2791135** |
| *Principal Deal Coordinator* | *Operations:* **Chakilla Robinson,  Narendra Singh**<br>*Development:* **Rachel Haithcoat,   Jeffrey Young** |
| *Transition Services* | **DVA Benefits Effective                        04/01/2013**<br>**Payroll Effective                                   04/01/2013**<br>**First paycheck from DVA                     04/19/2013**<br>**Billing Effective                                    04/01/2013** |
| | |
| *Seller Legal Entity* | **Crown Dialysis Clinic, LLC** |
| *Seller Tax ID#* | **26-2938916** |
| *Former D.B.A. Name of Center* | **Crown Dialysis Clinic** |



## SCHEDULE 2.1

## Allocation of Purchase Price

## Crown Dialysis Clinic, LLC

| | | |
|---|---|---|
| **Base Purchase Price** | $ | 3,500,000.00 |
| Adjustments to Purchase Price | | |
| Inventory Shortfall (per Section 6.5) | $ | (2,972.82) |
| **Aggregate Purchase Price (per Section 2.1)** | $ | 3,497,027.18 |
| Holdback (per Section 2.5) | $ | (175,000.00) |
| **TOTAL CASH TO BE PAID** | $ | 3,322,027.18 |

**Payments:**

| | | |
|---|---|---|
| Name of Bank: BANK OF AMERICA<br>Routing Number: 026009593<br>Account Number: 586008689811<br>Account Name: CROWN DIALYSIS CLINIC, LLC<br>Reference: Asset Purchase Agreement Crown Dialysis | $ | 3,262,538.83 |
| Name of Bank: BANK OF AMERICA<br>Routing Number: 026009593<br>Account Number: 002503150328<br>Account Name: American Kidney Foundation<br>Reference: Crown Dialysis (PC# 916) contribtuion thru Feb13 | $ | 59,488.35 |
| **TOTAL PAYMENTS** | $ | 3,322,027.18 |

**Other Contemporaneous Payments:**

| | | |
|---|---|---|
| Name of Bank: International Bank of Commerce<br>Routing Number: 114902528<br>Account Number: 6001256624<br>Account Name: Emuna Enterprises, LP<br>Reference: April Rent | $ | 7,327.00 |
| Name of Bank: Bank First National<br>Routing Number: 075901134<br>Account Number: 83009663<br>Account Name: Visonex, LLC<br>Reference: Visonex Transitional Service Agreement | $ | 5,000.00 |

*Rachel D. Heathcourt*
TRANSACTION DIRECTOR

# Exhibit 7



# HIPP Virtual Credit Card Tutorial

## March, 2016

 American Kidney Fund ®

# Introduction

- The American Kidney Fund (AKF) continually reviews the most efficient ways to deliver grant assistance to the patients we serve.

- Virtual credit cards (Vcards) are a new method of payment for specific patients who have insurance through carriers that allow credit cards as a payment method and who require premium payments to come directly from patients.

 American Kidney Fund ®

# What is a Vcard?

- A letter containing the one-time use credit card number.

- Patient must use the Vcard to pay the exact amount due for their insurance premium to their specified health insurance carrier.

- It is configured for insurance premium needs only. The credit card number will not work for any other purpose or amount.



# Pilot

- AKF has chosen to pilot the new Vcards with patients who have the following insurances and plan types only:
  - ➢ Sierra Health and Life – commercial and exchange plans
  - ➢ Premera BCBS – exchange plans
  - ➢ BCBS of ID –exchange plans
  - ➢ Blue Shield of CA – exchange plans
  - ➢ Humana – exchange plans
- AKF will gradually expand to other insurances in the coming months. Piloted insurances are subject to change at AKF's discretion

 American Kidney Fund®

# Why did AKF choose these plans?

These plans were chosen for one/all of the following reasons:

- Insurance companies have indicated that they will only accept payment from the patient for all premium payments

- Insurance companies have indicated that when applying for the insurance online, a credit card or bank account debit is required.

- Some states associated with the specified insurance have rejected payment directly from AKF.


American Kidney Fund ®

## Why is AKF transitioning to Vcards instead of checks?

- Some patients have indicated the following difficulties in handling payments by check sent directly to them:
  - ➤ Lack of bank account
  - ➤ Fees associated with check cashing facilities
  - ➤ Money order fees
  - ➤ Transportation needs to access a bank/check cashing facility

 American Kidney Fund ®

# **What will patients receive?**

- A letter containing the one-time-use credit card number, CVV (security code), and the billing ZIP code (20852)

- Patients will not receive an actual plastic card

- As with paper checks, AKF will send the Vcard letter to them in care of their dialysis facilities, to the attention of the social worker

- Both the letter and instructions are sent in English and in Spanish



# Vcard letter (also provided in Spanish)





# Vcard example




American Kidney Fund ®

# Vcard instructions (also provided in Spanish)



## 3 Easy Steps to Using Your HIPP Virtual Credit Card

**1**

Gather the paperwork you will need

☑ The enclosed letter
☐ Your health insurance company's phone number or website
☐ Your health insurance ID#

**2**

Contact your health insurance company via phone or web

Follow the prompts to make a payment

**3**

Pay using the credit card information in this letter

⚠ Remember to use billing zip code 20852 and the exact $ amount printed on the enclosed letter

## Having Problems?

For help, call your social worker or give us a call at 855.541.0950 or email HIPPVCCPayments@KidneyFund.org

 American Kidney Fund®

# **Vcards vs. Credit Cards**

Vcard numbers work just like regular credit cards. There are four differences:

- The unique Vcard number may only be used once
- The exact amount on the Vcard must be used at the time of payment
- Vcards may only be used for the insurance noted on the patient's letter
- If prompted, the patient MUST use "20852" as the billing ZIP code. The Vcard will not function with any other billing ZIP code

 American Kidney Fund ®

# What will happen in GMS?

- Since 3/2/2016, all new grant requests (one-time and recurring) approved for the piloted insurances have been automatically issued as Vcards

- If you have already released an existing recurring payment to AKF for the next coverage period, a check will be issued for payment of that coverage period

- AKF will be cancelling the existing recurring grants. A list of potentially affected patients will be forthcoming

- In order to receive subsequent payments, a new grant request must be entered

 American Kidney Fund ®

# **Important takeaways**

- Insurances selected for the pilot program are subject to change if deemed necessary by AKF

- Vcard numbers, as well as the patient's Vcard letter, cannot be emailed or faxed due to legal and security reasons

- When advising your patients about this Vcard, you should remind them that this is their card and it is in their name

 American Kidney Fund®

# Important takeaways

- Vcards may only be used for the approved amount. For most insurers, if the insurance premium amount has changed, a balance due request must be entered, at which point an additional Vcard will be generated

- Cards can be voided and reissued, if necessary

- If an insurer will not accept partial payments, a new grant request must be entered for the new premium amount (in the same manner as with paper checks). A Vcard will then be issued for the full premium amount

 American Kidney Fund ®

# Important takeaways

- When entering new grant requests, the payee choice will show as the patient. The Vcard will, however, be insurance-specific.

- Vcards are valid for 60 days from the date on the letter

- Issued Vcard numbers will display in the patient's GMS check payment history as the last 10 digits of the card number, and will also show as cleared, once used

- AKF will gradually expand Vcards to other insurances in the coming months

 American Kidney Fund ®

# Contact Information

Questions about Vcards must be sent to:

[HIPPVCCPayments@kidneyfund.org](mailto:HIPPVCCPayments@kidneyfund.org)

Or by calling: 1-855-541-0950

Please do not contact GMS Support with Vcard-related questions during the pilot program.

# **Exhibit 8**



# Panther Dialysis LLC - LE_201158

## Financial Review

## April 2018

*Mission: to be the Provider, Partner, and Employer of Choice*

**\*\*\*JV Meeting PowerForm Documentation due to Team Quest by July 31, 2018\*\*\***



*"To Be the Provider, Partner, and Employer of Choice"*

# Index to Financial  Review

## April 2018

**Financial Information:**

Income Statements  ..............................................................................   **2**

Balance Sheets  ..................................................................................   **5**

Cash Flows  .......................................................................................   **6**

Accounts Receivable Summary  ...........................................................   **7**

Significant Revenue Adjustments  .........................................................   **8**


Quarterly Supplemental Financial Information: *  ..........................................   **Begins on page 9**

     Capital Account Summary

     Significant AR Outstanding by Payor Type

     Significant AR Outstanding

     Significant Credit AR Outstanding

     Other Quarterly Highlights

*(*) Supplemental information is provided in the month that coincides with entity's normal quarterly reporting cycle.*

# Income Statements
## Six Month Periods Through April 2018



**Panther Dialysis LLC - LE_201158**

| | Month Ended | | | | | | | Month Ended Per Treatment | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Nov-17 | Dec-17 | Jan-18 | Feb-18 | Mar-18 | Apr-18 | | Nov-17 | Dec-17 | Jan-18 | Feb-18 | Mar-18 | Apr-18 |
| **Treatments:** | | | | | | | | | | | | | |
| Chronic | - | - | - | - | 1 | - | | | | | | | |
| PD | 1,790 | 1,789 | 1,778 | 1,640 | 1,941 | **1,962** | | | | | | | |
| Home hemo | 246 | 246 | 245 | 173 | 238 | **210** | | | | | | | |
| **Total Treatments** | 2,036 | 2,035 | 2,023 | 1,813 | 2,180 | **2,172** | | | | | | | |
| Treatment Adjustments | (8) | (21) | (20) | (15) | (18) | **(16)** | | | | | | | |
| **Net Treatments** | 2,027 | 2,014 | 2,003 | 1,799 | 2,161 | **2,156** | | | | | | | |
| | | | | | | | | | | | | | |
| **Treatment Days** | 26 | 27 | 27 | 24 | 27 | **25** | | | | | | | |
| **Treatments per Day** | 78 | 76 | 76 | 75 | 80 | **86** | | | | | | | |
| | | | | | | | | | | | | | |
| **Census (as of end of period):** | | | | | | | | | | | | | |
| Chronic | 6 | 8 | 7 | 9 | 6 | **9** | | | | | | | |
| PD | 145 | 145 | 141 | 150 | 156 | **164** | | | | | | | |
| Home hemo | 14 | 13 | 11 | 13 | 13 | **11** | | | | | | | |
| **Total Census** | 165 | 166 | 159 | 172 | 175 | **184** | | | | | | | |
| | | | | | | | | | | | | | |
| **Revenue:** | | | | | | | | | | | | | |
| PD | $688,091 | $683,989 | $714,336 | $682,078 | $801,841 | **$765,335** | | $384.47 | $382.27 | $401.76 | $415.79 | $413.20 | **$390.05** |
| Home hemo | 73,740 | 73,839 | 74,686 | 53,898 | 72,299 | **63,664** | | 299.76 | 300.16 | 304.84 | 311.55 | 303.78 | **303.16** |
| **Total Revenue** | 761,831 | 757,828 | 789,023 | 735,976 | 874,141 | **828,999** | | 374.23 | 372.34 | 390.03 | 405.85 | 401.06 | **381.65** |
| Revenue adjustments | 171,279 | 58,754 | (17,736) | 33,489 | 73,497 | **103,868** | | 86.04 | 33.14 | (5.02) | 21.90 | 37.43 | **50.98** |
| **Net Revenue** | 933,109 | 816,582 | 771,286 | 769,464 | 947,638 | **932,866** | | 460.28 | 405.48 | 385.01 | 427.75 | 438.49 | **432.63** |
| | | | | | | | | | | | | | |
| **Expenses:** | | | | | | | | | | | | | |
| Salaries, wages & benefits | 191,779 | 173,772 | 174,293 | 171,489 | 187,801 | **168,672** | | 94.60 | 86.29 | 87.00 | 95.33 | 86.90 | **78.22** |
| Pharmaceutical expenses | 84,650 | 62,533 | 103,236 | 113,718 | 116,223 | **87,235** | | 41.76 | 31.05 | 51.53 | 63.22 | 53.78 | **40.46** |
| Other medical supplies | 175,516 | 133,795 | 152,713 | 160,336 | 170,984 | **162,837** | | 86.58 | 66.44 | 76.23 | 89.13 | 79.12 | **75.52** |
| Other center expenses | 95,878 | 79,813 | 89,477 | 89,052 | 103,966 | **107,755** | | 47.29 | 39.63 | 44.67 | 49.50 | 48.11 | **49.97** |
| Management fees | 65,318 | 57,161 | 53,990 | 53,863 | 66,335 | **65,301** | | 32.22 | 28.38 | 26.95 | 29.94 | 30.69 | **30.28** |
| Depreciation & amortization | 8,889 | 8,889 | 8,889 | 8,889 | 9,123 | **7,757** | | 4.38 | 4.41 | 4.44 | 4.94 | 4.22 | **3.60** |
| **Total Operating Expenses** | 622,029 | 515,962 | 582,599 | 597,347 | 654,432 | **599,557** | | 306.83 | 256.21 | 290.82 | 332.07 | 302.82 | **278.05** |
| | | | | | | | | | | | | | |
| **Operating Income (Loss)** | 311,080 | 300,619 | 188,688 | 172,117 | 293,205 | **333,309** | | 153.45 | 149.28 | 94.19 | 95.68 | 135.67 | **154.58** |
| **Net Income (Loss)** | $311,080 | $300,619 | $188,688 | $172,117 | $293,205 | **$333,309** | | $153.45 | $149.28 | $94.19 | $95.68 | $135.67 | **$154.58** |
| | | | | | | | | | | | | | |
| **EBITDA** | $316,115 | $306,238 | $194,823 | $178,588 | $300,654 | **$338,749** | | $155.93 | $152.07 | $97.25 | $99.28 | $139.12 | **$157.10** |



# Income Statements
## Five Quarterly Periods Through April 2018

Panther Dialysis LLC - LE_201158

| | Quarter Ended | | | | | Quarter Ended Per Treatment | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Apr-17 | Jul-17 | Oct-17 | Jan-18 | Apr-18 | Apr-17 | Jul-17 | Oct-17 | Jan-18 | Apr-18 |
| **Treatments:** | | | | | | | | | | |
| Chronic | - | - | - | - | 1 | | | | | |
| PD | 5,263 | 5,572 | 5,334 | 5,357 | 5,543 | | | | | |
| Home hemo | 523 | 588 | 703 | 737 | 621 | | | | | |
| Total Treatments | 5,786 | 6,160 | 6,037 | 6,094 | 6,165 | | | | | |
| Treatment Adjustments | (49) | (51) | (81) | (50) | (49) | | | | | |
| Net Treatments | 5,738 | 6,110 | 5,956 | 6,044 | 6,116 | | | | | |
| | | | | | | | | | | |
| Treatment Days | 76 | 79 | 79 | 79 | 76 | | | | | |
| Treatments per Day | 75 | 77 | 75 | 77 | 80 | | | | | |
| | | | | | | | | | | |
| **Census (as of end of period):** | | | | | | | | | | |
| Chronic | 1 | 1 | 2 | 7 | 9 | | | | | |
| PD | 153 | 144 | 147 | 141 | 164 | | | | | |
| Home hemo | 11 | 11 | 15 | 11 | 11 | | | | | |
| Total Census | 165 | 156 | 164 | 159 | 184 | | | | | |
| | | | | | | | | | | |
| **Revenue:** | | | | | | | | | | |
| PD | $2,009,161 | $2,327,288 | $2,240,431 | $2,086,416 | $2,249,254 | $381.74 | $417.66 | $420.02 | $389.47 | $405.77 |
| Home hemo | 210,506 | 242,841 | 212,606 | 222,265 | 189,861 | 402.50 | 413.00 | 302.43 | 301.58 | 305.73 |
| Total Revenue | 2,219,666 | 2,570,130 | 2,453,037 | 2,308,681 | 2,439,115 | 383.62 | 417.22 | 406.32 | 378.84 | 395.63 |
| Revenue adjustments | 301,634 | 642,212 | 561,382 | 212,297 | 210,853 | 55.82 | 108.57 | 99.80 | 38.23 | 37.63 |
| Net Revenue | 2,521,300 | 3,212,342 | 3,014,418 | 2,520,978 | 2,649,968 | 439.44 | 525.79 | 506.13 | 417.07 | 433.26 |
| | | | | | | | | | | |
| **Expenses:** | | | | | | | | | | |
| Salaries, wages & benefits | 474,742 | 511,773 | 505,159 | 539,843 | 527,962 | 82.74 | 83.77 | 84.82 | 89.31 | 86.32 |
| Pharmaceutical expenses | 199,292 | 212,431 | 200,317 | 250,419 | 317,176 | 34.73 | 34.77 | 33.63 | 41.43 | 51.86 |
| Other medical supplies | 478,504 | 487,945 | 431,464 | 462,024 | 494,158 | 83.40 | 79.87 | 72.44 | 76.44 | 80.79 |
| Other center expenses | 256,159 | 267,974 | 283,113 | 265,168 | 300,773 | 44.65 | 43.86 | 47.54 | 43.87 | 49.18 |
| Management fees | 176,491 | 224,864 | 211,009 | 176,468 | 185,498 | 30.76 | 36.81 | 35.43 | 29.20 | 30.33 |
| Depreciation & amortization | 24,726 | 24,726 | 25,442 | 26,668 | 25,770 | 4.31 | 4.05 | 4.27 | 4.41 | 4.21 |
| Total Operating Expenses | 1,609,913 | 1,729,713 | 1,656,504 | 1,720,590 | 1,851,337 | 280.59 | 283.12 | 278.13 | 284.66 | 302.69 |
| | | | | | | | | | | |
| Operating Income (Loss) | 911,387 | 1,482,629 | 1,357,915 | 800,388 | 798,631 | 158.85 | 242.67 | 228.00 | 132.42 | 130.57 |
| Net Income (Loss) | $911,387 | $1,482,629 | $1,357,915 | $800,388 | $798,631 | $158.85 | $242.67 | $228.00 | $132.42 | $130.57 |
| | | | | | | | | | | |
| EBITDA | $929,023 | $1,499,696 | $1,374,380 | $817,176 | $817,992 | $161.92 | $245.47 | $230.76 | $135.19 | $133.74 |

# Income Statements
## Year to Date Periods Through April 2018



Panther Dialysis LLC - LE_201158

| | Year to Date Apr-17 | Apr-18 | YTD Change Prior Year | % Change Prior Year | Budget YTD Apr-18 | Budget Variance | | *Per Treatment* Year to Date Apr-17 | Apr-18 | Budget YTD Apr-18 | Budget Variance |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Treatments:** | | | | | | | | | | | |
| Chronic | - | **1** | 1 | - | - | 1 | | | | | |
| PD | 6,985 | **7,321** | 336 | 4.8 % | 7,307 | 14 | | | | | |
| Home hemo | 720 | **866** | 146 | 20.3 % | 823 | 43 | | | | | |
| Total Treatments | 7,705 | **8,188** | 483 | 6.3 % | 8,130 | 58 | | | | | |
| Treatment Adjustments | (73) | **(69)** | 5 | 6.6 % | - | (69) | | | | | |
| Net Treatments | 7,632 | **8,120** | 488 | 6.4 % | 8,130 | (10) | | | | | |
| | | | | | | | | | | | |
| Treatment Days | 102 | **103** | 1 | 0.5 % | 103 | - | | | | | |
| Treatments per Day | 75 | **79** | 4 | 5.9 % | 79 | (0) | | | | | |
| | | | | | | | | | | | |
| Census (as of end of period): | | | | | | | | | | | |
| Chronic | 1 | **9** | 8 | 800.0 % | - | 9 | | | | | |
| PD | 153 | **164** | 11 | 7.2 % | 150 | 14 | | | | | |
| Home hemo | 11 | **11** | - | - | 11 | (0) | | | | | |
| Total Census | 165 | **184** | 19 | 11.5 % | 162 | 22 | | | | | |
| | | | | | | | | | | | |
| **Revenue:** | | | | | | | | | | | |
| PD | $2,703,270 | **$2,963,591** | $260,320 | 9.6 % | $3,051,623 | $(88,032) | | $387.00 | **$404.80** | $417.62 | $(12.82) |
| Home hemo | 286,114 | **264,547** | (21,567) | (7.5)% | 300,708 | (36,161) | | 397.38 | **305.48** | 365.47 | (59.99) |
| Total Revenue | 2,989,385 | **3,228,138** | 238,753 | 8.0 % | 3,352,331 | (124,193) | | 387.97 | **394.25** | 412.34 | (18.09) |
| Revenue adjustments | 736,706 | **193,117** | (543,589) | (73.8)% | (67,047) | 260,164 | | 100.27 | **27.11** | (8.25) | 35.36 |
| Net Revenue | 3,726,091 | **3,421,255** | (304,836) | (8.2)% | 3,285,284 | 135,970 | | 488.24 | **421.36** | 404.09 | 17.27 |
| | | | | | | | | | | | |
| **Expenses:** | | | | | | | | | | | |
| Salaries, wages & benefits | 611,746 | **702,255** | 90,509 | 14.8 % | 608,131 | (94,123) | | 80.16 | **86.49** | 74.80 | (11.69) |
| Pharmaceutical expenses | 278,831 | **420,412** | 141,582 | 50.8 % | 443,096 | 22,684 | | 36.54 | **51.78** | 54.50 | 2.72 |
| Other medical supplies | 628,322 | **646,871** | 18,549 | 3.0 % | 674,915 | 28,044 | | 82.33 | **79.67** | 83.02 | 3.35 |
| Other center expenses | 336,413 | **390,250** | 53,838 | 16.0 % | 371,555 | (18,695) | | 44.08 | **48.06** | 45.70 | (2.36) |
| Management fees | 260,826 | **239,488** | (21,339) | (8.2)% | 229,970 | (9,518) | | 34.18 | **29.50** | 28.29 | (1.21) |
| Depreciation & amortization | 32,967 | **34,659** | 1,692 | 5.1 % | 12,618 | (22,041) | | 4.32 | **4.27** | 1.55 | (2.72) |
| Total Operating Expenses | 2,149,105 | **2,433,936** | 284,830 | 13.3 % | 2,340,286 | (93,649) | | 281.60 | **299.76** | 287.86 | (11.90) |
| | | | | | | | | | | | |
| Operating Income (Loss) | 1,576,986 | **987,319** | (589,667) | (37.4)% | 944,998 | 42,321 | | 206.64 | **121.60** | 116.24 | 5.36 |
| Net Income (Loss) | $1,576,986 | **$987,319** | $(589,667) | (37.4)% | $944,998 | $42,321 | | $206.64 | **$121.60** | $116.24 | $5.36 |
| | | | | | | | | | | | |
| EBITDA | $1,599,872 | **$1,012,815** | $(587,057) | (36.7)% | $948,453 | $64,362 | | $209.63 | **$124.74** | $116.66 | $8.08 |



# Balance Sheets
## Periods Through April 2018

**Panther Dialysis LLC - LE_201158**

| | Balance as of Month Ended | | | Balance as of Period End | | | |
|---|---|---|---|---|---|---|---|
| | Feb-18 | Mar-18 | Apr-18 | Apr-17 | Jul-17 | Oct-17 | Jan-18 |
| Cash held by DaVita | $2,192,832 | $2,447,744 | $2,467,979 | $2,472,533 | $2,648,990 | $4,258,177 | $2,135,246 |
| Accounts receivable, net | 404,785 | 432,910 | 684,779 | 245,359 | 297,281 | 84,305 | 295,348 |
| Pharma inventory | 41,316 | 35,442 | 44,999 | 54,679 | 73,064 | 62,168 | 48,769 |
| Other current assets | 28,105 | 28,105 | 28,504 | 28,105 | 29,046 | 28,105 | 28,105 |
| Property, plant, & equipment, net | 259,258 | 257,761 | 254,825 | 239,074 | 228,812 | 275,531 | 263,327 |
| Net intangible assets | 380,879 | 376,058 | 371,236 | 429,091 | 414,628 | 400,164 | 385,700 |
| Total Assets | $3,307,176 | $3,578,019 | $3,852,322 | $3,468,841 | $3,691,821 | $5,108,450 | $3,156,494 |
| Accrued payroll liabilities | 92,523 | 108,106 | 112,334 | 92,512 | 62,406 | 106,409 | 75,780 |
| Other accrued liabilities | 1,795 | 2,141 | 2,888 | 1,661 | 2,627 | 2,336 | 1,980 |
| Payor refund liabilities | 852,161 | 818,692 | 759,532 | 1,184,976 | 995,253 | 1,024,719 | 885,334 |
| Long-term liabilities, other | 380,879 | 376,058 | 371,236 | 429,091 | 414,628 | 400,164 | 385,700 |
| Total liabilities | 1,327,358 | 1,304,996 | 1,245,991 | 1,708,241 | 1,474,914 | 1,533,628 | 1,348,794 |
| Owners Equity | 1,979,817 | 2,273,023 | 2,606,332 | 1,760,600 | 2,216,908 | 3,574,822 | 1,807,701 |
| Total Liabilities and Equity | $3,307,176 | $3,578,019 | $3,852,322 | $3,468,841 | $3,691,821 | $5,108,450 | $3,156,494 |

# Cash Flows
### Periods Through April 2018



**Panther Dialysis LLC - LE_201158**

| | Month Ended | | | | | | Quarter Ended | | | | | YTD Ended | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Nov-17 | Dec-17 | Jan-18 | Feb-18 | Mar-18 | Apr-18 | Apr-17 | Jul-17 | Oct-17 | Jan-18 | Apr-18 | Apr-17 | Apr-18 |
| **Beginning Cash Balance** | $4,258,177 | $3,153,420 | $3,271,410 | $2,135,246 | $2,192,832 | **$2,447,744** | $2,630,323 | $2,472,533 | $2,648,990 | $4,258,177 | **$2,135,246** | $2,901,871 | **$3,271,410** |
| **Operating Cash Inflows:** | | | | | | | | | | | | | |
| Collections | 925,586 | 710,247 | 534,717 | 626,854 | 886,044 | **621,837** | 2,712,700 | 2,969,755 | 3,256,861 | 2,170,549 | **2,134,735** | 3,997,956 | **2,669,452** |
| Miscellaneous | 3,854 | 3,271 | 2,754 | 2,418 | 1,674 | **2,317** | 7,090 | 7,659 | 9,918 | 9,879 | **6,409** | 10,081 | **9,163** |
| **Operating Cash Outflows:** | | | | | | | | | | | | | |
| Salaries, wages & benefits | (176,107) | (238,227) | (156,138) | (154,746) | (172,219) | **(164,444)** | (427,633) | (541,879) | (461,156) | (570,472) | **(491,408)** | (548,432) | **(647,545)** |
| Pharmaceutical expenses | (78,349) | (78,042) | (80,629) | (106,265) | (110,349) | **(96,791)** | (203,918) | (230,816) | (189,422) | (237,020) | **(313,405)** | (260,057) | **(394,034)** |
| Other medical supplies | (175,516) | (133,795) | (152,713) | (160,336) | (170,984) | **(162,837)** | (478,504) | (487,945) | (431,464) | (462,024) | **(494,158)** | (628,322) | **(646,871)** |
| Other operating expenses | (104,807) | (88,303) | (96,757) | (96,476) | (110,116) | **(114,545)** | (277,980) | (289,131) | (306,845) | (289,867) | **(321,137)** | (365,746) | **(417,894)** |
| Management fees | (65,318) | (57,161) | (53,990) | (53,863) | (66,335) | **(65,301)** | (176,491) | (224,864) | (211,009) | (176,468) | **(185,498)** | (260,826) | **(239,488)** |
| Operating cash outflows | (600,096) | (595,528) | (540,227) | (571,685) | (630,003) | **(603,918)** | (1,564,526) | (1,774,635) | (1,599,895) | (1,735,851) | **(1,805,606)** | (2,063,384) | **(2,345,832)** |
| **Net Cash Inflows/(Outflows)** | 329,344 | 117,990 | (2,756) | 57,587 | 257,716 | **20,236** | 1,155,264 | 1,202,779 | 1,666,884 | 444,578 | **335,538** | 1,944,653 | **332,782** |
| **Investing and Financing Cash Flows:** | | | | | | | | | | | | | |
| Property, plant, & equipment | - | - | - | - | (2,804) | **-** | - | - | (57,697) | - | **(2,804)** | - | **(2,804)** |
| Partnership distributions | (1,434,101) | - | (1,133,408) | - | - | **-** | (1,313,054) | (1,026,322) | - | (2,567,509) | **-** | (2,373,992) | **(1,133,408)** |
| Net change in cash | (1,104,757) | 117,990 | (1,136,164) | 57,587 | 254,911 | **20,236** | (157,790) | 176,457 | 1,609,187 | (2,122,931) | **332,734** | (429,339) | **(803,431)** |
| **Ending Cash Balance** | $3,153,420 | $3,271,410 | $2,135,246 | $2,192,832 | $2,447,744 | **$2,467,979** | $2,472,533 | $2,648,990 | $4,258,177 | $2,135,246 | **$2,467,979** | $2,472,533 | **$2,467,979** |

## Property, Plant, & Equipment Activity

| Property, Plant, & Equipment Activity: | | | | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Dialysis machines | - | - | - | - | - | **-** | - | - | (47,514) | - | **-** | - | **0** |
| RO machines | - | - | - | - | - | **-** | - | - | (3,995) | - | **-** | - | **0** |
| Furniture, computers & other | - | - | - | - | (2,804) | **-** | - | - | (6,187) | - | **(2,804)** | - | **(2,804)** |
| Total Asset Activity | $ - | $ - | $ - | $ - | $(2,804) | **$ -** | $ - | $ - | $(57,697) | $ - | **$(2,804)** | $ - | **$(2,804)** |



# Accounts Receivable Summary
## Period Ended April 2018

**Panther Dialysis LLC - LE_201158**

| Accounts Receivable: | Aging | | | | | | |
|---|---|---|---|---|---|---|---|
| (as of end of period) | 0-30 | 31-60 | 61-90 | 91-120 | 121-180 | >180 | Total |
| Medicare | $225,569 | $25,743 | $12,304 | $19,623 | $10,522 | $22,392 | $316,152 |
| Medicaid | 6,084 | 12,765 | 8,929 | 5,582 | 11,887 | 40,757 | 86,004 |
| Government programs | 288,864 | 213,062 | 95,111 | 87,953 | 72,615 | 235,767 | 993,372 |
| Patient | - | 6,617 | 10,306 | 25,207 | 14,398 | 19,047 | 75,573 |
| Contract | 296,529 | 135,699 | 39,615 | 49,470 | 14,536 | 242,075 | 777,924 |
| Exchanges | 27,908 | 17,687 | 12,253 | 17,010 | 5,900 | 42,005 | 122,762 |
| Non-Contract | 11,080 | 21,212 | 14,532 | 12,697 | 22,689 | 62,889 | 145,098 |
| Gross accounts receivable | 856,033 | 432,785 | 193,049 | 217,540 | 152,546 | 664,932 | 2,516,885 |
| Contractual allowance reserve | (16,711) | (42,865) | (19,983) | (30,435) | (27,547) | (202,512) | (340,053) |
| Bad debt reserve | (8,454) | (12,440) | (15,044) | (29,136) | (18,913) | (272,201) | (356,188) |
| Total reserves | (25,165) | (55,305) | (35,027) | (59,572) | (46,460) | (474,712) | (696,241) |
| Net accounts receivable before other | $830,868 | $377,481 | $158,022 | $157,969 | $106,086 | $190,219 | $1,820,645 |
| | | | | | | | |
| Net credit balances | (26,614) | (3,090) | (5,609) | (18,387) | (26,368) | (1,057,209) | (1,137,277) |
| Unapplied cash and other | 1,411 | - | - | - | - | - | 1,411 |
| Accounts receivable, net | $805,665 | $374,391 | $152,413 | $139,582 | $79,718 | $(866,989) | $684,779 |

| Historical Accounts Receivable: | Aging | | | | | | |
|---|---|---|---|---|---|---|---|
| | 0-30 | 31-60 | 61-90 | 91-120 | 121-180 | >180 | Total |
| Apr-18 | $830,868 | $377,481 | $158,022 | $157,969 | $106,086 | $190,219 | $1,820,645 |
| % of Total | 45.6% | 20.7% | 8.7% | 8.7% | 5.8% | 10.4% | 100.0% |
| Jan-18 | $768,021 | $266,367 | $132,929 | $109,579 | $121,428 | $123,534 | $1,521,858 |
| % of Total | 50.5% | 17.5% | 8.7% | 7.2% | 8.0% | 8.1% | 100.0% |
| Oct-17 | $707,398 | $373,753 | $193,212 | $72,631 | $66,454 | $112,576 | $1,526,024 |
| % of Total | 46.4% | 24.5% | 12.7% | 4.8% | 4.4% | 7.4% | 100.0% |
| Jul-17 | $798,634 | $414,439 | $115,301 | $45,391 | $98,382 | $110,831 | $1,582,977 |
| % of Total | 50.5% | 26.2% | 7.3% | 2.9% | 6.2% | 7.0% | 100.0% |
| Apr-17 | $722,742 | $387,737 | $144,403 | $113,069 | $124,327 | $168,610 | $1,660,888 |
| % of Total | 43.5% | 23.3% | 8.7% | 6.8% | 7.5% | 10.2% | 100.0% |

| Historical DSO: | Month Ended | | | | |
|---|---|---|---|---|---|
| | Apr-17 | Jul-17 | Oct-17 | Jan-18 | Apr-18 |
| DSO | 9 | 9 | 3 | 11 | 23 |



# Significant Revenue Adjustments
## April 2018

**Panther Dialysis LLC - LE_201158**

**Revenue Adjustment Summary:**

| | Month Ended | | | Three Months |
|---|---|---|---|---|
| | **Feb-18** | **Mar-18** | **Apr-18** | **Apr-18** |
| **Net Revenue Adjustments** | **$33,489** | **$73,497** | **$103,868** | **$210,853** |

**Net Revenue Adjustments > $55,000 during the Quarter:**

| Reference Number | Patient/ MPI Number | Center Name | AR Adjustment (Write-off)/Write-on | Reserve Change | Net Adjustment | DOS Effected | Financial Class | Payor |
|---|---|---|---|---|---|---|---|---|
| *1* | Multiple | Menifee Home Dialysis | $301,886 | $2,920 | $304,806 | Multiple | Contract | Blue Shield of CA |

| Reference Number | Comments |
|---|---|
| *1* | Increase is primarily due to the write on of non-government credits per contract terms and state claw back rules |

*\* Monthly revenue threshold is $225,000 and Quarterly revenue threshold is $55,000*



# Capital Account Summary
## April 2018

**Panther Dialysis LLC - LE_201158**

| Initial Ownership Percentages | Menifee Home Dialysis, LLC 49.00% | Total Renal Care, Inc. 51.00% | Total 100% |
|---|---|---|---|
| **Initial Capital Contribution** | $          353,035 | $          367,444 | $          720,479 |
| | | | |
| **2014** | | | |
| **Net Income/(Loss)** | (101,188) | (105,318) | (206,507) |
| **Capital Balance as of December 31, 2014** | 251,846 | 262,126 | 513,972 |
| | | | |
| **2015** | | | |
| **Net Income/(Loss)** | (75,196) | (78,265) | (153,460) |
| **Capital Distributions** | 245,000 | 255,000 | 500,000 |
| **Capital Balance as of December 31, 2015** | 421,651 | 438,861 | 860,512 |
| | | | |
| **2016** | | | |
| **Net Income/(Loss)** | 1,180,742 | 1,228,935 | 2,409,677 |
| **Capital Contributions** | 379,750 | 395,250 | 775,000 |
| **Capital Distributions** | (728,915) | (758,667) | (1,487,582) |
| **Capital Balance as of December 31, 2016** | 1,253,227 | 1,304,380 | 2,557,607 |
| | | | |
| **2017** | | | |
| **Net Income/(Loss)** | 2,464,322 | 2,564,907 | 5,029,229 |
| **Capital Distributions** | (2,368,863) | (2,465,552) | (4,834,415) |
| **Capital Balance as of December 31, 2017** | 1,348,686 | 1,403,735 | 2,752,421 |
| | | | |
| **2018 YTD:** | | | |
| **Net Income/(Loss)** | 483,786 | 503,533 | 987,319 |
| **Capital Distributions:** | | | |
| **  January** | (555,370) | (578,038) | (1,133,408) |
| **Total Current Year Distributions** | (555,370) | (578,038) | (1,133,408) |
| | | | |
| **Current Capital Balance** | $          1,277,103 | $          1,329,230 | $          2,606,332 |



# Significant AR Outstanding by Payor Type
## Period Ended April 2018

**Panther Dialysis, LLC - LE_201158**

### Gov't Programs:

| Plan Group | Position | 0-30 | 31-60 | 61-90 | 91-120 | 121-180 | >180 | Total | Reserves | Net* |
|---|---|---|---|---|---|---|---|---|---|---|
| | | *Aging* | | | | | | | | |
| SCAN Health Plan | Primary | $117,019 | $120,004 | $48,938 | $28,245 | $20,337 | $52,084 | $386,628 | ($40,639) | $345,989 |
| UnitedHealth Group Incorporated | Primary | 81,422 | 34,764 | 8,452 | 9,585 | 426 | 7,476 | 142,126 | (22,283) | 119,843 |
| Aetna Inc. | Primary | - | 4,433 | 4,004 | 4,433 | 8,333 | 44,986 | 66,189 | (40,128) | 26,061 |
| **Total Highlighted** | | 198,441 | 159,201 | 61,395 | 42,263 | 29,096 | 104,546 | 594,942 | (103,050) | 491,893 |
| **Gross accounts receivable** | | 288,864 | 213,062 | 95,111 | 87,953 | 72,615 | 235,767 | 993,372 | (200,095) | 793,276 |
| *Coverage** | | *68.7%* | *74.7%* | *64.6%* | *48.1%* | *40.1%* | *44.3%* | *59.9%* | *51.5%* | *62.0%* |

### Contract:

| Plan Group | Position | 0-30 | 31-60 | 61-90 | 91-120 | 121-180 | >180 | Total | Reserves | Net* |
|---|---|---|---|---|---|---|---|---|---|---|
| Aetna Inc. | Primary | $15,949 | $17,658 | - | $5,696 | - | $201,966 | $241,268 | ($238,286) | $2,983 |
| Cigna Corporation | Primary | 122,501 | 28,722 | 5,105 | 627 | - | 24 | 156,979 | (11,627) | 145,353 |
| Blue Shield of California | Primary | 51,033 | 22,048 | 17,465 | 28,929 | 11,533 | 12,289 | 143,297 | (21,458) | 121,839 |
| **Total Highlighted** | | 189,483 | 68,427 | 22,570 | 35,253 | 11,533 | 214,279 | 541,545 | (271,370) | 270,175 |
| **Gross accounts receivable** | | 278,868 | 135,899 | 39,615 | 49,470 | 14,536 | 242,075 | 760,263 | (299,459) | 460,804 |
| *Coverage** | | *67.9%* | *50.4%* | *57.0%* | *71.3%* | *79.3%* | *88.5%* | *71.2%* | *90.6%* | *58.6%* |

### Non-Contract:

| Plan Group | Position | 0-30 | 31-60 | 61-90 | 91-120 | 121-180 | >180 | Total | Reserves | Net* |
|---|---|---|---|---|---|---|---|---|---|---|
| Ethicare Advisors Inc | Primary | $11,080 | $10,197 | $7,248 | $8,460 | $12,193 | $31,576 | $80,754 | ($25,976) | $54,778 |
| UnitedHealth Group Incorporated | Secondary | - | 2,888 | 3,380 | 2,624 | 4,532 | 678 | 14,102 | (3,085) | 11,016 |
| AmeriBen/IEC Group | Secondary | - | 1,004 | 805 | - | 1,619 | 8,691 | 12,118 | (6,266) | 5,852 |
| **Total Highlighted** | | 11,080 | 14,088 | 11,433 | 11,084 | 18,344 | 40,945 | 106,974 | (35,328) | 71,646 |
| **Gross accounts receivable** | | 11,080 | 21,212 | 14,532 | 12,697 | 22,689 | 62,889 | 145,098 | (57,566) | 87,532 |
| *Coverage** | | *100.0%* | *66.4%* | *78.7%* | *87.3%* | *80.9%* | *65.1%* | *73.7%* | *61.4%* | *81.9%* |

### Exchange:

| Plan Group | Position | 0-30 | 31-60 | 61-90 | 91-120 | 121-180 | >180 | Total | Reserves | Net* |
|---|---|---|---|---|---|---|---|---|---|---|
| Blue Shield of California | Primary | $20,492 | $16,142 | $12,152 | $17,010 | $3,821 | $22,234 | $91,851 | ($21,624) | $70,227 |
| Anthem, Inc. | Primary | - | - | - | - | 2,079 | 18,117 | 20,196 | (5,318) | 14,878 |
| Centene Corporation | Primary | 7,416 | 1,545 | 101 | - | - | - | 9,062 | (2,501) | 6,561 |
| **Total Highlighted** | | 27,908 | 17,687 | 12,253 | 17,010 | 5,900 | 40,351 | 121,109 | (29,443) | 91,666 |
| **Gross accounts receivable** | | 27,908 | 17,687 | 12,253 | 17,010 | 5,900 | 42,005 | 122,762 | (29,904) | 92,858 |
| *Coverage** | | *100.0%* | *100.0%* | *100.0%* | *100.0%* | *100.0%* | *96.1%* | *98.7%* | *98.5%* | *98.7%* |

### Secondaries:

| Plan Group | Position | 0-30 | 31-60 | 61-90 | 91-120 | 121-180 | >180 | Total | Reserves | Net* |
|---|---|---|---|---|---|---|---|---|---|---|
| Patient Pay | Secondary | - | $6,617 | $10,306 | $25,207 | $10,203 | $14,896 | $67,228 | ($65,536) | $1,692 |
| Inland Empire Health Plan | Secondary | - | 13,540 | 4,737 | 9,103 | 8,198 | 21,264 | 56,842 | (14,663) | 42,179 |
| Medicaid | Secondary | - | 1,438 | 1,992 | 679 | 5,562 | 32,729 | 42,400 | (27,640) | 14,760 |
| **Total Highlighted** | | - | 21,594 | 17,035 | 34,989 | 23,963 | 68,889 | 166,470 | (107,838) | 58,632 |

*Net balance shown includes aging-based reserves, but excludes any specific manual reserves.  Schedule shows AR for the top three payors in each payor type, regardless of primary or secondary position.

The "Secondaries" portion of the schedule reflects AR outstanding for the top three secondary or tertiary payors at the end of the period, regardless of financial class.

**Coverage percentage is calculated as highlighted amounts divided by respective payor type in "*Accounts Receivable- By Payor Type*" section of the Accounts Receivable Summary.



# Significant AR Outstanding
## April 2018

**Panther Dialysis LLC - LE_201158**

|  | Month Ended | | |
|---|---|---|---|
|  | Feb-18 | Mar-18 | Apr-18 |
| Net AR | $404,785 | $432,910 | $684,779 |

**AR > $75,000 with more than 3 months dates of service outstanding:**

| Reference Number | Patient/ MPI Number | Center Name | Total Balance | Reserves | Net Balance* | >90 Days Net Balance* | DOS Effected | Financial Class | Payor |
|---|---|---|---|---|---|---|---|---|---|
| *1* | L. Pond [1732225] | Menifee Home Dialysis (PD) | $201,966 | ($201,966) | $0 | $0 | 10/16 - 09/17 | Contract | Aetna Health Inc |
| *2* | M. Flaherty [1973222] | Menifee Home Dialysis (PD) | $80,754 | ($25,976) | $54,778 | $30,532 | 06/17 - 04/18 | Non-Contract | Ethicare Advisors Inc |
| *3* | Multiple | Menifee Home Dialysis (PD) | $386,628 | ($40,639) | $345,989 | $72,068 | Multiple | Government Programs | SCAN Health Plan |

| Reference Number | Comments |
|---|---|
| *1* | Aetna retracted original payments made on claims and then submitted short payments. A summary plan description demand letter was mailed to the patient's employer in January 2018 stating that it needs to be received so that payment can be pursued. In May 2018, appeals were sent to the payor due to claims being short paid.  Patient has Medicare as of 12/01/17. |
| *2* | Outstanding AR due to claims were originally billed to Anthem Blue Cross of California and regenerated under Ethicare Advisors as of January 2018.  We have sent multiple demand letters to Ethicare Advisors but have not received a status update of processing claims.  We are continuing to work with payor to resolve the issue. |
| *3* | Outstanding AR due to claims were denied for missing information that the payor requires.  As of May18, claims have been updated and sent back to the payor to process. |

*Net balance shown includes aging-based reserves.

# Significant Credit AR Outstanding

- Blue Shield of CA has a balance of ($1,503,781) for multiple dates of service ranging from 01/16-02/16, 05/16-08/16, 10/16-09/17, 11/17, & 02/18-03/18.  This Contract plan is primary and paid more than expected rates.  Refunds will be issued upon request.  No refund request has been identified as of 4/18.



# Other Quarterly Highlights
## April 2018

**Panther Dialysis LLC - LE_201158**

Calcimimetics:  Effective January 1, 2018, calcimimetics were introduced into the Medicare ESRD billing.  Revenue for calcimimetics is billed based on plan of care billing. Oral calcimimetics are expensed when dispensed to a patient. IV calcimimetics are inventoried and expensed when used. The cost of calcimimetics includes the manufacturer cost as well as a dispensing fee of $20 per script.

Income Statement:

- Other Center Expenses:  Increased primarily due to $12,950 franchise tax in Apr18 and $13K increase in lab expense in current quarter.

- Management fees:  YTD management fees of $239,488 represent 7% of YTD net revenue per the Management Services Agreement.

Balance Sheet:

- Payor refund liability: Decreased primarily due to credit balance write-on from Blue Shield of CA.  Please see Significant Revenue Adjustment note for more details.

- AR/DSO: Increase primarily due to Blue Shield of CA credit balance write-on.  Please see Significant Revenue Adjustment note for more details.

# Exhibit 9

# Module 4

## Insurance, Disability and Patient Assistance Plans



# Health Insurance Premium Program (HIPP)

Provides health insurance grants to qualified ESRD patients on dialysis to pay the following primary and/or secondary premiums:

- Medicare Part B
- "Medigap" or Supplement plans (< $550/month)
- Commercial insurance (EGHP, Individual, Exchanges)
- COBRA premiums

AKF will <u>not</u> assist with:

- Tertiary insurance
- Medicare Part A
- Medicare Part B reimbursement
- Medicare Part D premiums

**<u>HIPP is supported by provider contributions</u>**

# Who is eligible?

- Patients who dialyze in the U.S.

- Patients who demonstrate they cannot afford health coverage based on income, expenses, and liquid assets

- Monthly household income cannot exceed reasonable monthly expenses by more than <u>$600</u>

- Liquid assets (savings accounts, stocks etc.) may not exceed <u>$7,000</u>

- IRA and 401K retirement savings are EXCLUDED

**<u>HIPP is a "last resort" program</u>**

# HIPP Centralized Process Overview

- AKF HIPP requests are initiated at facility level by center teammates

- Forms required:  AKF HIPP Application, DaVita HIPPA authorization, Premium Request Form and Fax Cover Sheet
  - Print all forms from Reggie Next Generation (RNG) as top portion of Premium Request Form and Fax Cover Sheet will auto populate

- Completed forms must be faxed to Patient Assistance Department ONLY. Do not fax any documents directly to AKF.

- DaVita HIPP liaisons will enter all requests into AKF Grant Management System (GMS).
  - Entry of AKF HIPP Applications are a partnership between the SW and DaVita HIPP Liaison

51

# HIPP Centralized Process Overview

## Request type and documents needed

<u>1st Time & Re-App Request</u>

- Fax Cover Sheet
- Premium Request Form
- AKF HIPP Application (If not in GMS)
- DaVita HIPAA Authorization Form
- Coupon / Statement
- Transplant Letter (for Medicare Supplements with monthly premiums over $550.00 only)

- Remember – obtain all forms from RNG



# HIPP Centralized Process Overview

## Request type and documents needed

### Recurring  or Repeat Request

- Fax Cover Sheet
- Premium Request Form
- Coupon / Statement/ Letter
- Transplant Letter  (for Medicare Supplements with monthly premiums over $550.00 only)


- Remember – obtain all forms from RNG



# HIPP Centralized Process Overview

## Request type and documents needed

Balance Due/Underpayment Request

- Fax Cover Sheet
- Premium Request Form
- Bill showing premium increase
        OR
- Letter stating premium increase


- Remember – obtain all forms from RNG



# FAX Stacking Order

Important!
Please stack documents in the following order before faxing:

- Fax Cover Sheet
- Premium Request Form
- AKF HIPP Application (if applicable)
- DaVita HIPAA Authorization Form (if applicable)
- Premium Bill / Insurance Application

- Remember – obtain all forms from RNG



# Obtaining Premium Status

- Live status on HIPP applications and requests can be obtained by registering for the AKF GMS website at: https://gms.kidneyfund.org
  - Renal Professionals must use DaVita email address
  - Take the GMS training courses
  - Patients may also register

- Premium Status Report (PSR)
  - The PSR is sent out to the field every Tuesday and contains status for requests processed by the DaVita HIPP Liaisons
    - Contains 6 months worth of data (2 quarters)

56

# Additional Training & Questions?

- For detailed training:  Star Learning course
  - Living Our Mission AKF – INS6003

- For the AKF HIPP program, please contact the DaVita HIPP Liaison assigned to your state/region:
  - Liaison Directory listed on the PSR
  - Fax number: 949-930-6971 or 949-930-6888

- For GMS technical issues, please contact AKF:
  - 1-800-795-3226 or
  - Email: GMSSupport@kidneyfund.org.



# TRACKING PRIVATE PAY PATIENTS

Pri Pay Patients: Never a clinical difference

# Definition of Private Pay Patient

- Commercial Primary Insurance

- 1 of 10 patients' insurance plans reimburses DaVita above cost of providing treatment

- Need support to help with insurance needs

- ALL Commercial Primary Patients are now classified as Private Pay & followed by the Insurance Counselor

# Economics of 1 Private Pay Patient



# Why It Matters

10% of our patients generate 100% of our profits



# Impact On A Facility

| | | |
|---|---|---|
| **Patients:** | **16** | **16** |
| **Treatments:** | **2,370** | **2,370** |
| | | |
| **Payor Mix:** | Medicare + 1 Pri Pay | 16 Medicare |
| **Field Net Revenue:** | $310 PTX | $220 PTX |
| | | |
| **Total Revenue** | $747,422 | $521,400 |
| **Pre G&A Expenses:** | -$543,683 | -$543,683 |
| | | |
| **Pre G&A EBITDA:** | **$183,759** | **-$16,666** |

# Sam's Calls

## "What are these calls?"

## "What are the Facility's Responsibilities?"

- Mandatory calls to discuss:
  - Private Pay patients
  - Information gathered is recorded by Insurance Counselor on standard template

- Report viewed by senior leadership including:
  - Chief Operating Officer
  - Senior Vice Presidents for live discussion of any Private Pay losses

- Attendance is mandatory
  - Attendance may be taken and reported at the request of Operations

- Be prepared to discuss insurance, satisfaction and registration issues
  - Know the Big 4
  - If you are unable to attend, information must be provided prior to scheduled call (i.e. email, live discussion, fax, etc)

**Provides opportunity to learn, brainstorm, and celebrate successes**

# What Information You Should Share

- Insurance Changes
  - Change in employment or life status
  - Lose insurance coverage (COBRA and AKF)
  - Pressured by insurance co. (SPAs or contracts)
  - Open enrollment
  - Change in marital status

- Satisfaction Issues

- Requests to transfer out
  - Facility related distress
  - Transportation, shift and/or doctor difficulties

- New Admission & Visitors
  - DVA commercial patients with travel difficulties
  - Non-DVA visitors that want to transfer into DaVita

- Anything at all
  - Insurance Changes
  - Potential Non DaVita Transfers
  - Questions with New Admission & Visitors
  - Anything at all

# What Information Do We Discuss?

**Losses**

✶ Opportunities to learn from

**Pending**

✶ Potential insurance changes and non-DaVita transfers losses

**Saves**

✶ Successes to learn from and celebrate

# **Retention Toolkit**



- ✯ Know Big 4 for each Pri Pay Patient
  - ➢ Insurance
  - ➢ Why they have it
  - ➢ Who makes decisions
  - ➢ Open Enrollment

- ✯ Ask the right <u>satisfaction</u> & <u>insurance issue</u> at the right frequency

- ✯ Zero controllable losses

80

# **Exhibit 10**



# TD/SFA Role-Play ROFR's & ROFO's

October 2016

©2016 DaVita Inc. All rights reserved. Proprietary and confidential. For internal use only.

POSTFILDISC-044605

# Overview



- ROFR = <u>R</u>ight <u>O</u>f <u>F</u>irst <u>R</u>efusal

- ROFO = <u>R</u>ight <u>O</u>f <u>F</u>irst <u>O</u>ffer



- Difference between ROFO & ROFR:
  - A ROFO requires the seller to undergo exclusive, good faith negotiations with the ROFO holder before negotiating with other parties – a right to negotiate.
  - A ROFR is an option to enter a transaction on exactly or approximately the same terms that another bidder has proposed – a right to match.

- ROFO referred to as 1st bite at the apple; ROFR referred to as 2nd bite at the apple

©2016 DaVita Inc. All rights reserved. Proprietary and confidential. For internal use only.

POSTFILDISC-044606

# Type's of ROFR's



| ROFR's Typically **Received** | ROFR's Sometimes **Granted** |
|---|---|
| • Mgmt over additional centers | • Development |
| • Transfer of Group's Units in JV Company | • MDA |
| | • Transfer of LLC Mgr's Units in JV Company (rights to either i) "tag along" or ii) acquire the units DVA is transferring) |
| | |
| ROFR's Sometimes **Received** | |
| • Hospital Service Agreement | |
| • Payor network participation | |
| • ACO participation | |

©2016 DaVita Inc. All rights reserved. Proprietary and confidential. For internal use only.

POSTFILDISC-044607

# More About ROFR's



- Why do we sometimes give a ROFR?
  - When a partner is insisting on a mutual non-compete
  - When Ops feels confident this is who we want to partner with in the future

- Do we ever do only a ROFR or a ROFO?
  - Ideally, we can negotiate ROFO only
  - Next preferred option is ROFR only
  - Least ideal is granting ROFR+ROFR combo

## Important: We Don't Give ROFR's Easily!

©2016 DaVita Inc. All rights reserved. Proprietary and confidential. For internal use only.

POSTFILDISC-044608

# ROFR Approval Process



- Request current ROFR map from Nancy Wheeler

- Confirm operations is comfortable

- Confirm David Finn is agreeable

- Submit exception request deck to CDO after DVP, GVP, SVP and Finn all approve concept/deck

©2016 DaVita Inc. All rights reserved. Proprietary and confidential. For internal use only.

POSTFILDISC-044609

# Role Play - Background



- Acquisition target: 2 operational centers + 2 centers in development located in large metro area
- Seller: LLC owned by 2 unaffiliated nephrologists whose practice is young, entrepreneurial, and focused on growth
- Seller is entertaining offers from FMC and others
- Current provider landscape:

| Owner | # Centers | # Stations | Census |
|---|---|---|---|
| DaVita (1) | 16 | 184 | 422 |
| FMC | 8 | 155 | 677 |
| Hospital | 5 | 53 | 159 |
| Independent (2) | 9 | 278 | 1252 |
| Total | 38 | 670 | 2510 |
| | | | |
| (1) Includes three DeNovo's.  Station Count and Census N/A for DeNovo. | | | |
| (2) Seller facility included under Independent. | | | |

- Proposed deal structure: DVA acquires majority (~80%) interest
- DVA has fragmented physician relationship (i.e. multiple relationships) in this VSA with smaller, mature practices

©2016 DaVita Inc. All rights reserved. Proprietary and confidential. For internal use only.

POSTFILDISC-044610

# Role Play – Negotiation Specifics



- Seller requesting the ROFR and related rights:
  - Restricted Area = 3 county area around the target centers
  - Mutual non-compete
  - MDA ROFR for new development
  - MDA ROFR for existing DVA centers in Restricted Area
  - JV participation rights for existing DVA wholly owned units
  - Real estate rights tied to new development
  - Mutual ROFO+ROFR for transfer of Units in JV Company
  - Tag-along rights (if DVA transfers its JV units)

**Objective: determine DVA's response to the above ask's and prepare communication strategy around what can and cannot be entertained**

©2016 DaVita Inc. All rights reserved. Proprietary and confidential. For internal use only.

7

POSTFILDISC-044611