# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, STATE OF CALIFORNIA, STATE OF COLORADO, STATE OF CONNECTICUT, STATE OF FLORIDA, STATE OF GEORGIA, STATE OF ILLINOIS, STATE OF INDIANA, STATE OF IOWA, STATE OF LOUISIANA, STATE OF MARYLAND, STATE OF MICHIGAN, STATE OF MINNESOTA, STATE OF NEVADA, STATE OF NEW JERSEY, STATE OF NEW MEXICO, STATE OF NEW YORK, STATE OF NORTH CAROLINA, STATE OF OKLAHOMA, STATE OF TENNESSEE, STATE OF TEXAS, COMMONWEALTH OF VIRGINIA, STATE OF WASHINGTON, STATE OF WISCONSIN, AND THE DISTRICT OF COLUMBIA *ex rel.* JOHN BAYNE, <br><br> Plaintiff-Relator, <br><br> v. <br><br> DAVITA INC. and DAVITA HEALTHCARE PARTNERS INC., and NEPHROLOGY ASSOCIATES MEDICAL GROUP INC., <br><br> Defendants. | **CIVIL ACTION NO.:** 18-cv-5528-MRP <br><br> **JURY TRIAL DEMANDED** |

## RELATOR'S THIRD AMENDED COMPLAINT UNDER THE
## FEDERAL FALSE CLAIMS ACT AND STATE FALSE CLAIMS ACTS

## Table of Contents

I. SUMMARY OF THE CASE ................................................................................................ 1

II. THE PARTIES .................................................................................................................... 5

    A.    The Government ................................................................................................... 5

    B.    Relator ................................................................................................................. 5

    C.    Defendants ........................................................................................................... 7

III. JURISDICTION AND VENUE ......................................................................................... 7

IV. THE LAW ........................................................................................................................... 8

    A.    The False Claims Act .......................................................................................... 8

    B.    State False Claims Acts ....................................................................................... 9

    C.    The Anti-Kickback Statute .................................................................................. 9

V. BACKGROUND ............................................................................................................... 13

    A.    ESRD and Dialysis ............................................................................................ 13

    B.    Medicare Coverage of Dialysis ......................................................................... 14

    C.    DaVita ................................................................................................................ 17

    D.    DaVita's History of False Claims Act Liability ................................................ 18

VI. DAVITA'S FRAUD ......................................................................................................... 20

    A.    Overview of DaVita's Use of JV DeNovos ...................................................... 20

    B.    The Impropriety of DaVita's Use of a "Cost Approach" to Valuation ............ 25

    C.    DaVita's Intentionally and Illegally Undervalues the Ownership Interests it Sells in JV DeNovos ........................................................................................... 31

        1.    Relator Learns About DaVita's Misconduct ....................................... 31

        2.    Representative Examples of JV DeNovos ............................................ 35

    D.    DaVita Provides Kickbacks in the Form of Free Rights of First Refusal ........ 40

VII. DEFENDANTS' FCA AND AKS LIABILITY .............................................................. 55

    A.    The Purpose of DaVita's Kickbacks was to Induce Referrals ......................... 55

    B.    DaVita's Submission of False Claims to Government Healthcare Programs .... 60

    C.    The Materiality of DaVita's Kickbacks ............................................................ 66

VIII. COUNTS ........................................................................................................................... 68

PRAYER FOR RELIEF .......................................................................................................... 92

Plaintiff-Relator John Bayne ("Relator"), on behalf of the United States of America, the State of California, the State of Colorado, the State of Connecticut, the State of Florida, the State of Georgia, the State of Illinois, the State of Iowa, the State of Indiana, the State of Louisiana, the State of Maryland, the State of Michigan, the State of Minnesota, the State of Nevada, the State of New Hampshire, the State of New Jersey, the State of New Mexico, the State of New York, the State of North Carolina, the State of Oklahoma, the State of Tennessee, the State of Texas, the Commonwealth of Virginia, the State of Washington, the State of Wisconsin and the District of Columbia (collectively, "Plaintiff States"), brings this action against DaVita, Inc. and DaVita Healthcare Partners, Inc. (collectively "DaVita") and Nephrology Associates Medical Group, Inc. ("NAMG") for violations of the False Claims Act ("FCA"), 31 U.S.C. § 3729, et seq. and the corresponding state false claims acts of the Plaintiff States,[1] to recover all damages, civil penalties, and all other recoveries provided for under these statutes.

## I.    SUMMARY OF THE CASE

1.    Approximately 650,000-700,000 Americans suffer from kidney failure, also known

---

[1] The corresponding false claims acts of the Plaintiff States are the California False Claims Act, Cal. Gov't Code §§12650 et seq.; Colorado Medicaid False Claims Act, § 25.5-4-304, et seq.; Connecticut False Claims Act, Conn. Gen. Stat. § 17b-301b; District of Columbia False Claims Act, D.C. Code §§ 2-308.03 et seq.; Florida False Claims Act, Fla. Stat. §§ 68.081 et seq.; Georgia False Medicaid Claims Act, Ga. Code. §§49-4-168 et seq.; Illinois Whistleblower Reward and Protection Act, 740 Ill. Comp. Stat. §§175/1 et seq.; Indiana False Claims and Whistleblower Protection Act, Indiana Code §5-11-5.5; Iowa False Claims Act, §685.1, et seq.; Louisiana Medical Assistance Integrity Law, La. R.S. 46:437.1 et seq.; Maryland False Health Claims Act, § 2-601, et seq.; Michigan Medicaid False Claims Act, MCLS §§400.601 et seq.; Minnesota False Claims Act, Minn. Stat. § 15C.01 et seq.; Nevada False Claims Act, Nev. Rev. Stat. §§ 357.010 et seq.; New Jersey False Claims Act, N.J. Stat. §2A:32C-1 et seq.; New Mexico Medicaid False Claims Act, N.M. Stat. § 27-14-1 et seq.; New York False Claims Act, NY CLS St. Fin. §§187 et seq.; North Carolina False Claims Act, 2009-554 N.C. Sess. Laws § 1-605 et seq.; Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63, §§5053 et seq.; Tennessee Medicaid False Claims Act, Tenn. Code §§ 71-5-171 et seq.; Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code §§36.001 et seq.; Virginia Fraud Against Taxpayers Act, Va. Code § 8.01-216.1 et seq.; Washington Medicaid Fraud False Claims Act, RCW 74.09.201 et seq.; and Wisconsin False Claims for Medical Assistance Act, Wis. Stat. § 20.931.

as End Stage Renal Disease ("ESRD").[2] Dialysis and related services are the most common treatment option for these patients. DaVita is one of the largest providers of dialysis services in the United States. Medicare generally provides coverage for dialysis services.

2.      As described herein, DaVita engaged in a nationwide scheme to pay kickbacks to physicians in exchange for referrals of patients, the overwhelming majority of whom are insured by Medicare, to DaVita dialysis centers.  Specifically, DaVita induced physicians to buy into newly-established dialysis centers through entities known, in the parlance of DaVita, as "Joint Venture DeNovos" or "JV DeNovos." When calculating the price at which it would sell an ownership interest to physicians, DaVita did not take into account the projected future income of the new dialysis centers.  Rather, DaVita valued the entities at only the start-up costs associated with opening a new location.  This provided the physicians with remuneration in the form of valuations which were considerably below fair market value ("FMV").

3.      Selling ownership interests to doctors at artificially low prices, in order to induce those doctors to bring their existing patients to the newly-opened dialysis center, resulted in a kickback: DaVita agreed to sell an ownership interest in a JV DeNovo at a below-FMV price to induce doctors to bring their patients to the newly-established dialysis center. If DaVita had properly taken into account the projected income of the new dialysis center when valuing the entities – *i.e.* if DaVita had valued the income streams of the JV DeNovos – their prices would have been much higher and doctors would be less inclined to enter the ventures and bring their patients to DaVita.

4.      DaVita further induced doctors to invest in the entities by using a center's projected

---

[2] CONGRESSIONAL RESEARCH SERVICE, <u>Medicare Coverage of End-Stage Renal Disease (ERSD)</u> (Aug. 16, 2018), at 1, <u>available at</u> <u>https://fas.org/sgp/crs/misc/R45290.pdf</u>.

income to persuade the doctors that they were going to earn a substantial profit from their investment. In this way, DaVita utilized the projected income of the dialysis center to induce doctors to invest, but on the other side of the exercise, DaVita ignored that same income in order to value the center at below FMV and thereby make the doctors' investment in the center more financially attractive. DaVita often also simultaneously showed doctors the historical financial performance of existing 100% wholly owned DaVita centers nearby, including the actual cashflows, to show the doctors how their below-FMV investment would soon increase in value.

5.    In valuing the ownership interests of the JV DeNovos, DaVita also ignored the revenue generated through "cannibalized" patients. In DaVita's jargon, "cannibalization" refers to instances where DaVita operates a dialysis center that is 100%-owned by DaVita (as distinguished from JVs where DaVita only owns a portion of the center) and DaVita enters a JV DeNovo which contemplates opening a second dialysis center in the same geographic area. In this circumstance, DaVita forecasts how many of the patients at its existing center will move to the new JV DeNovo center. In fact, DaVita encourages such movement as an additional inducement to the new JV partner, *i.e.*, DaVita sacrifices some of the patients/revenue from its 100% DaVita-owned center in favor of the new JV DeNovo where DaVita only owns a portion of the center. In doing so, DaVita increases the revenues of the new center by ensuring a minimum baseline of patients, which substantially reduces the risk to investors in the JV DeNovo. In this way, through cannibalization, DaVita provides another inducement to prospective investors in the form of "free patients" as

6.    Compounding its misconduct, DaVita does not take into account projected cannibalization revenue when valuing the ownership interests of the JV DeNovo. But meanwhile,

in the process of inducing new JV partners, DaVita shows them the projected revenue stream from the cannibalized patients as further evidence that their investment will be profitable.

7.      In addition, in many instances, DaVita provides yet another type of kickback to physician-investors in the form of rights of first refusal ("ROFR").  ROFRs are option contracts which allow physician-investors to match investment proposals made to other physicians within a prescribed geographic area, thereby giving the physicians the opportunity to limit competition in the local area.  These option contracts are a particularly important and lucrative benefit in the context of the dialysis market, because dialysis patients are very sick and less mobile people and thus they typically reside within just a few miles of their dialysis clinic.

8.      Moreover, the fair market value of ROFRs can be readily and accurately determined, because as option contracts, their valuation is subject to recognized economic valuation formulas.  That said, there is no need to conduct a fair market analysis of the ROFRs that DaVita used to induce physicians to enter JV DeNovos, because DaVita provided the ROFRs *for free*, thereby establishing an independent basis of AKS and FCA liability (*i.e.,* independent of its JV DeNovo scheme).

9.      In terms of formal valuation methodologies, DaVita's valuation of the ownership interests at only the start-up costs employed a "cost approach," in contrast to an "income approach."  The critical difference between the two approaches is that the income approach values an asset by looking at expected future economic benefits, in the same way that a prospective investor in a business would when deciding how much they were willing to pay to acquire an ownership interest. On the other hand, the cost approach only looks at the cost of replacement without considering future economic benefits.  As described at length in the report of Relator's valuation expert (annexed hereto as **Exhibit 1** and hereby incorporated by reference), DaVita

inappropriately utilized the cost approach, which conveniently ignored the very same forecasted revenues and cashflows that DaVita used to persuade physicians that their investments would generate incredible returns with little risk.

10.    By engaging in these kickback schemes, DaVita caused the presentation of false claims to government healthcare programs and is liable for this conduct under the federal and state False Claims Acts.

## II.    **THE PARTIES**

### A.    **The Government**

11.    The United States is a plaintiff to this action on behalf of the Department of Health and Human Services ("HHS"), the Centers for Medicare and Medicaid Services ("CMS"), and federally funded healthcare programs.

### B.    **Relator**

12.    Relator is a citizen of the United States and presently resides in Pennsylvania.

13.    Relator worked for DaVita from approximately May 2012 through August 2018. He was originally stationed in DaVita's office in Calverton, MD (suburban Washington D.C.) for approximately two years before working in Singapore for approximately 11 months. He then returned to the United States and worked at DaVita's office in Los Angeles from June 2015 to February 2017. In February 2017, Relator was transferred to Rio de Janeiro, Brazil, where he remained until leaving DaVita in August 2018. At the time he left DaVita, Relator's title was Director of Financial Planning & Analysis.

14.    During his time in Calverton, Maryland from May 2012 to July 2014 and then again in Los Angeles from June 2015 to February 2017, Relator worked for a component of DaVita known as the "Deal Depot," which is DaVita's jargon for the group that handles its domestic mergers and acquisitions.

5

15.     As discussed herein, Relator's work at Deal Depot gave him insight into the false and fraudulent conduct at issue in this lawsuit, because the select employees working at Deal Depot had firsthand access to DaVita's valuation data, *i.e.*, the information necessary to generate both below-fair-market-valuations, and accurate fair-market-valuations.

16.     Turning to Relator's access to material information regarding ROFRs, , Relator was one of only two people within the Deal Depot who had access to the Microsoft MapPoint software that contained all of DaVita's national ROFR and non-compete restriction data maintained by Nancy Wheeler , DaVita's Manager of Business Intelligence.

17.     With this visibility, Relator fielded well over a hundred inbound requests from field operators in different states asking whether a ROFR had been given in a specific geography.  This is because even if a potential JV partner was deemed to be a strong referral source, the local Division Vice President or Regional Operations Officer had to check with Relator to know if that geography had already been given away or granted to another JV Partner.

18.     Relator has standing to bring this action pursuant to 31 U.S.C. §3730(b)(l) and the corresponding false claims statutes of the Plaintiff States.

19.     Relator's complaint is not based on public disclosures of the allegations or transactions discussed herein within the meaning of 31 U.S.C. § 3730(e)(4)(A) and the corresponding false claims statutes of the Plaintiff States.

20.     Relator is an original source of the information provided herein within the meaning of 31 U.S.C. § 3730(e)(4)(B) and the corresponding false claims statutes of the Plaintiff States.

21.     Prior to filing this action, Relator voluntarily disclosed to the United States and the Plaintiff States the information on which the allegations or transactions discussed herein are based

within the meaning of 31 U.S.C. § 3730(e)(4)(B) and the corresponding false claims statutes of the Plaintiff States.

### C.    Defendants

22.    Defendant DaVita Inc. is a corporation incorporated in Delaware that maintains its principal place of business in Colorado.

23.    Defendant DaVita Healthcare Partners, Inc. is a wholly-owned subsidiary of DaVita, Inc.

24.    DaVita Inc. and DaVita Healthcare Partners, Inc. are collectively referred to as "DaVita" unless other specified.

25.    Defendant Nephrology Associates Medical Group, Inc. ("NAMG") is a corporation incorporated in California that maintains its principal place of business in California.

26.    NAMG is  group of nephrologists that operates nephrology practices in the Inland Empire region of Southern California.

27.    As relevant here, NAMG (1) is the minority investor in many of DaVita's JV DeNovos at issue in this litigation and (2) refers patients to the dialysis centers operated by the JV DeNovos.

## III.    JURISDICTION AND VENUE

28.    Jurisdiction is founded under 31 U.S.C. § 3732(a) and (b), 28 U.S.C. §§ 1331, 1345, and 1367(a).

29.    Personal jurisdiction and venue are proper in the Eastern District of Pennsylvania pursuant to 28 U.S.C. §§ 1391(b) and 1395(a) and 31 U.S.C. § 3732(a), because one or more Defendants transact and have transacted business in the Eastern District of Pennsylvania and because a substantial portion of the events or omissions given rise to Relator's claims occurred in the Eastern District of Pennsylvania.

## IV.   THE LAW

### A.   The False Claims Act

30.     The FCA "was passed in 1863 as a result of investigations of the fraudulent use of government funds during the Civil War." United States v. Neifert-White Co., 390 U.S. 228, 232 (1968).

31.     The FCA "establishes a scheme that permits either the Attorney General or a private party to initiate a civil action alleging fraud on the Government," U.S. ex rel. Eisenstein v. City of New York, New York, 556 U.S. 928, 932 (2009) (citations omitted), and "imposes significant penalties on those who defraud the Government." Universal Health Servs., Inc. v. United States ex rel. Escobar, 579 U.S. 176, 180 (2016).

32.     The FCA provides, *inter alia,* that any person who (1) "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," or (2) "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," is liable to the United States for a civil monetary penalty plus treble damages. 31 U.S.C. § 3729(a)(1)(A)-(B).

33.     The terms "knowing" and "knowingly" mean "that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A)(i)-(iii).

34.     Proof of specific intent to defraud is not required.  31 U.S.C. § 3729(b)(1)(B).

35.     The term "claim" means "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (1) is presented to an officer, employee, or agent of the United States; or (2) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the

Governments behalf or to advance a Government program or interest, and if the United States Government (a) provides or has provided any portion of the money or property requested or demanded; or (b) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded . . . ."  31 U.S.C. § 3729(b)(2)(A)(i)-(ii).

36.     "[T]he term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  31 U.S.C. § 3729(b)(4).

37.     Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 and 64 Fed. Reg. 47099, 47103 (1999), the civil monetary penalties under the FCA are $5,500 to $11,000 for violations occurring on or after September 29, 1999 but before November 2, 2015. See 28 C.F.R. § 85.3.

38.     Pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015 and 83 Fed. Reg. 706 (Jan. 8, 2018), the civil monetary penalties under the FCA were adjusted to $13,508 to $27,018 for violations occurring on or after November 2, 2015 that are assessed after January 30, 2023. See 28 C.F.R. § 85.5. This range is subject to periodic adjustment.

**B.     State False Claims Acts**

39.     Each of the Plaintiff States has individually enacted a False Claims Act. Each of those Acts is modeled after the Federal FCA, and each contains provisions similar to those quoted above.

40.     Relator asserts claims under the State FCAs for the State portion of Medicaid false claims detailed in this Complaint.

**C.     The Anti-Kickback Statute**

41.     The federal Anti-Kickback Statute ("AKS") makes it a criminal offense to "knowingly and willfully" offer, pay, solicit, or receive any remuneration to induce, or in return

9

for, referrals of items or services paid for by a Federal health care program. 42 U.S.C. § 1320a-7b.

If any purpose of the remuneration is to induce or reward the referral or recommendation of

business payable in whole or in part by a federal health care program, the AKS is violated, *i.e.,* a

lawful purpose will not legitimize a remuneration that also has an unlawful purpose.

42.     Specifically, the AKS provides:

(1) Whoever knowingly and willfully solicits or receives any remuneration
(including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly,
in cash or in kind--
 (A) in return for referring an individual to a person for the furnishing or
 arranging for the furnishing of any item or service for which payment may
 be made in whole or in part under a Federal health care program, or
 (B) in return for purchasing, leasing, ordering, or arranging for or
 recommending purchasing, leasing, or ordering any good, facility, service,
 or item for which payment may be made in whole or in part under a Federal
 health care program,
shall be guilty of a felony and upon conviction thereof, shall be fined not more than
$100,000 or imprisoned for not more than 10 years, or both.

(2) Whoever knowingly and willfully offers or pays any remuneration (including
any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or
in kind to any person to induce such person--
 (A) to refer an individual to a person for the furnishing or arranging for the
 furnishing of any item or service for which payment may be made in whole
 or in part under a Federal health care program, or
 (B) to purchase, lease, order, or arrange for or recommend purchasing,
 leasing, or ordering any good, facility, service, or item for which payment
 may be made in whole or in part under a Federal health care program,
shall be guilty of a felony and upon conviction thereof, shall be fined not more than
$100,000 or imprisoned for not more than 10 years, or both.

42 U.S.C. § 1320a-7b(b)(1)-(2).

43.     "Federal health care program" is defined as "(1) any plan or program that provides

health benefits, whether directly, through insurance, or otherwise, which is funded directly, in

whole or in part, by the United States Government (other than the health insurance program under

chapter 89 of Title 5); or (2) any State health care program, as defined in section 1320a-7(h) of

this title." 42 U.S.C. § 1320a-7b(b)(1).

44.    "Federal health care program" includes both Medicare and Medicaid.

45.    Violation of the AKS can subject the perpetrator to exclusion from participation in federal healthcare programs and civil monetary penalties of $50,000 per violation and three times the amount of remuneration paid. 42 U.S.C. § 1320a-7(b)(7); 42 U.S.C. § 1320a-7a(a)(7).

46.    Reimbursement claims to federal health care program that are tainted by violations of the AKS are false claims within the meaning of the FCA.  42 U.S.C. § 1320a-7b(g) ("In addition to the penalties provided for in this section or section 1320a-7a of this title, a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of subchapter III of chapter 37 of Title 31.").

47.    As relevant to this lawsuit, the Department of Health and Human Services, Office of Inspector General ("HHS-OIG") has long been concerned with what it has previously characterized as "a proliferation of arrangements" within the health industry "between those in a position to refer business, such as physicians, and those providing items or services for which Medicare or Medicaid pays." HHS-OIG, Special Fraud Alert: Joint Venture Arrangements (Aug. 1989) (reprinted 59 FR 65372, 1994 WL 702552 (Dec. 19, 1994).

48.    Such arrangements are often referred to as joint ventures.

49.    HHS-OIG has stated on more than one occasion that joint ventures may violate the AKS if they are designed to induce patient referrals, including through two  "special fraud alerts." See 42 U.S.C. § 1320a-7d(c) (authorizing HHS-OIG to issue special fraud alerts).

50.    In 1989, HHS-OIG explained:

A joint venture may take a variety of forms: it may be a contractual arrangement between two or more parties to cooperate in providing services, or it may involve the creation of a new legal entity by the parties, such as a limited  partnership or closely held corporation, to provide such services. Of course, there may be legitimate reasons to form a joint venture, such as raising necessary investment

capital. However, the Office of Inspector General believes that some of these joint ventures may violate the Medicare and Medicaid anti-kickback statute.

Under these suspect joint ventures, physicians may become investors in a newly formed joint venture entity. The investors refer their patients to this new entity, and are paid by the entity in the form of ``profit distributions." These subject joint ventures may be intended not so much to raise investment capital legitimately to start a business, but to lock up a stream of referrals from the physician investors and to compensate them indirectly for these referrals. Because physician investors can benefit financially from their referrals, unnecessary procedures and tests may be ordered or performed, resulting in unnecessary program expenditures.

The questionable features of these suspect joint ventures may be reflected in three areas:

    (1) The manner in which investors are selected and retained;
    (2) The nature of the business structure of the joint venture; and
    (3) The financing and profit distributions.

HHS-OIG, Special Fraud Alert: Joint Venture Arrangements (Aug. 1989) (reprinted 59 FR 65372, 1994 WL 702552 (Dec. 19, 1994).

51.     HHS-OIG identified "examples of questionable features, which separately or taken together may result in a business arrangement that violates the anti-kickback statute," including: (1) "Investors are chosen because they are in a position to make referrals;" (2) "one of the parties may be an ongoing entity already engaged in a particular line of business;" and (3) "The amount of capital invested by the physician may be disproportionately small and the returns on investment may be disproportionately large when compared to a typical investment in a new business enterprise." Id.

52.     In April 2003, HHS-OIG revisited a similar issue and identified several factors that, "taken separately or together," could signal a prohibited contractual arrangement under AKS, including: (1) a captive referral base of existing patients is being serviced by the new business; (2) the party making the referrals is taking little or no business risk, and making little or no financial investment in the new business; (3) the parties to the venture would otherwise be competitors for the captive referrals, each having the independent capability to provide and bill for the same services; (4) the party receiving the referrals also provides a range of administrative services to the

new business, such as management, billing, personnel-related services and/or health care items and supplies; (5) the overall effect of the arrangement is to permit one party to bill for the business generated by the other party and the profits of the venture are based on the value and volume of the referrals generated; and (6) provisions exist restricting the ability of one or both parties to act in competition with the venture's business operations. HHS-OIG, <u>Special Advisory Bulletin: Contractual Joint Ventures</u> (April 2003) (reprinted 68 FR 23148-01, 2003 WL 1964127 (Apr. 30, 2003)).

## V.    <u>BACKGROUND</u>

### A.    **ESRD and Dialysis**

53.    End-Stage Renal Disease ("ESRD") "occurs when chronic kidney disease — the gradual loss of kidney function — reaches an advanced state."[3]

54.    When a person suffers from ESRD, the person's "kidneys are no longer able to work as they should to meet [his or her] body's needs." <u>Id</u>.

55.    ESRD is the final stage of chronic kidney disease, which "means kidneys are only functioning at 10 to 15 percent of their normal capacity."[4]

56.    The most common treatments for ESRD are a kidney transplant or dialysis.[5]

57.    As the National Kidney Foundation explains: "Dialysis is a treatment that does some of the things done by healthy kidneys. It is needed when your own kidneys can no longer

---

[3]    MAYO CLINIC, <u>End-stage renal disease</u> (Mar. 8, 2018), <u>available at https://www.mayoclinic.org/diseases-conditions/end-stage-renal-disease/symptoms-causes/syc-20354532</u>.

[4]    DAVITA, <u>What is End Stage Renal Disease</u>, <u>available at https://www.davita.com/education/kidney-disease/stages/what-is-end-stage-renal-disease</u>.

[5]    <u>See</u> MedlinePlus, <u>End stage kidney disease</u>, <u>available at https://medlineplus.gov/ency/article/000500.htm</u> ("ESRD may need to be treated with dialysis or kidney transplant.").

take care of your body's needs."[6]

58.    More specifically: "Dialysis is a procedure that is performed routinely on persons who suffer from acute or chronic renal failure, or who have ESRD. The process involves removing waste substances and fluid from the blood that are normally eliminated by the kidneys."[7]

**B.    Medicare Coverage of Dialysis**

59.    Medicare is a federal government healthcare program that provides healthcare benefits to people who are 65 or older, certain younger people with disabilities, and people with ESRD.[8]

60.    Thus, while Medicare is typically limited to individuals over 65 or who suffer from certain disabilities, Medicare generally provides coverage for the treatment of ESRD irrespective of age or disability status.

61.    When Congress extended Medicare coverage to ESRD patients in 1972, it "marked the first time that individuals were allowed to enroll in Medicare based on a specific medical condition rather than on age."[9]

62.    ESRD beneficiaries can be covered by traditional Medicare (fee-for-service) under Medicare Parts A, B, and D or Medicare Advantage Program managed care plans under Medicare Part C.

63.    More specifically, traditional Medicare provides ESRD beneficiaries services on a

---

[6]    NATIONAL        KIDNEY        FOUNDATION,        Dialysis,        available        at https://www.kidney.org/atoz/content/dialysisinfo.

[7]    JOHNS HOPKINS MEDICINE, End Stage Renal Disease (ERSD), available at https://www.hopkinsmedicine.org/healthlibrary/conditions/kidney_and_urinary_system_disorders/end_stage_renal_disease_esrd_85,p01474.

[8]    See CMS, What's Medicare, available at https://www.medicare.gov/what-medicare-covers/your-medicare-coverage-choices/whats-medicare.

[9]    See CONGRESSIONAL RESEARCH SERVICE, Medicare Coverage of End-Stage Renal Disease (ERSD) (Aug. 16, 2018), at 1, available at https://fas.org/sgp/crs/misc/R45290.pdf.

fee-for-service basis. Traditional Medicare beneficiaries must pay a yearly premium, a yearly deductible, and a co-pay (also known as co-insurance) each time they receive a covered service.

64.    Medicare Advantage, formerly known as Medicare+Choice and sometimes known as Part C, is an alternative to traditional Medicare.

65.    Under Medicare Advantage, private entities called Medicare Advantage organizations ("MAO") directly provide coverage to Medicare beneficiaries and in return receive funding from the federal government. See generally 42 U.S.C. § 1395w-21 et seq.; 42 C.F.R. 422.1 et seq.

66.    Like the above-described costs associated with traditional Medicare, Medicare Advantage plans typically require the beneficiary to pay a yearly premium, a yearly, deductible, and per-service co-pay.

67.    Currently, only a small subset of ESRD patients are eligible to participate in a Medicare Advantage plan. If a person becomes eligible for Medicare solely due to ESRD, they are generally not permitted to enroll in a Medicare Advantage plan and must use traditional Medicare. Current Medicare beneficiaries who develop ESRD are allowed to remain in their Medicare Advantage plan, but, with few exceptions, cannot switch to a Medicare Advantage plan if they were enrolled in traditional Medicare at the time of ESRD onset.

68.    In 2016, Congress passed the 21st Century Cures Act which, *inter alia*, largely removed the above-described limitations on ERSD patients participating in Medicare Advantage plans beginning in 2021.[10]

---

[10] CMS, Contract Year 2021 Medicare Advantage and Part D Final Rule (CMS-4190-F1) Fact Sheet (May 22,2020), available at https://www.cms.gov/newsroom/fact-sheets/contract-year-2021-medicare-advantage-and-part-d-final-rule-cms-4190-f1-fact-sheet ("The Cures Act amended the Social Security Act … to allow all Medicare-eligible individuals with ESRD to enroll in MA plans beginning January 1, 2021.").

69.     Medicare broadly covers treatment service for ESRD. See 42 U.S.C. § 1395rr(a) ("The benefits provided … shall include benefits for individuals who have been determined to have end stage renal disease…").

70.     This coverage includes broad coverage of dialysis and related services including dialysis performed in hospitals, at outpatient facilities, and at home:[11]

**Dialysis services & supplies covered by Medicare**

| Service or supply | Covered by Medicare Part A | Covered by Medicare Part B |
|---|---|---|
| Inpatient dialysis treatments (if you're admitted to a hospital for special care). | ✔ | |
| Outpatient dialysis treatments (if you get treatments in a Medicare-approved dialysis facility). | | ✔ |
| Outpatient doctors' services. See page 35. | | ✔ |
| Home dialysis training (includes instruction for you and the person helping you with your home dialysis treatments). | | ✔ |
| Home dialysis equipment and supplies (like the machine, water treatment system, basic recliner, alcohol, wipes, sterile drapes, rubber gloves, and scissors). See pages 33–34. | | ✔ |
| Certain home support services (may include visits by trained hospital or dialysis facility workers to check on your home dialysis, to help in emergencies when needed, and to check your dialysis equipment and water supply). See page 35. | | ✔ |
| Most drugs for home and in-facility dialysis. See page 33. | | ✔ |
| Other services and supplies that are a part of dialysis (like laboratory tests). | | ✔ |

71.     Medicare spends a tremendous amount of money to reimburse providers for the provision of services to treat ESRD. For example, in 2015, traditional Medicare spent approximately $34 billion for reimbursement of ESRD treatment services.[12]

72.     Medicare spends far more for ESRD Medicare beneficiaries than for non-ESRD

---

[11] CMS, Medicare Coverage of Kidney Dialysis & Kidney Transplant Services, at 18, available at https://www.medicare.gov/Pubs/pdf/10128-Medicare-Coverage-ESRD.pdf.
[12] Supra n. 9, at 17.

Medicare beneficiaries. In one recent year, "Medicare spent $61,996 per ESRD beneficiary, compared to $9,889 per non-ESRD beneficiary."[13]

73.    Indeed, "[b]ecause Medicare beneficiaries with ESRD have higher-than-average health care costs, they account for about 7% of Medicare fee-for-service (FFS) spending, while making up about 1% of program enrollment."[14]

74.    Medicare provides coverage for the overwhelming majority of ESRD patients in the United States, as compared to other potential providers such as commercial health insurance or Medicaid:[15]



Figure 3. Types of Coverage for Individuals with ESRD in 2015

75.    Overall, DaVita estimated in 2018 that "FFS Medicare covers three-fourths of U.S. annual medical spending to treat ESRD."[16]

**C.    DaVita**

76.    DaVita is one of the nation's largest providers of dialysis and related services.

77.    DaVita operates its dialysis business through a division called DaVita Kidney Care.

---

[13] Id. at 8.
[14] Id. at 1.
[15] Id. at 8.
[16] Id. at 8.

78.    DaVita claims to serve more than 1.7 million patients in 13 countries and to have more than 70,800 employees.[17]

79.    In California specifically, as of 2018, DaVita had approximately a 50% market share of the dialysis marketplace.

**D.    DaVita's History of False Claims Act Liability**

80.    DaVita has a substantial history of violations of the FCA and analogous state statutes.

81.     As most directly relevant here, in 2009, a relator filed a *qui tam* lawsuit under the FCA and its state counterparts against DaVita. See United States et al. ex rel. Barbetta v. DaVita Inc. et al., No. 09 cv 02175 WJM-KMT (D. Colo. 2009) ("Barbetta").

82.    Summarized briefly, the Barbetta case concerned DaVita's payment of kickbacks to physicians in exchange for referral to dialysis centers owned (at least in part) by DaVita.   In Barbetta, the primary component of the kickback scheme was DaVita's agreement to enter into a joint venture with a physician either through (1) DaVita's acquisition of an ownership interest in a dialysis center owned by a physician at an inflated price or (2) DaVita's sale of an ownership interest in a new or existing dialysis center owned by DaVita to a physician at a below fair market value price.   In sum, DaVita sold low and bought high.

83.    In October 2014, DaVita entered into a settlement agreement under which it agreed to pay $350 million to resolve the FCA lawsuit.[18]  As part of the settlement agreement, DaVita entered into a corporate integrity agreement. Id.

---

[17] See DAVITA, About, available at https://www.davita.com/about (last accessed on Oct. 15, 2018).
[18] See DEP'T OF JUSTICE, DaVita to Pay $350 Million to Resolve Allegations of Illegal Kickbacks (Oct. 22, 2014), available at https://www.justice.gov/opa/pr/davita-pay-350-million-resolve-allegations-illegal-kickbacks.

84.     Many of the same DaVita employees who were important actors with respect to the claims in <u>Barbetta</u> remained with the company, including Michael Staffieri (chief operating officer), Misha Palechek (chief development and transformation officer), Chet Mehta (vice president of finance), David Finn (vice president of mergers & acquisitions), Queenie Nguyen (manager), and Chris Pannell (transaction director).

85.     In fact, Mr. Palechek, who was quoted in the <u>Barbetta</u> complaint as instructing the relator in that case to "artificially inflate[] the operating cost projections for the centers because he wanted to 'crush the projections to keep the valuation low,'" and when the <u>Barbetta</u> relator indicated discomfort with that brazen admission, Mr. Palechek "warned him not to 'give me any of that ethics nonsense,'" was subsequently promoted within the company.

86.     In addition to a financial settlement agreement, DaVita also entered into a corporate integrity agreement ("CIA") with the Department of Health and Human Services' Office of the Inspector General as part of the resolution of the <u>Barbetta</u> lawsuit.

87.     As described herein, the CIA required DaVita to, *inter alia*, the retain an independent monitor (the "Monitor") to ostensibly review DaVita's transactions.

88.     Relator is not pursuing claims with respect to transactions that the Monitor specifically reviewed and expressly approved, and this Third Amended Complaint should not be read to assert such claims. However, Relator reserves the right to assert such claims based on additional evidence.

89.     Beyond <u>Barbetta</u>, DaVita has also been the subject of other FCA lawsuits which led to substantial recoveries for the government.[19]

---

[19] <u>See</u> <u>e.g.</u> DEP'T OF JUSTICE, <u>DaVita Rx Agrees to Pay $63.7 Million to Resolve False Claims Act Allegations</u> (Dec. 14, 2017), <u>available at</u> <u>https://www.justice.gov/opa/pr/davita-rx-agrees-pay-637-million-resolve-false-claims-act-allegations</u>; DEP'T OF JUSTICE, <u>Medicare Advantage</u>

## VI.    DAVITA'S FRAUD

### A.    Overview of DaVita's Use of JV DeNovos

90.    DaVita is extremely aggressive with respect to the expansion of its dialysis business.

91.    The primary method that DaVita utilizes to expand its dialysis business is through the establishment of new dialysis centers that will be co-owned by DaVita and one or more physicians, physician groups or hospital that can refer patients to these newly-established dialysis centers.

92.    In the parlance of DaVita, these newly-established dialysis centers are known as "Joint Venture DeNovos" or "JV DeNovos."

93.    "Joint Venture" refers to the fact that the newly-established dialysis center will be co-owned by DaVita and one or more physicians, physician group or hospital.

94.    "DeNovo" refers to the fact that the newly-established dialysis center is in fact newly-established, *i.e.* to distinguish it from existing dialysis centers.

95.    DaVita has established JV DeNovos across the country, and Relator estimates that DaVita presently operates over 1,000 dialysis centers that began as JV DeNovos.

96.    This Third Amended Complaint collectively refers to the physician groups, physicians or hospitals to whom DaVita has sold an ownership interest in a JV DeNovo as "JV Partners."

97.    JV Partners can be individual physicians, physician groups or hospital systems that have established bases of dialysis patients (usually from their nephrology practices) that they can

---

Provider to Pay $270 Million to Settle False Claims Act Liabilities, (Oct. 1, 2018), available at https://www.justice.gov/opa/pr/medicare-advantage-provider-pay-270-million-settle-false-claims-act-liabilities.

refer to the dialysis center owned by the JV DeNovo.

98.      As described in detail below, DaVita exploits its JV DeNovos as a front for a kickback scheme under which it pays kickbacks to JV Partners in return for the referral of patients to the dialysis center owned by the JV DeNovo.

99.      Specifically, DaVita sells an ownership interest in the JV DeNovo to the JV Partner at a price that does not reflect fair market value. Rather, DaVita values the ownership interest based only on the "startup" costs of opening the new dialysis facility.[20]

100.     More specifically, DaVita does not take into consideration the projected revenue and cashflow that the dialysis facility will generate when valuing the JV Novo for purposes of calculating the ownership interest or the JV Partners' purchase price.   Had DaVita done so, the value of the entity (and consequently the price of the ownership interest sold to the JV Partner) would have substantially increased, thereby making the investment less attractive to physician investors.

101.     The purpose of DaVita's sale of ownership interests to JV Partners at artificially low values is to provide them with remuneration that induced the JV Partners to refer their patients to the new dialysis facility now co-owned by the JV Partners.  Put differently, DaVita confidently assured its potential JV Partners that in exchange for a below-FMV investment, the JV Partners will receive tremendous profits.  And in fact, JV Partners did realize outstanding returns on their investments, *i.e.* the scheme worked exactly as it was intended to work as illustrated further below.

102.     As an added benefit, DaVita also ensured that the JV Partners would assume no risk by providing the JV Partner with a way to exit the JV DeNovo.  More specifically, after a

---

[20] At times, at the request of the physician partner, and for no reason other than to induce the JV Partner in question, DaVita waives a portion of the already artificially low "start-up" costs the physician partner is required to pay at the beginning of the deal.

specified anniversary of the close of the JV DeNovo (typically at the 5 or 7 year mark) the JV Partner has the option to sell their interests back to DaVita at fair market value. The fair market value is determined by a third-party appraiser.

103.    To Relator's knowledge, *only one* solo JV Partner (who was planning to retire) has ever exercised this option. This is because the JV DeNovos are so valuable that JV Partners want to continue to reap the profits rather than sell their ownership interests backs to DaVita.

104.    As described in detail below, DaVita's sale of ownership interests in JV DeNovos to JV Partners at artificially low values to induce referrals constitutes a kickback in violation of the Anti-Kickback Statute and taints the reimbursement claims that DaVita is submitting to Medicare for reimbursements in violation of the False Claims Act.

105.    In addition to remuneration in the form of below-fair-market-value ownership interests, DaVita provided its JV Partners with direct access to DaVita's substantial bargaining power in the dialysis marketplace, but does not charge them a cent for this valuable access.

106.    For example, JV Partners can take advantage of DaVita's better contractual reimbursement rates with private insurers. Because DaVita controls so much of the dialysis marketplace, it can exercise leverage over private insurers with respect to negotiating reimbursement rates, whereas the physicians have very little bargaining power with insurance companies.

107.    As an example, as of 2018, DaVita controlled approximately 50% of the outpatient dialysis capacity (*i.e.,* available dialysis chairs) in California. These dialysis chairs are "spread out" across the state. Similarly, private insurers in California have insureds that are "spread out" across the state.

108.    These insureds have to dialyze somewhere. If an insurance company does not agree

22

to pay what DaVita demands for dialysis treatments, that insurance company's insureds are locked out of 50% of the available dialysis chairs in California. This leads to logistical challenges for the insureds (and displeasure with their insurer) and exposes these very sick people to a greater risk of ending up in the hospital, which would cost the insurer even more money at inpatient rates than if their insured dialyzed at DaVita at high outpatient rates.

109.    For these reasons, private insurers are forced by DaVita to pay exorbitant rates that drastically exceed the rates paid by government payors.

110.    For example, the following slide from an internal DaVita PowerPoint presentation compares two scenarios involving a group of 16 patients. In the first scenario, 1 patient has private insurance and 15 patients have Medicare, yielding $747,422 in annual revenue for the facility. In the second scenario, all 16 patients have Medicare, yielding $521,400 in annual revenue for the facility. Thus, the financial difference to the dialysis clinic to have only one patient in a group of 16 patients insured by a private insurance plan rather than Medicare is about $226,000 annually.



**Impact On A Facility**

| | | |
|---|---|---|
| Patients: | 16 | 16 |
| Treatments: | 2,370 | 2,370 |
| | | |
| Payor Mix: | Medicare + 1 Pri Pay | 16 Medicare |
| Field Net Revenue: | $310 PTX | $220 PTX |
| | | |
| Total Revenue | $747,422 | 521,400 |
| Pre G&A Expenses | -$543,683 | -$543,683 |
| | | |
| Pre G&A EBITDA | $183,759 | -$16,666 |

111.    DaVita's JV Partners directly share in this increased remuneration in proportion to their ownership interests.

112.    Similarly, due to its bargaining power, DaVita can obtain far more favorable pricing

23

for dialysis machines, dialysis drugs, and related products/supplies than a small group of physicians negotiating on their own, and JV Partners are able to directly benefit from DaVita's bargaining power, yet they pay nothing for this remuneration.

113.    By way of example, Relator worked on an acquisition for DaVita in 2013 of three dialysis centers from the Dialysis Partners of Northwest Ohio, which was part of Greenfield Health Systems ("Greenfield"), a large network of dialysis centers.  Greenfield itself was a division of the Henry Ford Health System headquartered in Detroit.

114.    In reviewing Greenfield's assets while conducting due diligence for the deal, Relator noticed that Greenfield was paying $17,901 for each 2008T Dialysis Machine model, while during the same time period, DaVita was paying $13,200 for the same machine. Accordingly, Greenfield was paying 35.6% more than DaVita for the same machine.

115.    Similarly, Relator learned that Greenfield was paying 10.28 for every 1,000 units of Epogen – the most frequently used drug for dialysis treatment – while DaVita was paying $8.69. Accordingly, Greenfield was paying 18.3% more than DaVita was for Epogen.

116.    As these figures in the graphic below demonstrate, DaVita was paying drastically less than Greenfield for dialysis equipment and drugs, even though Greenfield itself was a large network of dialysis centers and was a division of the even-larger Henry Ford Health System.

| Pricing | | | | | | |
|---|---|---|---|---|---|---|
| | **DaVita** | | **Greenfield** | | **% Decrease** | **$ Decrease** |
| 2008T Hemo machine | $ | 13,200 | $ | 17,901 | 35.6% | $      (4,701) |
| EPO (1,000 units) | $ | 8.69 | $ | 10.28 | 18.3% | $          (2) |

117.    JV Partners directly benefit from the superior pricing available to DaVita, particularly given the enormous quantity of supplies and drugs that dialysis requires (with most patients receiving treatment 3 times per week).

118.    Finally, potential JV Partner physicians are eager to enter into these JV DeNovo transactions rather than build their own centers because they avoid many of the costs they would incur if they built their own centers by tapping into DaVita's market power for free.  For example, DaVita has extensive experience building dialysis centers, so DaVita can avoid or reduce many of the costs that would be incurred by a group of physicians seeking to build their own center. Similarly, DaVita has much greater bargaining power in the construction market than a group of physicians or even a hospital would have, so the physicians directly benefit from the lower costs that DaVita can demand.

**B.    The Impropriety of DaVita's Use of "De Novo Pricing"**

119.    As detailed below, DaVita effectuated one of its kickbacks by valuing the ownership interests it sold to JV Partners based only on the "startup" costs of opening the new dialysis facility, which grossly undervalue the ownership interests by excluding any consideration of the future revenue generated by the dialysis.

120.    The report of Relator's valuation expert, attached as **Exhibit 1**, comprehensively describes the impropriety of DaVita's conduct in the context of valuation methodologies. The information in the following paragraphs is taken from this report.

121.    To value a company (such as DaVita's JV DeNovo entities), there are three valuation methodologies that could potentially be used: the income approach, the cost approach, and the market approach. Id. at 11.

122.    The income approach "measures the value of a business or asset based upon the present value of its expected future economic benefits." Id.

123.    The income approach "is generally the most theoretically accurate method because it is the method that is able to explicitly account for all the specific attributes of the subject and

external market conditions and is also the method that most directly relates to the prospective cash flows to the investor – which is the fundamental quantification of value." Id.

124.    In other words, by taking future economic benefits into consideration, the income approach typically provides a more accurate measure of value and is akin to the analysis that a prospective investor considers, *i.e.* a prospective investor considers the future profits of the business when deciding whether to invest.

125.    The cost approach "measures the value of an asset by the cost to reconstruct or replace it with another of like utility, less depreciation from physical deterioration and functional and economic obsolescence." Id. at 12.

126.    In this way, the cost approach "is primarily a backward-looking approach, which places  value on the assets that the business has acquired to date, less liabilities." Id. at 23.

127.    As particularly relevant here, the cost approach "does not consider the expected returns that the business owner will receive over the course of their ownership of the business, and the risk of the achievement of those expected returns." Id.

128.    Applied in the context of a newly-opened dialysis clinic, the cost approach would value the clinic by only its start-up costs without taking into consideration future economic benefits, such as revenue expected to be generated by the clinic.

129.    The market approach "measures the value of a business or asset through an analysis of recent sales or offerings of comparable companies, both privately-held and publicly-traded, and of similar assets." Id. at 11.

130.    Under the market approach, "[v]aluation indications from these transactions are used to value the subject company or asset, adjusting the data as needed given the relative desirability of the subject company or asset versus the comparable companies or assets." Id.

131.    Importantly, whether one or more valuation methodologies can be appropriately used to assess fair market value depends on "the nature and characteristics of the subject company." Id. at 11 ("While each of these approaches should be initially considered, the nature and characteristics of the subject company will indicate which approach, or approaches, are most applicable."), at 12 ("Understanding the attributes of De Novo JVs and the repetitive nature and structure of the investments in these De Novo JVs is an important element of assessing the appropriateness and weighting of various valuation approaches to ascertain fair market value of ownership interests in these entities.").

132.    The selection of the most accurate valuation methodology is critically important because the use of valuation methodology that is not the most accurate with respect to the asset at issue will yield an inaccurate valuation.

133.    For example, a critical difference between the cost approach and income approach is the cost approach does not take into account future economic benefits (*i.e.* projected revenue) of the business, while the income approach does.

134.    Thus, unlike the income approach, the cost approach "does not consider the expected returns that the business owner will receive over the course of their ownership of the business, and the risk of the achievement of those expected returns." Id. at 23.

135.    In other words, the cost approach "does not account for the expected future cash flows to investors" even though such case flows are "the primary driver of value under the construct of fair market value." Id.

136.    On the other hand, "[t]he income approach is a forward-looking approach that considers all expected returns of the clinic from the valuation date forward: the expected capital expenditures, the expected revenues, and the expected expenses" and "[t]hese items are projected

into the future from the valuation date, and discounted back to present value based on the estimated risk of their achievement." <u>Id</u>.

137.    As Relator's valuation expert explains, "[w]hen there is a reasonable basis for estimating future performance and the application of an income approach provides value indications over the cost approach, the income approach is the preferred approach because it considers expected returns where the cost approach does not." <u>Id</u>.

138.    Here, "De Novo centers are a core part of DaVita's normal operations such that DaVita has deep insight into how any given De Novo center is likely to perform." <u>Id</u>. at 20.

139.    More specifically, the financial models and other materials that DaVita created "indicate that – due to the fact that DaVita has been engaged in building new dialysis centers for many years - DaVita has extensive data about what the expected start-up costs, capital expenditures, expected revenues, and the expected operating expenses will be for a particular De Novo JV going forward" and "[t]his data is available at the beginning of the development process – even before a site has been selected." <u>Id</u>. at 24.

140.    Likewise, "the available evidence indicates that DaVita has extensive information about dialysis patient populations by geographic area, the effectiveness of their steering strategy and detailed reimbursement information." <u>Id</u>. at 24.

141.    Overall, the extensive information available to DaVita drawn from its longstanding experience "provided DaVita with the foundation to reasonably estimate the future revenues of a particular De Novo JV." <u>Id</u>.

142.    Indeed, DaVita utilizes the same information that it should have used to employ the income approach to attract investors in the first place.

143.    DaVita uses the information in its possession to project future revenue and growth

when it wanted to induce physician investors to partner with DaVita but simultaneously ignores the same information when valuing ownership assets in JV DeNovos, which would not have the desired inducement effect on potential JV Partners.

144.    Put in terms of valuation methodologies, DaVita utilizes the income approach when it wants to ensure prospective investors of a high return on their investment, but simultaneously employs the cost approach when it comes time to value the ownership interest of JV DeNovos, so that it can provide remuneration to the investors in the form of below-fair-market-value ownership interests, which induces potential JV Partners to enter deals.

145.    There may be circumstances where it would be difficult to utilize an income approach for startup businesses since "there may be limited or no history of operations of that particular business which impacts the ability to provide reasonable projections and assessment of the risks inherent in those projections." Id. at 19.

146.    However, this potential concern is not applicable in the context of DaVita's JV DeNovos since, as discussed immediately above, DaVita was able to – and in fact, did – forecast future revenue based on its longstanding experience and information in its possession.

147.    As described at length in the report of Relator's valuation expert and as demonstrated below, DaVita's use of the cost approach – euphemistically referred to as "De Novo Pricing" – led to inaccurate valuations far below fair market value. Id. at 25 ("DaVita's alleged exclusive use of De Novo Pricing in the valuation of minority interests in De Novo JVs is not supported by valuation theory, does not properly consider the actual risks and returns involved with investments in De Novo JVs and creates a significant likelihood that De Novo Pricing derives valuations that are below fair market value.").

148.    Indeed, DaVita effectively acknowledges as much in internal documents. For

example, in June 2013, DaVita pitched an opportunity to the Mayo Clinic to acquire a 40%

ownership interest in a JV DeNovo that would own a dialysis clinic in Northfield, MN.

149.    The presentation that DaVita gave to the Mayo Clinic contained the following slide,

which generally describes the investment opportunity: the Mayo Clinic would purchase up to a

40% ownership interest with DaVita owning the remainder of at least 60%.



150.    Another slide in the presentation explains that the Mayo Clinic would be required

to make a pro rata contribution of construction costs based on the amount of its ownership interest,

*i.e.* up to 40%.

**JV Capital Requirements**

- Construction Costs: The actual costs to build the center. This cost category includes the following items:
  - Services and Fees
  - Construction
  - Utilities and Communication Systems
  - Water Tx Systems, Biomedical Equipment and Reuse Systems / Equipment
  - Clinical Equipment
  - Clinical Furniture and Fixtures
  - Lounge, Business Offices and General Furniture and Fixtures
  - Internal and External Signage
- The proportion of construction costs is determined based on the pro-rata JV ownership structure

151.    Incredibly, in another slide, DaVita told the Mayo Clinic that the "pro-rata investment" would only be available for 90 days after the center opened, while "[a]fter this period, pricing will be at Fair Market Value."



152.    In this way, DaVita effectively admitted that the "pro-rata investment" opportunity – *i.e.* an investment premised on a valuation that only considered startup costs– did *not* represent fair market value.

**C.    DaVita's Intentionally and Illegally Undervalues the Ownership Interests it Sells in JV DeNovos**

**1.    Relator Learns About DaVita's Misconduct**

153.    As described above, Relator worked for a component of DaVita known as the "Deal Depot" from June 2015 to February 2017.  Deal Depot is the internal name for the group that handles DaVita's domestic mergers and acquisitions.

154.    Relator first became suspicious of DaVita's conduct in late 2016 when he, through his work at Deal Depot, was a member of the mergers and acquisitions ("M&A") team working to acquire a dialysis center known as Montebello Artificial Kidney Center ("MAKC") owned by Dr. Vijay Dhawan and Dr. Kamlesh Dhawan.

155.    DaVita had approached the owners of MAKC in 2013 to purchase the dialysis center.  In 2013, MAKC serviced 79 patients.  Approximately 6% of the patients had private insurance, so MAKC had a relatively low revenue-per-treatment ("RPT") of $264.  This led DaVita to make an offer of $1.95 million.  The owners of MAKC were not interested in selling at this price.

156.    Three years later, in 2016, DaVita decided to re-approach MAKC to see if the doctors were interested in selling MAKC. Relator was instructed to prepare the valuation model.

157.    By 2016, MAKC was servicing 122 patients (an increase from 79), but the percentage of patients using private pay declined to 0.8% (from 6.3%).  The RPT for 2016 ($264) was the same as the RPT for 2013.  Thus, MAKC did not experience any growth in its profit margins over three years.  In fact, due to inflation, its margins appeared to have declined.  Thus, there was no good reason as to why the valuation or selling price for MAKC would increase substantially.

158.    On May 10, 2016, Relator sent the valuation memorandum he prepared to DaVita's Vice President of Mergers and Acquisitions, David Finn.

159.    On May 11, 2016, Mr. Finn determined that MAKC should be offered between $2-million and $2.5 million for the center and instructed Relator to send the materials to the appraisal firm so they could validate the internal pricing.  Relator did as he was told and sent the materials to the third-party appraisal firm to approve the pricing.

160.    About an hour after Mr. Finn priced the deal on May 11, 2016, Gary Lemon, the Vice President of Business Development, sent an email to Relator and others, asking "What are the key drivers that have changed since this proposal?"

161.    On May 17, 2016, Relator responded to Mr. Lemon's email including the following

financial statement comparison which showed that while the treatment numbers increased due to the increase in the number of patients, the percentage of patients utilizing private pay plans decreased, and thus, the RPT stayed the same ($264), and therefore there should be no significant increase in purchase price:

| | CURRENT | PREVIOUS |
|---|---|---|
| | Year 1 | Year 1 |
| Treatments | | |
| Chronic | 17,685 | 11,717 |
| PD/HHD | - | |
| Acutes | - | |
| Total Treatments | 17,685 | 11,717 |
| *Growth Rate* | - | |
| **Net Revenue** | $ 4,668,935 | $ 3,090,003 |
| *Net revenue per tx* | *$264* | *$264* |
| Salaries, Wages & Benefits | 1,783,199 | 1,318,100 |
| **per tx** | **100.83** | **112.49** |
| Pharma + Medical Supplies | 990,911 | 649,631 |
| **per tx** | **56.03** | **55.44** |
| Medical Director Fees | 96,000 | 90,000 |
| Rent | 317,280 | 163,200 |
| Other | 691,790 | 437,297 |
| Other Expenses | 1,105,070 | 690,497 |
| **per tx** | **62.49** | **58.93** |
| Management Fee | 455,380 | 309,000 |
| Total Expenses | $ 4,334,560 | $ 2,967,228 |
| **EBITDA** | **$  334,376** | **$  122,775** |
| | 7% | 4% |
| **per tx** | **18.91** | **10.48** |

162.    Kapil Vashistha, DaVita's Division Vice President who had responsibility for over fifty (50) dialysis centers in California (and who was the most senior executive on the email chain), responded with the following:

> On May 17, 2016, at 9:56 PM, Kapil Vashistha <Kapil.Vashistha@davita.com> wrote:
>
> Thanks John. A few questions for you:
>
> 1.) RPT Assumptions: I believe David may have raised this already with Michael, but how are you taking into account the Medicaid to Exchange opportunity over the course of the pro-forma? Based on the eligible Medicaid census in the clinic, this could be a significant driver so want to ensure we are accounting for that reality.

163.    Relator did not know how to respond to this email because there was no history of patients at this center choosing or electing for themselves to opt out of Medicare or Medicaid, and

the percentage of patients with Medicare Advantage and commercial health plans had actually gone down over the last three years.

164.    Mr. Vashistha replied to the group "Let's have a call for tomorrow to discuss." And then separately Michael Spivak replied to Relator alone:

> **From:** Michael Spivak
> **Sent:** Wednesday, May 18, 2016 1:47 AM
> **To:** John Bayne
> **Subject:** Fwd: Montebello Presentation
>
> No more emails on this topic please.

165.    Michael Spivak separately replied to the group as follows: "Gary: The below analysis should not be shared with the Doctor. I can explain why tomorrow on a live call."

166.    On May 20, 2016, Mr. Spivak sent an email to the third-party valuation group Relator had contacted to review the deal and told them to cancel the valuation that Relator had sent.

167.    Subsequently, Relator, Mr. Spivak, Mr. Vashistha, Mr. Lemon, and two additional operations directors, David Armstrong and Brian Nordin, had a conference call on May 24, 2016. During that call, Mr. Lemon repeatedly stated that he believes the owners of MAKC wanted to be paid at least $3 million for MAKC and asked to get the valuation "bumped up" to that number. Mr. Vashistha talked about his confidence in converting MAKC's Medicare/Medicaid patients to higher paying "exchange plans."

168.    In the days after the call, a series of emails and communications occurred through which Relator became aware that there was a nationwide effort to convert patients from Medicare/Medicaid coverage to coverage from private insurers or Medicare Advantage plans. As it specifically related to the MAKC deal, Relator was instructed to, and did, change the valuation

model to include a prospective increase in conversions of Medicare/Medicaid patients to these higher paying insurance plans.

169.    Relator's revised valuation for MAKC was carefully worded and approved by Mr. Finn, Mr. Vashistha, Mr. Spivak, and Mr. Young.

170.    At the direction of Mr. Spivak, the deal was sent to a different third-party valuation firm for approval.  This is because DaVita did not have a good explanation for why its valuation went up so much.  Moreover, since the second firm had not seen the first valuation, the second firm would be less likely to question the revised valuation.

171.    On November 11, 2016, Mr. Finn priced the deal in the $3.4 to $3.9 million range.

172.    In sum, a low profitability clinic valued at $1.95 million based on actual historical figures was re-valued at $3.4-$3.9 million based on, *inter alia*, projections incorporating future profits.

### 2.    Representative Examples of JV DeNovos

173.    Relator provides several representative examples that illustrates these principles but in a different market: the JV DeNovo market. These examples are typical and are indicative of DaVita's standardized and systemic efforts of committing fraud through its JV DeNovos.

#### a.    Panther Dialysis LLC

174.    Given the complex array of corporate entities and individuals involved in this representative example, Relator provides the following summary table:

| DaVita Entity | Name of JV DeNovo Entity | Dialysis Center Owned by JV | JV Partner | Entity or Person Controlling JV Partner |
|---|---|---|---|---|
| Total Renal Care, Inc. | Panther Dialysis LLC | Menifee Home At Home | Menifee Home Dialysis LLC | Nephrology Associates Medical Group |

175.    Panther Dialysis LLC is a home dialysis business that is jointly owned by Total Renal Care, Inc. (a subsidiary of DaVita) and an entity called Menifee Home Dialysis LLC, which is located in Menifee, CA.[21]

176.    DaVita owns 51% of Panther Dialysis and Menifee Home Dialysis owns 49% of Panther Dialysis.

177.    Menifee Home Dialysis, in turn, is controlled by Defendant Nephrology Associates Medical Group ("NAMG").

178.    NAMG is a large physician group with more than a dozen office locations and an extensive patient network throughout Southern California.

179.    NAMG, through Menifee Home Dialysis, collectively invested $977,785 in Panther Dialysis in return for its 49% ownership interest.

180.    This $977,785 investment consisted of an initial capital contribution of $353,035, and subsequent working capital contributions of $245,000 and $379,750.

181.    NAMG, through Menifee Home Dialysis, made the initial contribution of $353,035 in 2014.

182.    Subsequently, NAMG, through Menifee Home Dialysis, made capital contributions of $245,000 and $379,750 in 2015 and 2016, respectively.

183.    The working capital contributions were needed because the volume of dialysis treatments and revenues at Panther Dialysis were growing so rapidly that further working capital was needed to support the business.  This is often a positive sign for fast growing ventures because

---

[21] Menifee Home Dialysis LLC operates "Menifee Home At Home," which provides home therapy services to dialysis patients, specifically PD (Peritoneal Dialysis) and HHD (Home Hemodialysis). While in-center dialysis typically requires the patient to travel to the dialysis center three times a week, "home patients" typically go to the dialysis center only once a month to pick up supplies. The "home patients" self-provide their own dialysis services at home.

there is a time delay between when revenue is billed and when it is collected.  So, more working capital was required to finance the rapid growth.

184.    A financial review statement dated in April 2018 for Panther Dialysis describes the initial and subsequent contributions to Panther Dialysis by NAMG through Menifee Home Dialysis. **Exhibit 2** at 9.

185.    The initial price of $353,035 and subsequent working capital contributions of $245,000 and $379,750 were based on the startup/construction costs and a need for working capital rather than a valuation methodology which projected future cash flows or profit (such as the projection-based valuation methodology DaVita itself used when the company bought into MAKC).

186.    The construction costs for Panther Dialysis were very low because patients did not dialyze there, *i.e.*, Panther Dialysis was a small medical office location with some computers and exam room where the home therapy patients came once a month to get additional medical supplies so they could self-dialyze at home.  It did not have all the dialysis infrastructure (dialysis chairs, water systems, etc.) of a typical dialysis center.

187.    Through April 2018, NAMG received $3,653,148 in distributions (*i.e.* profit sharing) from DaVita:

| Year | JV Partners | DaVita |
|---|---|---|
| | 49% | 51% |
| 2016 | $728,915 | $758,667 |
| 2017 | $2,368,863 | $2,465,552 |
| 2018 (as of April) | $555,370 | $578,038 |

188.    These distributions are described in the April 2018 financial review statement for Panther Dialysis. **Exhibit 2** at 9.

189.    A total distribution of $3,653,148 amounts to a total return of NAMG's initial

investment *plus* an additional 274% in profits over a period of only 2.25 years (January 2016 to April 2018).

190.    In addition, Panther's April 2018 balance sheet reflected undistributed cash of $2,467,979 (NAMG's 49% of which would be $1,209,310).

191.    Finally, the total distribution does not include a terminal value today (for future distributions) of their 49% stake should NAMG wish to sell its interest back to DaVita.  If the widely recognized and accepted Gordon Growth Model[22] is applied to determine the terminal value based on the most recent quarter's annualized free cash flow (ending June 2018), the JV Partners' stake would be valued at $15,567,626 (after adding the excess cash on the balance sheet yet to be paid out and apply the same discount rate of 12% that DaVita uses in its models).

192.    This is described in the chart below:[23]

| | |
|---|---|
| Free Cash Flow | 2,629,712 |
| | |
| Terminal Value | $30,095,591 |
| Excess Cash | $1,675,075 |
| Equity - 100% | $31,770,665 |
| | |
| DaVita - 51% | $16,203,039 |
| **JV Partners - 49%** | **$15,567,626** |

193.    Considering this valuation of $15,567,626 and $3,653,148 of prior distributions in tandem, this totals $19,220,774 of value, or an overall return of 19.66x or 1,966% return on NAMG's initial investment of $977,785.

194.    If DaVita valued Panther Dialysis accurately in 2015 using a widely accepted

[22] The Gordon Growth Model is a standard model used to value an asset based on the present value of future dividends and is commonly used by third-party appraisers.
[23] This chart utilizes a free cash flow of $2,629,712, based on annualizing (*i.e.,* multiplying by 4) the quarterly free cash flow from the June 2018 quarterly financial statement.

valuation methodology of Net Present Value and a discount rate of 12%, NAMG should have contributed $13,561,528 of equity in 2015. This is depicted in the chart below:

|  | 3/17/2015 | 6/30/2016 | 6/30/2017 | 6/30/2018 |
|---|---|---|---|---|
| Distributions | $0 | $728,915 | $2,368,863 | $555,370 |
| Exit Value Today |  |  |  | $15,567,626 |
| Total Returns | $0 | $728,915 | $2,368,863 | $16,122,996 |
| Equity Value for 49% in 2015 | 13,561,528 |  |  |  |
| Partners Actual Contributions | $977,785 |  |  |  |

195.    If DaVita had appropriately valued Panther Dialysis, NAMG's contribution of $977,785 would have constituted a 3.5% ownership interest, not 49%. Put differently, if DaVita had appropriately valued Panther Dialysis, the JV Partner would have had to contribute $13,561,528 to purchase a 49% ownership interest.

### b.  Other Representative Examples

196.    The report of Relator's valuation expert provides a detailed analysis of three additional examples of JV DeNovo transactions where DaVita drastically undervalued the minority ownership interests sold to JV Partners. **Exhibit 1** at 27-28. Relator summarizes those examples here.

197.    Seabay Dialysis, LLC is a JV DeNovo that operates a home dialysis business in San Bernadino, CA.

198.    DaVita calculated the startup costs for Seabay Dialysis, LLC as $2,490,000 and thus sold a 40% ownership interest to a JV Partner for $996,000.

199.    Employing an income approach, Relator's valuation expert calculated the actual fair market value of that 40% ownership interest in Seabay Dialysis, LLC to be $1,450,000 to $1,610,000, demonstrating that the JV Partner's buy-in price of $996,000 represented just 61% to

68% of fair market value, *i.e.*, the JV Partner paid 32% to 39% below fair market value

200.    Neff Dialysis, LLC is a JV DeNovo that operates an in-center dialysis center in Moorhead, MN.

201.    DaVita calculated the startup costs for Neff Dialysis, LLC as $1,860,407 and thus sold a 40% ownership interest to a JV Partner for $744,163.

202.    Employing an income approach, Relator's valuation expert calculated the actual value of that 40% ownership interest in Neff Dialysis, LLC to be $1,780,000 to $1,960,000. demonstrating that the JV Partner's buy-in price of $744,163 represented just 38% to 42% of fair market value, *i.e.*, the JV Partner paid 58% to 62% below FMV.

203.    Fanthorp Dialysis, LLC is a JV DeNovo that operates an in-center dialysis center in Mankato, MN.

204.    DaVita calculated the startup costs for Fanthorp Dialysis, LLC as $2,594,000 and thus sold a 20% ownership interest to a JV Partner for $518,800.

205.    Employing an income approach, Relator's valuation expert calculated the actual value of that 20% ownership interest in Fanthorp Dialysis, LLC to be $850,000 to $930,000. demonstrating that the JV Partner's buy-in price of $518,800 represented just 56% to 61% of fair market value, *i.e.*, the JV Partner paid 39% to 44% below fair market value.

### D.    DaVita Provides Kickbacks in the Form of Free Rights of First Refusal

206.    In addition to the above-described kickbacks, DaVita provides additional remuneration to select JV Partners in the form of free rights of first refusal ("ROFR").

207.    An ROFR "is an option to enter a transaction on exactly or approximately the same terms that another bidder has proposed – a right to match." **Exhibit 3** at 2.

208.    In other words, an ROFR provides a contractual option to a party to enter into a transaction with the owner before the owner may transact with a third-party.

209.    DaVita utilizes two types of ROFRs with JV Partners. First, DaVita utilizes Development ROFRs, which confer a right to invest at DeNovo pricing in any future DaVita dialysis centers within the agreed-upon geographic area (referred to in DaVita's parlance as the "restricted area"). Second, DaVita utilizes Medical Director Agreement ROFRs ("MDA ROFR"), which confer the right to serve as the Medical Director of any new dialysis centers in a given restricted area, and the promise of compensation for doing so.

210.    DaVita utilizes ROFRs extensively to induce physicians to enter JV DeNovos. Relator has documents showing hundreds of JV DeNovo transactions involving ROFRs.

211.    The geographic control provided by Development ROFRs is highly valuable to potential JV Partners, as described immediately below.

212.    Ideally, DaVita would like to partner with all referral sources, but if there are competitive dynamics at play among potential JV Partners in a given area, one of these referral sources (*e.g.*, a hospital or a nephrology group) may demand that DaVita only work with them. This referral source is usually a hospital or nephrology group that, through a large captive base of patients, holds substantial leverage in negotiating with DaVita.

213.    A Development ROFR is an option contract. To illustrate, if a JV DeNovo partner demands and DaVita provides a Development ROFR, DaVita cannot partner with a different nephrology group to open a new dialysis center in that geographical area unless the JV DeNovo partner declines the option to be the investor at the new dialysis center.

214.    ROFRs are extremely valuable to JV Partners in securing their investments. Absent an ROFR, DaVita could potentially open another dialysis facility with a new JV Partner near an existing facility, which would risk the existing facility losing patients to the new facility. A Development ROFR safeguards against this risk, while also providing the existing JV Partner with

the opportunity to invest in the new facility and to serve as the medical director at the new facility. This ensures that a competitor will not benefit from the JV opportunity, in addition to generating additional revenue for the JV Partner.

215.    Development ROFRs also ensure that hospitals and nephrology groups will be able to take advantage of DaVita's lower costs and higher rates in the entire market area, while their competitors will not. If, as expected, the JV Partner grows alongside DaVita, it brings comfort to both DaVita and the JV Partner because they are now tied together (not competing) and expect to lock up the patient pipeline in that geographic area for their mutual benefit.

216.    Development ROFRs are particularly valuable in the context of dialysis patients. While some dialysis patients can travel, many are physically unable or unwilling to travel long distances, while others are dependent on public transportation. Given that patients typically receive dialysis three times a week, patients typically want to be within a few miles of their dialysis center. By affording control to an entire geographic region, Development ROFRs provide the JV Partner with valuable opportunities to make additional investments in new dialysis centers.

217.    By way of illustration, assume Hospital A and Hospital B are both operating in the same city of 4 million people, where there are a total of around 1,600 dialysis patients (as of 2016, the US reported a rate of just under 400 dialysis patients per million residents).  Of these 1,600 patients, around 15% (or 240) have private insurance and the remaining 85% (or 1,360) are insured by government health insurance programs including Medicare and Medicaid.  These numbers are typical in many jurisdictions across the country.

218.    Assume further that these two hospitals are located within a couple miles of each other and that DaVita, through its communications with both, has learned that Hospital A's nephrology program likely has a pipeline of approximately 100 patients at any given time.  Further

assume these patients are receiving treatment in the hospital's in-house dialysis unit (which is comparatively expensive to operate) or at local dialysis units outside the hospital. Further assume Hospital A is affiliated with an academic medical center (such as Cornell and/or Johns Hopkins), making it a valuable "Tier 1" potential partner.

219.    Finally, assume DaVita has also been in Joint Venture talks over the last year with Hospital B, which has a pipeline of around 40 patients among the different stages of kidney disease., and which is a local community hospital (making it a less valuable "Tier 2" potential partner).

220.    DaVita considers Hospital A to be the more attractive partner because its academic relationships make it very likely that Hospital A is "in network" with all of the local health insurance plans and therefore will also have a higher mix of wealthier patients with private insurance (which reimburse at ~$1,000 per treatment on average, v. the Medicare average of $260 per treatment).

221.    Although DaVita values its potential relationship with Hospital A above its potential relationship with Hospital B, DaVita is interested in working with both in separate dialysis centers in the future to obtain the highest referral volume possible.  DaVita ascertains that at the current time, the two-mile area around both hospitals will support one 210-patient dialysis center, but within in a year or two, that specific area could support an additional dialysis center (DaVita knows the dialysis market is growing at 4-5% a year, faster than US population growth).

222.    DaVita therefore pitches Hospital A on investing in a new 35-chair outpatient dialysis center (with a maximum capacity of 210 patients being treated via 6 weekly shifts). Hospital A is interested.  Hospital B also reaches out to say that they are interested but would like to revisit the planning discussions in six months, because they are going through some

administrative changes.  This timing works well for DaVita as they can focus first on their preferred partner Hospital A and focus on the second dialysis center with Hospital B later.

223.    As is typical in a JN DeNovo transaction, DaVita tells Hospital A that they can invest at cost (*i.e.* not based on cashflow projections), will be able to take advantage of DaVita's payor and purchasing leverage as discussed above.

224.    DaVita will also show the JV partner a 5-year cashflow projection for the proposed dialysis center, which includes projections relating to future profits, often including projections of DaVita diverting (a/k/a "cannibalizing") its own patients from a DaVita center nearby.

225.    Hospital A, however, does not want to develop a JV DeNovo with DaVita unless it is given a Development ROFR with a 15-mile radius.  This is because Hospital A is worried DaVita will do another JV DeNovo nearby with another partner like Hospital B, which may cause some of Hospital A's patients to switch to the center operated by Hospital B (*e.g.,* if Hospital B's location is closer to certain patients' homes).  Hospital A also demands that DaVita provide an MDA ROFR to secure the additional revenue provided by medical director agreements.

226.    Threatened with the possibility of losing the deal with Hospital A to one of its competitors (*e.g.* Fresenius), DaVita agrees to give Hospital A the 15-mile Development ROFR and the MDA ROFR.  This guarantees Hospital A the first "bite at the apple" if another JV DeNovo is planned in the future, while simultaneously preventing DaVita from doing a second deal with Hospital B within the restricted area.

227.    DaVita provides these ROFRs ***for free***, despite knowing that giving Hospital A the Development ROFR might lead Hospital B to do a deal with DaVita's main competitor Fresenius, because overall, DaVita secured the larger (100 patients) and more profitable (better commercial insured v. government insured mix) referral source, while its competitors are left to potentially

partner with Hospital B, with its 40 patients, the great majority of whom have less profitable government insurance.

228.    At the end of the day, Hospital A opens the new JV DeNovo with DaVita and tells its patients that their current nephrologist(s) from the hospital are now the Medical Director(s) at this new DaVita center.  The patients will go where their nephrologist suggests, as long as it is within reasonable commuting distance.  As a further perk, when the nephrologists from Hospital A become the Medical Director(s) of the new center, the doctors are not required to be at the center any given amount of time, and the doctors will not need to come to the dialysis center often (some only "stop by" once a month).

229.    DaVita knows that with the market growing at 4-5% annually, the ROFR is a very valuable option that it is granting to Hospital A – at no cost – in order to establish the referral relationship.  This is why, when DaVita trains employees who negotiate with potential JV DeNovo partners as follows: "**IMPORTANT: We Don't Give ROFRs Easily!**" Exhibit 3 at 5 (DaVita October 2016 internal presentation describing ROFRs (emphasis in original)).

230.    Although the above example involves competing hospitals, this same analysis applies to competing groups of nephrologists.

231.    Consistent with the notion that ROFRs have considerable economic value, DaVita executive David Finn, the Vice President of Mergers and Acquisitions, must approve any ROFRs. Id. at 5.  This is the same David Finn who, in the complaint leading to DaVita's $350 million FCA settlement in 2014 in Barbetta, "manipulated the model" to justify paying kickbacks to nephrologists in the form of above FMV prices in joint ventures.

232.    As noted, a Development ROFR is an option contract. The economic value of a Development ROFR can be readily calculated under well-accepted economic modeling used to

value option contracts.

233.    The Black-Scholes Model – the most commonly used economic model for pricing options – utilizes the below formula to value options:

In mathematical notation:

$$C = S_t N(d_1) - Ke^{-rt} N(d_2)$$

**where:**

$$d_1 = \frac{ln\frac{S_t}{K} + (r + \frac{\sigma^2}{2})\, t}{\sigma_s\ \sqrt{t}}$$

and

$$d_2 = d_1 - \sigma_s\ \sqrt{t}$$

**where:**

$C$ = Call option price
$S$ = Current stock (or other underlying) price
$K$ = Strike price
$r$ = Risk-free interest rate
$t$ = Time to maturity
$N$ = A normal distribution

234.    It is important to understand how the variables impact the value of the option:

| Formula Terms | Call Option Price will be higher when: | Call Option Price will be lower when: |
|---|---|---|
| Current Stock Price | Higher (relative to strike price) | Lower (relative to strike price) |
| Strike Price | Lower (relative to stock price) | Higher (relative to stock price) |
| Time to Maturity | Longer | Shorter |
| Risk free rate | Higher | Lower |
| Volatility (N) | Higher | Lower |

235.    As applied in the context of DaVita's Development ROFRs and utilized in the example below:

- The current stock price is the FMV of the DeNovo opportunity ($3,000,000 in the example below);
- The "strike price" is the price that the referral source is allowed to invest in the DeNovo opportunity ($1,500,000 in the example below);
- The "time to maturity "is the length of the ROFR option (10 years in the example below, although DaVita often grants these options in perpetuity);
- The risk-free rate is the rate on the 10-year treasury bond (a normal corporate finance assumption); and
- Volatility is assumed low or flat as a proxy for the stability of the dialysis business.

46

236.    The Black-Scholes calculator mathematically applies the Black-Scholes formula.[24] Using the above-identified inputs, Black-Scholes produces the following results:



| Formula Terms | DaVita | Example |
|---|---|---|
| Call Option Price | DaVita grants at $0 | **$886,000** |
| Current Stock Price | FMV of opportunity | $3,000,000 |
| Strike Price | DeNovo Pricing | $1,500,000 |
| Time to Maturity | 10 years | 10 years |
| Risk free rate | 2% | 2% |
| Volatility (N) | 1% | 1% |

237.    As illustrated by this example, the Development ROFR is incredibly valuable because the strike price (DeNovo pricing) is always below the stock price (the fair market value of the opportunity).

238.    In the parlance of option contracts, an option is "in the money" when the current value of an asset exceeds the strike price, since in such circumstances, the option holder can

---

[24]    See    Black-Scholes    Calculator,    available    at    https://www.mystockoptions.com/black-scholes.cfm?ticker=&s=2.5&x=1.2&t=10&r=3%25&v=1&calculate=Calculate

purchase the asset for less than its value. In contrast, an option is "out of the money" where the current value of an asset is less than the strike price, such that the option holder would be forced to pay more than an asset's value.[25] Normally when corporations provide stock options for executive compensation, they set the strike price **above** the current value of the stock, such that that executives are incentivized to improve the current value of the stock so that their out-of-the-money options go to in-the-money and then can be sold at a profit. In contrast, as illustrated above, the Development ROFRs given by DaVita are always "in the money" from the outset.

239.    Despite their considerable value, DaVita gives ROFRs to JV Partners *for free* when it concludes that doing so is ultimately in DaVita's best financial interests, *i.e.* where the payoff is worth the cost to DaVita.

240.    DaVita has given hundreds of free Development ROFRs and MDA ROFRs to JV Partners.

241.    By way of representative example, on or around February 4, 2003, DaVita gave a Development ROFR to NAMG Dialysis Ventures, LLC, an entity controlled by Defendant Nephrology Associates Medical Group (the same entity described in the Panther Dialysis example above).

242.    This ROFR came with an expiration date of February 4, 2028 (*i.e.*, 25 year term) and included the right of first participation (including up to 40% ownership interest) in any new outpatient dialysis facility located in Riverside County, CA.

243.    This ROFR was given to NAMG Ventures to induce NAMG to make an investment of 40% into DaVita Riverside, LLC.

---

[25] See generally In the Money and Out of the Money Options and Their Intrinsic Value, available at  https://www.thebalance.com/determining-intrinsic-value-1031125.

244.    This ROFR was then amended several times. As of 2011, it was made perpetual (as in it would never expire) and included MDA rights, along with an expanded geographic scope to include mutually agreed upon locations in Norco, Hemet, Chino and Banning, CA.

245.    Under the ROFR, if DaVita "decides to construct, develop, or otherwise establish a new outpatient dialysis center within the Restricted Area," then it must "first provide the Members with at least one hundred twenty (120) days prior written notice before commencing construction on the Additional Center" and "[e]ach Member shall have the right to participate in the ownership of such Additional Center on substantially same or similar terms and conditions as set forth in this Agreement."[26]

246.    Over the next 13 years (and likely through today), NAMG Ventures exercised its ROFR rights to open *sixteen* new dialysis centers with DaVita in the ROFR area (Riverside and San Bernadino counties).   All sixteen centers are co-owned by DaVita (majority ownership interest) and JV Partner NAMG (minority ownership interest). A list of those facilities and their respective operating start dates appears below:

| Facility Name (Common) | City | State | County | Operating Start Date | Legal Entity |
|---|---|---|---|---|---|
| DIAMOND VALLEY DIALYSIS | HEMET | CA | RIVERSIDE | 8/1/2004 | 200125 Davita - Riverside, LLC |
| MURRIETA DIALYSIS | MURRIETA | CA | RIVERSIDE | 8/1/2004 | 200125 Davita - Riverside, LLC |
| MAGNOLIA WEST DIALYSIS | RIVERSIDE | CA | RIVERSIDE | 5/26/2006 | 200275 Davita - Riverside II, LLC |
| NORCO DIALYSIS | NORCO | CA | RIVERSIDE | 12/1/2006 | 200275 Davita - Riverside II, LLC |
| YUCAIPA DIALYSIS CENTER | YUCAIPA | CA | SAN BERNARDINO | 12/23/2006 | 200584 Yucaipa Dialysis, LLC |
| MAGNOLIA WEST AT HOME | RIVERSIDE | CA | RIVERSIDE | 4/1/2007 | 201151 Iroquois Dialysis, LLC |
| CANYON SPRINGS DIALYSIS | MORENO VALLEY | CA | RIVERSIDE | 4/9/2009 | 200583 Canyon Springs Dialysis, LLC |
| HIGHLAND RANCH DIALYSIS | HIGHLAND | CA | SAN BERNARDINO | 3/22/2010 | 200761 Crystals Dialysis, LLC |
| CATHEDRAL CITY DIALYSIS | CATHEDRAL CITY | CA | RIVERSIDE | 8/1/2011 | 200610 Dolores Dialysis, LLC |
| CATHEDRAL CITY AT HOME | CATHEDRAL CITY | CA | RIVERSIDE | 8/1/2011 | 200610 Dolores Dialysis, LLC |
| BERMUDA DUNES DIALYSIS | PALM DESERT | CA | RIVERSIDE | 5/2/2012 | 200615 Channel Dialysis, LLC |
| MOJAVE SAGE DIALYSIS | VICTORVILLE | CA | SAN BERNARDINO | 5/2/2012 | 200996 Villanueva Dialysis, LLC |
| SUN CITY MENIFEE DIALYSIS | PERRIS | CA | RIVERSIDE | 10/2/2012 | 200690 Cinco Rios Dialysis, LLC |
| SAN BERNARDINO HT AT HOME | SAN BERNARDINO | CA | SAN BERNARDINO | 7/30/2014 | 200685 Seabay Dialysis, LLC |
| MENIFEE HOME AT HOME | MENIFEE | CA | RIVERSIDE | 3/17/2015 | 201158 Panther Dialysis, LLC |
| JURUPA VALLEY DIALYSIS | JURUPA VALLEY | CA | RIVERSIDE | 8/15/2016 | 201180 Noster Dialysis, LLC |
| CIRCLE CITY DIALYSIS | CORONA | CA | RIVERSIDE | 12/21/2016 | 201199 Moraine Dialysis, LLC |

---

[26] The Restricted Area is often defined as a milage radius around the dialysis center's location, but can also include entire counties, zip codes or any custom boundaries required.  Based on Relator's experience at DaVita, the ROFR given to NAMG Dialysis Ventures LLC is representative of the ROFRs that DaVita generally gave to JV Partners.

247.    In effect, NAMG Ventures used the initial Development ROFR DaVita gave to NAMG *for free* to establish a dominant position in the dialysis industry over a huge portion of Southern California.

248.    The only ostensible justification for DaVita valuing Development ROFRs at $0 is articulated in DaVita's "JV Compliance Handbook," which, says with respect to Development ROFRs: "If mutual, the ROFRs are offset, so therefore no value and no need for valuation."

Version 3 (03/01/2010)

IX.    Right of First Refusal (ROFR)

   A.    Inclusion of a ROFR in favor of the non-DaVita party in a MDA, a JV agreement, or as part of any other transaction must be approved by the CCO (or designee), General Counsel and COO

   B.    If a ROFR is approved, it must be valued (internally or by a third party) to ensure total value to both DVA and the other party is consistent with FMV. The only exceptions to this requirement are defined in Section G below

   C.    The buyout of an existing ROFR from a current agreement requires advance approval from the CCO (or designee) and External Litigation Counsel

   D.    ROFR cannot be offered until it has been approved by the CCO (or designee) and it has been confirmed there are no other conflicting or overlapping ROFRs already in place

   E.    Development ROFR

      1.    Development ROFR is defined to mean the offering of a contractual right to jointly develop future centers which are not part of the current deal transaction

      2.    May be added to the JV if value to DVA is equal to or greater than value to JV partner; or if payment from JV partner is obtained

      3.    Types of Development ROFRs

         a)    JV partner developed facility - DVA may purchase a percentage

         b)    DVA developed facility - JV partner may purchase a percentage

      4.    Valuation must be obtained through an internal model or third party valuation, unless the ROFR is mutual.

         Note: if mutual, the ROFRs are offset, so therefore no value and no need for valuation

      5.    No stand-alone Development ROFRs

249.    In other words, if both DaVita and its JV Partner give each other Development ROFRs, DaVita assumes that the two ROFRs "offset" one another such that the Development ROFR has $0 in value that needs to be considered in the valuation.

250.    This assumption is false and in direct conflict with recognized principles of fair market value.  As Relator's valuation expert explains, "DaVita's policy of assuming that the value of mutual ROFRs offset is inconsistent with fundamental principles of valuation methodology for at least two reasons. For the reasons set forth above, the probability of the occurrence of a triggering event in relation to a DaVita-Granted ROFR – and the consequent opportunities

presented – very likely provides economic value to the JV Partner. However, the probability of the occurrence of a triggering event in relation to a Group-Granted ROFR is effectively zero, i.e., DaVita receives little to no value from a Group-Granted ROFR. Thus, DaVita's policy – which effectively assumes that mutual ROFRs are by definition of equal value – is not consistent with fundamental valuation principles related to the valuation of such rights, nor with the available evidence regarding the exercise of such ROFRs." Id. at 18.

251.    Turning to recognized principles of fair market valuation, Relator's valuation expert conducted a valuation of the Development ROFR DaVita gave for free to Fanthorp Dialysis, LLC (one of the four JV De Novo examples cited above and detailed in the report of Relator's valuation expert). Id. at 15.

252.    As described above, DaVita calculated the startup costs for Fanthorp Dialysis, LLC as $2,594,000 and thus sold a 20% ownership interest to the JV Partner for $518,800. Employing an income approach, Relator's valuation expert calculated the actual value of that 20% ownership interest in Fanthorp Dialysis, LLC to be $850,000 to $930,000, meaning that DaVita provided $331,200 to $411,200 of free value to the JV Partner. Id. at 22.

253.    As stated in the report of Relator's valuation expert, the Development ROFR for Fanthorp Dialysis, LLC had a fair market value between $575,000 and $630,000. Id. at 15-16..

254.    This value transfer of between $575,000 and $630,000 from the Development ROFR is in addition to the remuneration DaVita provided to the JV Partner through the below fair market value buy-in price. Id. at 23 ("Davita's DeNovo Pricing …not only suffers from the inadequacies of the cost approach but compounds such inadequacies by not accounting for the value of certain assets at all.").

255.    Combining the value of the below fair market value buy-in price ($331,200 to

$411,200) and the value of the free Development ROFR ($575,000 and $630,000) leads to a

transfer of free remuneration from DaVita to the nephrologists of up to $906,200 and $1,041,200.

256.    On a percentage basis, the JV Partner's buy-in price of $518,800 represented just

33.2% to 36.4% of the fair market value of the ownership interest plus the fair market value of

ROFR, *i.e.*, the JV Partner paid 63.6% to 66.8% below fair market value.

257.    Turning to MDA ROFRs, they also have considerable value.  As illustrated in the

graphic below, the MDA ROFR entitles the holder (here, West Bay Nephrology in San Francisco,

CA) to receive all the future medical director income in the restricted area:



258.    As illustrated above, West Bay Nephrology has been granted a Development ROFR

for the center black circle with a radius of 8 miles, encompassing the entire downtown San

Francisco area, allowing them the right to participate in any JV DeNovos – at cost – that DaVita

builds in that area. In addition, just below the black circle, the blue circle grants West Bay

Nephrologists the right to act as medical director, for any DaVita center within radius of 3 miles.

259.    DaVita calculates the value of all ROFRs by assessing population density as a proxy

for density of patients with ESRD by area code using its "NonCompeteRadiusTool."

260.    As illustrated in the chart below, the value of the ROFR to the JV Partner is calculated by grading geographies on "tiers" based on population in the area, referred to as the MSA/CBSA (metropolitan statistical area and core-based statistical area, two metrics used by the government to measure population in a given area). DaVita differentiates between in-center hemodialysis and home dialysis, because home patients only come to the dialysis center once a month (instead of 3 times a week), so the logistical hurdle of sick patients traveling is lower, therefore the protective barrier (radius) to retain these patients needs to be greater for home patients.

261.    For Tier 1 areas with high population densities (and therefore more patients), a 15-mile radius normally suffices to fill up a dialysis center with 35 chairs (210 patient capacity). However, in less urban areas, a larger radius is required to find patients to fill the chairs, *i.e.*, in rural areas, the radii can be as wide as 40 miles as depicted in the chart below.

262.    The radii for home dialysis patients starts at 25 miles, since patients treating at home are typically willing to travel further because they only have to make the trip to pick up home dialysis re-supplies once a month (as opposed to the In-Center (IC) patients who have to travel three times a week to the dialysis center).

| MSA/CBSA Population | Tier | ICHD Non-Compete Radius | Home Non-Compete Radius |
|---|---|---|---|
| ≥ 5M | 1 | 15 mi | 25 mi |
| 2M - 5M | 2 | 20 mi | 30 mi |
| 0.5M - 2M | 3 | 25 mi | 35 mi |
| 0.1M - 0.5M | 4 | 30 mi | 40 mi |
| < 0.1M | 5 | 40 mi | 40 mi |

263.    As with Development ROFRs, DaVita provides MDA ROFRs *for free*.

264.    The guarantee of MDA income is a powerful incentive.  This is particularly true with regard to a hospital, because any nephrologists on payroll are being paid a fixed amount.  If one of the hospital's nephrologists is named the medical director at a nearby DaVita dialysis center,

the hospital receives the MDA income from that center to help defray their costs (~$85k, $35k, and $15k annually in 2015 with hemodialysis, peritoneal dialysis, and home hemodialysis programs, respectively). Medical Directors do not have to provide any patient care and are not required to be present at the dialysis facility while patients are dialyzing.

265.    Moreover, many of the patients are already the Medical Director's own patients from their hospital or nephrology practice so there is little need to familiarize themselves with the patient population. Often the Medical Directors provide an oversight role and from Relator's experience, they often do not show up to the dialysis center even once a week and many times not more than once a month.  It is more of an oversight role for regulatory purposes (like a board seat) and does not detract meaningfully from a nephrologist's "day job."

266.    As with projected profits from cannibalization, when DaVita is negotiating with physicians or a hospital, DaVita shows the potential partner the remuneration the partner will receive on its investment with and without the Medical Director income.

267.    By showing the referral source that the Medical Director income flows 100% to the financial returns, DaVita is showing the referral source that there is really no associated cost to them receiving this MDA income stream.  This is just a "check the box" regulatory position that will not take up much of their physician's time.

268.    As described above, the MDA ROFR is provided as a "sweetener" to induce the referral source to enter the deal, which is: (1) already priced below fair market value, and (2) already includes a free Development ROFR. Additionally, if there are any existing 100% DaVita-owned dialysis centers in the restricted area, the MDA ROFR entitles the new owner of the ROFR to that MDA income as well, *i.e.* DaVita will replace the existing Medical Director(s) with the MDA ROFR holder's nephrologist(s).

269.    Finally, DaVita's use of ROFRs has negative and disruptive effects on patients. Relator's experience is that DaVita will, without considering patients' needs, switch a group of patients' Medical Director to one receiving and MDA ROFR, or shuffle patients through cannibalization from one DaVita center to a new DaVita center that received a Development ROFR.

## VII.    DEFENDANTS' FCA AND AKS LIABILITY

270.    Reimbursement claims tainted by violations of the AKS are false claims within the meaning of the FCA. 42 U.S.C. § 1320a-7b(g); see US. ex rel. Gohil v. Sanofi U.S. Servs. Inc., 2020 WL 4260797, at *7 (E.D. Pa. July 24, 2020) ("Claims tainted by AKS violations are automatically 'false' under the FCA").

271.    As described below, DaVita's kickbacks violated the AKS and serve as predicate offenses for DaVita's violation of three provisions of the federal FCA and the corresponding state statutes. See 31 U.S.C. § 3729(a)(1)(A) (prohibiting the presentation and causing the presentation of false claims); § 3729(a)(1)(B) (prohibiting the creation or causing the creation of false records that are material to false claims); and § 3729(a)(1)(C) (prohibiting conspiring to violate the FCA).

### A.    The Purpose of DaVita's Kickbacks was to Induce Referrals

272.    A provider violates the AKS "if at least one purpose of the remuneration is to induce prescriptions or referrals," *i.e.* it is not necessary "to prove that this is the sole purpose" of the remuneration, and it is irrelevant if the remuneration has another, more benign purpose." US. ex rel. Gohil v. Sanofi U.S. Servs. Inc., 2020 WL 4260797, at *9 (E.D. Pa. July 24, 2020) (quotations omitted).

273.    The kickbacks DaVita offered to its JV Partners – the purchase of ownership interests in JV DeNovos at below fair market value, free ROFRs, and cannibalized patients – were intended to, and did, induce the referral of patients to DaVita-owned dialysis centers.

274.    DaVita's JV DeNovos possess all of the "questionable features" that HHS-OIG identified in its above-discussed Special Fraud Alerts as indicators that joint venture relationships violate the AKS, including that (1) DaVita chose investors – *i.e.* JV Partners – based on their position to make referrals; (2) both parties – *i.e.* DaVita and the JV Partners – were already in the nephrology business; (3) the amount invested by the JV Partners was disproportionately small relative to the return on investment; (4) the JV Partners assumed little risk; and (5) the JV relationships included provisions – *e.g.* ROFRs – that reduced and inhibited competition.

275.    DaVita is a for-profit business and has no financial interest in selling ownership interests at below fair market value unless it is receiving something valuable in return.

276.    Here, DaVita freely elected to sell ownership interests in JV DeNovos at below fair market value because by doing so, it was securing a continued stream of referrals and money.

277.    DaVita tellingly did not offer to sell these ownerships interests to individuals or businesses who were not in a position to refer patients (*i.e.*, people other than nephrologists) even though doing so would have increased the sales price of the ownership interest by dramatically expanding the base of potential investors.

278.    In this way, contrary to its own economic interests (apart from the financial benefit derived from the kickback) DaVita limited the base of potential purchasers to only include nephrologists who were positioned to refer patients.

279.    Company documents further corroborate that DaVita chose JV Partners based on their ability to refer patients.

280.    For example, an internal August 2008 document describes DaVita's motivation to establish Crystals Dialysis, LLC, a JV DeNovo entity to own a dialysis center in Highland, CA named Highland Ranch Dialysis.

281.    As with many of the above-described examples, NAMG was the JV Partner for Crystals Dialysis, LLC and owned a minority interest in the entity.

282.    The August 2008 document contains the following information:



283.    On the left-hand side, "RAI – Redland clinic, Indiana Court)" is identified as one of only two competitors in the area.

284.    On the righthand side, "DaVita Drivers" – *i.e.* DaVita's motivation to enter the deal – are described as: "Dr. Huynh for MD, (Le, Serros, Huynh are have their own Med group) - very good relationship. ***Docs have indicated they'll transfer pts from Indian Court (RAI clinic) once this center opens. They want to refer these pts now to Mnt Vista but the center is at capacity***. We expect 3 HIPPERs  to come from these transfers." (emphasis added).

285.    Thus, DaVita internally described its own "driver" as that the doctors would transfer patients from DaVita's competitor to Highland Ranch Dialysis (the newly-opened dialysis center owned by the JV DeNovo).

286.    And the three "HIPPERs" (in DaVita parlance, HIPPER means a patient on private

insurance) were especially valuable to DaVita since, as noted above, private insurers reimburse for dialysis at drastically higher rates than government payors like Medicare.

287.    By way of representative example, the following screenshot demonstrates that for Seabay Dialysis, LLC – one of the above-discussed exemplars discussed in the report of Relator's valuation expert – DaVita determined that the revenue-per-treatment (RPT) would be $278 for government payors and $700 for non-government payors in the first of the center's operation (with similar differences in future years).

| Parent Facilities | LTM TXs | | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|---|---|
| Govt | - | Revenue / Tx | $ - | $ - | $ - | $ - | $ - |
| ICHD | | Growth Rate | | 0.0% | 0.0% | 0.0% | 0.0% |
| | | Tx Frequency | 3.0 | | | | |
| Non-Govt (rev/tx < $750) | - | Revenue / Tx | $ - | $ - | $ - | $ - | |
| | | Tx Frequency | 3.0 | | | | |
| Non-Govt (rev/tx > $750) | - | Revenue / Tx | $ - | $ - | $ - | $ - | $ - |
| | | Tx Frequency | 3.0 | | | | |
| Commercial (total) | | Revenue / Tx | $ - | $ - | $ - | $ - | |
| Govt | 34,981 | Revenue / Tx | $ 278 | $ 277 | $ 278 | $ 280 | $ 283 |
| PD | | Growth Rate | 0.0% | -0.3% | 0.5% | 0.5% | 1.0% |
| | | Reimbursement Freq | 3.0 | | | | |
| Non-Govt (rev/tx < $750) | 8,233 | Revenue / Tx | $ 700 | $ 716 | $ 733 | $ 749 | $ 767 |
| | | Reimbursement Freq | 3.0 | | | | |
| Non-Govt (rev/tx > $750) | | Revenue / Tx | $ - | $ - | $ - | $ - | $ - |
| | | Reimbursement Freq | 3.0 | | | | |
| Commercial (total) | | Revenue / Tx | $ 700 | $ 716 | $ 733 | $ 749 | $ 767 |

288.    DaVita's SMART Communications protocol further demonstrates that the purpose of the kickbacks was to induce referrals.

289.    SMART is an acronym standing for Simple, Meaningful, Actual, Read, Teach, and as described an internal DaVita presentation, is "[d]esigned to identify potentially problematic communications and to address them."

290.    While at DaVita, Relator was repeatedly instructed to adhere to the company's SMART Communications protocol.

291.    An important component of the SMART Communications protocol was to whitewash problematic language from communications by replacing it with vague and neutral-sounding language.

292.    For example, an internal DaVita presentation disseminated widely within the company and then posted to the company's intranet, cited the following examples of problematic emails that accurately describe DaVita's efforts to promote illegal payments for referrals and suggested sanitized replacement language in the red box:



293.    As illustrated by these emails, DaVita instructed its employees to forego the use of problematic (but accurate) language in communications and to replace it with intentionally vague language.

294.     Simply put, if one purpose of the kickbacks was *not* to induce referrals and DaVita did not understand that this was illegal, there would have been no reason for DaVita to train its employees to avoid using such language.

295.     In a similar vein, during Relator's time at DaVita, he was told by David Finn (DaVita's Vice President of Mergers and Acquisitions) to write emails "as if the Justice Department was reading them over our shoulder" and that if something couldn't be expressed in a coded or compliant way, that a phone call or meeting should be scheduled to discuss it verbally.

### B.     DaVita's Submission of False Claims to Government Healthcare Programs

296.     Dialysis providers like DaVita submit reimbursement claims to government-funded healthcare programs. For example, as particularly relevant here, DaVita directly submits reimbursement claims to Medicare for services provided to Medicare beneficiaries.

297.     Non-institutional providers submit reimbursement claims to government payors using CMS Form 1500 or its electronic equivalent known as the 837P format, while institutional providers submit reimbursement claims to government payors using CMS Form 1450 (sometimes known as Form UB-04) or its electronic equivalent known as the 837I format.

298.     When submitting claims, both institutional and non-institutional providers must attest to certain certifications.

299.     These certifications include the following relevant statements (with added emphasis):

> In submitting this claim for payment from federal funds, I certify that: 1) the information on this form is true, accurate and complete; 2) I have familiarized myself with all applicable laws regulations, and program instructions, which are available from the Medicare contractor; 3) I have provided or will provide sufficient information required to allow the government to make an informed eligibility and payment decision; 4) ***this claim, whether submitted by me or on my behalf by my designated billing company, complies with all applicable Medicare and/or Medicaid laws, regulations, and***

*program instructions for payment including but not limited to the Federal anti-kickback statute and Physician Self-Referral law (commonly known as Stark law);* 5) the services on this form were medically necessary and personally furnished by me or were furnished incident to my professional service by my employee under my direct supervision, except as otherwise expressly permitted by Medicare or TRICARE; 6) for each service rendered incident to my professional service, the identity (legal name and NPI, license#, or SSN) of the primary individual rendering each service is reported in the designated section.

300.    Thus, if a claim does not "compl[y] with . . . the Federal anti-kickback statute," the certification contained on the claim form is expressly false.

301.    In addition to the certifications made when submitting claims, providers make similar certifications when enrolling to participate in government healthcare programs.

302.    As particularly relevant here, Medicare reimbursement to institutional providers is conditioned on their enrollment in the Medicare program.

303.    Institutional providers apply for enrollment in Medicare using a form known as "CMS 855A."

304.    To complete enrollment, institutional providers must: (1) certify that they will abide by applicable "Medicare laws, regulations and program instructions"; and (2) attest that the institutional provider understands that "payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions."

305.    For the same reasons as described above, the certifications DaVita's made on its Medicare enrollment application are false since DaVita's kickback-tainted claims did not comply with applicable laws, regulations and program instructions.

306.    In addition to these false certifications, and as described above, by operation of law, Medicare reimbursement claims that are tainted by violations of the AKS are false claims within

the meaning of the FCA.  42 U.S.C. § 1320a-7b(g) ("In addition to the penalties provided for in this section or section 1320a-7a of this title, a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of" the FCA).

307.    The overwhelming majority of DaVita's patients are covered by government-funded healthcare programs, and the majority of DaVita's revenue is received from government-funded healthcare programs (predominantly Medicare), as demonstrated by the following slides from an internal DaVita presentation:





308.    Consistent with the above slides, the following screenshot shows that in 2016 and 2017, about 79% of the patient base for Panther Dialysis – the above-discussed JV DeNovo located in Menifee, CA in which NAMG controlled a 49% ownership interest – consisted of patients on government healthcare programs, primarily consisting of Medicare beneficiaries:

**DaVita** Kidney Care

**Performance Summary**
October 2017
Panther Dialysis LLC - LE_201158

| (Dollars in thousands, except per treatment data) | Quarter Ended-Actual/Tx | | | | Quarter Ended-Actual | | | | Year to Date-Actual | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Jul-17 | Oct-17 | Change | % Change | Jul-17 | Oct-17 | Change | % Change | Oct-16 | Oct-17 | Change | % Change |
| *Treatment/Mix Data:* | | | | | | | | | | | | |
| Medicare | | | | | 2,027 | 1,975 | (52) | -2.6% | 5,410 | 6,754 | 1,344 | 24.8% |
| Other Government | | | | | 2,737 | 2,751 | 14 | 0.5% | 5,818 | 8,879 | 3,061 | 52.6% |
| Total Government | | | | | 4,763 | 4,726 | (38) | -0.8% | 11,229 | 15,634 | 4,405 | 39.2% |
| % of total treatments | | | | | 77.3% | 78.3% | | | 79.1% | 78.6% | | |
| % change in treatments from prior year | | | | | 38.9% | 12.6% | | | NM | NM | | |
| Contract | | | | | 886 | 1,088 | 202 | 22.8% | 2,043 | 2,983 | 941 | 46.0% |
| Exchanges | | | | | 123 | 114 | (9) | -7.6% | 23 | 388 | 366 | NM |
| Non-Contract | | | | | 388 | 110 | (278) | -71.7% | 904 | 897 | (6) | -0.7% |
| Total Non-Government | | | | | 1,397 | 1,312 | (85) | -6.1% | 2,969 | 4,269 | 1,300 | 43.8% |
| % of total treatments | | | | | 22.7% | 21.7% | | | 20.9% | 21.4% | | |
| % change in treatments from prior year | | | | | 55.9% | 18.7% | | | NM | NM | | |
| Total Treatments | | | | | 6,160 | 6,037 | (123) | -2.0% | 14,197 | 19,902 | 5,705 | 40.2% |
| Treatment Adjustments | | | | | (51) | (81) | (31) | -60.7% | (125) | (205) | (80) | -64.2% |
| Net Treatments | | | | | 6,110 | 5,956 | (154) | -2.5% | 14,072 | 19,697 | 5,625 | 40.0% |
| % change in treatments from year period | | | | | 42.4% | 12.9% | | | NM | NM | | |

309.    As such, DaVita routinely submits reimbursement claims to government healthcare programs and receives such reimbursement.

310.    Relator provides the following representative examples of DaVita's submission of false claims to government healthcare programs.

311.    Based on Relator's experience working at DaVita and his firsthand access to information – including access to the valuations DaVita performed for JV DeNovos nationwide, these examples are representative of DaVita's routine submission of claims to government healthcare programs across the country.

312.    Specifically, Relator had access to the materials described below in the ordinary course of his duties for virtually every JV DeNovo.

313.    In May 2018, Panther Dialysis – the above-discussed JV DeNovo located in Menifee, CA in which NAMG controlled a 49% ownership interest – had about $319,500 in

accounts receivable from Medicare and approximately $80,000 in accounts receivable from Medicaid, meaning that Panther Dialysis had submitted claims to Medicare and Medicare and was awaiting payment in those amounts.

314.    Below is a slide from an internal presentation reflecting these figures:

**DaVita**
Kidney Care
Panther Dialysis LLC - LE_201158

**Accounts Receivable Summary**
Period Ended May 2018

| Accounts Receivable: (as of end of period) | 0-30 | 31-60 | 61-90 | 91-120 | 121-180 | >180 | Total |
|---|---|---|---|---|---|---|---|
| | | | Aging | | | | |
| Medicare | $236,199 | $21,034 | $16,083 | $8,675 | $12,525 | $24,984 | $319,500 |
| Medicaid | 8,183 | 7,748 | 5,029 | 7,678 | 9,425 | 42,379 | 80,442 |
| Government programs | 309,361 | 162,910 | 111,404 | 60,060 | 85,715 | 189,045 | 918,495 |
| Patient | - | 1,798 | 7,317 | 10,964 | 32,641 | 17,873 | 70,592 |
| Contract | 294,686 | 42,496 | 35,240 | 26,275 | 44,873 | 240,331 | 683,900 |
| Exchanges | 23,293 | 19,111 | 17,376 | 12,253 | 1,287 | 34,263 | 107,583 |
| Non-Contract | 11,459 | 20,704 | 16,986 | 11,381 | 19,523 | 68,162 | 148,216 |
| Gross accounts receivable | 883,181 | 275,800 | 209,435 | 137,287 | 205,988 | 617,036 | 2,328,728 |
| Contractual allowance reserve | (8,261) | (22,316) | (32,056) | (27,054) | (27,661) | (199,320) | (316,669) |
| Bad debt reserve | (9,997) | (7,328) | (10,561) | (15,623) | (37,907) | (272,574) | (353,991) |
| Total reserves | (18,258) | (29,644) | (42,617) | (42,678) | (65,569) | (471,895) | (670,660) |
| Net accounts receivable before other | $864,923 | $246,157 | $166,819 | $94,609 | $140,419 | $145,141 | $1,658,068 |
| | | | | | | | |
| Net credit balances | (20,145) | (54,188) | (29,494) | (15,978) | (34,110) | (872,295) | (1,026,210) |
| Unapplied cash and other | (3,046) | - | - | - | - | - | (3,046) |
| Accounts receivable, net | $841,732 | $191,968 | $137,325 | $78,631 | $106,309 | $(727,153) | $628,811 |

| Historical Accounts Receivable: | 0-30 | 31-60 | 61-90 | 91-120 | 121-180 | >180 | Total |
|---|---|---|---|---|---|---|---|
| | | | Aging | | | | |
| May-18 | $864,923 | $246,157 | $166,819 | $94,609 | $140,419 | $145,141 | $1,658,068 |
| % of Total | 52.2% | 14.8% | 10.1% | 5.7% | 8.5% | 8.8% | 100.0% |
| Feb-18 | $711,074 | $429,573 | $145,332 | $94,267 | $169,564 | $168,395 | $1,718,204 |
| % of Total | 41.4% | 25.0% | 8.5% | 5.5% | 9.9% | 9.8% | 100.0% |
| Nov-17 | $708,258 | $317,864 | $131,237 | $97,388 | $91,250 | $91,965 | $1,437,962 |
| % of Total | 49.3% | 22.1% | 9.1% | 6.8% | 6.3% | 6.4% | 100.0% |
| Aug-17 | $801,810 | $329,158 | $168,589 | $35,163 | $45,432 | $117,767 | $1,497,920 |
| % of Total | 53.5% | 22.0% | 11.3% | 2.3% | 3.0% | 7.9% | 100.0% |
| May-17 | $818,112 | $317,402 | $163,226 | $101,704 | $149,562 | $183,040 | $1,733,046 |
| % of Total | 47.2% | 18.3% | 9.4% | 5.9% | 8.6% | 10.6% | 100.0% |

315.    In April 2018, Seabay Dialysis – one of the JV DeNovo examples discussed in the report of Relator's valuation expert – had $92,185 in accounts receivable from Medicare and $35,511 in accounts receivable from Medicaid, meaning that Seabay Dialysis had submitted claims to Medicare and Medicare and was awaiting payment in those amounts.

316.    Below is a slide from an internal presentation reflecting these figures:

**Accounts Receivable Summary**

*Period Ended April 2018*

DaVita
Kidney Care
Seabay Dialysis LLC - LE_200996

| Accounts Receivable: (as of end of period) | 0-30 | 31-60 | 61-90 | 91-120 | 121-180 | >180 | Total |
|---|---|---|---|---|---|---|---|
| Medicare | $73,317 | $9,726 | $ - | $394 | $206 | $8,552 | $92,195 |
| Medicaid | 2,068 | 2,648 | 2,930 | - | 699 | 27,167 | 35,511 |
| Government programs | 128,026 | 102,179 | 31,809 | 23,392 | 18,512 | 93,423 | 397,341 |
| Patient | 295 | 2,732 | 6,896 | 5,993 | 12,459 | 83,137 | 111,511 |
| Contract | 121,802 | 60,912 | 29,687 | 44,251 | 53,111 | 46,494 | 356,256 |
| Exchanges | 20,492 | 12,160 | 11,423 | 8,752 | - | - | 52,827 |
| Non-Contract | 17,272 | 24,513 | 13,183 | 22,661 | - | 7,977 | 85,607 |
| Gross accounts receivable | 363,271 | 214,869 | 95,928 | 105,443 | 84,987 | 266,750 | 1,131,247 |
| Contractual allowance reserve | (17,530) | (24,630) | (15,761) | (23,105) | (10,113) | (42,564) | (133,702) |
| Bad debt reserve | (3,477) | (4,544) | (8,653) | (7,105) | (13,566) | (169,925) | (207,269) |
| Total reserves | (21,007) | (29,174) | (24,413) | (30,210) | (23,678) | (212,489) | (340,971) |
| Net accounts receivable before other | $342,265 | $185,695 | $71,514 | $75,233 | $61,308 | $54,260 | $790,276 |
| Net credit balances | (3,867) | (262) | 0 | (532) | (604) | (28,488) | (33,753) |
| Unapplied cash and other | (19,808) | - | - | - | - | - | (19,808) |
| Accounts receivable, net | $318,590 | $185,434 | $71,515 | $74,701 | $60,704 | $25,772 | $736,715 |

| Historical Accounts Receivable: | 0-30 | 31-60 | 61-90 | 91-120 | 121-180 | >180 | Total |
|---|---|---|---|---|---|---|---|
| Apr-18 | $342,265 | $185,695 | $71,514 | $75,233 | $61,308 | $54,260 | $790,276 |
| % of Total | 43.3% | 23.5% | 9.0% | 9.5% | 7.8% | 6.9% | 100.0% |
| Jan-18 | $316,019 | $135,198 | $57,248 | $18,804 | $48,714 | $39,896 | $615,880 |
| % of Total | 51.3% | 22.0% | 9.3% | 3.1% | 7.9% | 6.5% | 100.0% |
| Oct-17 | $283,277 | $118,000 | $81,322 | $29,360 | $32,954 | $49,186 | $594,098 |
| % of Total | 47.7% | 19.9% | 13.7% | 4.9% | 5.5% | 8.3% | 100.0% |
| Jul-17 | $296,080 | $141,657 | $42,698 | $15,780 | $38,390 | $48,900 | $583,506 |
| % of Total | 50.7% | 24.3% | 7.3% | 2.7% | 6.6% | 8.4% | 100.0% |
| Apr-17 | $227,647 | $105,286 | $45,293 | $32,273 | $33,964 | $57,882 | $502,345 |
| % of Total | 45.3% | 21.0% | 9.0% | 6.4% | 6.8% | 11.5% | 100.0% |

| Historical DSO: | Apr-17 | Jul-17 | Oct-17 | Jan-18 | Apr-18 |
|---|---|---|---|---|---|
| DSO | 52 | 49 | 46 | 58 | 69 |

317.    In the first half of 2018, Yucaipa Dialysis – a JV DeNovo in Yucaipa, CA in which NAMG also controlled a minority ownership interest – submitted 1,376 claims to Medicare and received $394,293 in Medicare reimbursement:

| Month | Treatments | Medicare Revenue |
|---|---|---|
| February 2018 | 272 | $78,533 |
| March 2018 | 304 | $85,027 |
| April 2018 | 255 | $71,066 |
| May 2018 | 279 | $83,666 |
| June 2018 | 266 | $76,001 |
| Total | 1,376 | $394,293 |

318.    In the same time period, Yucaipa Dialysis submitted 101 claims to Medicaid and received $15,396 in Medicaid reimbursement:

| Month | Treatments | Medicaid Revenue |
|---|---|---|
| February 2018 | 36 | $5,715 |
| March 2018 | 26 | $3,789 |
| April 2018 | 13 | $2,295 |
| May 2018 | 13 | $1,929 |
| June 2018 | 13 | $1,668 |
| Total | 101 | $15,396 |

319.    In the first half of 2018, Canyon Spring Dialysis – a JV DeNovo in Moreno Valley, CA in which NAMG also controlled a minority ownership interest – submitted 4,246 claims to Medicare and received $1,187,567 in Medicare reimbursement:

| Month | Treatments | Medicare Revenue |
|---|---|---|
| February 2018 | 767 | $211,367 |
| March 2018 | 907 | $261,115 |
| April 2018 | 848 | $233,997 |
| May 2018 | 896 | $246,784 |
| June 2018 | 828 | $234,304 |
| Total | 4,246 | $1,187,567 |

320.    In the same time period, Canyon Spring Dialysis submitted 502 claims to Medicaid and received $90,844 in Medicaid reimbursement:

| Month | Treatments | Medicaid Revenue |
|---|---|---|
| February 2018 | 91 | $17,092 |
| March 2018 | 87 | $15,736 |
| April 2018 | 106 | $18,697 |
| May 2018 | 119 | $21,827 |
| June 2018 | 99 | $17,492 |
| Total | 502 | $90,844 |

## C.    The Materiality of DaVita's Kickbacks

321.    Under the FCA, "'material' means having a natural tendency to influence, or be capable of influencing, *the payment or receipt of money or property*." 31 U.S.C. § 3729(b)(4) (emphasis added).

322.    DaVita's violations of the AKS were *per se* material pursuant to 42 U.S.C. § 1320a-7b(g) ("[A] claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of" the FCA).

323.    In addition to establishing the falsity of DaVita's claims, 42 U.S.C. § 1320a-7b(g) also precludes the need for an independent showing of materiality. See U.S. v. Mallory, 988 F.3d 730, 741 (4th Cir. 2021) (district court did not err in failing to give jury instruction on materiality

because "[a] violation of the Anti-Kickback Statute thus automatically constitutes a false claim under the False Claims Act"); Guilfoile v. Shields, 913 F.3d 178, 190 (1st Cir. 2019) ("We further read the AKS amendment as obviating the need for a plaintiff to plead materiality -- that is, to plead that compliance with the AKS was material to the government's decision to pay any specific claim. This construction inescapably follows from the statute's plain language stating that a claim resulting from a violation of the AKS 'constitutes a false or fraudulent claim.'").

324.    Even if any independent of materiality is required, DaVita's kickback violations "ha[d] a natural tendency to influence" and were "capable of influencing, the payment or receipt of money or property" that DaVita received from government payors and were thus material under the FCA. See 31 U.S.C. § 3729(b)(4). This is demonstrated by several considerations.

325.    First, even presuming that 42 U.S.C. § 1320a-7b(g) does not preclude the need for an independent assessment of materiality, it "clearly demonstrates Congress's intent that AKS compliance is material to payment decisions in all cases." U.S. v. Berkeley Heartlab, Inc., No., 2017 WL 6015574, at *2 (D.S.C. Dec. 4, 2017) ("Providing that AKS compliance is a condition of payment and that a tainted claim is ineligible for reimbursement even when submitted by an innocent party clearly demonstrates Congress's intent that AKS compliance is material to payment decisions in all cases.").

326.    Second, "[c]ompliance with the AKS is clearly a condition of payment" for government healthcare programs. U.S. ex rel. Wilkins v. United Health Grp., Inc., 659 F.3d 295, 313 (3d Cir. 2011).

327.    Third, AKS violations go to the very essence of the bargain between providers and government healthcare programs, and "[t]he Government does not get what it bargained for when a defendant is paid by CMS for services tainted by a kickback." Id. at 314 (quotations omitted).

328.    Fourth, the seriousness of AKS violations is demonstrated by the fact that, in addition to civil liability, violators are subject to ten years of imprisonment. 42 U.S.C. § 1320a-7b(a).

329.    Fifth, "the Government routinely punishes AKS violations through criminal proceedings and civil proceedings to recoup funds." U.S. ex rel. Gohil v. Sanofi U.S. Servs. Inc., 2020 WL 4260797, at *15 (E.D. Pa. July 24, 2020) (quotations omitted).

## VIII.   COUNTS

### COUNT I
### Violation of the False Claims Act - 31 U.S.C. §3729(a)(1)(A)

330.    Relator repeats and re-alleges each and every allegation contained in the paragraphs above as though fully set forth herein.

331.    In violation of 31 U.S.C. § 3729(a)(1)(A), Defendants knowingly presented or caused the presentment of false or fraudulent claims for payment or approval to (1) officials of the United States and/or (2) contractors, grantees, or other recipients of money provided by or that would be reimbursed by the United States.

332.    The false statements made by Defendants had a natural tendency to influence or be capable of influencing the payment of the claims, and in fact, did influence the payment of the claims.

333.    Defendants made fraudulent and false statements with actual knowledge of the falsity of its statements, with deliberate ignorance of the falsity of its statements, or with reckless disregard as to the falsity of its statements.

334.    By virtue of the false or fraudulent claims that Defendants presented or caused to be presented, the United States has suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

## COUNT II
### False Claims Act – Violation of 31 U.S.C. §3729(a)(1)(B)

335.    Relator repeats and re-alleges each and every allegation contained in the paragraphs above as though fully set forth herein.

336.     In violation of 31 U.S.C. § 3729(a)(1)(B), Defendants knowingly made, used or caused to be made or used, false records or statements material to false or fraudulent claims to (1) the United States or (2) contractors, grantees, or other recipients of money provided by or that would be reimbursed by the United States.

337.    The false records and statements made by Defendants had a natural tendency to influence or be capable of influencing the payment of the claims, and in fact, did influence the payment of the claims. By virtue of the false records and statements made by Defendants, the United States has suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

### COUNT III–
### Violation of the False Claims Act - 31 U.S.C. § 3729(a)(1)(C)

338.    Relator repeats and re-alleges each and every allegation contained in the paragraphs above as though fully set forth herein.

339.    In violation of 31 U.S.C. § 3729(a)(1)(C), Defendants DaVita and NAMG conspired to commit violations of the False Claims Act, including the violations in Count I and Count II described above.

340.    In addition, Defendant DaVita also conspired with other JV Partners to commit violations of the False Claims Act, including the violations in Count I and Count II described above.

341.    Through the conduct described in this Complaint, DaVita reached agreements with certain JV DeNovo partners, including Defendant NAMG, to commit violations of the False

Claims Act, including the violations in Count I and Count II described above, and committed overt acts toward the commission of such violations.

342. This conduct had a natural tendency to influence and was capable of influencing the payment of the claims, and in fact, did influence the payment of the claims.

343. By virtue of this conspiracy, the United States has suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

### COUNT III
### California False Claims Act – Violation of Cal Gov't. Code §12651(a)(1), (2), (3)

344. Relator repeats and re-alleges each and every allegation contained in the paragraphs above as though fully set forth herein.

345. This is a claim for treble damages and penalties under the California False Claims Act.

346. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the California State Government for payment or approval.

347. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to get the California State Government to approve and pay such false and fraudulent claims.

348. By virtue of the acts described above, Defendant DaVita conspired with its JV DeNovo partners to commit violations of the California False Claims Act, including the violations described in the preceding paragraphs, and committed overt acts toward the commission of such violations.

349. The California State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and

continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

350.    By reason of the Defendants' acts, the State of California has been damaged, and continues to be damaged, in substantial amount to be determined at trial and is also entitled to recover the maximum civil penalty for each and every violation.

**COUNT IV**
**Colorado Medicaid False Claims Act – C.R.S. §25.5-4-305(a), (b), (c)**

351.    Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

352.    This is a claim for treble damages and penalties under the Colorado Medicaid False Claims Act.

353.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Colorado State Government for payment or approval.

354.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to get the Colorado State Government to approve and pay such false and fraudulent claims.

355.    By virtue of the acts described above, Defendant DaVita conspired with its JV DeNovo partners to commit violations of the Colorado Medicaid Claims Act, including the violations described in the preceding paragraphs, and committed overt acts toward the commission of such violations.

356.    The Colorado State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

357.    By reason of the Defendants' acts, the State of Colorado has been damaged, and

continues to be damaged, in substantial amount to be determined at trial and is also entitled to recover the maximum civil penalty for each and every violation.

## COUNT V
## Connecticut False Claims Act – Conn. Gen. Stat. § 4-275(a)(1), (2), (3)

358.    Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

359.    This is a claim for treble damages and penalties under the Connecticut False Claims Act.

360.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Connecticut State Government for payment or approval.

361.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to get the Connecticut State Government to approve and pay such false and fraudulent claims.

362.    By virtue of the acts described above, Defendant DaVita conspired with its JV DeNovo partners to commit violations of the Connecticut False Claims Act, including the violations described in the preceding paragraphs, and committed overt acts toward the commission of such violations.

363.    The Connecticut State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

364.    By reason of the Defendants' acts, the State of Connecticut has been damaged, and continues to be damaged, in substantial amount to be determined at trial and is also entitled to

recover the maximum civil penalty for each and every violation.

**COUNT VI**
**Florida False Claims Act – Fla. Stat. §68.082(2)(a), (b), (c)**

365.    Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

366.    This is a claim for treble damages and penalties under the Florida False Claims Act.

367.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Florida State Government for payment or approval

368.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to induce the Florida State Government to approve and pay such false and fraudulent claims.

369.    By virtue of the acts described above, Defendant DaVita conspired with its JV DeNovo partners to commit violations of the Florida False Claims Act, including the violations described in the preceding paragraphs, and committed overt acts toward the commission of such violations.

370.    The Florida State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

371.    By reason of the Defendants' acts, the State of Florida has been damaged, and continues to be damaged, in substantial amount to be determined at trial and is also entitled to recover the maximum civil penalty for each and every violation.

**COUNT VII**
**Georgia False Medicaid Claims Act – Ga. Code. §49-4-168.1(1), (2), (3)**

372.    Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

373.    This is a claim for treble damages and penalties under the Georgia False Medicaid Claims Act.

374.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Georgia State Government for payment or approval.

375.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to get the Georgia State Government to approve and pay such false and fraudulent claims.

376.    By virtue of the acts described above, Defendant DaVita conspired with its JV DeNovo partners to commit violations of the Georgia False Medicaid Claims Act, including the violations described in the preceding paragraphs, and committed overt acts toward the commission of such violations.

377.    The Georgia State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

378.    By reason of the Defendants' acts, the State of Georgia has been damaged, and continues to be damaged, in substantial amount to be determined at trial and is also entitled to recover the maximum civil penalty for each and every violation.

**COUNT VIII**
**Illinois Whistleblower Reward and Protection Act–740 Ill. Comp. Stat. §175/3(a)(1), (2), (3)**

379.    Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

380.    This is a claim for treble damages and penalties under the Illinois Whistleblower Reward And Protection Act.

381.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Illinois State Government for payment or approval.

382.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to induce the Illinois State Government to approve and pay such false and fraudulent claims.

383.    By virtue of the acts described above, Defendant DaVita conspired with its JV DeNovo partners to commit violations of the Illinois Whistleblower Reward and Protection Act, including the violations described in the preceding paragraphs, and committed overt acts toward the commission of such violations.

384.    The Illinois State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

385.    By reason of the Defendants' acts, the State of Illinois has been damaged, and continues to be damaged, in substantial amount to be determined at trial and is also entitled to recover the maximum civil penalty for each and every violation.

### COUNT IX
### Indiana False Claims and Whistleblower Protection Act – IC 5-11-5.5-2(b)(1), (2), (3)

386.    Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

387.    This is a claim for treble damages and penalties under the Indiana False Claims and Whistleblower Protection Act.

388.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Indiana State Government for payment or

approval.

389.    By virtue of the acts described above, Defendants knowingly made or used false records and statements to obtain payment or approval of a false claim from the Indiana State Government.

390.    By virtue of the acts described above, Defendant DaVita conspired with its JV DeNovo partners to commit violations of the Indiana False Claims and Whistleblower Protection Act, including the violations described in the preceding paragraphs, and committed overt acts toward the commission of such violations.

391.    The Indiana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

392.    By reason of the Defendants' acts, the State of Indiana has been damaged, and continues to be damaged, in substantial amount to be determined at trial, and is also entitled to recover the maximum civil penalty for each and every violation.

**COUNT X**
**Iowa False Claims Act – Iowa Code § 685.2(1)(A), (B), (C)**

393.    Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

394.    This is a claim for treble damages and penalties under the Iowa False Claims Act.

395.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Iowa State Government for payment or approval.

396.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to induce the Iowa State Government to approve and pay such false and fraudulent claims.

397.    By virtue of the acts described above, Defendant DaVita conspired with its JV DeNovo partners to commit violations of the Iowa False Claims Act, including the violations described in the preceding paragraphs, and committed overt acts toward their commission.

398.    The Iowa State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

399.    By reason of the Defendants' acts, the State of Iowa has been damaged, and continues to be damaged, in substantial amount to be determined at trial, and is also entitled to recover the maximum civil penalty for each and every violation.

**COUNT X**
**Louisiana Medical Assistance Programs Integrity Law – La. Rev. Stat. § 46:438.3**

400.    Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

401.    This is a claim for treble damages and penalties under the Louisiana Medical Assistance Programs Integrity Law.

402.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Louisiana State Government.

403.    By virtue of the acts described above, Defendants knowingly engaged in misrepresentation or made, used, or caused to be made or used false records and statements, to obtain payment for false and fraudulent claims from the Louisiana State Government.

404.    By virtue of the acts described above, Defendant DaVita conspired with its JV DeNovo partners to commit violations of the Louisiana Medical Assistance Programs Integrity Law, including the violations described in the preceding paragraphs, and committed overt acts toward the commission of such violations.

405.    The Louisiana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

406.    By reason of the Defendants' acts, the State of Louisiana has been damaged, and continues to be damaged, in substantial amount to be determined at trial, and is also entitled to recover the maximum civil penalty for each and every violation.

**COUNT XI**
**Maryland False Health Claims Act – Md. Code Health-Gen. §§ 2-602(a)(1), (2), (3)**

407.    Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

408.    This is a claim for treble damages and penalties under the Maryland False Health Claims Act.

409.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Maryland State Government for payment or approval.

410.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to induce the Maryland State Government to approve and pay such false and fraudulent claims.

411.    By virtue of the acts described above, Defendant DaVita conspired with its JV DeNovo partners to commit violations of the Maryland False Claims Act, including the violations described in the preceding paragraphs, and committed overt acts toward the commission of such violations.

412.    The Maryland State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and

continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

413.    By reason of the Defendants' acts, the State of Maryland has been damaged, and continues to be damaged, in substantial amount to be determined at trial, and is also entitled to recover the maximum civil penalty for each and every violation.

**COUNT XII**
**Michigan Medicaid False Claims Act – Mich. Comp. Laws §400.603(1), (2), (3)**

414.    Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

415.    This is a claim for treble damages and penalties under the Michigan Medicaid False Claims Act.

416.    By virtue of the acts described above, Defendants knowingly made or caused to be made a false statement or false representation of material fact in an application for Medicaid benefits to the Michigan State Government.

417.    By virtue of the acts described above, Defendants knowingly made or caused to be made a false statement or false representation of material fact for use in determining rights to a Medicaid benefit.

418.    By virtue of the acts described above, Defendant DaVita conspired with its JV DeNovo partners to commit violations of the Michigan Medicaid False Claims Act, including the violations described in the preceding paragraphs, and committed overt acts toward the commission of such violations.

419.    The Michigan State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

420.    By reason of the Defendants' acts, the State of Michigan has been damaged, and

continues to be damaged, in substantial amount to be determined at trial, and is also entitled to recover the maximum civil penalty for each and every violation.

## COUNT XIII
## Minnesota False Claims Act – Minn. Stat. §15c.02(1), (2), (3)

421.    Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

422.    This is a claim for treble damages and penalties under the Minnesota False Claims Act.

423.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Minnesota State Government for payment or approval.

424.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to get the Minnesota State Government to approve and pay such false and fraudulent claims.

425.    By virtue of the acts described above, Defendant DaVita conspired with its JV DeNovo partners to commit violations of the Minnesota False Claims Act, including the violations described in the preceding paragraphs, and committed overt acts toward the commission of such violations.

426.    The Minnesota State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

427.    By reason of the Defendants' acts, the State of Minnesota has been damaged, and continues to be damaged, in substantial amount to be determined at trial, and is also entitled to recover the maximum civil penalty for each and every violation.

**COUNT XIV**
**Nevada False Claims Act – Nev. Rev. Stat. §357.040(1)(a), (b), (c)**

428.    Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

429.    This is a claim for treble damages and penalties under the Nevada Submission of False Claims to State or Local Government Act.

430.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Nevada State Government for payment or approval.

431.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Nevada State Government to approve and pay such false and fraudulent claims.

432.    By virtue of the acts described above, Defendant DaVita conspired with its JV DeNovo partners to commit violations of the Nevada False Claims Act, including the violations described in the preceding paragraphs, and committed overt acts toward the commission of such violations.

433.    The Nevada State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

434.    By reason of the Defendants' acts, the State of Nevada has been damaged, and continues to be damaged, in substantial amount to be determined at trial, and is also entitled to recover the maximum civil penalty for each and every violation.

**COUNT XV**
**New Jersey False Claims Act – N.J. Stat. §2A:32C-3(a), (b), (c)**

435.    Relator repeats and realleges each and every allegation contained in the paragraphs

above as though fully set forth herein.

436.    This is a claim for treble damages and penalties under the New Jersey False Claims Act.

437.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the New Jersey State Government for payment or approval.

438.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to get the New Jersey State Government to approve and pay such false and fraudulent claims.

439.    By virtue of the acts described above, Defendant DaVita conspired with its JV DeNovo partners to commit violations of the New Jersey False Claims Act, including the violations described in the preceding paragraphs, and committed overt acts toward the commission of such violations.

440.    The New Jersey State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

441.    By reason of the Defendants' acts, the New Jersey has been damaged, and continues to be damaged, in substantial amount to be determined at trial, and is also entitled to recover the maximum civil penalty for each and every violation.

**COUNT XVI**
**New Mexico Medicaid False Claims Act – N.M. Stat.§ 27-14-3(a)(1), (2), (3)**

442.    Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

443.    This is a claim for treble damages and penalties under the New Mexico Medicaid

False Claims Act.

444.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the New Mexico State Government for payment or approval.

445.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to induce the New Mexico State Government to approve and pay such false and fraudulent claims.

446.    By virtue of the acts described above, Defendant DaVita conspired with its JV DeNovo partners to commit violations of the New Mexico Medicaid False Claims Act, including the violations described in the preceding paragraphs, and committed overt acts toward the commission of such violations.

447.    The New Mexico State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

448.    By reason of the Defendants' acts, the State of New Mexico has been damaged, and continues to be damaged, in substantial amount to be determined at trial, and is also entitled to recover the maximum civil penalty for each and every violation.

**COUNT XVII**
**New York False Claims Act – NY St. Fin. §189(a), (b), (c)**

449.    Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

450.    This is a claim for treble damages and penalties under the New York False Claims Act.

451. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the New York State Government for payment or approval.

452. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to get the New York State Government to approve and pay such false and fraudulent claims.

453. By virtue of the acts described above, Defendant DaVita conspired with its JV DeNovo partners to commit violations of the New York False Claims Act, including the violations described in the preceding paragraphs, and committed overt acts toward the commission of such violations.

454. The New York State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

455. By reason of the Defendants' acts, the State of New York has been damaged, and continues to be damaged, in substantial amount to be determined at trial, and is also entitled to recover the maximum civil penalty for each and every violation.

## COUNT XVIII
## <u>North Carolina False Claims Act – N.C. Gen. Stat. 1-607(a)(1), (2), (3)</u>

456. Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

457. This is a claim for treble damages and penalties under the North Carolina False Claims Act.

458. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the North Carolina State Government for payment or

approval.

459. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to get the North Carolina State Government to approve and pay such false and fraudulent claims.

460. By virtue of the acts described above, Defendant DaVita conspired with its JV DeNovo partners to commit violations of the North Carolina False Claims Act, including the violations described in the preceding paragraphs, and committed overt acts toward the commission of such violations.

461. The North Carolina State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

462. By reason of the Defendants' acts, the State of North Carolina has been damaged, and continues to be damaged, in substantial amount to be determined at trial, and is also entitled to recover the maximum civil penalty for each and every violation..

**COUNT XIX**
**Oklahoma Medicaid False Claims Act – Okla. Stat. tit. 63, §5053.1B (1), (2), (3)**

463. Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

464. This is a claim for treble damages and penalties under the Oklahoma Medicaid False Claims Act.

465. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Oklahoma State Government for payment or approval.

466.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to get the Oklahoma State Government to approve and pay such false and fraudulent claims.

467.    By virtue of the acts described above, Defendant DaVita conspired with its JV DeNovo partners to commit violations of the Oklahoma Medicaid False Claims Act, including the violations described in the preceding paragraphs, and committed overt acts toward the commission of such violations.

468.    The Oklahoma State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

469.    By reason of the Defendants' acts, the State of Oklahoma has been damaged, and continues to be damaged, in substantial amount to be determined at trial, and is also entitled to recover the maximum civil penalty for each and every violation.

**COUNT XX**
**Tennessee False Claims Act and Medicaid False Claims Act –**
**Tenn. Code. §§ 4-18-103(a)(1), (2), (3) and 71-5-181(a)(1)(A), (B) (C)**

470.    Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

471.    This is a claim for treble damages and penalties under the Tennessee False Claims Act and Tennessee Medicaid False Claims Act.

472.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Tennessee State Government for payment or approval.

473.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to induce the Tennessee State Government to

approve and pay such false and fraudulent claims.

474.    By virtue of the acts described above, Defendant DaVita conspired with its JV DeNovo partners to commit violations of the Tennessee False Claims Act and the Tennessee Medicaid False Claims Act, including the violations described in the preceding paragraphs, and committed overt acts toward the commission of such violations.

475.    The Tennessee State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

476.    By reason of the Defendants' acts, the State of Tennessee has been damaged, and continues to be damaged, in substantial amount to be determined at trial, and is also entitled to recover the maximum civil penalty for each and every violation.

**COUNT XXI**
**<u>Texas Medicaid Fraud Prevention Act – Tex. Hum. Res. Code. §36.002(1)</u>**

477.    Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

478.    This is a claim for treble damages and penalties under the Texas Medicaid Fraud Prevention Act.

479.    By virtue of the acts described above, Defendants knowingly made, caused to be made, induced or sought to induce the making of a false statement or misrepresentation of material fact concerning information required to be provided by a federal or state law, rule, regulation or provider agreement pertaining to the Medicaid program.

480.    By virtue of the acts described above, Defendant DaVita conspired with its JV DeNovo partners to commit violations of the Texas Medicaid Fraud Prevention Act, including the violations described in the preceding paragraphs, and committed overt acts toward the commission

of such violations.

481.    The Texas State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

482.    By reason of the Defendants' acts, the State of Texas has been damaged, and continues to be damaged, in substantial amount to be determined at trial, and is also entitled to recover the maximum civil penalty for each and every violation.

**COUNT XXII**
**<u>Virginia Fraud Against Taxpayers Act – Va. Code §8.01-216.3(a)(1), (2), (3)</u>**

483.    Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

484.    This is a claim for treble damages and penalties under the Virginia Fraud Against Taxpayers Act.

485.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Virginia State Government for payment or approval.

486.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to induce the Virginia State Government to approve and pay such false and fraudulent claims.

487.    By virtue of the acts described above, Defendant DaVita conspired with its JV DeNovo partners to commit violations of the Virginia Fraud Against Taxpayers Act, including the violations described in the preceding paragraphs, and committed overt acts toward the commission of such violations.

488.    The Virginia State Government, unaware of the falsity of the records, statements

and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

489.    By reason of the Defendants' acts, the State of Virginia has been damaged, and continues to be damaged, in substantial amount to be determined at trial, and is also entitled to recover the maximum civil penalty for each and every violation.

**COUNT XXIII**
**Washington Health Care False Claim Act – Wash. Rev. Code §§ 48.80.030(1), (2), (3)**

490.    Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

491.    This is a claim for treble damages and penalties under the Washington Health Care False Claims Act.

492.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Washington State Government for payment or approval.

493.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to get the Washington State Government to approve and pay such false and fraudulent claims.

494.    By virtue of the acts described above, Defendant DaVita conspired with its JV DeNovo partners to commit violations of the Washington Health Care False Claims Act, including the violations described in the preceding paragraphs, and committed overt acts toward the commission of such violations.

495.    The Washington State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants'

unlawful conduct.

496.    By reason of the Defendants' acts, the State of Washington has been damaged, and continues to be damaged, in substantial amount to be determined at trial, and is also entitled to recover the maximum civil penalty for each and every violation.

**COUNT XXIV**
**Wisconsin False Claims for Medical Assistance Act – Wis. Stat. §20.931(2)(a), (b), (c)**

497.    Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

498.    This is a claim for treble damages and penalties under the Wisconsin False Claims for Medical Assistance Act.

499.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Wisconsin State Government for payment or approval.

500.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to get the Wisconsin State Government to approve and pay such false and fraudulent claims.

501.    By virtue of the acts described above, Defendant DaVita conspired with its JV DeNovo partners an to commit violations of the Wisconsin False Claims for Medical Assistance Act, including the violations described in the preceding paragraphs, and committed overt acts toward the commission of such violations.

502.    The Wisconsin State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

503.    By reason of the Defendants' acts, the State of Wisconsin has been damaged, and

continues to be damaged, in substantial amount to be determined at trial, and is also entitled to recover the maximum civil penalty for each and every violation.

**COUNT XXV**
**District of Columbia False Claims Act – D.C. Code. §2-308.14(a)(1), (2), (3)**

504.    Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

505.    This is a claim for treble damages and penalties under the District of Columbia False Claims Act.

506.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the District of Columbia Government for payment or approval.

507.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, to get the District of Columbia Government to approve and pay such false and fraudulent claims.

508.    By virtue of the acts described above, Defendant DaVita conspired with its JV DeNovo partners to commit violations of the District of Columbia False Claims Act, including the violations described in the preceding paragraphs, and committed overt acts toward the commission of such violations.

509.    The District of Columbia Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

510.    By reason of the Defendants' acts, the District of Columbia has been damaged, and continues to be damaged, in substantial amount to be determined at trial, and is also entitled to

recover the maximum civil penalty for each and every violation.

## PRAYER FOR RELIEF

WHEREFORE, Relator, on behalf of the United States and the Plaintiff States, demands that judgment be entered in their favor and against Defendants for:

(1) Three times the amount of damages to the United States;

(2) Civil penalties of (a) $5,500-$11,000 for each violation of the FCA that occurred after September 29, 1999 but before November 2, 2015 and (b) $13,508 to $27,018 for each violation of the FCA that occurred on or after January 30, 2023, or the range of penalties existing at the time penalties are imposed.

(3) Any other recoveries or relief provided for under the FCA;

(4) Civil penalties as provided under the State FCAs;

(5) Any other recovers or relief provided for under the State FCAs;

(6) Relator's receipt of the maximum amount permitted by law of the proceeds of this action or settlement of this action collected by the United States, the Plaintiff States, plus reasonable expenses necessarily incurred, and reasonable attorneys' fees and costs, based upon the total value recovered, both tangible and intangible, including any amounts received from individuals or entities not parties to this action; and

(7) Such other relief as the Court may deem appropriate.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Relator hereby demands a trial by jury.

Dated: August 4, 2023

/s/ _Dan Miller_
_____
Daniel R. Miller (PA Bar 68141)
Jonathan Z. DeSantis (PA Bar 316007)
WALDEN MACHT & HARAN LLP
2000 Market Street Ste. 1430

Philadelphia, PA 19103
Tel:(215) 825-5283
dmiller@wmhlaw.com
jdesantis@wmhlaw.com

## **CERTIFICATE OF SERVICE**

I certify that I caused the foregoing document, and its exhibits, to be filed with the Court through CM/ECF, which will provide a copy to all counsel of record.

Dated: August 4, 2023

/s/ _____

Daniel R. Miller